UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CRYSTAL CRITTENDON, | ) | |
| SHALEAH DAYE, RIANA EAST, | ) | |
| CASSIDY GATES, JOVANA | ) | CIVIL ACTION |
| GIBBS-ARNOLD, ASHLEY | ) | FILE NO. 1:18-mi-99999 |
| HAYES, MERRIAH | ) | |
| HILLARD, ASHLEY JOHNSON, | ) | |
| TIFFANY LOWE, JASMINE ROSS, | ) | |
| JASMINE THOMAS, MEGAN | ) | |
| THOMAS, and SAMANTHA | ) | |
| WILLIAMS, individually and on | ) | FLSA COLLECTIVE ACTION |
| behalf of those similarly situated | ) | |
| and LINDSEY CROOME, NICOLE | ) | |
| MILLER-JORDAN and AVIA | ) | **JURY TRIAL DEMANDED** |
| SHLTON individually only, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL FOLLIES, INC. | ) | |
| d/b/a Cheetah and JACK BRAGLIA, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

**COME NOW**, CRYSTAL CRITTENDON, SHALEAH DAYE,

RIANA EAST, CASSIDY GATES, JOVANA GIBBS-ARNOLD, ASHLEY

HAYES, MERRIAH HILLARD, ASHLEY JOHNSON, TIFFANY LOWE,

JASMINE ROSS, JASMINE THOMAS, MEGAN THOMAS, SAM WILLIAMS, Individually and on behalf of those similarly situated, and LINDSEY CROOME, NICOLE MILLER-JORDAN and AVIA SHELTON, individually and files their Complaint against INTERNATIONAL FOLLIES, INC. d/b/a Cheetah and JACK BRAGLIA and show:

## INTRODUCTION

1.     Plaintiffs are former or current employees of INTERNATIONAL FOLLIES, INC. ("Cheetah").

2.     Cheetah operates an adult entertainment club in Atlanta, Fulton County, Georgia known as the "Cheetah."

3.     JACK BRAGLIA ("Braglia") is the general manager of Cheetah and part owner of Cheetah.

4.     Cheetah failed to pay Plaintiffs and other similarly situated entertainers the minimum wage and overtime wage for all hours worked in violation of 29 U.S.C. §§ 206 and 207 of the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq*. ("FLSA").

5.     Cheetah also required Plaintiffs and similarly situated entertainers to make certain payments to Cheetah employees and others which caused Plaintiff's wages to drop below the minimum wage and applicable overtime wage, thereby constituting an illegal deduction under

the FLSA.

6.     Cheetah required Plaintiffs and similarly situated entertainers to contribute to an unlawful tip pool which caused Plaintiffs' and the similarly situated entertainers' wages to drop below the minimum wage and applicable overtime wage.

7.     As a result of Defendants' violation of the FLSA, Plaintiffs and the similarly situated entertainers seek all unpaid minimum and overtime wages, recovery of unlawful deductions, liquidated damages, interest, and attorneys' fees and costs pursuant to 29 U.S.C. § 216.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because this action arises under the FLSA, 29 U.S.C. § 201 *et seq.*

9.     Venue is proper in this District because all or a substantial portion of the events forming the basis of this action occurred in this District. Defendants' club is located in this District and Plaintiffs and the collective action members worked in this District.

## PARTIES

10.    Plaintiffs and the other similarly situated entertainers were employed as entertainers by Cheetah and each of them qualified as an

"employee" as defined by the FLSA, 29 U.S.C. § 203(e)(1).

11.    Plaintiffs have consented in writing to assert claims under the FLSA. As this case proceeds, it is likely that other individuals will sign consent forms and join this action as opt-in Plaintiffs.

12.    The collective action members are current or former entertainers who were employed by Defendants as entertainers from April 9, 2016 through the present.

13.    Cheetah is a Georgia Corporation with its principal place of business located at 887 Spring Street, NW, Atlanta, Fulton County, Georgia 30308. At all times mentioned herein, Cheetah was an "employer" of Plaintiffs and the collective action members within the meaning of the FLSA, 29 U.S.C. § 203(d), (g). Defendant International Follies, Inc. d/b/a Cheetah may be served by serving its registered agent, William M. Hagood at 887 Spring Street NW, Atlanta, Fulton County, Georgia, 30308.

14.    Defendant Jack Braglia ("Braglia") is the General Manager of the Cheetah and a resident of Fulton County, Georgia. Braglia acted directly or indirectly on behalf of Cheetah, and, at all times mentioned herein was an "employer" or joint employer of Plaintiffs and the collective action members within the meaning of the FLSA.  Defendant Braglia may be served at 887 Spring Street, NW, Atlanta, Fulton County, Georgia 30308.

15.     Plaintiff Crystal Crittenden ("Crittenden") has been employed by Cheetah from July 10, 2012 through the present. Crittenden brings this action individually and on behalf of the collective action members.

16.     Plaintiff Shaleah Daye ("Daye") was employed by Cheetah from May 22, 2013 through August 16, 2016. Daye brings this action individually and on behalf of the collective action members.

17.     Plaintiff Riana East ("East") was employed by Cheetah from June 10, 2013 through May 25, 2016. East brings this action individually and on behalf of the collective action members.

18.     Plaintiff Cassidy Gates ("Gates") was employed by Cheetah from January 31, 2012 through November 10, 2017. Gates brings this action individually and on behalf of the collective action members.

19.     Plaintiff Jovanna Gibbs-Arnold ("Gibbs-Arnold") has been employed by Cheetah from October 24, 2012 through the present. Gibbs-Arnold brings this action individually and on behalf of the collective action members.

20.     Plaintiff Ashley Hayes ("Hayes") has been employed by Cheetah from July 15, 2014 through the present. Hayes brings this action individually and on behalf of the collective action members.

21.    Plaintiff Merriah Hilliard ("Hilliard") has been employed by Cheetah from July 24, 2013 through the present. Hilliard brings this action individually and on behalf of the collective action members.

22.    Plaintiff Ashley Johnston ("Johnston") was employed by Cheetah from December 12, 2012 through April 20, 2016. Johnston brings this action individually and on behalf of the collective action members.

23.    Plaintiff Tiffany Lowe ("Lowe") has been employed by Cheetah from March 26, 2011 through the present. Lowe brings this action individually and on behalf of the collective action members.

24.    Plaintiff Jasmine Ross ("Ross") has been employed by Cheetah from November 23, 2012 through the present. Ross brings this action individually and on behalf of the collective action members.

25.    Plaintiff Jasmine Thomas ("Thomas") was employed by Cheetah from August 6, 2013 through August 5, 2015. Thomas brings this action individually.

26.    Plaintiff Megan Thomas ("M. Thomas") has been employed by Cheetah from January 26, 2011 through the present. M. Thomas brings this action individually and on behalf of the collective action members.

27.    Plaintiff Samantha Williams ("Williams") has been employed by Cheetah from June 14, 2012 through the present. Williams brings this action individually and on behalf of the collective action members.

28.    Plaintiff Lindsey Croome ("Croome") was employed by Cheetah from August 26, 2013 through January 6, 2016. Croome brings this action individually and on behalf of the collective action members.

29.    Plaintiff Nicole Miller-Jordan ("Jordan") was employed by Cheetah from December 16, 2013 through April 1, 2016. Jordan brings this action individually.

30.    Plaintiff Avia Shelton ("Shelton") was employed by Cheetah from November 17, 2013 through March 22, 2016. Shelton brings this action individually and on behalf of the collective action members.

## FACTUAL ALLEGATIONS

31.    Plaintiffs were employed by Cheetah as entertainers during the past three (3) years.

32.    The collective action members were employed by Cheetah after April 9, 2016.

33.    The primary duty of a cheetah entertainer is "to dance and entertain customers, give them a good experience."

34.    Specifically, an entertainer performs stage and table dances, and entertains customers on an hourly basis.

35.    Stated differently, entertainers "danc[e] on stage, perfor[m] table dances, and entertai[n] customers in Cheetah's VIP rooms, all while nude or semi-nude."

### A.   FLSA Claims Arising Prior to April 9, 2016.

36.    From 2001 until April 9, 2016, Cheetah classified entertainers as independent contractors.[1]

37.    Plaintiffs Hayes, East, Thomas, M. Thomas, Johnston, Daye, Williams, Crittenden, Gibbs-Arnold, Jordan, Lowe, Ross, Croome, Hilliard, Shelton and Gates ("Misclassified Plaintiffs") worked for Cheetah prior to April 9, 2016 and were misclassified as independent contractors.

38.    Misclassified Plaintiffs were actually employees under the FLSA.

39.    Cheetah exercised significant control over Misclassified Plaintiffs through written and unwritten policies and procedures.

---

[1]   From Cheetah's inception through the present, it has repeatedly changed the employment status of its entertainers to reflect its business interests. In the 90's, Cheetah treated entertainers as employees. In 2001, it began treating them as independent contractors. In 2016, Cheetah began treating entertainers as employees again.

40.     Misclassified Plaintiffs were subject to specific work schedules requiring them to be at work at certain times and on certain days.

41.     Misclassified Plaintiffs were required to work at least 3 scheduled shifts per week.

42.     The weekly schedule was determined at the onset of Misclassified Plaintiffs' employment and changed only with Cheetah's consent.

43.     For each night shift, Misclassified Plaintiffs were required to be at work by 7:30 pm., on the floor at 8:00 p.m. and remain at work until checkout was completed which rarely occurred before 3:30 am.

44.     Requests for a night off or a vacation while scheduled to work were required to be approved by Cheetah in advance.

45.     Misclassified Plaintiffs who showed up late for work were fined between $25 and $50 depending on the time they arrived at work.

46.     If an entertainer arrived after 9:45, she was not permitted to work, and subject to other discipline.

47.     An entertainer was subject to discipline, including suspension or termination, for an unexcused absence from work.

48.     Misclassified Plaintiffs were required to dance at specified times and in a specified manner on stage and for customers.

49.     Misclassified Plaintiffs were required to perform stage dance sets once every hour during each shift.[2]

50.     Each stage set consisted of four (4) dances.

51.     Misclassified Plaintiffs were also required to participate in a walk out and provide two for one dances every night following the walkout ceremony.

52.     During the walkout all of the entertainers are required to dress in evening gowns and parade before the customers.

53.     Cheetah tightly controlled the nightly walkout. Specifically, Cheetah's rules regarding the walkout demonstrate its control:

> [w]alkout for nightshift is at 10:00 p.m.  A two-for-one dance (two songs for $10) immediately follows the walkout. When you hear the house mom calling for everyone to go behind the main stage and line up, you should be ready and headed that way. Once behind the main stage, line up on either side and follow the line as it move up to the top of the stage. The house mom will be there and she will tell which stage to stop-on. Once the DJ calls your name make your way down the main stage and to the stage number that you were assigned. Once at your stage, smile and wait to be picked. DO NOT TALK TO EACH OTHER WHILE YOU ARE ON STAGE.  If you are picked, make sure everyone has walked out, use the stairs to get off the stage, and go to the customer's table. Dance two songs for $10. (Remember that all reviews are danced table-top, stage-top, and bar-top only, on the main floor.) If you are not

---

[2] When an entertainer arrived for work, she was required to sign in with the house mom. The house mom typically then assigns the entertainer to one of four color-coded dance groups (red, yellow, green, blue). These assignments determine when each entertainer actually performs on stage.

picked, you must stay on stage for the entire two-for one and wait for the next set to show up before you get down.

54.     Cheetah exercised significant control over other key aspects of an entertainer's work, such as "Table Dancing."

55.     With regard to table dancing, Cheetah's rules provide as follows:

·       [t]able dances are done table-top, table-side, stage top, stage-side, bar-side or bar-top in the main room. You *must* dance tableside in VIP rooms,   in the dining room, in the mezzanine area. In the executive room, you may dance either table-top or table side;

(emphasis added).

56.     Cheetah controlled the amount an entertainer could charge a customer for a table dance:

·       [a]ll table dances are $10.  *You may not ask for more than $10 for a dance anywhere in the club.*

(emphasis added).

57.     Cheetah controlled the way an entertainer could interact with a customer:

·       [e]ntertainers are allowed to ask for dances, but the are **NOT** allowed to go from person to person asking for them. We observe a no-hassle policy with dances here. You may mingle and flirt with customers to let them know that you are available to dance for them. We encourage you to act has

hostesses,   ask   customers'   name,   introduce yourself, etc....

58.   Cheetah  controlled  the  way  an  entertainer  danced  for  a customer:

· [d]ancing  at  the  Cheetah  is  *very*  conservative compared to other clubs. We want dancing here to be very clean, so we do not allow lewd dancing... Here are some dancing "don'ts" and "nevers":

-No squatting
-No slapping
-No "pulling" (of butt cheeks-gross!)
-No fondling (by your or by the customer)
-No "flossing" or "slingshotting" your bottoms
-No bending over
-Never give your bottoms to a customer
-Never take a tip from behind
-Never get down from a table until you are full dressed

Please  remember  that  you  should  only  be naked while dancing.  ***You are not allowed to walk around topless or naked.***

59.   Cheetah  controlled  the  means  and  manner  by  which Misclassified Plaintiffs performed their duties at the workplace.

60.   Cheetah  had  authority  to  suspend,  fine,  fire,  or  otherwise discipline entertainers for non-compliance with its rules regarding dancing.

61.   Cheetah  actually  suspended,  fined,  fired,  or  otherwise disciplined entertainers for non-compliance with its rules regarding dancing.

62.     Cheetah tightly regulated entertainer appearance while on duty, including the costumes, footwear, makeup, hair, nails and accessories used by an entertainer.

63.     Each entertainer was "required to wear makeup, to have [their] nails painted, and to have [their] hair done, all according to standards communicated to [them] by Cheetah management and/or house moms."

64.     If an entertainer failed to comply with the dress and appearance requirements, she was required to either correct the problem, or was not allowed to perform.

65.     Entertainer footwear was specifically subject to management approval.

66.     Each entertainer was required to wear stiletto heals no shorter than 4.5 inches.

67.     Each entertainer was forced to wear two piece outfits and garters for stage dancing, covers for walking around and break away bottoms.

68.     Although Cheetah allowed entertainers to choose their own costumes, Cheetah reserved the right to decide what a particular entertainer was allowed to wear on the premises.

69.    In short, Cheetah directly and meticulously controlled entertainer appearance while on duty at the club.

70.    Cheetah provided and paid for all advertising and marketing efforts undertaken on behalf of Cheetah.

71.    Cheetah paid for the building used by the Cheetah, maintenance of the facility, the sound system, stages, lights, food, beverage and inventory used at the facility.

72.    Cheetah made all hiring decisions regarding wait staff, security, entertainer, managerial and all other employees on the Cheetah premises.

73.    Cheetah's opportunity for profit and loss far exceeded each entertainer's opportunity for profit and loss from work at the Cheetah.

74.    Nude dancing is an integral part of Cheetah's operations. Cheetah's advertising prominently displays nude dancing for its customers. The Cheetah is well known as a "strip club."

75.    Cheetah needs entertainers to successfully and profitably operate the Cheetah business model.

76.    The position of entertainer requires no managerial skill of others.

77.    The position of entertainer requires little other skill or education, formal or otherwise.

78.    The only requirements to become a Cheetah entertainer are "physical attributes" and the ability to dance seductively.

79.    The amount of skill required is more akin to an employment position than that of a typical independent contractor.

80.    The hiring process involves a brief audition before Defendant Braglia or one of Cheetah's house moms.

81.    The audition consists of the prospective entertainer briefly dancing in the nude for Defendant Braglia or the house mom, or merely disrobing and showing the house mom or Defendant Braglia her nude front and backside.

82.    Cheetah does not require prior experience as an entertainer or any formal dance training as a job condition or prerequisite to employment.

83.    Cheetah does not require the submission of an application or a resume as part of the hiring process.

84.    Misclassified Plaintiffs had little or no formal dance training and experience before auditioning to dance at Cheetah.

85.    Cheetah failed to pay Misclassified Plaintiffs an hourly wage or salary.

86.    Instead, Misclassified Plaintiffs were compensated by Cheetah's customers in the form of tips and gratuities.

87.    The tips and gratuities were paid directly by the customer to the Misclassified Plaintiffs.

88.    Cheetah never took possession of the payments made to Misclassified Plaintiffs.

89.    Cheetah failed to keep records of Misclassified Plaintiffs' tips, gratuities and/or service charges paid to Plaintiff or any other entertainer by customers in violation of 29 CFR Part 516.28.

90.    Cheetah failed to include Misclassified Plaintiffs' earnings from customers in Cheetah's gross receipts for tax or accounting purposes.

91.    At the end of each shift, each Misclassified Plaintiff was required to go through a tip out procedure during which the entertainer was required to pay the House mom, floormen, floor manager, disc jockey, cheetah buck girls, and other Cheetah employees a portion of their tips.

92.    Misclassified Plaintiffs, if late for work, failed to appear for a scheduled shift, or are deemed to have violated certain Cheetah rules, were charged additional fees or fines that were retained by the Club or management.

93.    Fines are paid directly to the General Manager and/or house mom.

94.    Cheetah maintains no record of fines, tips and gratuities and/or

service charges received by Misclassified Plaintiffs.

95.    Cheetah maintains incomplete records of time worked by Misclassified Plaintiffs.

96.    Cheetah's failure to maintain records of the time worked and amounts paid as fines, tips, gratuities and service charges violate the record keeping requirements of 29 CFR Part 516.

97.    Defendants required Plaintiffs and the other entertainers to attend meetings at Defendants' business.

98.    Misclassified Plaintiffs typically worked at least three (3) eight (8) hour shifts per week without being paid any wages by Defendants.

99.    Misclassified Plaintiffs worked over forty (40) hours in some weeks they worked for Defendants without being paid any wages.

100.   In order to comply with Cheetah's strict dress and appearance standards, Misclassified Plaintiffs typically expended at least one (1) hour of time each shift getting ready for work without being paid any wages for such time getting ready.

101.   At the end of each night shift, Misclassified Plaintiffs were required to wait at Cheetah until the premises and the parking lot were cleared of customers before they were allowed to leave work without being paid wages for such waiting time.

102.   Cheetah never paid Misclassified Plaintiffs any wages or compensation for any hour in any workweek in which they worked, got ready for work or were required to be on the premises.

103.   Cheetah did not pay Misclassified Plaintiffs one-and-a-half times their regular rate of pay when Plaintiffs worked over forty hours in a given workweek.

104.   Cheetah has repeatedly been sued for similar non-compliance with the FLSA beginning in 2013.

105.   Cheetah has been subject to numerous arbitration proceedings raising similar FLSA issues resulting in several adverse FLSA decisions involving the same issues in this lawsuit.

106.   Cheetah has repeatedly sought and received counsel from attorneys regarding the legality of their FLSA misclassification schemes.

107.   Since at least 2011, Cheetah has been aware that similar FLSA misclassification schemes involving similar adult entertainment establishments are illegal.

108.   In spite of Cheetah's knowledge of the illegality of its FLSA misclassification schemes and compensation practices, it continued until April 8, 2016, to operate illegally because the practice was financially profitable to Cheetah and others.

109.   Defendants knew, or showed reckless disregard for the fact that they misclassified these individuals as independent contractors, and accordingly failed to pay these individuals the minimum and overtime wage at the required rate under the FLSA and unlawfully deducted tip-outs and fines from their pay.

110.   Misclassified Plaintiffs were not covered by any minimum or overtime wage exemption contained in the FLSA.

**B.     Claims Accruing After April 9, 2016.**

110.   On or about April 9, 2016, Cheetah began classifying its entertainers as employees under the FLSA.

112.   After reclassification, Cheetah began paying entertainers a wage of $2.13 per hour and used a tip credit to make up the difference between the hourly wage and the minimum wage under the tip credit provisions of the FLSA.

113.   Plaintiffs Hayes, East, M. Thomas, Johnston, Daye, Williams, Crittenden, Gibbs-Arnold, Lowe, Ross, Hilliard, Hayes and Gates ("Collective Action Plaintiffs") and the collective action members were employed as entertainers at the Cheetah after April 9, 2015.

114.   The primary duties of an entertainer after reclassification remained the same as before reclassification.

115.   Collective Action Plaintiffs and the collective action members were required to work at least three (3) shifts per week.

116.   Collective Action Plaintiffs and the collective action members worked a day or night shift.

117.   Collective Action Plaintiffs and the collective action members were required for each night shift to be at work by 7:30 pm., on the floor at 8:00 p.m. and remain at work until checkout was completed which rarely occurred before 3:30 am.

118.   During the day shift, entertainers were required to be at work by 11:00 a.m., on the floor by 11:30 a.m. and remain at work until 8:00 p.m., and checkout was completed by roughly 8:30 p.m.

119.   After reclassification, Cheetah continued to tightly regulate entertainer appearance while on duty, including the costumes, footwear, makeup, hair, nails and accessories used by an entertainer to work at Cheetah.

120.   After reclassification, each entertainer was still "required to wear makeup, to have [their] nails painted, and to have [their] hair done, all according to standards communicated to [them] by Cheetah management and/or house moms."

121.   Because of Cheetah's strict dress and appearance requirements, Collective Action Plaintiffs and the collective action members typically required in excess of an hour per shift of time to get ready for work.

122.   Cheetah did not pay the entertainers, including the Collective Action Plaintiffs and the collective action members, for the time they spent getting ready for work required to comply with Cheetah policies.

123.   Cheetah knew that their entertainers, including the Collective Action Plaintiffs and the collective action members, were not being compensated for time incurred getting ready for work at Cheetah.

124.   After reclassification, Cheetah continued to require Cheetah dancers to go through a check-out process at the end of each shift, during which the entertainer is required to make certain payments to the floor men, floor manager, house moms and DJ.

125.   The check out process included a breathalyzer test and required the entertainer to wait for the floor to clear, to wait in line to make the required payments, wait for the parking lot to clear before they could leave the premises.

126.   Cheetah did not pay the entertainers, including the Collective Action Plaintiffs and the collective action members, for the time they spent

getting ready for work and going through the mandatory check out and required waiting procedures.

127.   Cheetah knew that entertainers, including the Collective Action Plaintiffs and collective action members, were not being compensated for the time incurred waiting on the premises to leave work.

128.   After reclassification, Cheetah continued to require entertainers to find and pay for another dancer to "cover" for her if she did not receive permission to miss work or could not make it to work on a scheduled shift.

129.   The cover charge minimum was $40 per shift and the average night shift charge for a cover was $80 per shift.

130.   Every time an entertainer was required to pay a cover in a workweek, her wages dropped below the minimum wage for that workweek, and the overtime wage in those workweeks in which overtime wages were applicable.

131.   The Collective Action Plaintiffs and the collective action members paid covers which dropped their wages to drop below the minimum wage and applicable overtime rate.

132.   Cheetah knew that its entertainers, including the Collective Action Plaintiffs and the collective action members, were paying covers when they were unable to work.

133.   After Cheetah classified entertainers as employees, it required each entertainer to contribute ten percent (10%) of their earnings to a tip pool.

134.   The tip pool was divided amongst the house moms, floor men, night manager and disc jockey each shift.

135.   Because a portion of the tip pool was shared with management, floor men, house moms and the DJ, the tip pool is invalid under the FLSA.

136.   Because the tip pool is invalid, Cheetah is not entitled to a tip credit for the difference between the hourly wage of $2.13 and the minimum wage of $7.25 per hour.

137.   After reclassification, entertainers were still required to pay the floormen a tip of 20% for all VIP referrals.

138.   Collective Action Plaintiffs and the collective action members paid floormen VIP referral fees to floormen during certain workweeks.

139.   For each workweek in which a VIP referral fee was paid by an entertainer, the entertainer's wages dropped below the minimum wage.

140.   The cover charges, VIP referral fees, unpaid time spent getting ready for work, going through the check-out process, time spent waiting after work and invalid tip pool caused Collective Action Plaintiffs and the collective action members' wages to drop below the minimum wage.

141.   Cheetah's entertainers were not covered by any exemption under the FLSA.

142.   Cheetah maintained inaccurate records of fines, tips and gratuities and/or service charges received by Collective Action Plaintiffs and the collective action members.

143.   Cheetah maintains incomplete records of time worked by each by Collective Action Plaintiffs and the collective action member.

144.   Cheetah's failure to maintain records of the time worked and amounts paid as fines, tips, gratuities and service charges violate the record keeping requirements of 29 CFR Part 516.

145.   Defendants knew, or showed reckless disregard for the fact that there compensation policies violated the FLSA.

## COLLECTIVE ACTION ALLEGATIONS – 29 U.S.C. § 216(b)

146.   Cheetah maintained a policy and practice of not compensating entertainers for the time they spent getting ready for work.

147.   Cheetah maintained a policy and practice of not compensating entertainers for time spent during the check out process and waiting time on Cheetah's premises at the end of the night shift.

148. Cheetah maintained a policy and practice of requiring entertainers to hire and pay another entertainer as a cover if the entertainer was unable to make a scheduled shift.

149. Cheetah maintained a policy and practice of requiring entertainers to participate in an unlawful tip pool.

150. Like the Collective Action Plaintiffs, there are members of the putative Collective action who are or were subject to the same FLSA violations. These individuals would benefit from the issuance of court-supervised notice of this lawsuit and the opportunity to join by filing their written consent. Defendants can readily identify these similarly situated entertainers through its business records and produce their contact information to Plaintiffs' counsel. The Collective Action Plaintiffs are "similarly situated" to the § 216(b) class of persons they seek to represent, and will adequately represent the interests of the class. Collection Action Plaintiffs have hired experienced Counsel who will adequately represent the class.

151. The putative class includes:

All entertainers who were employed by International Follies, Inc. after April 9, 2016.

## COUNT I
## MINIMUM WAGE CLAIM (Claims for Violation of 29 U.S.C. § 206)

152.   Each Defendant is an "employer" or joint employer of Plaintiffs and all others similarly situated within the meaning of the FLSA, 29 U.S.C. § 203(d).

153.   Defendants are engaged in "commerce" and/or in the production of "goods" for "commerce" as those terms are defined in the FLSA.

154.   Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), because it has employees engaged in commerce, and because its annual gross volume of sales made is more than $500,000.

155.   Plaintiffs consent to sue in this action pursuant to 29 U.S.C. § 216(b).

156.   A consent to sue executed by each Plaintiff is attached to Complaint.

157.   Defendants failed to pay Plaintiffs and all others similarly situated the minimum wage in violation of 29 U.S.C. § 206.

158.   Based upon the conduct alleged herein, Defendants knowingly, intentionally and willfully violated the FLSA by not paying Plaintiffs and the collective action members the minimum wage under the FLSA.

159.   Throughout the relevant period of this lawsuit, there is no evidence that Defendants' conduct that gave rise to this action was in good faith and based on reasonable grounds. In fact, Defendants continued to violate the FLSA long after it learned that its misclassification scheme and compensation policies were illegal.

160.   Due to Defendants' FLSA violations, Plaintiffs and the collective action members are entitled to recover from Defendants, minimum wage  compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including interest, pursuant to 29 U.S.C. § 216(b).

## COUNT II
## OVERTIME WAGE CLAIM (Violation of 29 U.S.C. § 207)

161.   Each Defendant is an "employer" or joint employer of Plaintiffs and all others similarly situated within the meaning of the FLSA, 29 U.S.C. § 203(d).

162.   Defendants are engaged in "commerce" and/or in the production of "goods" for "commerce" as those terms are defined in the FLSA.

163.   Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), because it has employees

engaged in commerce, and because its annual gross volume of sales made is more than $500,000.

164.   Plaintiffs consent to sue in this action pursuant to 29 U.S.C. § 216(b).

165.   A consent to sue executed by each Plaintiff is attached to this Complaint.

166.  Defendants failed to pay Plaintiffs and all others similarly situated the applicable overtime wage for each hour in excess of forty (40) during each workweek in which they worked in violation of 29 U.S.C. § 207.

167.   Based upon the conduct alleged herein, Defendants knowingly, intentionally and willfully violated the FLSA by not paying Plaintiffs and the collective action members the overtime wage required under the FLSA.

168.   Throughout the relevant period of this lawsuit, there is no evidence that Defendants' conduct that gave rise to this action was in good faith and based on reasonable grounds. In fact, Defendants continued to violate the FLSA long after it learned that its misclassification scheme and compensation policies were illegal.

169.  Due to Defendants' FLSA violations, Plaintiffs and the collective action members are entitled to recover from Defendants, overtime

wage compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including interest, pursuant to 29 U.S.C. § 216(b).

**WHEREFORE**, Plaintiffs respectfully pray that this Court grant relief as follows:

a.   Certify this as a collective action and issue notice to collective action members;

b.   As to Count I award Plaintiffs and the collective action members judgment for wages at the minimum rate, including the recovery of all payments reducing wages below the minimum wage, as well as liquidated damages, interest and attorneys' fees as provided for under the FLSA;

c.   As to Count II award Plaintiffs judgment for overtime wages, including the recovery of all payments reducing wages below the overtime wage, as well as liquidated damages in an equal amount, interest and attorneys' fees as provided for under the FLSA;

d.   Award Plaintiffs costs of this action, including expert fees;

e.   Grant Plaintiffs and the collective action members a jury trial on all issues so triable; and

f.      Award Plaintiff such other and further relief as the Court may

deem just and proper.


This 16th day of May, 2018.


                                        */s/ Ainsworth G. Dudley*
                                        Ainsworth G. Dudley
                                        Ga. Bar No. 237415
                                        Attorney for Plaintiffs
                                        adudleylaw@gmail.com

DUDLEY LAW, LLC
4200 Northside Parkway
Bldg. 1, Suite 200
Atlanta, GA  30327
404.687.8205


                **FLYNN LAW FIRM, LLC**


                                        /s/ Jonah A. Flynn
                                        Jonah A. Flynn
                                        Georgia Bar No. 266555
                                        *Counsel for Plaintiffs*

4200 Northside Parkway NE
Building One, Suite 200
Atlanta, GA 30327
Phone: 404-835-9660
Fax: 404-835-6005
e-mail: jflynn@flynnfirm.com

## **JURY DEMAND**

Pursuant to F.R.C.P 38, Demand is hereby made for trial by jury on all issues raised by these pleadings.

*/s/ Ainsworth G. Dudley*

Case 1:18-cv-02185-ELR   Document 1   Filed 05/16/18   Page 32 of 32

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing pleading complies

with the font and point selections approved by the Court in Local Rule 5.1B.

This pleading has been prepared in Times New Roman font, 14 point.

By: *<u>/s/ Ainsworth G. Dudley</u>*