1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4    ALISON VALENTE, JENNIFER
     BARLOW, KATHRYN MONROE,
5    SOPHIA SMITH, STEPHANIE
     LEBEAU on behalf of            CIVIL ACTION
6    themselves and all others      FILE NO.
     similarly situated,            1:15-CV-02477-ELR
7
                    Plaintiff,
8
             vs.
9
     INTERNATIONAL FOLLIES, INC.,
10   d/b/a THE CHEETAH and WILLIAM
     HAGOOD,
11
                    Defendants.
12

13

14                 DEPOSITION OF

15               JOHN P. BRAGLIA

16            Tuesday, July 25, 2017

17                  10:04 a.m.

18                 Suite 2700
               260 Peachtree Street
19              Atlanta, Georgia

20       Renda K. Cornick, RPR, CCR-B-909

21

22            WSG REPORTING, LLC
              2745 Daniel Park Run
23           Dacula, Georgia 30019
               (770) 367-7822
24         Office@WSGreporting.com

25                 ORIGINAL

```
 1                      TABLE OF CONTENTS

 2        Witness                                    Page

 3   JOHN P. BRAGLIA

 4        Examination by Mr. Dudley                    4

 5

 6                        -  -  -

 7   Plaintiff's
       Exhibit              Description              Page
 8

 9   Exhibit 1    International Follies, Inc.
                  Contract Entertainer Policies        56
10
     Exhibit 2    Night Shift Entertainer
11                Orientation and Guidelines           59

12   Exhibit 3    DJ Tipout Sheet                     115

13   Exhibit 4    Cassell Order on Claimant's
                  Motion for Partial Summary Judgment 153
14
     Exhibit 5    Cuesta Partial Final Award          154
15

16
          (Original Exhibits 1 through 5 have been attached
17   to the original transcript.)

18

19

20

21

22

23

24

25
```

1   Caldwell Bridgers was the law firm representing the

2   plaintiffs.  Did you give a deposition in that case?

3        A.     I don't recognize that law firm.

4        Q.     You don't recall -- as I understand it

5   there have been three district court cases against

6   Cheetah on wage and hour claims.  One of them was the

7   Bromirski claim.

8        A.     Correct.

9        Q.     One of them was this claim.

10       A.     Yes.

11       Q.     The reason why we are here today -- and

12  there was a third one that was filed I believe in

13  2015.  You don't recall whether you gave a deposition

14  in that case?

15       A.     It doesn't sound familiar.

16       Q.     There is also a couple of Title VII cases

17  against Cheetah; is that correct?

18       A.     There is one now.

19       Q.     Did you give a deposition in those cases?

20       A.     No.

21       Q.     And there was a RICO case.  Did you give a

22  deposition in that case?

23       A.     No.

24       Q.     Did you testify in any of the hearings in

25  this case?

1        Q.      You are a stockholder?

2        A.      Yes.

3        Q.      And who are the other stockholders?

4        A.      William Hagood and a trust of his

5    children.

6        Q.      Does the trustee of that trust play any

7    role in the operation of The Cheetah?

8              MS. PAWLAK:  I object to that.  I don't

9         think this is a relevant area of inquiry.

10             MR. DUDLEY:  Let's understand what

11        objections we have.  We stipulate that we will

12        reserve all objections except for the form of the

13        question, responsiveness of the answer.

14             MS. PAWLAK:  Sure.  I will stipulate to

15        that.

16       Q.      (By Mr. Dudley)  Does anyone else that is

17   a stockholder with Cheetah or International Follies

18   Inc., is anyone else in that role as a trustee or

19   stockholder or trustee of a trust that owns stock, do

20   they play any operational role in Cheetah?

21             MS. PAWLAK:  Object to the form.

22             THE WITNESS:  No.

23       Q.      (By Mr. Dudley)  Do you typically work

24   from 1:00 p.m. to 10:00 p.m. daily?

25       A.      Not right now.

1   Cheetah entertainers into employees; is that correct?

2        A.     Correct.

3        Q.     You are the person who made the decision

4   how to pay Cheetah entertainers, correct?

5        A.     Correct.

6        Q.     That's at all times since you have been

7   GM.

8        A.     Correct.

9        Q.     And it was your decision to establish the

10  scheme whereby Cheetah dancers paid fees, fines, and

11  tipouts to work at Cheetah; is that correct?

12             MS. PAWLAK:   I object to the form.

13             I object to the characterization of it as

14        a scheme.  I think the question is improper on

15        that basis.

16        Q.     (By Mr. Dudley)  Can you answer that

17  question?

18        A.     It is a multipart question.  So I would

19  have to answer it --

20        Q.     Well, I'll go through each one of them if

21  you want to.

22             Do you understand what a scheme is?  Do

23  you understand what the word "scheme" means?

24        A.     A scheme?

25        Q.     Yes.

1        A.      Correct.

2        Q.      As GM, it is your decision to establish

3    the procedures, guidelines, that sort of thing that

4    entertainers worked under, correct?

5        A.      Correct.

6        Q.      Do you believe there was anybody over

7    Cheetah that shares responsibility for those type of

8    decisions?

9        A.      No.

10       Q.      Now, I went through your deposition

11   before.  You tell me whether this is a true statement.

12   You said that you made the decisions regarding

13   Cheetah's operations.  That's correct, right?

14       A.      Correct.

15       Q.      You made the decisions regarding Cheetah's

16   advertising; is that correct?

17       A.      Correct.

18       Q.      You made the decisions regarding Cheetah's

19   marketing, correct?

20       A.      Correct.

21       Q.      You made the decisions regarding the food

22   and drink that you served at Cheetah; is that correct?

23       A.      Correct.

24       Q.      You made the decisions regarding the type

25   of music to be played at Cheetah, correct?

```
1        Q.      For example, if I went over there, you
2    didn't want me in there, you could tell me to leave,
3    right?
4        A.      Right.
5        Q.      And you decide the lighting, the music,
6    stage, type of sound systems used, basically all the
7    operations of the club, correct?
8        A.      Yes.
9        Q.      You have the power to fine, hire, fire,
10   supervise, terminate, suspend, discipline any
11   entertainer or employee at Cheetah, do you not?
12       A.      I do.
13       Q.      And not only do you have the power, you
14   have exercised that power in the past, have you not?
15              MS. PAWLAK:  As to which of those topics?
16       There were multiple.
17       Q.      (By Mr. Dudley)  You hire.  As a matter of
18   fact, your testimony is -- you testified when I took
19   or Harlan took your deposition you have hired every
20   entertainer that ever came through The Cheetah, did
21   you not?
22       A.      Yes.
23       Q.      So you certainly exercise that.
24       A.      Yes.
25       Q.      You fired people before.
```

```
 1        to answer questions about unrelated arbitration
 2        matters and any proposals by you with respect to
 3        those arbitration matters.
 4                 MR. DUDLEY:  That's fine.
 5                 MR. WARD:  Or privilege.
 6                 MR. DUDLEY:  We can reserve for another
 7        deposition.
 8                 MR. WARD:  They have the privilege --
 9                 MR. DUDLEY:  We are going to have one
10        person here under the Georgia rules, we are not
11        going to have two people.
12                 MR. FUCHS:  You have to follow your own
13        advice on that on.
14                 MR. DUDLEY:  Do you see Mike objecting?
15                 MR. FUCHS:  Not today.
16                 MS. PAWLAK:  I hope Mike doesn't object to
17        your questions.
18                 MR. DUDLEY:  Rather than arguing with you,
19        why don't you tell me what you want to say.
20                 MS. PAWLAK:  What I am going to say is you
21        are not taking his deposition for arbitration
22        matters today.
23                 MR. DUDLEY:  That's fine.
24                 MS. PAWLAK:  You haven't noticed that, we
25        haven't agreed to it.
```

1      Q.     Does that list include all of the

2   entertainers that worked at Cheetah from July 2012

3   until April the 9th, 2016?

4      A.     Yes.

5      Q.     How was that list compiled?

6      A.     From any and all of the records we had of

7   the entertainers.

8      Q.     Well, I would like you to be a little more

9   specific if you can.

10     A.     Well, things have changed.  Now we have

11  employee packages on the entertainers with applicable

12  tax forms, G-4s, W-4s, I-9s, employment application.

13  So that was part of the list.  Prior to that, we had

14  just a dancer information sheet they filled out when

15  they started working there.

16     Q.     Do you have dancer info sheets for all

17  dancers who worked as entertainers during that time

18  period?

19     A.     We should, yes.

20     Q.     Who prepared this list?

21     A.     That was a combination of myself, Sam Kim;

22  the current payroll information was from Liz Barton in

23  our office.

24     Q.     I will submit to you that I have been

25  through the list and I am aware of numerous

```
1         Q.    Do you know Tanis Tsetz?

2         A.    Yes.

3         Q.    Is she on the list?

4         A.    No.

5         Q.    Do you know Sandra Bloedorn?

6         A.    Yes.

7         Q.    Is she on the list?

8         A.    No.

9         Q.    Do you know Tiffany Bromirski?

10        A.    Yes.

11        Q.    Is she on the list?

12        A.    No.

13        Q.    Do you know Brittani Cassell?

14        A.    Yes.

15        Q.    Do you know Sierra Christian?

16        A.    Yes.

17        Q.    Do you know Katie Devine?

18        A.    Yes.

19        Q.    Do you know Leslie Holden?

20        A.    Yes.

21        Q.    Haley Lytle?

22        A.    Yes.

23        Q.    Are any of those people on the list?

24        A.    Probably not.  Those are people that have

25   sued us already.
```

1   discretion.

2        MS. PAWLAK:   I am absolutely not

3   suggesting it is.

4        MR. DUDLEY:   I think you are.

5        MS. PAWLAK:   I am saying that is something

6   we can discuss.   You telling him to talk to his

7   counsel is not appropriate in a deposition.

8        MR. DUDLEY:   Well, I can do it by a motion

9   for contempt if you want to.

10       MS. PAWLAK:   You are not asking a

11   question.

12       MR. DUDLEY:   I am having a discussion with

13   you about your objection to me asking about this.

14       MS. PAWLAK:   I am objecting to you

15   instructing him to speak to his counsel which was

16   not a question.   You can go ahead and ask him

17   questions which you already have.

18       If there is a discussion about the list,

19   we can have that as counsel or by motion or

20   however you decide to handle it.   But he has

21   answered the questions you asked him about the

22   list.

23       MR. DUDLEY:   I note your objection.

24   Q.    (By Mr. Dudley)   Do you know a former

25   entertainer or current entertainer, young lady named

1   talking about and they are not on the list.

2           MS. PAWLAK:  Objection.

3           Is there a question?

4   Q.      (By Mr. Dudley)  Would you agree with the

5   statement The Cheetah is a club featuring nude

6   entertainment?

7   A.      Yes.

8   Q.      Is that a yes?

9   A.      Yes.

10  Q.      Would you agree that Cheetah couldn't have

11  a strip club without nude dancers?

12  A.      Yes.

13  Q.      Would you agree that Cheetah needs the

14  dancers?  Would you agree with that statement?

15  A.      Yes.

16  Q.      Would you agree with the statement the

17  dancers need Cheetah?

18  A.      Yes.

19  Q.      It would be hard for either the dancers to

20  make a living dancing without Cheetah or Cheetah to

21  make a living without -- running a club without

22  dancers, right?

23  A.      Yes.

24  Q.      You would agree they are dependent on one

25  another?

1      A.      Correct.

2      Q.      I want to ask you to go back when you

3 first started working at Cheetah.  I believe the club

4 opened in 1987; is that correct?

5      A.      I believe so.  At that location.

6      Q.      Had they been somewhere else before?

7      A.      Yes.

8      Q.      Here in Atlanta?

9      A.      Yes.

10      Q.      When you started working there in 1988 to

11 1993, entertainers were classified as independent

12 contractors, correct?

13      A.      Correct.

14      Q.      And something happened in 1993 which

15 caused you to change the classification of the

16 entertainers at Cheetah, correct?

17      A.      Correct.

18      Q.      And that resulted in entertainers being

19 classified as employees from 1993 until 2001; is that

20 correct?

21      A.      Yes.

22      Q.      Now, what was the reason for Cheetah

23 deciding to reclassify dancers from independent

24 contractors to employees in 1993?

25      A.      Because Gold Club was doing it.

```
 1        A.      I was not.

 2        Q.      At that time were you aware of Cheetah

 3   having any discussions with this law firm about adult

 4   entertainers?

 5        A.      We didn't.

 6        Q.      And would you have been the person

 7   handling it at the time?

 8        A.      Yes.

 9        Q.      Did The Gold Club or any other managers at

10   any other adult entertainment clubs in Atlanta tell

11   you about what was going on there?

12              MS. PAWLAK:  Objection to form.

13              Can you repeat or re --

14              THE WITNESS:  No.

15        Q.      (By Mr. Dudley)  I want to be clear about

16   this.  Are you saying that Cheetah was not part of

17   that investigation by the Department of Labor in 1993?

18        A.      No.   Not that I am aware of.

19        Q.      Can you think of any reason why Cheetah

20   would not be treated like all the other clubs at the

21   same time?

22              MS. PAWLAK:  Objection to form.

23              Asks him to assume the reasoning of the

24        Department of Labor which I don't think he is

25        equipped to do.
```

1       Q.      April 2016, Cheetah again switched course
2    and you made a decision to treat them as employees
3    once again; is that correct?
4       A.      Correct.
5       Q.      They have been treated as employees from
6    that date to the present; is that correct?
7       A.      Correct.
8       Q.      What motivated you to start treating them
9    as employees in April of 2016?
10      A.      When we lost the arbitration.
11      Q.      You are referring to the Cassell and
12   Cuesta arbitrations?
13      A.      Yes.
14      Q.      If I am not mistaken, those were in the
15   fall of 2015, were they not?
16      A.      They were in the beginning of 2016 as I
17   recall.
18      Q.      We will get into that later.  Think it was
19   November and October of '15.
20              But those were the motivating reasons for
21   Cheetah to reclassify the entertainers as employees,
22   correct?
23      A.      Correct.
24      Q.      Just to be real clear on this, you made
25   the decision -- each of these decisions to classify or

1        Q.      (By Mr. Dudley)   Starting in 1993, how did

2    things change -- one day they are an independent

3    contractor, the next day they are employees.

4        A.      Right.

5        Q.      How did their jobs change in any way?

6        A.      We were better equipped and had -- we were

7    able to get them to work schedules, schedule them,

8    have more control over them at work as opposed to kind

9    of letting them do whatever they want, trying to

10   establish guidelines to get them to do what we would

11   like them to do.

12       Q.      If you could, explain to me.   You

13   mentioned two things, scheduling and control.   Can you

14   tell me how the scheduling changed?

15       A.      Well, as independent contractors they

16   would tell us when they wanted to work and they would

17   either show up or not show up.   It was kind of a crap

18   game.

19               As employees, we are scheduling them now

20   and we try to --

21       Q.      I am not asking you about now.   I am

22   asking you about 1993.

23       A.      Okay.   As far as scheduling goes, that was

24   (indicating).

25       Q.      Did they not work a three-shift schedule

1   when they were an independent contractor because they
2   did whatever they wanted and that's what they --
3   that's what entertainers are used to.  They have
4   always believed that they are independent contractors.
5          Q.     Did you give us a set of rules back in the
6   Cuesta and Cassell arbitrations that were used at
7   Cheetah in basically the same form ever since you were
8   GM?
9                 MS. PAWLAK:  I object to the form.
10                You just said he gave them to you.  I
11        think they were produced by The Cheetah if they
12        were produced in some form by that case.
13         Q.     (By Mr. Dudley)  You are aware that
14   Cheetah gave us a set of guidelines involving
15   entertainers in the Cuesta and Cassell arbitration,
16   are you not?
17         A.     Yeah.  There were forms that we handed
18   over.
19         Q.     Mr. Miller went through lengthy testimony
20   with you about those policies, correct?
21         A.     Correct.
22         Q.     And my understanding from that deposition
23   is that that set of rules had been in force at Cheetah
24   roughly the whole time you had been GM; is that
25   correct?

1      Q.      (By Mr. Dudley)  Meaning The Cheetah.
2              MS. PAWLAK:  I mean, I am just going to
3      say, you know, he is not testifying as a
4      30(b)(6).  That was scheduled for yesterday and
5      postponed.
6              MR. DUDLEY:  I understand.  He oversees
7      everything.  He has been there a long time.  I am
8      asking him what he understands.
9              MS. PAWLAK:  He does.  But he is not here
10     as Cheetah today.  If you are wanting to --
11             MR. DUDLEY:  I understand that.  I don't
12     think that is in dispute.
13             MS. PAWLAK:  Do you have documents you can
14     produce, you being you individually?
15             THE WITNESS:  No.
16     Q.      (By Mr. Dudley)  So in 2001 when Cheetah
17     decided to reclassify dancers as independent
18     contractors, tell me how their terms and conditions
19     were changed.
20     A.      Well, we were no longer paying them.  We
21     were no longer -- there was no longer scheduling the
22     way we were doing it before.  We were reverting back
23     to letting them tell us when they wanted to work and
24     show up or not show up.  And we had less control of
25     them when they were at work.

1  referring to your testimony repeatedly that the way a
2  dancer's schedule was done was the housemom would ask
3  her how many -- give me three days.  The dancer would
4  give the housemom the three days and that was her
5  schedule.
6              Did that change at all from 2001 until
7  April the 9th, 2016?
8       A.    Not that I recall.
9       Q.    I want to go back to when they were
10 employees between '93 and 2001 because you said you
11 quit paying them a wage.  So between 1993 and 2001,
12 you paid an hourly wage to the entertainers?
13      A.    Yes.
14      Q.    And how much was that?
15      A.    It was two thirteen an hour.
16      Q.    And you utilized the tip credit provisions
17 of the FLSA?
18      A.    Yes.
19      Q.    The company was familiar with how that
20 worked?
21      A.    Yes.
22      Q.    And tell me how you understood it worked.
23 Company would pay two thirteen an hour and what would
24 happen with tips?
25              MS. PAWLAK:  Objection.

1      to stipulate who the 30(b)(6) representative is.

2            MR. DUDLEY:  Keep saying it over and over

3      and over again when we all understand he is not

4      the 30(b)(6) rep today.

5            MS. PAWLAK:  Because it is not a 30(b)(6)

6      deposition today.  But go ahead.  Ask questions.

7      Q.      (By Mr. Dudley)  Cheetah utilized the tip

8  credit from 1993 to 2001 when you classified

9  entertainers as employees, correct?

10     A.      Correct.

11     Q.      How did you understand the tip credit

12 worked?

13     A.      The tip credit made -- you pay someone two

14 thirteen an hour and the difference between that and

15 minimum wage is what they received in tips.

16     Q.      At that time, did Cheetah keep track of

17 the tips they earned?

18     A.      Yes.

19     Q.      Did the terms of any entertainer's

20 compensation change in any other way as a result of

21 that classification, reclassification in 1993?

22     A.      I don't understand the question.

23     Q.      Well, did their compensation change in any

24 other way?  They were independent contractors.  You

25 did not pay them a wage before the classification.

1        A.      When?

2        Q.      In 1993 or 2001.

3        A.      No.

4        Q.      Did the way the entertainers earned money

5    other than the two thirteen wage, did it change in any

6    way?

7                MS. PAWLAK:   What period of time?

8        Q.      (By Mr. Dudley)  1993 to 2001

9    reclassification.

10       A.      No.

11       Q.      I want to be clear.  The only change is

12   what you feel like was a scheduling difference and

13   some type of control difference; is that right?

14       A.      Correct.

15       Q.      Now, in April of 2016, tell me how things

16   changed.

17       A.      We now pay them two thirteen an hour.

18       Q.      Okay.

19       A.      They declare tips.  And they participate

20   in a qualified tip pool.

21       Q.      How do they declare tips?

22       A.      When they clock out at the end of the

23   night.

24       Q.      The entertainer enters into a computer

25   what they earned in tips that night?

```
 1   much they make in a night to a tip pool.
 2        Q.    Who shares in the tip pool?
 3        A.    The DJ and the floormen.
 4        Q.    Anyone else?
 5        A.    No.
 6        Q.    Housemom does not receive anything out of
 7   the tip pool?
 8        A.    No.
 9        Q.    What do the DJ and the floormen receive?
10   How do they divide that up?
11        A.    I don't know.
12        Q.    You don't know?
13        A.    That's between them.
14        Q.    Does Cheetah get any portion of that?
15        A.    No.
16        Q.    Do any Cheetah managers get any portion of
17   that?
18        A.    No.
19        Q.    Your night manager does not get a portion
20   of it?
21        A.    Well, my night manager is also a floorman,
22   so yes, he does.
23        Q.    So the answer is yes?
24        A.    Yes.
25        Q.    The floor manager gets a portion of the
```

```
 1        Q.      So there are no late fees for being late
 2   for stage or for coming in after the prescribed time
 3   for each shift, no fines or fees for that type of
 4   thing?
 5        A.      No fines or fees.
 6        Q.      Now, Cheetah does have a cover policy, do
 7   they not?
 8        A.      Excuse me?
 9        Q.      Don't they have a policy in the handbook,
10   doesn't it say if an entertainer can't work that she
11   has to get a cover; is that correct?
12        A.      Yes.
13        Q.      And you understand that these entertainers
14   have to pay these other entertainers to cover for
15   them, do you not?
16        A.      I do not.
17        Q.      You do not understand that?
18        A.      No.
19        Q.      You have been at Cheetah since 1988 and
20   you have been a bartender, a night manager, a GM, and
21   you are not aware the entertainers pay covers to other
22   entertainers?
23             MS. PAWLAK:   That wasn't what you asked
24        him originally.
25             THE WITNESS:   I have heard that they have.
```

```
 1                    I mean, that presupposes they don't have
 2         an excuse and that they are missing work.  So I
 3         think your question is not quite fair.
 4                    MR. DUDLEY:  I would appreciate it if you
 5         would make your objection, not run with it.  It
 6         will be noted and we will move as quickly as
 7         possible.
 8         Q.      (By Mr. Dudley)  Can you answer that
 9    question?
10         A.      Which time period are we talking about?
11         Q.      I am talking about actually the whole time
12    period.
13         A.      Okay.  If a girl didn't show up for a
14    shift and didn't have a cover, we would threaten to
15    terminate her but most probably not terminate her.
16         Q.      The entertainers have been terminated for
17    not showing up for work and not having a cover,
18    correct?
19         A.      I don't know if there have ever been any.
20    It is certainly possible.  But as I have described in
21    these depositions before, dealing with entertainers is
22    like herding cats.  You have to set the bar at a
23    certain height to get them to achieve a minimal
24    amount.  So we try to threaten them as much as we can
25    in the sense of getting them to do what they do.  But
```

```
1                 MR. WARD:   That is why you had us thrown.
2        Q.      (By Mr. Dudley)  Judge in Clincy I believe
3   said these entertainers were like a sword of Damocles.
4   Would you agree with that statement?
5                 MS. PAWLAK:  He doesn't know what it is.
6                 THE WITNESS:  I don't know what the sword
7        of Damocles is.
8        Q.      (By Mr. Dudley)  Would you agree with the
9   statement that an entertainer's primary duty is to
10  dance and entertain customers?
11       A.      Yes.
12       Q.      The dancing and the entertaining is done a
13  couple of different ways, right?
14       A.      Right.
15       Q.      One would be stage dancing, correct?
16       A.      Correct?
17       Q.      One would be table dancing.
18       A.      Correct.
19       Q.      One would be dancing in VIP.
20       A.      Correct.
21       Q.      All girls have to do stage dancing unless
22  they are excused, right?
23       A.      Right.
24       Q.      Table dancing they don't have to do, but
25  it would be hard for them to make money not doing it,
```

1        A.      I don't know about regularly.

2        Q.      Some don't do so well, right, they make

3    500 a night?

4        A.      And a lot less.

5        Q.      Sometimes they make less than that.

6        A.      Yes.

7        Q.      It would be hard for them to survive if

8    they made less than a couple hundred, wouldn't it?

9                MS. PAWLAK:  Object to form.

10       Q.      (By Mr. Dudley)  From your experience.

11   You have been there since 1988.  Girls that are making

12   a couple hundred a night are not going to stay around

13   long, are they?

14       A.      I disagree with that.

15       Q.      You disagree with it.  Okay.

16               MS. PAWLAK:  Ainsworth, are you at a point

17       we can take a five-minute break?

18               MR. DUDLEY:  Sure.

19               MS. PAWLAK:  Thank you.

20               (Recess from 11:15 a.m. to 11:23 a.m.)

21       Q.      (By Mr. Dudley)  I want to go back to

22   those classifications that Cheetah did in '93, 2001,

23   and April the 9th, 2016.  I know you were represented

24   by counsel in the April 9th, 2016.  I don't want you

25   to tell me anything that any attorneys told you in any

1  not asking about you personally.

2       A.    Okay.

3       Q.    Did you consult with any attorneys about

4  that reclassification April 9th, 2016?

5            MS. PAWLAK:  Objection to form.

6            THE WITNESS:  Yes.

7       Q.    (By Mr. Dudley)  What firm was that?

8       A.    Ford & Harrison.

9       Q.    Are there written communications involving

10 that consultation?

11           MS. PAWLAK:  Objection to form.

12           THE WITNESS:  I am not sure.  I don't

13      recall.

14      Q.    (By Mr. Dudley)  Ed Mangiafico was

15 Cheetah's corporate counsel from when to when?

16      A.    I don't know if you would call him our

17 corporate counsel.  He had done some insurance defense

18 for us and was always someone we could -- we didn't

19 retain him.  He would help out from time to time on

20 things.

21      Q.    When did that start and end?

22      A.    Started sometime in the early '90s.  I

23 forget when the first case he was brought in on from

24 an insurance company and it continued until he got

25 brain cancer which was May of last year.

1          Q.      Takes her clothes off?

2          A.      Yes.

3          Q.      Hired for physical attributes and ability

4    to dance seductively, is that why they are hired?

5          A.      Yes.   And how well she smiles and just

6    overall stage presence on top of that.

7          Q.      You are looking for somebody that is going

8    to be attractive to men, right?

9          A.      Correct.

10         Q.      No prior dance experience is needed,

11   correct?

12         A.      Correct.

13         Q.      And no formal education in dance is

14   needed, correct?

15         A.      Correct.

16         Q.      As a matter of fact, no experience period

17   is needed other than what you testified to, right?

18         A.      Correct.

19         Q.      You don't care whether they have held a

20   job before, right?

21         A.      Right.

22         Q.      They don't need to have a college

23   education, right?

24         A.      No.

25         Q.      Don't need any type of certification,

 1   Contract Entertainer Policies; is that correct?

 2       A.     Yes.

 3       Q.     Can you tell me what period of time this

 4   set of rules was in effect?

 5       A.     I don't know exactly.

 6       Q.     If we asked in discovery -- I know you are

 7   not the corporate representative.  But we asked in

 8   discovery for all policies dealing with entertainers

 9   for the period of time the plaintiffs worked for

10   Cheetah.  This is what was given to us.

11              You don't know when this came into effect?

12       A.     This has changed many times.

13       Q.     So I need to ask a corporate

14   representative what are the effective dates of this?

15       A.     I mean, I am the corporate representative.

16   By looking at this, I am not sure which one this is,

17   for what time period.

18       Q.     Do you have a way of finding out which way

19   it is and what the effective period is?

20       A.     Yeah.

21       Q.     How would you do that?

22       A.     I will have to check my file.

23       Q.     Are there other entertainer policies in

24   there?

25       A.     There is the current -- the entertainer

```
 1        A.      Yes.

 2        Q.      This is not that one.

 3        A.      No.   It is not.

 4        Q.      Are you referring to a set of rules that

 5   came into effect after April the 9th, 2016?

 6        A.      Yes.

 7        Q.      And then does that help recollect your

 8   testimony about what this document is?

 9        A.      Yes.

10        Q.      What do you think this document is?

11        A.      This would have been -- this is obviously

12   prior to 2016.  And looking at this, this would be

13   post 2011.

14        Q.      Let me say this to you.  I have reviewed

15   your deposition and all your testimony in these

16   matters that I was involved in and there was a

17   different set of rules that were in effect until

18   October of 2015.  And then in October 2015 you changed

19   that set of rules, did you not?

20        A.      Yeah.   The rules have been changed.  These

21   are policies.  I believe these are pretty much the

22   same.   There is another rule that -- another guideline

23   book that was shown that was changed.

24                (Plaintiff's Exhibit 2 was marked for

25           identification.)
```

```
 1   until October of 2015.  Is that true?
 2        A.    Yes.  But it is not the set of guidelines
 3   that -- it is a set of guidelines created by a
 4   housemom, not by The Cheetah.
 5        Q.    We went through that, too.  I think we can
 6   agree -- your position is you did not approve of
 7   portions of this, correct?
 8        A.    Correct.
 9        Q.    And I will get to the portions that you
10   said you did not approve.
11             But it was quite clear from your
12   testimony, you are not disputing this for purposes of
13   today that this, in fact, was what was given to the
14   entertainers, right?
15        A.    Yes.
16        Q.    This is what they read, they signed for,
17   and what they agreed to adhere to, right?
18        A.    They didn't sign for this.  This was shown
19   to them by the housemom.  They signed for the
20   policies.
21        Q.    There is not an acknowledgment of receipt
22   by the dancers that they received this and read it?
23        A.    No.
24        Q.    But the housemom did go over it with them?
25        A.    Yes.
```

```
 1   who works at Cheetah has to purchase a permit for the
 2   entire period of time they work for Cheetah, right?
 3        A.     Every person that works at The Cheetah has
 4   to purchase their permit.
 5        Q.     Certainly entertainers, right?
 6        A.     Yes.
 7        Q.     And the entertainer pays for that, right?
 8        A.     Yes.
 9        Q.     That is a requirement of the job, right?
10        A.     It is a requirement of the law.
11        Q.     It is also a requirement of the job, is it
12   not?
13        A.     Yes.
14        Q.     In that first night they have to have what
15   is considered appropriate costumes; is that correct?
16        A.     Correct.
17        Q.     And that is something they go out on the
18   floor and dance in, right?
19        A.     Yes.
20        Q.     They have to have appropriate shoes; is
21   that correct?
22        A.     Yes.
23        Q.     What type of shoes do they have to have?
24        A.     Heels.
25        Q.     That's stilettos?
```

```
1        Q.      There is a certain image The Cheetah wants
2   their dancers to have, correct?
3        A.      Correct.
4        Q.      They want them to be considered properly
5   dressed, that sort of thing, correct?
6        A.      Correct.
7        Q.      If a dancer wears something to work that
8   management or the housemom feels is not up to their
9   standards, they would certainly tell her that is not
10  appropriate, correct?
11       A.      Yes.
12       Q.      That happens?
13       A.      Yes.
14       Q.      I am sure some of these girls do not know
15  how to -- what Cheetah expects in that regard,
16  correct?
17       A.      Yes, sir.
18       Q.      They buy all these things at their cost,
19  right?
20       A.      Yes, sir.
21       Q.      Now, the next category is called
22  scheduling and attendance, correct?
23       A.      Yes.
24       Q.      And under the first bullet point, if you
25  could -- could you read that first bullet point to me?
```

```
 1        A.      Yes.
 2        Q.      Now, Cheetah allows dancers to come extra
 3   days, correct?
 4        A.      Yes.
 5        Q.      Cheetah's policy is a dancer can lose the
 6   privilege of coming the extra days if she doesn't come
 7   her scheduled days, right?
 8        A.      Yes.
 9        Q.      Like other jobs, Cheetah tries to
10   accommodate dancers if they have a hectic family life,
11   school schedule or something like that; is that
12   correct?
13        A.      Yes.
14        Q.      That's not atypical in the employment
15   context, is it?
16                MS. PAWLAK:  Objection to form.
17                THE WITNESS:  What do you mean?
18        Q.      (By Mr. Dudley)  You agree that lots of
19   places of employment will allow employees the time off
20   from work for certain family matters and things like
21   that.
22                MS. PAWLAK:  Objection to form.
23                He can't testify about what other places
24        do.
25                THE WITNESS:  I guess.
```

1    vacation must also be made with the housemom.

2         Q.     Is that a true and accurate statement of

3    what Cheetah's policy was at the time?

4         A.     Yes.

5         Q.     Now, if you could go down to the fourth

6    bullet point and read that first sentence.

7         A.     If you cannot make your shift for a valid

8    reason, you must call in by 7:30 p.m.

9         Q.     And would you agree that Cheetah's policy

10   is that if you have a valid reason to miss work, you

11   must call by 7:30 p.m. and talk to a housemom about

12   it?

13        A.     Yes.

14        Q.     Is it Cheetah's policy that failure to

15   show up for your shift without calling is considered a

16   no show and will result in suspension or termination?

17   Is that their policy?

18        A.     No.

19        Q.     That's not their policy.  Tell me how

20   Cheetah's policy differs from that.

21        A.     Failure to show up for your shift without

22   calling is considered a no show and will possibly

23   result in suspension or termination.

24        Q.     The only difference you have with the

25   written policy here which is given to the dancers is

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | Read that second sentence, that last |
| 3 | sentence, bullet point 4, please. | |
| 4 | A. | If not, you must get your shift covered by |
| 5 | another entertainer who is not scheduled for that | |
| 6 | shift. | |
| 7 | Q. | "Must" is in bold and underlined, right? |
| 8 | A. | Right. |
| 9 | Q. | That's basically telling a dancer she must |
| 10 | cover her shift if she does not have a valid reason to | |
| 11 | not be at work, correct? | |
| 12 | A. | Correct. |
| 13 | Q. | You have already testified that you were |
| 14 | aware that in order to find somebody to cover an | |
| 15 | entertainer's shift they may have to pay a cover | |
| 16 | charge to that entertainer, correct? | |
| 17 | A. | That they may have paid them, not that |
| 18 | they may have to. | |
| 19 | Q. | Well, if a housemom told an entertainer |
| 20 | you must get a cover and pay her for it, that's what | |
| 21 | an entertainer would do, would she not? | |
| 22 | | MS. PAWLAK:  Objection to form. |
| 23 | | That's assuming a lot.  I am not sure -- |
| 24 | Q. | (By Mr. Dudley)  Let me withdraw that |
| 25 | question. | |

1          He has testified they did not have to pay.

2              MR. DUDLEY:  Your objection is noted.  I

3      think your speech is inappropriate.

4              MS. PAWLAK:  Short one but...

5              THE WITNESS:  We have a sign up saying

6      that, you know, don't pay people to cover your

7      shift.

8      Q.      (By Mr. Dudley)  You are saying you have

9  something up saying that?

10     A.      Yeah.

11     Q.      Where is that?

12     A.      It is in the dancers' dressing room and at

13  the entrance to the dressing room.

14     Q.      How long has that been there?

15     A.      I don't know.  Awhile.

16     Q.      We have asked for those kind of documents.

17  We haven't gotten them.  I have litigated a number of

18  cases against Cheetah and I have never been provided

19  with anything like that.  You say there is one?

20     A.      Yep.

21     Q.      I thought a minute ago you testified you

22  didn't even know that happened, like news to you that

23  could even be a possibility.

24             MS. PAWLAK:  I think that

25      mischaracterizes.

1        Q.      So it was last year --
2        A.      It hasn't been that long ago.
3        Q.      It was last year or this year?
4        A.      When I found out what was going on, that
5    girls were paying other girls to cover shifts.
6        Q.      How did you find that out?
7        A.      When one of the girls was collecting money
8    from more than one girl to cover her shift and not
9    showing up.
10       Q.      If you could, go down to the last bullet
11   point of the scheduling and attendance rules for
12   Cheetah, and read that first sentence, please.
13       A.      Whenever you work scheduled or extra, you
14   must be at work no later than 7:30 p.m. and ready for
15   walkout at 8:00.
16       Q.      Is that Cheetah's policy?
17       A.      When?
18       Q.      Is that an accurate statement of Cheetah's
19   policy, what you just read?
20       A.      What time period?
21       Q.      Well, I think we have already established
22   that this was not used after -- well, let me ask you
23   this, how has that changed over the course of you
24   being a general manager?  How has that provision
25   changed?

| | | |
|---|---|---|
| 1 | Q. | You close at 3:00? |
| 2 | A. | You have 30 minutes to get everyone out of |
| 3 | the building. | |
| 4 | Q. | And just to make sure here, the night |
| 5 | shift is 8:00 p.m. to 2:30 a.m. now, right? | |
| 6 | A. | Yes. |
| 7 | Q. | And during the period of time this was in |
| 8 | effect, the night shift was 8:00 p.m. to 2:30 a.m. or | |
| 9 | 3:00 a.m.? | |
| 10 | A. | It has been 2:30 for ten years. |
| 11 | Q. | Is that what you testified to in 2015? |
| 12 | A. | I believe so.  But depending on what you |
| 13 | consider -- I was under the impression from the city | |
| 14 | that it was 3:00 o'clock.  But what it is and the | |
| 15 | reality, it is 2:30 and you have 30 minutes to get | |
| 16 | everyone out of the building.  No more drinks can be | |
| 17 | served and everything pretty much stops at 2:30. | |
| 18 | Q. | Is this something you learned recently? |
| 19 | A. | No.  Well, it was a year ago. |
| 20 | Q. | Now, if you were late when this policy was |
| 21 | in effect, you were fined; is that correct? | |
| 22 | A. | You may have been fined. |
| 23 | Q. | Read that second sentence to me, if you |
| 24 | could. | |
| 25 | A. | If you are late or miss walkout you will |

1   use them for spreading the love, tipping the girls.

2        Q.     But as I understood it from your prior

3   testimony is that those fines did not go on the books

4   at Cheetah.

5        A.     Correct.

6        Q.     There were no records of those fines.

7        A.     Correct.

8        Q.     Now, the first lawsuit that entertainers

9   filed against Cheetah was back in 2013 and from 2013

10  up until April the 9th of 2016 when you stopped that

11  process, did you take any action, start recording what

12  those late fines were?

13       A.     No.

14       Q.     You didn't keep records even though you

15  knew entertainers were asking for that as a portion of

16  their damages, correct?

17       A.     Correct.

18       Q.     Do you understand that the Fair Labor

19  Standards Act requires you to keep proper records of

20  deductions from employee's pay?  Do you understand

21  that?

22            MS. PAWLAK:  Object as to form.

23            He is not going to answer as to the legal

24       conclusions.

25            THE WITNESS:  I don't know.

1        A.      No.

2        Q.      Go to the next page.  That category is

3   called Walkout at the top.  This is something that

4   Cheetah no longer does.

5        A.      Correct.

6        Q.      When did they stop doing that?

7        A.      Earlier this year.

8        Q.      Why did they stop doing it?

9        A.      Because it was counterproductive.

10       Q.      Well, until earlier this year, tell me how

11  the walkout process worked.

12       A.      The DJ would announce that we were doing

13  the walkout.  The customers could get two-for-one

14  table dances and all the girls would go and put an

15  evening gown on and be introduced, have their names

16  introduced while they came down from the main stage to

17  the side stages.

18       Q.      And how long would that process take?

19       A.      Probably 15, 20 minutes.

20       Q.      The girl would be -- the entertainer goes

21  in the back, they all get dressed, right?

22       A.      Right.

23       Q.      In gowns?

24       A.      Yes.

25       Q.      Black gowns?

1       A.      Right.

2       Q.      There are certain rules about how the

3  walkout is done.  For example, the girls are not

4  allowed to talk to each other, right?

5       A.      Yes.

6       Q.      Supposed to smile.

7       A.      Yes.

8       Q.      I had a dancer tell me she was sent home

9  one time because she didn't smile on stage.  Is that

10  something that happened at Cheetah occasionally?

11       A.      It is possible.

12       Q.      And they are required to -- everybody is

13  required to stay out there until those two songs are

14  done then they go about their business, right?

15       A.      No.  If they don't get picked, they can

16  get off the stage.

17       Q.      The next category that Cheetah has in its

18  guidelines is table dancing.  That's the type of

19  dancing that is done really everywhere but stage and

20  VIP.

21       A.      Let me read it.

22               Okay.  What was the question?

23       Q.      Is that dancing that is really done

24  everywhere but -- well, it says it includes the stage

25  top.  Can you kind of explain that to me?  You are

```
 1    asking for all the money in the end.
 2         Q.    Then the next sentence.
 3         A.    This may avoid any discrepancies
 4    concerning how much money is owed to you.
 5         Q.    Based upon those two sentences, would you
 6    agree the statement that the monies that an
 7    entertainer gets from table dancing belongs to the
 8    entertainer?
 9         A.    Yes.
10         Q.    In fact, it expressly states they should
11    avoid discrepancies for money owed to them.
12         A.    Yes.
13         Q.    That's not considered Cheetah's money by
14    Cheetah.
15         A.    No.
16         Q.    The fifth bullet point, I think, is
17    there -- you tell me if I am wrong -- to let
18    entertainers know that dancing at the Cheetah is more
19    conservative than a lot of other clubs.
20         A.    Yes.
21         Q.    That goes with the image of Cheetah
22    wanting to be more sophisticated, correct?
23         A.    Correct.
24         Q.    It also attempts to comply with the law,
25    correct?
```

```
 1    on both shifts right now.
 2         Q.    It is one or the other.
 3         A.    Yes.
 4         Q.    Cheetah's rule for stage dancing is that
 5    customer has to tip you $5 before you take your top
 6    off, $10 before you take your bottoms off, right?
 7         A.    Yes.
 8         Q.    Girls are required to stage dance unless
 9    they are in VIP, correct?
10         A.    Yes.
11         Q.    And how long would you say a stage set
12    lasts?
13         A.    Ten to 15 minutes.
14         Q.    And how often does an entertainer do a
15    stage set?
16         A.    That would be about once an hour.
17         Q.    And that would also depend on the number
18    of girls, right?
19         A.    Right.
20         Q.    But you could say typically it is an hour
21    or less?
22         A.    Typically.
23         Q.    So over the course of a seven- or
24    eight-hour shift, your typical entertainer would do
25    that at least seven or eight times.
```

 1        A.       Well, just try to raise the bar.
 2                 MR. DUDLEY:    Can you answer my question.
 3                 (The record was read by the reporter.)
 4                 THE WITNESS:    Correct.
 5        Q.       (By Mr. Dudley)    And there are rules when
 6    they are finished with dancing they have to get
 7    dressed on the stage before they can leave, correct?
 8        A.       Yes.
 9        Q.       They have to wait for another dancer to
10    replace them, correct?
11        A.       Yes.
12        Q.       There is a good reason for that, business
13    reason, that is that you always want there to be
14    enough girls dancing on the DJ stage, right?
15        A.       Right.
16        Q.       It is Cheetah's policy to always have nude
17    dancers out there dancing on the stage, right?
18        A.       Right.
19        Q.       That's what draws in business, right?
20        A.       Right.
21        Q.       And there are rules about what the girls
22    do when they are on stage, such as participating in
23    the rotation, right?
24        A.       Yes.
25        Q.       They can't stand in the same place,

```
 1                    (Recess from 12:18 p.m. to 1:07 p.m.)
 2          Q.      (By Mr. Dudley)   If we could go to Page 5
 3   of the Night Shift Entertainer Orientation and
 4   Guidelines.
 5                   These are rules at the top regarding
 6   executive room; is that correct?
 7          A.      Yes.
 8          Q.      And Cheetah's rules are that an
 9   entertainer must be invited into the executive room.
10          A.      Yes.
11          Q.      And how do things operate from the
12   executive room as opposed to the rest of the -- or the
13   floor, I guess, what you call the main room.
14          A.      Yes.   Customers pay $25 to get in there
15   and it is -- there's not stages -- there is a little
16   stage.   But we don't have the stage rotation like it
17   is in the main room.   There is different music in
18   there and it is more room that the girls will check in
19   with the customer and do an hourly.   But some girls do
20   table dances in there.
21          Q.      Are most girls checked into the room at an
22   hourly rate when they are in the executive room?
23          A.      Say for the most part.
24          Q.      Does Cheetah do revues any longer?
25          A.      Walkout revues?
```

```
1        A.      They are not supposed to.  Some of them
2   do.
3        Q.      Well, if you could read the third sentence
4   of bullet point 3.
5        A.      Entertainers may charge up to $300 per
6   hour, but sometimes on slow nights a girl may cut a
7   deal.
8        Q.      Is that an accurate statement of Cheetah's
9   policy?
10       A.      No.
11       Q.      So you say the difference is they are not
12  supposed to negotiate that rate?
13       A.      Right.
14       Q.      It would be an accurate statement that
15  Cheetah controls the hourly rate the girl can charge.
16       A.      Yes.
17       Q.      If you go down to the fifth bullet point.
18       A.      Okay.
19       Q.      If you could read that first sentence.
20       A.      Make sure that your customer understands
21  and agrees to pay you hourly.
22       Q.      Is that a true and correct statement of
23  the Cheetah's policy?
24       A.      Yes.
25       Q.      Would you agree with the statement that
```

1           MS. PAWLAK:  Objection to form.

2           I don't think he can speculate or state.

3      He has said he doesn't know.

4           THE WITNESS:  Yeah.  I don't know that,

5      how you could.

6      Q.    (By Mr. Dudley)  You testified you don't

7  have records.

8      A.    Right.

9      Q.    Do you have any opinion as to the average

10 number of check-ins by a Cheetah entertainer?

11     A.    I could only guess.

12     Q.    What would your guess be?

13          MS. PAWLAK:  Objection to form.

14          THE WITNESS:  Two.

15     Q.    (By Mr. Dudley)  Now, what if somebody was

16 the type of entertainer that stayed in VIP a lot, made

17 a lot of money back in VIP.  What do you think would

18 be that sort of entertainer's average number of

19 check-ins per shift?

20     A.    Maybe three or four.

21     Q.    I want to ask you whether the floormen

22 keep records of this.

23     A.    Do the floormen keep records?  Yeah.  For

24 their use on a nightly basis, who is checked in and

25 checked out.

```
 1   at that point.  It made it easier.  The $10 was to try
 2   to get them to make sure that they were doing their
 3   sets and not just saying they were checked in and
 4   avoiding doing their stage sets.
 5         Q.     Is there a line item on Cheetah's
 6   financial statements that would indicate the amount
 7   paid as VIP check-in fees?
 8         A.     No.
 9         Q.     Tell me how those fees could be accounted
10   for.
11         A.     The same as the fines.
12         Q.     How is that?
13         A.     They would go to me.
14         Q.     So you were given cash each night?
15         A.     Yeah.
16         Q.     From the floormen?
17         A.     From the housemom.  It was the next
18   morning I would get it, the next day.
19         Q.     So the housemom would collect the VIP
20   check-in fees and give them to you the next morning?
21         A.     Yes.  They would be left in an envelope.
22         Q.     What did you do with the money?
23         A.     I would use that to tip the girls on stage
24   and slow nights to get all the girls dancing and try
25   to get the excitement and energy building.
```

1        A.      Yes.

2        Q.      And again, if you go to the next sentence,

3    it is company policy that you get your money upfront,

4    that would refer to the hourly rate that the customer

5    paid directly to the entertainer, correct?

6        A.      Correct.

7        Q.      If you go to the Cheetah Buck section of

8    the employer guidelines, I think this portion of the

9    rules defines what Cheetah Bucks are and how they

10   should be handled; is that correct?

11       A.      Yes.

12       Q.      Could you explain in your words what a

13   Cheetah Buck is.

14       A.      It is like a gift certificate.  A customer

15   can use a credit card and receive Cheetah Bucks and

16   use them for whatever they want.

17       Q.      So it is something available if a customer

18   does not have cash or chooses not to use cash.

19       A.      Correct.

20       Q.      And Cheetah's policy allows the customer

21   to purchase Cheetah Bucks from Cheetah with a

22   surcharge of 10 percent, correct?

23       A.      Yes.

24       Q.      Then they get the dollar value of whatever

25   they are purchasing, correct?

1    not write the guidelines you are looking at.

2         Q.    (By Mr. Dudley)   What do you mean by

3    customary?

4         A.    Customary is like people customarily tip

5    the girl at the front door with they walk in.  She has

6    a tip jar.  People customarily put money in the tip

7    jar when they buy coffee.  Not everyone does it, but

8    it is customary.

9         Q.    Let me understand what you are saying

10   because the rules say what so far as the 1 or 2

11   percent?

12        A.    The rules say it is customary to tip at

13   least 1 to 2 percent.

14        Q.    Are you now saying that's not the rule?

15              MS. PAWLAK:  Objection.

16              THE WITNESS:  I didn't write that rule.

17        Q.    (By Mr. Dudley)   Regardless of whether you

18   wrote it or not, is that the rule?

19              MS. PAWLAK:  Objection to form.

20              THE WITNESS:  This guideline says it is

21        customary to tip at least 1 to 2 percent.  That's

22        what it says.

23        Q.    (By Mr. Dudley)   And what was Cheetah's

24   understanding of that rule?  What was an entertainer

25   supposed to do?

1      Q.      And you can understand how an entertainer

2   would think that she is supposed to tip 1 or 2

3   percent, right?

4              MS. PAWLAK:  Objection to form.

5              THE WITNESS:  I can't understand what an

6         entertainer will think.

7      Q.      (By Mr. Dudley)  You don't think your

8   guidelines are some indicator of what the entertainer

9   ought to think?

10             MS. PAWLAK:  Objection to form.

11             THE WITNESS:  No.

12     Q.      (By Mr. Dudley)  Do you have any records

13  of tips received by Cheetah Buck girls from

14  entertainers?

15     A.      No.

16     Q.      Have you made any efforts to maintain

17  those records since, say, 2011?

18     A.      No.

19     Q.      Do you know of anyone that would know

20  those amounts?

21     A.      No.

22     Q.      Do you know how Cheetah Buck girls treat

23  those tips?  I am sorry.  Yeah.  Cheetah Buck girls

24  treat those tips.

25             MS. PAWLAK:  Objection to form.

1  point, is it?

2       A.     No.   They are in the process of getting

3  the customers out.

4       Q.     Aren't dancers still dancing and people

5  still drinking at that point in time?

6              MS. PAWLAK:   At 2:30?

7              MR. DUDLEY:   Yes.

8              THE WITNESS:   They are finishing up.

9       Q.     (By Mr. Dudley)   It is last call at 2:30?

10      A.     Right.

11      Q.     If somebody buys a drink at 2:30, they can

12  finish that drink until 3:00, right?

13      A.     They have to be out of the building at

14  3:00.

15      Q.     You are not going to -- for example, if an

16  entertainer who is dancing for somebody at 2:30, that

17  customer is paying that entertainer, you are not going

18  to run that customer off until 3:30, right?

19      A.     Until when?

20      Q.     I am sorry, 3:00.

21      A.     We are going to start getting them out at

22  quarter of, ten of.   They have to be out of the

23  building at 3:00.

24      Q.     Even if the customer is paying for

25  services?

1      Q.     Have you ever seen anybody there after
2   4:00?
3      A.     Not that I can recall, other than
4   employees cleaning up.  Bartenders.  Kitchen people.
5      Q.     Have you spoken with housemoms and
6   floormen and the people involved in the tipout process
7   to find out how long it takes for entertainers to go
8   through that process?
9      A.     No.
10     Q.     Have you spoken with those same people
11  about how late that process may last per shift?
12     A.     No.
13     Q.     Have you done anything to maintain records
14  for situations where an entertainer may be there later
15  than 3:00 o'clock?
16           MS. PAWLAK:  Objection to form.
17           It assumes facts that are not in evidence
18      at this point.
19           THE WITNESS:  The entertainers clock out
20      when they leave.
21     Q.     (By Mr. Dudley)  Well, they do now.  But
22  they didn't before April 2016, right?
23     A.     They signed out when they left prior to
24  that.
25     Q.     Well, you correct me if I am wrong.  But I

1      A.      After the checkout process.

2      Q.      Includes the time spent going through the

3   checkout process, correct?

4      A.      Yes.

5      Q.      Cheetah has videos that are on all the

6   time, right?  Cameras, I am sorry.

7      A.      Security cameras?

8      Q.      Yes.

9      A.      Yes.

10      Q.      Do those videos indicate when dancers

11   left?

12      A.      Yeah.  There would be a camera that would

13   show that.

14      Q.      And how long are those videos saved?

15      A.      It is a hard drive so it overwrites

16   itself.  I think they last a few days.  Depends on the

17   amount of activity.  Anywhere from a few days to a

18   week.

19      Q.      That is something that Cheetah could have

20   preserved, correct?

21            MS. PAWLAK:  Objection to form.

22            THE WITNESS:  I am not a technician, but I

23      guess so.

24      Q.      (By Mr. Dudley)  And that's something we

25   could use if records existed to indicate when

1   during the checkout process?

2       A.      Why did she previously or why does she

3   now?

4       Q.      When are you saying that stopped

5   happening?

6       A.      No.   There is no -- didn't you say

7   something about some sort of form or something?

8       Q.      Let's look at your rules.   If you go to

9   the first bullet point under Checkout, says, Checkouts

10  are done with the housemom and should be completed

11  once you are cleared to go home for the night.

12              Does it say that?

13      A.      Yes.

14      Q.      Is that Cheetah's policy?

15      A.      Yes.

16      Q.      Why is the entertainer going to the

17  housemom as part of the checkout process?   What are

18  they doing with the housemom?

19      A.      Telling them they are leaving.

20      Q.      And tipping them?

21      A.      If they want.

22      Q.      Wouldn't that kind of indicate to you that

23  that might be part of the process?

24              MS. PAWLAK:   Objection to form.

25              THE WITNESS:   No.   But it is certainly

1  think it is required?  Is that what you are saying?

2       A.     Yes.   That's what I am saying.

3       Q.     Does it happen?

4       A.     Does it happen, yeah.  Is it required, no.

5       Q.     Okay.

6       A.     I can clarify the first one now.  That's

7  for their -- with the housemom for their VIP sessions.

8  That's why they check out with the housemom.

9       Q.     That's it?

10      A.     Yeah.

11      Q.     They don't pay housemoms tipouts, either?

12      A.     If they want to, they do.

13      Q.     Would you say it is customary around

14 The Cheetah for an entertainer to tip out the

15 housemom?

16      A.     Probably.

17      Q.     Probably.  Yes or no?

18             MS. PAWLAK:  Objection to form.

19             THE WITNESS:  Probably.

20      Q.     (By Mr. Dudley)  I understand for purposes

21 of this you are saying it is not required.  But you

22 are not denying that it happens, right?

23      A.     Correct.

24      Q.     What are all these stamps they have to get

25 as part of the checkout process?

```
 1        A.      I don't remember.
 2        Q.      It was a laminated form indicating what
 3   the entertainers' obligations were to the DJ; is that
 4   not true?
 5        A.      Oh, DJ, yes.
 6        Q.      Do you remember what that form said?
 7        A.      It had dollar amounts, I think, on it, and
 8   how much to tip out based on how much you made.
 9        Q.      Do you remember what they were?
10        A.      I don't.
11        Q.      Do you remember the document said it is a
12   minimum of 5 percent?  Do you remember that?
13                MS. PAWLAK:  Objection to form.
14                THE WITNESS:  I do not.
15                (Plaintiff's Exhibit 3 was marked for
16        identification.)
17        Q.      (By Mr. Dudley)  I don't have another
18   copy.  You will have to share that one.
19                Is that the DJ tipout sheet we were
20   talking about?
21        A.      Yes.
22        Q.      Could you read the top part of it?  Tell
23   me what that says.
24        A.      DJ tipout is minimum 5 percent.
25        Q.      Is there any confusion to you about what
```

1   guidelines under the DJ tipout bullet point expressly

2   states that there is a tipping chart in the housemoms'

3   desk if you are not sure what you should tip, correct?

4          A.      Correct.

5          Q.      And that was what was told to entertainers

6   as far as you know by the housemoms.

7          A.      Yes.

8          Q.      Is there any other reason for an

9   entertainer to go see the DJ at the end of the night

10  other than to tip him out?

11         A.      No.

12         Q.      If you go to the next bullet point on the

13  next page, Page 8, says housemom tipout.  Could you

14  read that next sentence, please.

15         A.      Your next stop will be the housemoms' desk

16  to pay your fees, if any.  Once finished it is

17  customary to tip your housemom.

18         Q.      So after the entertainer goes to the DJ,

19  she is supposed to go to the housemom and pay her

20  fees; is that correct?

21         A.      Yes.

22         Q.      Did you understand that it was customary

23  at Cheetah for entertainers to tip out the housemom at

24  the end of their shifts?

25         A.      Yes.

```
1        A.      Yes.
2        Q.      Housemoms are responsible for telling them
3    what Cheetah's policies are.
4        A.      Yes.
5        Q.      Are there any records of what was paid to
6    the housemom as a tipout?
7        A.      No.
8        Q.      Are there any records of what was paid to
9    the DJ as a tipout?
10       A.      No.
11       Q.      Has Cheetah taken any efforts since 2012
12   to keep track how much an entertainer paid a DJ per
13   shift?
14       A.      No.
15               MS. PAWLAK:  Objection to form.
16       Q.      (By Mr. Dudley)  Has Cheetah to your
17   knowledge taken any steps to determine how much an
18   entertainer paid to the housemom per shift?
19               MS. PAWLAK:  Objection to form.
20               THE WITNESS:  No.
21       Q.      (By Mr. Dudley)  Go to the next bullet
22   point.  It says Floormen Tipout.  Could you read that
23   sentence, please?
24       A.      There is one designated floorman who will
25   take the tipout for all of them.
```

1        A.      No.   Just the Breathalyzer receipt.

2        Q.      That is shown to the valet?

3        A.      That she can drive.

4        Q.      Are there any records of what the

5    entertainers tip the floormen?

6        A.      No.

7        Q.      Has Cheetah undertaken any efforts since

8    2012 to keep track of what entertainers pay floormen

9    per shift in tipouts?

10              MS. PAWLAK:   Objection to form.

11              THE WITNESS:   No.

12       Q.      (By Mr. Dudley)   Do housemoms, floormen,

13   or DJs utilize a tip credit at Cheetah?

14       A.      No.

15       Q.      Housemom or the floorman does the

16   Breathalyzer?

17       A.      Yes.   The floorman.

18       Q.      Floorman?

19       A.      Yeah.

20       Q.      Entertainers are not allowed to drive home

21   if they Breathalyze more than .07?

22       A.      Correct.

23       Q.      That is Cheetah's policy?

24       A.      Yes.

25       Q.      If a Cheetah entertainer drives to work,

1      Q.     Who owns that property?

2      A.     Who owns the property?

3      Q.     Yeah.

4      A.     Trac-Eric.

5      Q.     Is that somebody affiliated with Cheetah?

6             MS. PAWLAK:   Objection to form.

7             THE WITNESS:   That's the property owner.

8      Q.     (By Mr. Dudley)   Does Cheetah lease the

9      property from this person?

10     A.     Yes.

11     Q.     Cheetah has hired a valet company to park

12     the cars?

13            MS. PAWLAK:   Objection to form.

14            THE WITNESS:   The valet company pays us a

15     fee.   We subcontract the valet service out.

16     Q.     (By Mr. Dudley)   They pay Cheetah?

17     A.     Right.

18     Q.     Is that a fee based upon the number of

19     cars?

20     A.     No.

21     Q.     It is just a flat rate.

22     A.     Yes.

23     Q.     And then an entertainer pays the valet

24     company for the parking or do they pay Cheetah for the

25     parking?

1      A.      Because in the terms of our agreement with
2  the valet company they are -- they control all parking
3  on our premises for the amount that they pay us every
4  month.
5      Q.      Did you try to enter into a lease whereby
6  the entertainers would not have to pay for parking?
7      A.      No.
8      Q.      Do you pay for parking?
9      A.      Yes.
10     Q.      Could you have negotiated a deal where you
11 didn't have to pay for parking?
12             MS. PAWLAK:  Objection to form.
13             You are asking him to assume what the
14      valet company would have negotiated.
15             THE WITNESS:  I don't know.
16     Q.      (By Mr. Dudley)  I don't know what they
17 would have done.  You could, couldn't you?
18     A.      I guess if I wanted to renegotiate the
19 lease I could do anything I want.
20     Q.      Would you agree with the statement your
21 salary -- you are paid a salary, right?
22     A.      Yes.
23     Q.      Your salary is not reduced below the
24 minimum wage by paying a parking fee, okay?
25             MS. PAWLAK:  Objection to form.

1    Atlanta law about contact to overlap that.

2        Q.     Cheetah does not allow its entertainers to

3    chew gum on the floor, correct?

4        A.     Correct.

5        Q.     There is a business reason for that.  It

6    doesn't look good and it doesn't fit with Cheetah's

7    image, does it?

8        A.     Correct.

9        Q.     Same goes for drinks or cigarettes on the

10   floor, right?

11       A.     Yes, sir.

12       Q.     You don't want your dancers smoking while

13   they are on stage.  It is just not appropriate, is it?

14       A.     Right.

15       Q.     It doesn't fit Cheetah's image, does it?

16       A.     No.

17       Q.     Is there a reason why entertainers are not

18   permitted to drink straight shots of alcohol?

19       A.     Because if they do that, there is a good

20   chance they are going to get intoxicated and just be a

21   mess.

22       Q.     Cheetah has a policy where they allow

23   entertainers to drink; is that correct?

24       A.     Yes.

25       Q.     Does that policy exist because customers

1      Q.     And that's because the customer doesn't
2  want to hear about that kind of stuff, right?
3      A.     Right.
4      Q.     It is a good business decision to allow
5  the customer to come in and not hear about other
6  people's problems, right?
7      A.     Right.
8      Q.     If you violate that policy, you can be
9  subject to discipline which under the express terms of
10 your policy here says termination; is that correct?
11     A.     Yes.
12     Q.     Cheetah also has a policy they don't allow
13 entertainers to discuss club business or other
14 people's personal business with customers, correct?
15     A.     Right.
16     Q.     Cheetah has a policy where they don't like
17 entertainers to come in when they are not working,
18 right?
19     A.     Right.
20     Q.     Why is that?
21     A.     We just don't want people in there when
22 they are not working.
23     Q.     But is there a business reason for that,
24 though?
25     A.     Might be some confusion as to who is

1      Q.      Did you make any other changes to the
2  rules back in October, November of 2015?
3      A.      I am not sure.  I remember these
4  specifically.
5      Q.      Did you make any changes to the rules
6  after that period of time up until April the 9th,
7  2016?
8      A.      I don't recall for sure.
9      Q.      After April 9th, 2016, you created or
10  Cheetah created a new document; is that right?
11      A.      Yes.
12      Q.      Do you have a copy of that document?
13      A.      Not on me but yes.
14      Q.      You have it, Cheetah has one?
15      A.      Yes.
16      Q.      That they can produce to me.
17      A.      Yes.
18      Q.      They have a copy of the policy that was in
19  effect between November 2015 and April 2016, right?
20      A.      They should.
21      Q.      Are there any other written policies I
22  need to be aware of?
23      A.      Not that I know of.
24      Q.      If you would, turn to Bates Stamp No. 122
25  in Exhibit 1, I believe.  The one on top, Exhibit 2.

1    it, correct?

2         A.     No.

3                MS. PAWLAK:   Objection to form.

4         Q.     (By Mr. Dudley)   What does it say?

5         A.     It says that they understand the policies

6    which is this document.

7                MS. PAWLAK:   Referring to the Exhibit 1.

8                THE WITNESS:   Exhibit 1.

9         Q.     (By Mr. Dudley)   We are saying the same

10   thing.

11        A.     Well, you said the guidelines which leads

12   me to believe this.

13        Q.     What I am saying to you -- Mr. Braglia, I

14   am not trying to confuse you.   I am very familiar with

15   these documents.

16        A.     Okay.

17        Q.     I know this also existed with a prior set

18   of rules, the guidelines we have been going through.

19   It is a similar document that was used by Cheetah, did

20   they not?

21        A.     There was never a signed document to refer

22   to the guidelines.

23        Q.     Are you saying the guidelines are a

24   separate document than your contractor entertainer

25   policy?

1       Q.     (By Mr. Dudley)  Just yes or no.  Is this
2   the form that entertainers signed indicating that they
3   received the guidelines we just went over?
4                  MS. PAWLAK:  Objection to form.
5                  The form states --
6                  MR. DUDLEY:  Look, I appreciate --
7                  MS. PAWLAK:  But you are trying to
8            confuse --
9                  MR. DUDLEY:  We can go off the record if
10           you want to and talk.  I don't want my deposition
11           with your testimony.
12                 MS. PAWLAK:  You can ask the question
13           again.  But you are intentionally trying to --
14                 MR. DUDLEY:  No, I am not.
15                 MS. PAWLAK:  Yes, you are.
16                 MR. DUDLEY:  Absolutely not.
17                 MS. PAWLAK:  You were just referring to
18           the guidelines we just looked at when this
19           document clearly says The Dos and Don'ts for
20           Dancing, Guidelines for Entertainers at the
21           Cheetah Lounge.  And you have that document
22           attached to your Exhibit 1.
23                 So I think you are intentionally trying to
24           confuse the record.
25       Q.     (By Mr. Dudley)  Mr. Braglia, can you show

```
1              MS. PAWLAK:  I am going to object again.
2         You are misstating what this document
3    says.
4              Read the document, Jack.  The Dos and
5    Don'ts of Dancing.
6              THE WITNESS:  Right.
7              MS. PAWLAK:  Now look at the rest of the
8    exhibit.
9              THE WITNESS:  This refers to City of
10   Atlanta laws which is No. 2 and the Dos and
11   Don'ts of Dancing because No. 1, By signing this,
12   I acknowledge I received, read, and understand
13   the following documents.
14        Q.    (By Mr. Dudley)  How long has The Dos and
15   Don'ts of Dancing been around?
16        A.    In some form for a long time.  20 years,
17   30 years.
18        Q.    As you recall, there is no official
19   receipt form used for Exhibit 2, correct?
20        A.    No.  Because there was no -- it was never
21   given.
22        Q.    Is there any particular reason why it
23   needs to be returned to the housemoms' desk?
24        A.    Obviously because they didn't want me to
25   see it.  That's all I can guess.
```

1    Q.      And you understand that Cheetah maintains

2  no records of VIP transactions, correct?

3    A.      Correct.

4    Q.      And you have never included VIP room

5  charges in Cheetah's gross receipts, correct?

6    A.      Correct.

7    Q.      Now, can you please tell me how you are

8  claiming a service charge in this case given those

9  factors.

10           MS. PAWLAK:  Objection to form.

11   Q.      (By Mr. Dudley)  In good faith.

12           MS. PAWLAK:  Objection to form.

13           THE WITNESS:  I believe it because we set

14      the price for them.

15   Q.      (By Mr. Dudley)  And I don't want you to

16  reveal any advice an attorney has given you.  But have

17  you received advice from an attorney about whether

18  service fees are -- or VIP fees are, in fact, service

19  fees under the FLSA given your situation?

20           MS. PAWLAK:  Objection to form.

21           THE WITNESS:  No.

22   Q.      (By Mr. Dudley)  That is despite the fact

23  that you have had numerous attorneys represent Cheetah

24  at least since 2013, correct?

25           MS. PAWLAK:  Objection to form.

1       A.      Not that I know of.

2       Q.      I am going to ask you the same thing about

3   the table dance.  Are you contending that the table

4   dance is a service fee under the FLSA?

5       A.      Yes.

6       Q.      What is the basis for that contention?

7       A.      That we set the price.

8       Q.      Again, you would acknowledge the table

9   dance is paid directly by the customer to the

10  entertainer, correct?

11      A.      Correct.

12      Q.      You would agree that your own rules state

13  the table fees belong to the entertainers, right?

14      A.      Right.

15      Q.      You would agree that table dance fees paid

16  to entertainers are never included in Cheetah's gross

17  receipts, correct?

18      A.      Correct.

19      Q.      You would agree you have absolutely no

20  records of table dances ever done by any entertainer

21  at Cheetah, correct?

22      A.      Correct.

23      Q.      Your good-faith basis for asserting a

24  service defense in this case, service charge defense

25  is that Cheetah set the rate, therefore it is a

1        Q.      Back between '93 and 2001, table dances

2    were included in Cheetah's gross receipts?

3        A.      Yes.

4        Q.      Tell me how that worked.

5        A.      Everyone kept track of the girls' table

6    dance, the DJs, housemoms and the floormen.

7        Q.      Why did Cheetah keep track of that then?

8        A.      Because we were utilizing that, as an

9    employee, taking the table dance revenue.

10       Q.      Would you say that you were familiar with

11   the service charge provisions of the FLSA as far back

12   as 1993?

13       A.      Explain that.

14               MR. DUDLEY:  It is a question.

15               (The record was read by the reporter.)

16               THE WITNESS:  I don't know.

17       Q.      (By Mr. Dudley)  Let me ask it another

18   way.  You treated table dances as service charges

19   between '93 and 2001 and you included them in gross

20   receipts and you distributed them to the employee,

21   right?

22       A.      Yes.

23       Q.      And you kept records of it.

24       A.      Yes.

25       Q.      For some reason in 2001 you decided not to

```
1        A.      No.
2        Q.      Just to be clear, since 2001 dancers have
3   always kept the table dances, right, the fees from
4   table dancing, right?
5        A.      Yes.
6        Q.      Is that the same with VIP fees?
7        A.      Yes.
8        Q.      And now after April 9th, 2016, are you
9   treating VIP fees as a service charge?
10       A.      Yes.
11       Q.      And is Cheetah crediting itself for that?
12       A.      No.
13       Q.      Are they included in gross receipts?
14       A.      No.
15       Q.      In other words, nothing has changed?
16       A.      Correct.
17       Q.      With respect to the VIP.
18       A.      Correct.
19       Q.      Would you agree that at any given time you
20  try to have 16 girls dancing on stage?
21       A.      It is 12 now.
22       Q.      12 now.  Why has that changed?
23       A.      Less stages.
24       Q.      Dancer permits in Atlanta are club
25  specific?
```

1      Q.      Many entertainers as far as you know are

2  dependent on Cheetah for their livelihood as far as

3  you know.

4      A.      As far as I know.

5      Q.      Now, in October 2011 Cheetah started

6  implementing the contractor entertainer policy and

7  arbitration agreements; is that correct?

8      A.      Yes.

9      Q.      And that was a result of the Clincy versus

10  Onyx decision, was it not?

11      A.      It was a recommendation by our attorney.

12      Q.      You may not want to tell me what your

13  attorney told you unless you are waiving that.  Are

14  you waiving it?

15              MS. PAWLAK:   No, he is not waiving that.

16              THE WITNESS:   No.

17      Q.      (By Mr. Dudley)   You understood in the

18  Clincy decision that Judge Story here in the Northern

19  District of Georgia had determined that entertainers

20  at the Onyx were employees rather than independent

21  contractors under the FLSA.

22      A.      Yes.

23      Q.      You testified to that in your prior

24  deposition.

25      A.      Yeah.

```
 1         Q.      You knew from the Clincy decision that a
 2  federal judge in the Northern District of Georgia had
 3  determined exactly the opposite of that in a similar
 4  case, had he not?
 5                  MS. PAWLAK:  Objection to form.
 6                  THE WITNESS:  Yes.
 7         Q.      (By Mr. Dudley)  Instead of classifying
 8  the girls as employees which you eventually did and
 9  you had done before, you decided your resources or
10  Cheetah's resources would be better spent fighting it
11  rather than conforming, correct?
12                  MS. PAWLAK:  Objection to form.
13                  I don't think that's a proper
14        characterization.
15         Q.      (By Mr. Dudley)  Is that true?
16         A.      Yes.
17         Q.      And do you remember Tiffany Bromirski?
18         A.      Yes.
19         Q.      You remember that Harlan Miller and I
20  represented her; is that correct?
21         A.      Yes.
22         Q.      You remember her filing a case back in
23  2013 in the U.S. District Court that was also in front
24  of Judge Ross, correct?
25         A.      Yes.
```

1        A.      That sounds about right.

2        Q.      One of the ones we tried was a young lady

3    named Brittani Cassell, wasn't it?

4        A.      Yes.

5        Q.      One was a Jessica Cuesta.

6        A.      Yes.

7        Q.      And one Tiffany Bromirski.

8        A.      Yes.

9        Q.      And in late 2015 Ms. Cassell prevailed on

10   the motion for summary judgment on the issue of

11   whether Cheetah's entertainers were employees or

12   independent contractors, correct?

13       A.      Correct.

14       Q.      And during that motion we also were

15   granted summary judgment on the issue of whether

16   Cheetah acted in good faith; is that right?

17       A.      I believe so.

18       Q.      And we were granted summary judgment on

19   the issue of whether Cheetah acted willfully; is that

20   correct?

21       A.      Yes.

22       Q.      And we were granted summary judgment on

23   the issue of whether these VIP fees and tableside

24   dances were service charges, correct?

25       A.      Yes.

```
1                  THE WITNESS:  I don't remember for sure.
2          Q.     (By Mr. Dudley)  You remember that -- you
3   know for a fact that Cheetah's VIP fees and dance fees
4   have never been included in the gross receipts.  You
5   know that?
6          A.     Yes.  I know that.
7          Q.     You know that's what the arbitrator said,
8   correct?
9          A.     I don't remember what the arbitrator said.
10  I remember the first things you said.
11         Q.     Well, your attorneys -- you are certainly
12  aware of the order; is that not true?
13         A.     Penn Payne?
14                (Plaintiff's Exhibit 4 was marked for
15         identification.)
16         Q.     (By Mr. Dudley)  Yes.  You know exactly
17  what I am talking about.  I will show it to you.
18                Do you recognize Exhibit 4?
19         A.     Yes.
20         Q.     You have read this order before?
21         A.     Yeah.  A long time ago.
22         Q.     After this order was entered, we then had
23  a hearing on damages; is that correct?
24         A.     I believe we did.
25         Q.     Do you recall that hearing Penn Payne
```

```
 1    correct?
 2         A.      Yep.
 3         Q.      And you testified in that case, correct?
 4         A.      I did.
 5         Q.      And you were aware that Mr. Grubbs
 6    determined that Cheetah entertainers were also
 7    employees under the FLSA, correct?
 8         A.      Correct.
 9         Q.      And Mr. Grubbs also determined that
10    Cheetah acted willfully and without good faith; is
11    that correct?
12         A.      Correct.
13         Q.      And Mr. Grubbs also determined that
14    Cheetah's service charge defense was not valid,
15    correct?
16         A.      Correct.
17         Q.      And he also found the tipout to the DJs,
18    the housemom, the floormen were required by Cheetah;
19    is that correct?
20         A.      Correct.
21         Q.      And that partial final award was never
22    appealed, correct?
23         A.      Correct.
24         Q.      Now, I know you disagreed with the
25    arbitrator's -- well, let me ask you, do you disagree
```

1    violated the FLSA?

2         A.    I do not.

3         Q.    You also feel like it is the fault of the

4    attorneys, too, don't you?

5         A.    It is what?

6         Q.    All of this is about I think you called it

7    ambulance-chasing attorneys.

8         A.    Absolutely.

9         Q.    The judges are wrong, the lawyers are

10   ambulance chasers.  That's the real problem here, is

11   it not?

12             MS. PAWLAK:  Objection to form.

13             What is the problem?

14             THE WITNESS:  Not a single entertainer has

15        come forth with an FLSA complaint in all the time

16        I have been there and all of a sudden they start

17        getting letters promising them free money.  I

18        have a real problem with that.

19        Q.    (By Mr. Dudley)  You are not insinuating I

20   sent out any letter to anyone, are you?

21        A.    Not at all.

22        Q.    Regardless of whether you believed these

23   decisions were correct or not, shortly after these

24   decisions, Cheetah began treating all employees as --

25   I mean all entertainers as employees, correct?

```
 1          Q.      Was there a reason why you didn't tell
 2    them that?
 3          A.      No.
 4          Q.      Do you think that's a bit deceptive to
 5    them?
 6          A.      No.
 7          Q.      You don't think it is deceptive to present
 8    an agreement to them saying they were an independent
 9    contractor when you just read that a judge said they
10    are not, they are similar dancers or not?
11          A.      Well, they were independent contractors
12    for ten years before that.  He didn't change anything.
13          Q.      Could you understand how an entertainer
14    may be misled by that?
15                  MS. PAWLAK:  Objection to form.
16                  What is the "that" in your question?  I'm
17          sorry.
18          Q.      (By Mr. Dudley)  Misled by you telling
19    them that they are independent contractors.
20          A.      No.
21          Q.      They don't know whether they are
22    independent contractors or employees, do they?
23          A.      They know they are independent
24    contractors.  They flaunt it.
25          Q.      As far as you know, they don't know
```

```
 1    affirmative defense that they acted in good faith?
 2              MS. PAWLAK:  Objection to form.
 3              I think that is more appropriately
 4         answered by a Cheetah representative.
 5         Q.    (By Mr. Dudley)  What is your
 6    understanding of the factual basis of Cheetah's
 7    affirmative defense it acted in good faith?
 8              MS. PAWLAK:  Objection.
 9              THE WITNESS:  What does that mean?
10         Q.    (By Mr. Dudley)  Are you claiming that
11    Cheetah is acting in good faith?
12              MS. PAWLAK:  Is he claiming or is
13         Cheetah --
14              MR. DUDLEY:  We are playing games here.
15              MS. PAWLAK:  It is not a game.  He is here
16         individually.
17              MR. DUDLEY:  I understand he is not a
18         corporate representative.  I don't know how many
19         times we have to talk about that.
20              MS. PAWLAK:  Perhaps save the questions
21         for the affirmative defenses on the corporate
22         representative.
23              MR. DUDLEY:  Are you instructing him not
24         to answer?
25              MS. PAWLAK:  I am not.  If you are asking
```

1        Q.      (By Mr. Dudley)   Do you have a factual

2   basis for that?

3               MS. PAWLAK:   Objection.

4               Asked and answered.

5               THE WITNESS:   No.  I don't know if I have

6         a factual basis for that.

7        Q.      (By Mr. Dudley)   Have you read

8   Judge Story's order?

9        A.      No.

10       Q.      Do you understand that it specifically

11  dealt with that issue?

12       A.      Not specifically, no.  I haven't read it.

13       Q.      You did go over that decision with

14  counsel, did you not?

15              MS. PAWLAK:   Objection to form.

16              Do not answer that question.  You do not

17        need to talk about what you discussed with your

18        attorneys.

19              MR. DUDLEY:   I will come back to that.   I

20        disagree with you.

21       Q.      (By Mr. Dudley)   But dancer choice is one

22  factual basis and the other factual basis is industry

23  custom?

24       A.      Yes.

25       Q.      That's not even Cheetah's custom anymore,

1        Q.     Are you relying on advice of counsel as

2    far as a good faith defense?

3        A.     No.

4        Q.     I have asked for a privilege log in this

5    case under Rule 26 which I contend I am entitled to.

6    It is my contention if you don't give one that you

7    waive your right to the attorney-client privilege.   I

8    have authority for that.

9               But for purposes of today, have you spoken

10   with counsel about the legality -- don't tell me what

11   they said -- but have you spoken with counsel about

12   the legality of classifying dancers as employees,

13   making them pay tipouts and fees to the club?  Have

14   you sought legal advice about those two matters?

15       A.     No.

16       Q.     Are you sure about that?

17       A.     As far as I can recall.

18       Q.     Do you remember the privilege log that the

19   arbitrator ordered you to produce?

20       A.     No.

21       Q.     Or ordered Cheetah to produce?

22       A.     No.

23       Q.     Did you speak to Ed Mangiafico on

24   September 20th, 2011 -- excuse me.  Did you receive an

25   e-mail from Ed Mangiafico on 9/20/2011 about the

```
1        Q.      About, again, tipping policy?
2        A.      I remember something to do with the tip
3    pool for employees, for waitresses and bartenders.
4        Q.      Do you intend on producing these documents
5    to me?
6                MS. PAWLAK:  No.  I don't believe so.
7        Q.      (By Mr. Dudley)  Is it your contention
8    that Cheetah's state of mind and yours in particular
9    since you are responsible for these matters, that that
10   is not an issue in the case?
11       A.      I don't know.
12       Q.      You are not contending any girl here
13   falsely reported her hours, are you?
14       A.      Say that again.
15       Q.      You are not contending any entertainer
16   here falsely reported her hours to Cheetah, are you?
17       A.      In what way?
18       Q.      Simple.  Are you contending that any of
19   the claimants I represent are --
20       A.      That they are falsely reporting their
21   hours?
22                MS. PAWLAK:  I am sorry.  Objection to
23           form.
24                Falsely reporting to whom?
25       Q.      (By Mr. Dudley)  Mr. Braglia, you
```

1    anything?

2         Q.     Can you tell me the factual basis of the

3    counterclaims.

4                MS. PAWLAK:  Objection to form.

5                They are not his counterclaims.  They are

6         Cheetah's counterclaims.

7         Q.     (By Mr. Dudley)  Can you tell me the

8    factual basis of Cheetah's counterclaims?

9         A.     That the girls worked as independent

10   contractors and then they made all this money and then

11   they are saying no, we are minimum wage employees, we

12   should be receiving minimum wage.

13        Q.     I am confused here.

14        A.     They are double dipping.

15        Q.     So explain to me how they are double

16   dipping.

17        A.     Well, if you want to be paid as a minimum

18   wage employee, be paid as a minimum wage employee.  If

19   you want to make money from table dances and VIPs as

20   an independent contractor, that's fine, too.

21        Q.     Isn't that exactly what is going on now at

22   Cheetah?

23        A.     Yeah.  That's what we have chosen to do

24   now at Cheetah.

25        Q.     You understand my clients have brought

1       Q.      And Cheetah at any time could have

2   included it in gross receipts, right, tableside

3   dances, right?

4       A.      Yes.

5       Q.      They have chosen not to do that starting

6   in April of 2016 when they decided to treat them as

7   employees, correct?

8       A.      Correct.

9       Q.      Now, is there a document or is there some

10  representation?  Where do you get it from that any

11  Cheetah dancer agreed to reimburse Cheetah any money

12  if they were employees under the FLSA?

13      A.      There is no document.

14      Q.      And is that what you are contending?

15      A.      Yes.

16      Q.      You are contending there is a document,

17  there is a basis for that?

18      A.      No.

19              MS. PAWLAK:  He said there is no document.

20      There is a basis as just described by him.

21      Q.      (By Mr. Dudley)  Are you claiming that

22  everything they were paid they have to pay back or

23  just what you consider to be service charges?

24      A.      Service charges.

25      Q.      I think we already established that the

```
 1          A.     Yes.
 2          Q.     You are aware that they are claiming they
 3   had to make certain payments to Cheetah and others
 4   that reduced their pay below the minimum wage,
 5   correct?
 6          A.     Yes.
 7          Q.     You are aware that they are claiming they
 8   are misclassified as independent contractors when they
 9   were really employees under the FLSA, correct?
10          A.     State that last part.
11          Q.     That they were misclassified as
12   independent contractors when they were really
13   employees under the FLSA.  That's their claim.  You
14   disagree with it, but that's their claim.
15          A.     That's correct.  Yes.
16          Q.     They are obviously asking for relief under
17   the FLSA, right?
18          A.     Right.
19          Q.     In response to their request for relief
20   under the FLSA, Cheetah has sued them, right?
21               MS. PAWLAK:  Objection to form.
22               THE WITNESS:  Yeah.  If that's what the
23          counterclaim is.  Yes.
24          Q.     (By Mr. Dudley)  What Cheetah is alleging
25   is that if these entertainers are employees under the
```

1   covered by FLSA, you owe us money, right?

2                   MS. PAWLAK:   Objection to form.

3                   Is it your contention that a compulsory

4          counterclaim is retaliation under the FLSA?   Is

5          that what you are asking?

6                   MR. DUDLEY:   You bet.

7          Q.     (By Mr. Dudley)   Do you understand that

8    under the FLSA -- do you understand that for a claim

9    for retaliation, you can get emotional distress

10   damages?  Do you understand that?

11         A.     No, I didn't know that.

12         Q.     Do you understand you can get liquidated

13   damages?

14         A.     I didn't know that.

15         Q.     Do you understand you can get an

16   injunction against retaliatory action?

17         A.     I didn't know that.

18         Q.     Do you understand that Sophia Smith is

19   accusing Cheetah of retaliating against her?

20         A.     I am not aware of that.

21         Q.     Do you have any records to prove any

22   damages you would have for service charges?

23         A.     No.

24         Q.     It would be speculative for you to try to

25   come up with that figure because you have no records

```
 1        A.      No.
 2        Q.      What does Cheetah do that affects their
 3   profits and losses?  I know that's a broad question.
 4   But I am sure you do concentrate on trying to make the
 5   place profitable.  What are things that Cheetah can do
 6   to make it more profitable?
 7        A.      Controlling liquor costs, food costs,
 8   labor costs, repairs, maintenance, advertising.
 9        Q.      Do entertainers have any say-so in those
10   matters?
11        A.      No.
12        Q.      Cheetah pays all the costs of operating
13   the club, correct?
14        A.      Yes.
15        Q.      And that includes rent, all the overhead.
16   What other types of things?
17        A.      Utilities.  Advertising.  Inventory.
18   Licensing.
19        Q.      Is Cheetah's monthly expenditures, is it
20   over 200,000 a month?
21        A.      Yes.
22        Q.      Do the entertainers have any say-so on how
23   that money is spent?
24        A.      No.
25        Q.      Typical entertainer brings her clothes to
```

1       A.      Yes.

2       Q.      I want to ask you some questions about

3   recordkeeping before 4/9/17.

4               What is the best source of determining the

5   number of hours an entertainer worked at Cheetah?

6       A.      The timesheets.

7       Q.      Tell me exactly what the timesheets are.

8       A.      Timesheets, an Excel sheet.  That's

9   produced from the handwritten sign-in, sign-out sheets

10  that the housemoms then transfer to an Excel sheet on

11  a daily basis.

12      Q.      Excel sheets, is that a weekly or daily

13  thing?

14      A.      It is done daily.  And then at the end of

15  the week, it is e-mailed to me and a hard copy goes in

16  a binder.

17      Q.      Is the weekly form different than the

18  daily Excel form?

19      A.      Well, the daily form is -- they continue

20  adding onto it to create a week.

21      Q.      Same document?

22      A.      Yeah.

23      Q.      So you have a handwritten sheet that the

24  housemom uses.

25      A.      Daily.

1    correct?

2          A.      Right.

3          Q.      Same goes for VIP fees paid by dancers,

4    correct?

5          A.      Yes.

6          Q.      Same thing, there are no documents showing

7    that any tableside dance fees or VIP room dance fees

8    were included in gross receipts, correct?

9          A.      Yes.

10         Q.      There are no documents showing what fines

11   are, correct?

12         A.      Correct.

13         Q.      Other than the time-in sheets, there is no

14   documents showing what fines were other than the

15   time-in sheets, right?

16         A.      The time-in sheet doesn't show a fine.

17   Just based on the time they arrived you could

18   extrapolate that.

19         Q.      It shows their time of arrival.

20                 No document showing the tipouts to DJs,

21   housemom, floormen, parking, bathroom attendant,

22   anyone else on the premises, correct?

23         A.      Yes, sir.

24         Q.      Any documents showing referral fees paid

25   to floormen?

1      Q.      There are no records of Cheetah Buck
2  transactions.
3      A.      Correct.
4      Q.      Does Cheetah not keep credit card
5  receipts?
6      A.      You can only keep them for a short time
7  because of the credit fraud laws.
8      Q.      As far as damages go, let me ask you about
9  hourly wages.  Is it your contention that these
10 entertainers are owed seven twenty-five an hour for
11 each hour they worked?
12             MS. PAWLAK:  Objection to form.
13             Is it his contention?  It is your clients'
14       contention.
15             MR. DUDLEY:  And also yours.
16             MS. PAWLAK:  He is not contending that.
17             MR. DUDLEY:  Can I ask the witness a
18       question?  If you have an objection --
19             MS. PAWLAK:  I am objecting.  It is a
20       confusingly worded question.  Does he agree with
21       your clients' contentions?  He is not making
22       contentions in the case.  He is not a party in
23       the case.
24             MR. DUDLEY:  Can you please read the
25       question back.

1    other places, right?

2         A.     Yes.

3         Q.     Some of them do it at work, some of them

4    don't do it at work, right?

5         A.     Right.

6         Q.     Some of them do part of it at work, some

7    do part of it at home.

8         A.     Right.

9         Q.     The things they do to get ready for work,

10   they do their hair, put on makeup, do their nails, do

11   their toenails, shave, tan.   Those are the sorts of

12   things that Cheetah dancers typically do to get ready

13   for work, right?

14              MS. PAWLAK:   Objection to form.

15              THE WITNESS:   Yes.

16        Q.     (By Mr. Dudley)   And the reason why they

17   do that is because Cheetah wants them to look nice at

18   work, correct?

19              MS. PAWLAK:   Objection to form.   You are

20         asking him to speculate about the reason they do

21         that.   They may do it to look nice on a

22         day-to-day basis.

23              MR. DUDLEY:   I would really appreciate it

24         if you would respect the rule here and make your

25         objection and do not testify about the problem

1      Q.      Would you agree that some women take a
2   very long time to get ready, some do it quicker than
3   others?   Would you agree with that statement?
4      A.      Yes.
5      Q.      But you don't have any personal knowledge
6   or any opinion as to how long it would take to get
7   ready for work for a typical entertainer.
8      A.      No.   Some of them looks like it takes them
9   five minutes or less.
10      Q.      You probably wouldn't like the ones that
11   look like it took five minutes, would you?
12      A.      We don't like them.   But we have them.
13   More than I would like to say.
14      Q.      Try not to have them, right?
15      A.      We try not to have them.
16      Q.      Encourage them not to look that way,
17   correct?
18      A.      Correct.
19      Q.      Would you agree there are no records kept
20   by Cheetah for the amount of time it takes an
21   entertainer to get ready for work?
22      A.      No.   I disagree with that.
23      Q.      You think that Cheetah has records of
24   that?
25      A.      Yes.

1    Q.    Who at Cheetah made the decision to file
2  these counterclaims?
3    A.    I did.
4    Q.    Did the terms and conditions of any
5  entertainer's work change from the time -- from
6  October of 2015 until April 9th, 2016, other than what
7  you testified about the housemom fees, DJ fees, and
8  floormen fees that you took out of the handbook?
9    A.    Right.
10   Q.    Did the dancers' work conditions at all
11  change during that period of time other than that?
12   A.    Not that I recall.
13   Q.    Now, up until very recently you have
14  contended or Cheetah has contended that entertainers
15  were subject to arbitration policies and FLSA disputes
16  were required to be arbitrated; is that correct?
17   A.    Yes.
18   Q.    This is a position that Cheetah has taken
19  repeatedly in legal topics, correct?
20   A.    Yes.
21   Q.    It is my understanding that in the last
22  week or two that Cheetah has unilaterally decided to
23  cancel their arbitration policy; is that true?
24   A.    Yes.
25   Q.    Can you tell me what arbitration policies

1   unilateral change in that arbitration policy other

2   than continued employment?

3        A.     I don't understand.

4               MS. PAWLAK:  Objection to form.

5        Q.     (By Mr. Dudley)  Is it Cheetah's position

6   now that entertainers are not allowed to arbitrate

7   their disputes any longer?

8        A.     Yes.

9        Q.     That you contend is the case even if they

10  don't work for Cheetah any longer?

11       A.     Yes.

12       Q.     Do you have some authority for how you

13  were able to unilaterally do that?

14              MS. PAWLAK:  Objection to form.

15              You are very specifically asking him for a

16        legal conclusion.

17              MR. FUCHS:  Seriously.

18              MR. DUDLEY:  I am asking about his

19        understanding.

20              MS. PAWLAK:  You asked him for authority.

21        You didn't ask for his understanding.

22              MR. DUDLEY:  That's my understanding of

23        how that is authorized.  It is certainly an

24        appropriate question.

25              MS. PAWLAK:  That wasn't the question,

1   arbitrations?  Do you understand that?

2       A.      No.

3               MS. PAWLAK:  Objection to form.

4       Q.      (By Mr. Dudley)  You didn't understand

5   that?

6       A.      I don't understand what tolling is.

7               MS. PAWLAK:  Same objection.

8       Q.      (By Mr. Dudley)  Do you understand that I

9   offered not to sue you and Cheetah if Cheetah would

10  enter into a tolling agreement?

11      A.      I am not clear on that.  I don't remember.

12      Q.      Well, I will explain it to you.  A tolling

13  agreement is something that allows the statute of

14  limitations to stop.  In exchange for the statute of

15  limitations stopping, I was willing to forego filing

16  of arbitration demands so Cheetah would not have to

17  pay arbitration fees and the huge cost of arbitration.

18  Do you understand that?

19              MR. WARD:  Are you going to be a witness

20          in this case?

21              MR. DUDLEY:  Attorneys' fees are an issue

22          here.  I tried to avoid them.  They are certainly

23          an issue.

24              MR. WARD:  I know.  Let's pause for a

25          moment.  I am not making an objection.  I want to

1      appropriate area of inquiry, whether we spend

2      money.  I am asking to be reimbursed for certain

3      items.  I am asking to be paid attorneys' fees.

4      These items are all at issue in this case and the

5      reasonableness of those fees are at issue.

6      Frankly, I think these were unreasonable costs

7      that didn't need to be incurred.  I am going to

8      ask him about that.

9              MR. WARD:  If you are going to ask the

10     question in the form you have asked it, then you

11     have to add and by the way --

12             MR. DUDLEY:  I will withdraw the question.

13     It is not that important, really.

14     Q.     (By Mr. Dudley)  Do y'all intend on giving

15     me a privilege log?

16             MR. WARD:  We can talk about that.

17             MR. FUCHS:  Is that a question to the

18     witness?

19             MR. WARD:  We can talk about that, you

20     know.  We aren't here for a 30(b)(6).

21             MR. DUDLEY:  I have served discovery.

22             MS. PAWLAK:  We can discuss that following

23     the deposition.

24             MR. FUCHS:  Why don't you finish your

25     examination of the witness.

```
1         Q.      (By Mr. Dudley)   When did that practice
2    start?
3         A.      I don't exactly know.
4         Q.      When did you find out about it?
5         A.      When the Valente lawsuit was filed.
6         Q.      Prior to the filing of the Valente lawsuit
7    you knew nothing about this referral practice.
8         A.      No.
9         Q.      How did you find out about it?
10        A.      It is in the Valente lawsuit.
11        Q.      From the pleadings is how you found out
12   about it?
13        A.      Yes.
14        Q.      After you read the pleadings, did you talk
15   to the floormen?
16        A.      Yes.
17        Q.      What did they say?
18        A.      They said there is no -- some girls will
19   give them, throw them a few bucks if they hook them up
20   with a customer.  But a lot of girls don't.  Some do,
21   some don't.  It is arbitrary.  It is (indicating).  I
22   equate it to tipping a maître d' at a restaurant to
23   get a better table.
24        Q.      What floorman told you that's how it
25   worked?
```

```
1        A.      Yes.
2        Q.      Has he given a deposition about that
3   matter?
4        A.      I don't know.
5        Q.      Mark Holcomb is another floorman?
6        A.      Yes.
7        Q.      What did he tell you?
8        A.      Same thing.  That some girls will tip a
9   few bucks to get referred with a customer for a VIP.
10       Q.      What are the few bucks in your mind?
11       A.      It could be any amount.
12       Q.      What percentage did they tell you was
13  involved?
14       A.      He said some girls -- what he said was,
15  you know, the girls -- the girls are the ones that
16  initiated this, saying, hey, if you have a customer I
17  could really use -- I really need to make money
18  tonight.
19              And then whenever it started, the girl
20  would say, oh, you know, here's a couple of bucks.
21              If any girls ever asked about it, just say
22  whatever you are comfortable with.  There was never
23  any percentage stated.
24       Q.      Do you believe that this was something the
25  girls concocted or do you think maybe the floormen
```

```
 1          Q.      So they continue to do it to this day?
 2          A.      Oh, no.   After the lawsuit, I put up a
 3   notice that, you know, that entertainers are not
 4   allowed to tip out anyone for a VIP referral.
 5          Q.      In the lawsuit, you are referring to which
 6   one?
 7          A.      Valente.
 8          Q.      Which Valente?
 9          A.      Title VII.
10          Q.      Are you sure it wasn't RICO or was it
11   both?
12          A.      I don't know.
13          Q.      Have you talked to entertainers about this
14   practice?
15          A.      Yes.
16          Q.      And who did you talk to?
17          A.      Just generally.
18          Q.      Who did you talk to?
19          A.      Groups of entertainers when they were -- I
20   posted it up in the dressing room.   I told them and
21   told the housemoms to tell them.
22          Q.      Who did you talk to?
23          A.      I don't remember who I talked to
24   specifically.
25          Q.      You don't remember a single entertainer
```

```
1              THE WITNESS:   The entertainers don't have
2       to do that.   Some choose to, some don't.
3       Q.     (By Mr. Dudley)   Was there a range of
4  numbers that were given to you about what the
5  percentage was that some girls paid?
6       A.     I think in the lawsuit it said 10 to 20
7  percent.   Specifically the 20 percent club.
8       Q.     And can you give me a day as close as you
9  can as to when you directed that this practice stop?
10      A.     I couldn't say for sure.
11      Q.     Are we talking about this year, last year?
12      A.     I mean, the days turn into weeks turn into
13 months.   I mean, I can't believe how long this has
14 been dragging on for.
15      Q.     Are there any records of those
16 transactions?
17             MS. PAWLAK:   Which transactions?   Object
18      to form.
19      Q.     (By Mr. Dudley)   I think you know what I
20 am talking about, don't you?
21      A.     The referral?
22      Q.     The referral fees that we have been
23 talking about for the last five or ten minutes.
24      A.     No.   You asked me that already.   I said
25 there wasn't any records.
```

1        Q.      If they paid a 20 percent referral fee,
2   that adds up, too, doesn't it?
3        A.      They weren't paying 20 percent referral
4   fee.  Some girls say they were but...
5        Q.      At an hourly rate, that ends up being a
6   good bit of money, doesn't it?
7        A.      If you say so.
8        Q.      It may not be good money to you.  But I
9   mean, they charged $300 an hour, right?
10               MS. PAWLAK:  Objection to form.
11          Argumentative.
12          Q.      (By Mr. Dudley)  You would agree that the
13   floormen, the housemom, DJ all benefit from
14   entertainers tipping them, correct?
15          A.      Yes.
16          Q.      Has Cheetah ever used a tip credit policy
17   other than the period 1993 to 2001 and April the 9th,
18   2016, through the present?
19          A.      For the entertainers?
20          Q.      Yes.
21          A.      No.
22          Q.      You are not raising a tip credit defense
23   in this case or Cheetah is not raising a tip credit
24   defense in this case, are they?
25               MS. PAWLAK:  That was asked earlier.

```
 1              That mischaracterizes his testimony
 2       greatly.
 3       Q.    (By Mr. Dudley)  Is that right?
 4       A.    I used those fees to give them back to the
 5  girls.
 6       Q.    I understand.  But they were paid to you,
 7  correct?
 8       A.    Yes.
 9              MR. DUDLEY:  Are y'all contesting that?
10              THE COURT REPORTER:  I am sorry.  I didn't
11       understand that.
12              MR. FUCHS:  Why don't you ask the witness
13       a question.
14              MR. DUDLEY:  I am trying to avoid getting
15       into --
16              MR. WARD:  What was the question?
17              MR. DUDLEY:  Is there an issue of
18       enterprise coverage.
19              MR. WARD:  You have to ask the witness.
20              MR. DUDLEY:  In lieu of answering that, I
21       will just serve a -- as a matter of fact, I
22       already have.  I would ask you to produce your
23       financial statements and your tax returns at your
24       earliest convenience.  I also already asked you
25       to produce that and I haven't gotten it.
```

1    any given time prior to April 4th, 2016; is that
2    correct?
3         A.    16th, 60 employees, yes.
4         Q.    60?
5         A.    Six-oh.
6         Q.    Since entertainers have been classified as
7    employees you have over 200, roughly?
8         A.    Yes.
9         Q.    That stayed consistent over that same time
10   period?
11        A.    Pretty much.
12        Q.    You buy, you serve name brand alcohol at
13   your club.
14        A.    Yes.
15        Q.    What sort of brands do you sell?
16        A.    Maker's Mark.  Ketel.  Crown Royal.
17   Stoli.  Grey Goose.  Hennessy.
18        Q.    Those don't come from Georgia, do they?
19        A.    From Georgia?
20        Q.    Yeah.
21        A.    I don't know which ones come from Georgia.
22        Q.    You don't know whether Stoli is made in
23   Georgia?
24        A.    No.  That's from Russia, I believe.
25        Q.    What about Maker's Mark?  That is made in

```
 1        A.      Yeah.   I would assume so.
 2        Q.      Do you process credit cards from
 3   out-of-state customers?
 4        A.      Yes.
 5        Q.      Out-of-state vendors?
 6        A.      Out-of-state vendors.
 7        Q.      Some of the credit card companies are out
 8   of state, are they not?
 9        A.      I guess.
10        Q.      Your customers come from out of state,
11   some of them.
12        A.      Yes.
13        Q.      A lot of them come from conventions, that
14   sort of thing.
15        A.      Not so much anymore.
16        Q.      That is an area that Cheetah attempts to
17   market.
18        A.      Yeah.  The convention business in Atlanta
19   has pretty much dried up.
20        Q.      They market sporting events that occur in
21   Atlanta.
22        A.      Yes.
23        Q.      A lot of times those events are things
24   that customers from other states come to.
25        A.      Yes.
```

```
1        Q.      Anybody else file any to your knowledge?
2        A.      Yes.   But I think they were all
3   incorporated into yours now.
4        Q.      Do you remember dealing with any attorneys
5   other than Harlan Miller and myself?
6        A.      I can't think of his name.
7        Q.      Charles Bridgers?
8        A.      No.   Bernie.
9        Q.      Chris Burner [phonetic].
10               MR. WARD:   And Nutter.
11               MR. DUDLEY:   Nutter was the arbitrator.
12               THE WITNESS:   Then Chapman, your partner.
13       Q.      (By Mr. Dudley)  He is not my partner.
14       A.      There was one other one.   There was one
15   girl.
16       Q.      Was that with the Caldwell Bridgers law
17   firm?
18       A.      Doesn't sound familiar.
19       Q.      Do you recall how many there were
20   altogether?
21       A.      Including yours or in the past?
22       Q.      Including mine.
23       A.      I don't know.
24       Q.      My calculations are around 140 that I was
25   involved in.
```

1      Q.      That would include the DJ, housemom,

2   floormen?

3      A.      No.

4      Q.      Are you aware of other managers,

5   housemoms, other persons at The Cheetah who has

6   disciplined entertainers because they failed to tip

7   out what a floorman, housemom, DJ felt was sufficient?

8      A.      No.

9      Q.      Are you telling me that that has not

10  happened?

11     A.      Not to my knowledge.

12     Q.      If I had an entertainer that says she was

13  terminated for not tipping out appropriately, she

14  would not be telling the truth to your knowledge?

15     A.      Correct.

16     Q.      The housemoms and the club keep records of

17  disciplinary action, do they not?

18     A.      Yes.

19     Q.      And I have been given pieces of logs that

20  were kept by a housemom.  I am assuming that there are

21  entire logs dealing with the class period of this

22  lawsuit; is that not correct?

23     A.      With what?

24     Q.      Well, disciplinary logs.

25     A.      Yes.

```
 1        A.      Yes.
 2        Q.      On that form it asks the dancer to
 3   indicate what schedule she can work, right?
 4        A.      Right.
 5        Q.      They fill in the dates they can work,
 6   correct?
 7        A.      Correct.
 8        Q.      They are expected to work those dates,
 9   correct?
10        A.      Yes.
11        Q.      On discovery Cheetah has given me a number
12   of what looks like excuses for not being at work, like
13   medical excuses, some you can't tell who they are
14   from.  But it appears that records are kept of why
15   entertainers may miss work; is that correct?
16        A.      Yes.
17        Q.      That is something that Cheetah requires an
18   entertainer to turn in if they want an excused
19   absence, right?
20        A.      Yes.
21        Q.      They are pretty strict about that policy.
22        A.      What?
23        Q.      Cheetah is pretty strict about that
24   policy.
25        A.      Yes.
```

1        Q.     Is that a word that Cheetah uses for

2    inappropriate conduct?

3        A.     Yes.

4        Q.     That could be a range of what?

5        A.     Letting customers touch them, touch

6    customers, touch themselves.

7               MR. DUDLEY:  I don't have anything else.

8        Thank you.

9               MR. FUCHS:  We will reserve signature.

10              (Deposition concluded at 4:32 p.m.)

11              (Pursuant to Rule 30(e) of the Federal

12       Rules of Civil Procedure and/or O.C.G.A.

13       9-11-30(e), signature of the witness has been

14       reserved.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT REPORTER DISCLOSURE

 2

 3         Pursuant to Article 10.B of the Rules and
       Regulations of the Board of Court Reporting of the
 4     Judicial Council of Georgia, I make the following
       disclosures:
 5
           I am a Georgia Certified Court Reporter.  I am
 6     here as a representative of WSG Reporting, LLC.

 7         I am not disqualified for a relationship of
       interest under the provisions of O.C.G.A.
 8     Section 9-11-28(c).

 9         WSG Reporting, LLC, was contacted by Ainsworth G.
       Dudley, Jr., to provide court reporting services for
10     this deposition.

11         WSG Reporting, LLC, will not be taking this
       deposition under any contract that was prohibited by
12     O.C.G.A. 15-14-37 (a) and (b).

13         WSG Reporting, LLC, has no exclusive contract to
       provide reporting services with any party to the case,
14     any counsel in the case, or any reporter or reporting
       agency from whom a referral might have been made to
15     cover this deposition.

16         WSG Reporting, LLC, will charge its usual and
       customary rate to all parties in the case, and a
17     financial discount will not be given to any party to
       this litigation.

18

19

20

21         Renda K. Cornick, CCR-B-909
           July 25, 2017
22

23

24

25
```

```
1    DEPOSITION OF:  JOHN P. BRAGLIA/RKC

2         I do hereby certify that I have read all
     questions propounded to me and all answers given by me
3    on July 25, 2017, taken before Renda K. Cornick, and
     that:
4
          1)   There are no changes noted.
5         2)   The following changes are noted:

6         Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure and/or the Official Code of Georgia
7    Annotated 9-11-30(e), both of which read in part:  Any
     changes in form or substance which you desire to make
8    shall be entered upon the deposition...with a
     statement of the reasons given...for making them.
9    Accordingly, to assist you in effecting corrections,
     please use the form below:
10

11   Page No.          Line No.          should read:

12
     Page No.          Line No.          should read:
13

14   Page No.          Line No.          should read:

15
     Page No.          Line No.          should read:
16

17   Page No.          Line No.          should read:

18
     Page No.          Line No.          should read:
19

20   Page No.          Line No.          should read:

21
     Page No.          Line No.          should read:
22

23   Page No.          Line No.          should read:

24
     Page No.          Line No.          should read:
25
```

AMENDED CERTIFICATE

STATE OF GEORGIA

COUNTY OF GWINNETT

IN RE:    ALISON VALENTE, JENNIFER BARLOW, KATHRYN
          MONROE, SOPHIA SMITH, STEPHANIE LEBEAU on behalf
          of themselves et al,
          v.
          INTERNATIONAL FOLLIES, INC., et al

          WITNESS:  JOHN P. BRAGLIA


I hereby certify that in addition to the certification made on Page 220

of the transcript, the more than thirty (30) days provided the witness to read

and sign the original transcript has expired.  Therefore, the original is being

filed without signature of the witness.

This the 27th day of September, 2017


_____

Whitney S. Guynes, CCR - B-1897

