# In The Matter Of:

*Alison Valente v.*
*International Follies, Inc., d/b/a The Cheetah*

---

*Robert 'Bob' Johnson*
*April 4, 2017*

---



**WSG REPORTING, LLC**

**Whitney S. Guynes, CCR**
*Owner*

*Certified Court Reporting*
(770) 367-7822
2745 Daniel Park Run
Dacula, GA 30019

wsgreporting.com
office@wsgreporting.com

*Original File C0404BOBJOHNSON_Jscoped.txt*
*Min-U-Script® with Word Index*

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

---

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3
   ALISON VALENTE,                    )
4                                     )
             Plaintiff,               )
5                                     )  CIVIL ACTION FILE NO:
        vs.                           )
6                                     )  1:16-cv-01138-ELR-JSA
   INTERNATIONAL FOLLIES, INC.,       )
7  d/b/a THE CHEETAH,                 )
                                      )
8            Defendant.               )
9  _____

10
                    DEPOSITION OF
11
                    ROBERT JOHNSON
12
                 **** CONFIDENTIAL ****
13
                    April 4, 2017
14
15                   10:14 a.m.
16
17      SCHULTEN, WARD, TURNER & WEISS, LLP
        260 Peachtree Street, NW, Suite 2700
18             Atlanta, Georgia  30303
19
     ***********************************
20
             Whitney S. Guynes, CCR
21             WSG REPORTING, LLC
              2745 Daniel Park Run
22            Dacula, Georgia 30019
                (770) 367-7822
23           office@WSGreporting.com
24
25
```

---

**Page 2**

```
1               A P P E A R A N C E S
2
   On behalf of the Plaintiff, Alison Valente:
3
       JAMES F. McDONOUGH, III, ESQ.
4      Heninger, Garrison, Davis, LLC
       Vinings Main
5      3621 Vinings Slope
       Suite 4320
6      Atlanta, Georgia  30339
       (404) 996-0864 (T)
7      email: jmcdonough@hgdlawfirm.com
8  On behalf of the Defendant, International Follies, Inc.
   d/b/a The Cheetah:
9
       KEVIN L. WARD, ESQ
10     Schulten, Ward, Turner & Weiss, LLP
       260 Peachtree Street, N.W.
11     Suite 2700
       Atlanta, Georgia  30303
12     (404) 688-6800 (T)
       (404) 688-6840 (F)
13     email: k.ward@swtwlaw.com
14
15 Also Present: Stephanie Pippen
                 Jack Braglia
16
17
18                    * * *
19
20
21
22
23
24
25
```

---

**Page 3**

```
1                    I N D E X
2
3       WITNESS: ROBERT JOHNSON
4
5   EXAMINATION                              PAGE
6
7   By Mr. McDonough: ...............................5
8
9
10                   * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1                PLAINTIFF'S EXHIBITS
2
3   EXHIBIT            DESCRIPTION           PAGE
4
5   Exhibit  28    Defendant, International     125
                   Follies, Inc.'s Objections
6                  and Responses to Plaintiff's
                   First Set of Interrogatories
7                  to International Follies,
                   Inc.
8
9
10                   * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 5

1    (Reporter disclosure made pursuant to
2    Article 10.B of the Rules and Regulations of
3    the Board of Court Reporting of the Judicial
4    Council of Georgia.)
5        * * *
6        Deposition of ROBERT JOHNSON
7        April 4, 2017
8    WHEREUPON:
9        ROBERT JOHNSON,
10   having been first duly sworn, was examined and
11   testified as follows:
12       MR. WARD: And I apologize, but I just
13   have one small preliminary matter to clarify.
14   He is here on an individual capacity, not as a
15   30(b)(6) witness. He's not here speaking on
16   behalf of Follies International.
17       MR. McDONOUGH: Correct.
18       MR. WARD: Okay.
19       MR. McDONOUGH: And do you understand --
20   I'm sorry, Mr. Johnson, do you understand what
21   Kevin was --
22       MR. WARD: We talked about it.
23       MR. McDONOUGH: -- referring to just now?
24       MR. WARD: We talked about it.
25       MR. McDONOUGH: So you're clear on that.

Page 6

1        Okay. So just looking for your personal
2    knowledge based on my questions, and that's it.
3        EXAMINATION
4    BY MR. McDONOUGH:
5    Q    So, for the record, my name is Jim
6    McDonough, with Heninger, Garrison, Davis, on behalf
7    of Plaintiffs Valente and Monroe today.
8        Did you want to make an appearance?
9        MR. WARD: I'm Kevin Ward, attorney on
10   behalf of Follies International. Stephanie
11   Pippin is my paralegal and is sitting next to
12   me. Jack Braglia is a corporate representative
13   for Follies here today.
14   BY MR. McDONOUGH:
15   Q    Mr. Johnson, do you prefer I refer to you
16   as Bob, Mr. Johnson, or some other name?
17   A    It doesn't matter.
18   Q    It doesn't matter?
19   A    Whatever you feel more comfortable saying.
20   Q    Okay. So I just want to go through some
21   background questions first.
22       And generally the way these work, I'm
23   going to ask you questions. I'm going to ask that you
24   answer those questions to the best of your ability as
25   you sit here today.

Page 7

1        Is there any reason you can't testify
2    truthfully today, any kind of medications or anything
3    like that?
4    A    No reason.
5    Q    Okay. Have you been deposed before?
6    A    No.
7    Q    Okay. So I assume Kevin has prepared you
8    some on kind of the procedural aspects of this, but I
9    may introduce documents as we go along and mark them
10   for the record as exhibits, and ask you questions
11   based on those documents; and again, to the extent you
12   have personal knowledge of them or any of the events
13   that I bring up, I ask you to answer those questions;
14   and if you don't, please let me know.
15   A    Okay.
16   Q    And also, if I ask you a question that's
17   unclear or, you know, you have any hesitation about
18   what I mean when I ask the question, feel free to tell
19   me it's not clear.
20       Your attorney will object as we go along.
21   You're still to answer the question, unless he
22   instructs you specifically not to answer the question.
23       So how long have you worked for
24   International Follies?
25   A    26 years.

Page 8

1    Q    26 years.
2        And what was your role when you first
3    began working at International Follies?
4    A    Floorman.
5    Q    Floorman, is that short for floor manager?
6    A    (Nods head.)
7    Q    Okay.
8    A    Yes.
9    Q    Sorry, yeah, to the extent you can be
10   verbal, it will help the court reporter. And we'll
11   try to remind you, because I know it's hard.
12       MR. WARD: She has to write this stuff
13   down, so she needs a yes or a no, not a nod or a
14   shake.
15       MR. McDONOUGH: Right.
16       THE WITNESS: Okay.
17   BY MR. McDONOUGH:
18   Q    And so you started as a floor manager. Do
19   you remember the year that you started?
20   A    1990.
21   Q    1990.
22       (Ms. Clark-Palmer & Mr. Samuel join the
23   proceedings via telephone.)
24       MR. WARD: For purposes of appearance,
25   Amanda Clark and Don Samuel have joined by

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 9

1    telephone.
2  BY MR. McDONOUGH:
3    Q    So you said '96?
4    A    '90.
5    Q    '90.
6         And you first started as a floor manager.
7         What are the responsibilities of a floor
8  manager?
9    A    I was stationed at --
10        MR. WARD: Object to form. Do you mean at
11   that time or now?
12 BY MR. McDONOUGH:
13   Q    Well, let's do at that time.
14   A    Me, personally?
15   Q    Yes.
16   A    At that time, I was a doorman. I was
17 stationed at the door, checking IDs, greeting
18 customers, and was pretty much on a relief situation.
19   Q    And then are there different -- well, let
20 me get this right.
21        So were those responsibilities different
22 than what a typical floor manager would have done at
23 that time?
24   A    No.
25   Q    Okay. So everybody rotated at some point

Page 10

1  and worked the door?
2    A    Yes.
3    Q    And back in -- back in 1990, what other
4  responsibilities did the floor managers have?
5    A    Pretty much the same that they have now.
6         MR. CLARK-PALMER: Excuse me. I'm sorry
7    to interject. Is there any way you could move
8    the speaker phone a little closer to the
9    witness?
10        MR. WARD: We'll try.
11        MR. CLARK-PALMER: All right. Thank you.
12        MR. WARD: Say something, please. Don't
13   lean in, just speak the way you normally speak.
14        THE WITNESS: Hello. Can you hear me?
15   Hello?
16        MR. McDONOUGH: Can you hear the witness?
17        MR. CLARK-PALMER: Yes, that's better.
18   Thank you.
19 BY MR. McDONOUGH:
20   Q    Okay. So --
21   A    The duties basically haven't changed;
22 security, overlooking the club, customers, girls.
23   Q    Okay. When you say "overlooking the
24 club," what does that mean exactly?
25   A    Security, making sure people aren't doing

Page 11

1  wrong things, grabbing girls, getting drunk and
2  stupid --
3    Q    Uh-huh.
4    A    -- usual bar stuff.
5    Q    Okay. So -- and when you say with respect
6  to customers, do you mean that same thing, making sure
7  customers don't get unruly and that sort of thing?
8    A    Yes.
9    Q    Any other responsibilities that you can
10 think of that a floor manager had or has now, given
11 that you said the job really hasn't changed?
12   A    No. It's basically the same.
13   Q    Are you responsible -- or is a floor
14 manager responsible for collecting money from
15 customers at any point in time?
16   A    No.
17   Q    Now -- that was in 1990.
18   A    Correct.
19   Q    Have your personal responsibilities
20 changed over time?
21   A    Yes, I'm now the night manager.
22   Q    And what does that entail?
23   A    Oversee the front of the house operations
24 of the entire club during the night shift.
25   Q    All right. Now, if -- is there anyone

Page 12

1  senior to you at the club?
2    A    Yes.
3    Q    Who would that be?
4    A    Mr. Braglia.
5    Q    Okay. And do your responsibilities change
6  today, depending on if Mr. Braglia is present in the
7  club on a particular evening?
8    A    No.
9    Q    So during a night when Mr. Braglia is not
10 present, are you the most senior person in the club?
11   A    Yes.
12   Q    And just for the record, if I refer to
13 International Follies, The Cheetah or "the club," will
14 you understand that I'm referring to the -- to the
15 International Follies company?
16   A    Yes.
17   Q    Now, how does -- again, there's two
18 different time periods here.
19        Do you recall approximately what year you
20 were promoted to night manager?
21   A    It's been probably 10 years ago.
22   Q    Okay. So you were floor manager -- or a
23 floor manager up until about 10 years ago?
24   A    Yes.
25   Q    Do you know why you were promoted?

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 13

1   A   No. That wasn't my choice.
2   Q   Okay. Did Mr. Braglia hire you in 1990?
3   A   No.
4   Q   Who did hire you?
5   A   Brian Rulo [phonetic].
6   Q   And was Brian Rulo a --
7   A   General manager.
8   Q   He was the general manager at the time?
9       MR. WARD: Let him finish his questions
10  before you answer, for the court reporter's
11  sake.
12  BY MR. McDONOUGH:
13  Q   I'm sorry, what was that? He was the
14  general manager at that time?
15  A   Correct.
16  Q   And did Jack Braglia work, to your
17  knowledge, for the club at that time?
18  A   Yes.
19  Q   Okay. Was he a manager of some sort, or
20  was he a floor manager, or do you know?
21  A   Day manager.
22  Q   Okay. So when you were hired in 1990, do
23  you recall who you reported to?
24  A   Kim Tan [phonetic] was the night manager.
25  Q   Do you know how to spell that?

Page 14

1   A   I do not.
2   Q   Now, do you recall, again in 1990, your
3   compensation structure, how you were paid?
4   A   There was a shift pay, but I don't recall
5   how much it was to the floor guys, and then we got
6   tips from the girls.
7   Q   Shift pay, what is a shift pay exactly?
8   A   They gave the floormen a set amount per
9   shift that they worked. I really don't remember how
10  much it was. I don't recall.
11  Q   Okay. But there was a shift pay, and that
12  was -- so you weren't paid any kind of salary; it was
13  basically by the night?
14  A   Correct.
15  Q   And then on top of that, there were tips
16  from entertainers; is that right?
17  A   Yes.
18  Q   And what about from, like, bartenders or
19  the DJ or anybody else that you can think of?
20  A   There was a DJ tip-out.
21  Q   But that was -- the DJ didn't give the
22  floor managers money, I assume; the entertainers gave
23  them some sort of tip-out?
24  A   The DJs did tip a small amount, maybe like
25  hand a guy $5.

Page 15

1   Q   And what about -- so do you know -- well,
2   let me stick with you for now.
3       Currently, what is your pay structure
4   composed of?
5   A   I get a salary from the club, and then I
6   receive tips from entertainers.
7   Q   Okay. Any other sources of income?
8   A   No.
9   Q   Sorry. For the record, any source of
10  income from The Cheetah?
11  A   No.
12  Q   Okay. So in general -- so you're here
13  today for the Title VII case. I don't know if you
14  know exactly what that means. I'm sure you have some
15  idea.
16      Who, if anybody, have you spoken about --
17  this case about?
18  A   Who have I spoken to about this case?
19  Q   Yeah, with the exception of your
20  attorneys.
21      MR. WARD: If I may just -- or with
22  lawyers present. People get confused about
23  that.
24      THE WITNESS: No one. I speak to my wife,
25  but that's it.

Page 16

1   BY MR. McDONOUGH:
2   Q   Okay. So your wife and then any other
3   time lawyers are present or you spoke to lawyers, but
4   nobody else you can think of sitting here right now?
5   A   Correct.
6   Q   And did you personally review any
7   documents or anything for preparing for this
8   deposition or --
9   A   Yes.
10  Q   Okay. Let's jump into -- I just mentioned
11  this is a Title VII case, and that's what you're here
12  to be deposed in today.
13      So you've been a manager for 26 years or
14  so, and you've got to be very familiar with any
15  policies on sexual harassment, harassment in general
16  at the club; is that right?
17  A   Yeah, I couldn't recite them to you, but
18  familiar, yes.
19  Q   Can you tell me, just off the top of your
20  head -- or if you need to reference something, that's
21  fine -- just generally what the policies are on, say,
22  sexual harassment?
23  A   If someone feels that they have been
24  sexually harassed, they are to report it to the
25  general manager, and it's his responsibility to

Page 17

1 investigate it.
2 Q Okay. And when you talk about sexual
3 harassment, do you include being harassed by customers
4 in that or are you referring strictly to other
5 employees that may be harassing somebody else?
6 A To my understanding, it's any form of
7 sexual harassment, in our handbook.
8 Q Okay. And then once that's reported --
9 would that be reported to you, or would that be
10 reported to somebody else?
11 A Mr. Braglia.
12 Q Okay. So no one would report that
13 directly to you?
14 A No.
15 Q Why is that?
16 A That's the club policy.
17 Q Okay. So it's a club policy that you, as
18 a general proposition, don't hear any kind of
19 complaints of that type?
20 A It is written in our policy to report to
21 the general manager.
22 Q Okay. Now, do people, nonetheless, still
23 come to you with issues they have with harassment of
24 any sort, including sexual, during work hours?
25 A Do you mean like they got grabbed by a

Page 18

1 customer, slapped on the butt, something like that?
2 Q Sure, yeah.
3 A Yeah.
4 Q And then if something like that occurs, if
5 someone raises that to you, what do you do?
6 A We escort them out.
7 Q You escort the --
8 A The customer.
9 Q -- customer out of the club.
10 Do you take a second and ask the customer
11 any questions, or do you just immediately remove them?
12 A No, we just usually -- you can tell if a
13 guy is being unruly. If a girl comes and says, this
14 guy just slapped me on the butt, we just throw them
15 out.
16 Q Is there ever a case where you wouldn't
17 throw out a customer if a girl reported to you that
18 they were harassed sexually in some way --
19 A No.
20 Q -- or their butt spanked -- sorry.
21 MR. WARD: So I'm just going to just make
22 a comment at this point.
23 MR. McDONOUGH: Sure.
24 MR. WARD: Every question you're asking so
25 far is perfectly appropriate for a 30(b)(6).

Page 19

1 I'm not going to object to it, but I can tell
2 you this: If you've covered all the topics for
3 a 30(b)(6) with his deposition, we're not going
4 to present him again. I don't care if you do it
5 now, I really don't. That's not what you
6 noticed him for, but every question you're
7 asking is a 30(b)(6) question. You're asking
8 about club policies, you're asking about --
9 MR. McDONOUGH: I'm asking about his
10 knowledge of club policies. I'm not asking him
11 to refer to a document. I'm just -- he's been a
12 manager for 26 years. I would think he had some
13 knowledge of that.
14 MR. WARD: Absolutely. And as a 30(b)(6)
15 witness, he could fully testify about that.
16 None of this is going to be binding on the
17 club, unless it's --
18 MR. McDONOUGH: I agree.
19 MR. WARD: These are all 30(b)(6)
20 questions, in my opinion, and I object to them
21 on that ground.
22 MR. McDONOUGH: Sure.
23 MR. WARD: But I'll let him answer.
24 MR. McDONOUGH: Yeah. I mean, I think he
25 should answer the questions. I think it's --

Page 20

1 based on his answers, he's not the person that
2 would be responsible, ultimately, for those
3 complaints in the end anyway. So that would
4 be -- it sounds like whoever is would be the
5 30(b)(6) witness, subject to your putting them
6 up for that topic.
7 MR. WARD: Again, I'm going to let him
8 answer, because we've only got a month to do
9 discovery, but I just wanted to get that on the
10 record.
11 MR. McDONOUGH: Sure.
12 BY MR. McDONOUGH:
13 Q Okay. So sorry about that, we're just --
14 MR. WARD: Clarifying.
15 BY MR. McDONOUGH
16 Q -- clarifying a couple of things, yeah.
17 So if someone did come to you and report
18 that, despite the fact that they're supposed to go to
19 Mr. Braglia to report those type of incidences, what
20 would you personally do?
21 A I would go to Mr. Braglia and make him
22 aware.
23 Q Okay. Every time?
24 A Yes.
25 Q So if something happened in the club and

Page 21

1  you were made aware of it, you would then communicate
2  that to Mr. Braglia?
3     A    Correct.
4     Q    Now, in your role as manager, do floor
5  managers ever come to you about any type of
6  activity, whether it's, you know, harassment or some
7  other unruly customer?
8     A    Unruly customers, yes.
9     Q    Okay. So is it -- so -- now, the floor
10 manager's job, as I understand it, is to provide
11 security --
12    A    Yes.
13    Q    -- at least one aspect of it.
14    A    Yes.
15    Q    And they're, I assume, to independently
16 provide that security; they're ultimately responsible
17 for keeping the club secure; is that right?
18    A    Yes.
19    Q    Does a floor manager, to the extent any
20 incident arises -- or are they supposed to come to you
21 to report that, so that you're aware?
22    A    Yes.
23    Q    And so if something happened in the club
24 and a floor manager saw it or dealt with an issue,
25 they would come to you under protocol and report it?

Page 22

1        MR. WARD: Object to the form.
2        THE WITNESS: By the book -- are you
3     talking sexual harassment?  It should be
4     reported to Mr. Braglia.
5  BY MR. McDONOUGH:
6     Q    Right. Well, I was asking, as you're --
7  so maybe I need to clarify your role as general
8  manager.
9        Do you -- did the floor manager report to
10 you?
11    A    Yes.
12    Q    Okay. So if a floor manager has an issue
13 with one of these things -- sees sexual harassment or,
14 because they're on the floor, an entertainer reports
15 that to them, because they're, say, the closest person
16 nearby -- do they then bring that to you, as their
17 manager, to make you aware of that?
18    A    Yes.
19    Q    And do you know -- do they also go to
20 Mr. Braglia to report that, or do they assume you'd
21 take that responsibility on?
22    A    They can, yes.
23    Q    So they may or may not?
24    A    If he's in the area, yes, certainly.
25    Q    Okay. But you don't tell the floor

Page 23

1  managers to go to Mr. Braglia and not talk to you?
2     A    No, I don't tell them that.
3     Q    Okay. And again, I'm asking you these
4  questions in your personal experiences there, as a
5  general manager, within, you know, the past couple of
6  years, what the general protocol is for -- strike
7  that.
8        Do you instruct the floor managers
9  specifically on how to handle situations in the club?
10    A    Yes.
11    Q    Okay. What types of situations do you
12 instruct them on how to handle?
13    A    In a unruly customer situation?
14    Q    Sure. We'll take that one.
15    A    They are to restrain the person.  People
16 will try to swing at them.  We tell them not to hit
17 back --
18    Q    Uh-huh.
19    A    -- that they can just restrain, put on the
20 ground.  I instruct them to not have relations with
21 the dancers, and they are not to ever be with the
22 dancers, touching, inappropriate behavior.
23    Q    Any other issues that could arise in the
24 club that you would instruct them on, besides
25 inappropriate conduct with entertainers or unruly

Page 24

1  customers?
2     A    Just general things, like looking out for
3  the club, be aware of where you're standing, what
4  you're looking at, be aware of your surroundings, just
5  general security stuff.
6     Q    So are you aware of a policy in place
7  where, if an entertainer is, say, assaulted or
8  accosted in some way, what they are to do or what --
9  you know, what they are to do, besides speak to
10 Mr. Braglia?  Is there anything else that, as a
11 policy, they're supposed to do?
12    A    If a customer grabs a girl in a room or on
13 the floor, they're supposed to report to security
14 right away, and we will swiftly escort the customer
15 out.
16    Q    Okay. So they're supposed to report that
17 to security first, and then they're also supposed to
18 report that to Mr. Braglia?
19    A    No.  We're talking a situation where a
20 customer needs to be thrown out.
21    Q    Okay. All right. So sexual harassment
22 and discrimination, those types of things, are
23 reserved -- the entertainer is just supposed to report
24 that directly to Mr. Braglia.
25        But in the case of a customer getting

Page 25

1  unruly, you know, an assault, battery, whatever a
2  customer inflicts upon an entertainer, that would be
3  reported, by protocol, to a floor manager, security?
4       MR. WARD: Object to the form.
5  BY MR. McDONOUGH:
6    Q   Did I get that right?
7    A   It should be reported, yes, to security,
8  to me.
9    Q   Okay. So they may report that directly to
10 you?
11   A   Yes.
12   Q   So what about when you were describing the
13 protocol for an assault or a customer accosting an
14 entertainer, is the protocol any different when it's
15 something more serious, like rape? If there's a
16 reported rape, is there a different protocol in place?
17   A   Oh, certainly.
18   Q   Have you personally been working when a
19 rape was reported at the Cheetah?
20   A   No.
21   Q   Never?
22   A   Never.
23   Q   And are you aware of any rapes happening
24 at The Cheetah?
25   A   No.

Page 26

1    Q   No?
2    A   No.
3    Q   Have you heard rumors of any rapes
4  happening at The Cheetah?
5    A   Only since these proceedings have started.
6    Q   Okay. So prior to that, never an issue
7  with rape?
8    A   No.
9    Q   Okay. And then to the extent there was
10 anything -- I don't want to minimize it, but anything
11 less than something like rape, you're aware of things
12 like that happening, and there are protocols in place
13 that, to your knowledge, are followed?
14   A   Yes.
15   Q   You certainly attempt to follow the
16 policies and procedures that you know of, I guess,
17 right?
18   A   Yes.
19   Q   Okay. Now are any of those policies, to
20 your knowledge, different when it comes to there being
21 alcohol involved?
22   A   No.
23       MR. WARD: I'm not sure I understood that
24   question.
25 BY MR. McDONOUGH:

Page 27

1    Q   If alcohol is involved in the assault or
2  the situation that has given rise to the need to
3  communicate to a manager or a floor manager or you,
4  does the use of alcohol by the customer affect in any
5  way what you would do or your protocol?
6    A   No.
7       MR. WARD: Can we just pause for one
8  second while we try to figure out what is
9  causing this static?
10      MR. McDONOUGH: Sure.
11      (Short break.)
12 BY MR. McDONOUGH:
13   Q   Okay. So there's no difference whether
14 alcohol is involved in a situation or not, protocols
15 are the same, right?
16   A   Let me make sure I understand the
17 question.
18   Q   Sure.
19   A   Are you asking me, if someone was drinking
20 and grabbed a girl and someone was not drinking and
21 grabbed a girl, would I treat that situation
22 differently?
23   Q   Exactly.
24   A   There's no difference.
25   Q   Is there a difference if somebody is

Page 28

1  completely inebriated, unable to walk? Is the
2  protocol any different if somebody is so intoxicated
3  that they don't hear reason and don't appear to
4  understand what is going on around them?
5    A   No.
6    Q   Regardless, you would throw them out of
7  the club?
8    A   Yes.
9    Q   Do you also, in the case of extreme
10 intoxication, ensure that they're not going to drive
11 or are in a cab or something like that?
12   A   Yes.
13   Q   In terms of entertainers that have drank
14 too much -- too much alcohol, what do you do, as the
15 general manager -- I'm sorry, as the night manager,
16 when someone makes you aware that any of the
17 entertainers has overly imbibed or is intoxicated?
18   A   We send them home that night and speak to
19 them the next shift that they work.
20   Q   Okay. Is a notation made concerning the
21 situation, or is that something some other person
22 would have responsibility for doing?
23   A   House mother log.
24   Q   So the house mothers are responsible for
25 logging those type of issues?

Page 29

1    A    Yes.
2    Q    Do you independently log those kind of
3  issues?
4    A    No.
5    Q    Now, do you -- is protocol different if
6  one of the entertainers is under the age of 21 and so
7  is not legally allowed to drink?
8    A    No, they would still be sent home and
9  spoken to by night shift.
10    Q    Do you report -- if there's a situation
11  like that, do you report or is it within your
12  responsibilities to report the underage drinking to
13  anybody outside of The Cheetah?
14    A    No.
15    Q    So as a general policy, you do not do
16  that, is that correct, in your role?
17    A    Correct.
18    Q    So in your role as the night manager, do
19  you also have responsibilities over, like, the bar and
20  anything else besides things to do with just
21  entertainers?  I mean, do you have responsibilities
22  for bartenders, the DJ?
23    A    Yes.
24    Q    Are you ultimately responsible -- if
25  you're on-site and Mr. Braglia is not, are you

Page 30

1  ultimately responsible for all activities in the club?
2        MR. WARD: Object to form; calls for legal
3      conclusion.
4        THE WITNESS: I would say Mr. Braglia
5      would be in charge any time he is in the club,
6      certainly.
7  BY MR. McDONOUGH:
8    Q    Okay.  And if he's not in the club, are
9  you in charge --
10    A    Yes.
11    Q    -- of all the happenings of the club?
12    A    Yes.
13    Q    And are -- do you know -- well, strike
14  that.
15        Do you know what a Cheetah Buck is?
16    A    Yes.
17    Q    Could you state for the record what that
18  is, again, your personal knowledge of that?
19    A    When someone wants to buy something with
20  their credit card, they purchase Cheetah Bucks, and we
21  give them -- it's like house money.  If they want a
22  hundred dollars in Cheetah Bucks, we charge their
23  credit card $100, and we give them Cheetah Bucks.
24  They use it to pay for dances, generally.
25    Q    So it's like Monopoly money in The

Page 31

1  Cheetah, basically?
2    A    Pretty much.
3    Q    No use outside The Cheetah, I'm guessing,
4  right?
5    A    Right.
6    Q    Do you know if those Cheetah Bucks have a
7  serial number?  I mean, is there a way that you track
8  those Cheetah Bucks?
9    A    Yes.
10    Q    Now, are you, in your role, responsible
11  for dealing with issues that arise with Cheetah Bucks,
12  as well?
13    A    Yes.
14    Q    And so if there's an issue with the
15  issuance of Cheetah Bucks or something to do with
16  Cheetah Bucks, you would ultimately be the one
17  responsible for sorting that issue out?
18    A    Generally, yes.
19    Q    When you say "generally," is there someone
20  else that would be responsible for that?
21    A    Well, I'm not entirely sure what kind of
22  an issue you're speaking of.  If it's something where
23  a customer -- I don't know what -- maybe you need to
24  clarify what you're asking me.
25    Q    Sure.

Page 32

1        So are you responsible for dealing with
2  issues concerning a customer believing they were
3  overcharged for Cheetah Bucks, for instance?
4    A    Yes.
5    Q    Can you think of any other issues that
6  would arise relating to Cheetah Bucks that you've
7  dealt with in your role?
8    A    Stolen Cheetah Bucks would be the only
9  other I could think of.
10    Q    Stolen by customers or by somebody else?
11    A    Customers and dancers.
12    Q    So you've had an issue raised to you about
13  Cheetah Bucks, where one entertainer has stolen from
14  another entertainer?
15    A    Yes.
16    Q    And what do you do in a situation like
17  that?
18    A    We track the number.  And when someone
19  cashes it in, then we catch the person that had the
20  Cheetah Bucks.
21    Q    So you keep track of whoever issued the
22  Cheetah Bucks -- whoever was given the Cheetah Bucks
23  originally; and then whoever turned them in, if
24  there's a difference there, you would know --
25    A    Correct.

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 33

1    Q    -- that was the person that had stolen --
2    if that was an accusation, with respect to those
3    Cheetah Bucks; is that right?
4    A    Yes.
5    Q    Did you know who's responsible for issuing
6    the Cheetah Bucks?
7    A    The Cheetah Bucks Girls.
8    Q    Cheetah Bucks Girls, is that their
9    official title?
10   A    Yes.
11   Q    Okay.  Do you know how many of those there
12   are?
13   A    Two.
14   Q    Two.
15        Is that on any particular night, or is
16   that --
17   A    Correct.
18   Q    -- an employee of The Cheetah?
19   A    On a given night, a Cheetah employee.
20   Q    Okay.  Do you know -- what are the names
21   of some of those Cheetah Buck Girls?
22   A    Korey Montgomery, Jennifer Jackson,
23   Sherri --
24        She's changed her name.  I don't know her
25   last name now.  She went back to her maiden name.

Page 34

1    Maybe -- no, don't know it.
2    Q    Do you know her -- what was --
3    A    Jo Pasco --
4    Q    I'm sorry, hold on.
5        What was the name that it used to be?
6    A    Mulcahy.
7    Q    Okay.  Any other persons you can think of?
8    A    Jo Pasco.
9    Q    That is a -- is that a male?
10   A    It's a girl.
11   Q    It's a girl.  Okay.
12        Is that everyone?
13   A    Then we have two that do relief, Meghan
14   Brulet [phonetic] -- don't ask me how to spell that --
15   and Sylvia Slominski.
16   Q    Okay.  And what can Cheetah Bucks be used
17   for in The Cheetah, if a customer gets a thousand
18   dollars' worth of Cheetah Bucks?
19   A    Everything:  Drinks, food, dancers.
20   Q    Drinks, food, dancers -- anything else?
21   A    That's it.  Anything that you would
22   purchase at The Cheetah.
23   Q    So it is good -- a Cheetah Buck is good to
24   buy any service or food item or any product that's
25   available for sale at The Cheetah?

Page 35

1    A    Yes.
2    Q    Have you personally ever held meetings
3    specifically about Cheetah Bucks with entertainers or
4    any other employees at the club?
5    A    No.
6    Q    Never?
7    A    Never.
8    Q    Are you aware of how The Cheetah makes
9    money off Cheetah Bucks?
10   A    Just service charge is 10 percent.
11   Q    And do you personally make money off
12   Cheetah Bucks in any way?
13   A    No.
14   Q    Okay.  So no part of your tips or anything
15   else are related in any way to Cheetah Bucks?
16   A    Oh, the floormen can be tipped in Cheetah
17   Bucks.  I thought you were referring to Cheetah Bucks
18   sales.
19   Q    No, just Cheetah Bucks in general.
20        So floor managers can be tipped with
21   Cheetah Bucks, and, in turn, I guess, you get a
22   percentage or some portion of the floor manager tips
23   for the evening; is that right?
24   A    Yes, they can receive Cheetah Bucks.
25   Q    In terms of your compensation, do you get

Page 36

1    a set amount of money from each floor manager or does
2    it vary?
3    A    No, it varies.
4    Q    Does it vary in both dollar and
5    percentage?
6    A    No, just dollar.
7    Q    Okay.  So is there a set percentage that
8    you expect to receive at the end of the night from
9    floor managers' tips?
10   A    We have a tip pool that is 10 percent of
11   what is made.
12   Q    When you say "we have a tip pool" --
13   A    At the club.
14   Q    Okay.  And that 10 percent, it goes to you
15   or that goes to several folks?
16   A    Floormen and DJs.
17   Q    Okay.  But the -- so maybe I
18   misunderstood.  I'm talking in terms of your
19   compensation.
20        You get -- you get a portion of a tip pool
21   that's funded by the floor managers?
22   A    By the dancers.
23   Q    By the dancers, okay.
24        So you don't get any percentage directly
25   from floor managers?

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 37

1    A    No.
2    Q    So you and the floor managers split this
3    tip pool, which is 10 percent of the -- whatever
4    entertainer's income for the evening, or is supposed
5    to be?
6    A    Yes.
7         MR. WARD: I'm sorry, are you using the
8    term "floor managers"? Do you mean floormen?
9         MR. McDONOUGH: Floor managers -- well, he
10   had said -- I asked him, in the beginning, if
11   floorman stood for floor manager.
12        MR. WARD: Oh, if it's -- okay.
13        THE WITNESS: They call them both.
14        MR. WARD: Okay.
15   BY MR. McDONOUGH:
16   Q    So there's 10 percent.
17        Do you get -- so, just as an example, we
18   have -- the entertainers made a hundred dollars that
19   night. There's a tip pool created that's $10, which
20   would be 10 percent.
21        Is there a specific portion of that that
22   goes to you as the night manager and then the rest to
23   the floor managers that are working that evening, or
24   is it sort of a everyone gets an equal portion of that
25   10 percent?

Page 38

1    A    It's split: The DJ gets half; the
2    floormen split the other.
3    Q    The DJ gets half of that.
4         Are you including yourself as a floor
5    manager, when you say they split the rest?
6    A    Yes.
7    Q    So you don't have an additional share or
8    something for your role as being night manager?
9    A    No.
10   Q    Okay. And that dollar figure, obviously,
11   varies to you, depending on how well the entertainers
12   did that evening, I guess?
13   A    Yes.
14   Q    And is that the portion -- when we were
15   discussing earlier your salary structure or your
16   compensation structure, you said there's a salary and
17   then there's also some tip component.
18        Is that what you're referring to as the
19   tip component?
20   A    Yes.
21   Q    Is there anything else that you would
22   consider as part of the tip component that you
23   mentioned earlier?
24   A    No.
25   Q    So that's your sole -- your sole income is

Page 39

1    your salary base plus your percentage of the
2    10 percent tip pool?
3    A    Yes. And if a customer tips a floorman,
4    that all goes into the pool also.
5    Q    Okay. So floor managers, if they get any
6    tips, put the entirety of that tip into the tip pool?
7    A    (Nods head.)
8    Q    And then they share in the pool?
9    A    Yes. I'm sorry. Yes.
10   Q    Now, are you ever tipped directly from
11   customers for any reason?
12   A    Yes.
13   Q    And is that something that you consider
14   part of your nightly income -- strike that.
15        Is that something that happens on a
16   frequent basis?
17   A    More so lately, no. But yes, I would say
18   that.
19   Q    But you count on that as part of -- again,
20   strike that.
21        Is it true that you expect, at the end of
22   the night, you will get -- you will have earned some
23   tips directly from customers?
24   A    I never expect it, but it does happen.
25   There are nights where we don't get any tips from

Page 40

1    customers, so I can't say that that's expected on a
2    nightly basis.
3    Q    Okay. What percent of the time do you
4    think that -- you earn money through that means?
5    A    I don't know. I couldn't tell you. It's
6    so sporadic, I couldn't answer that.
7    Q    If you had to estimate, 50 percent of the
8    time?
9    A    I don't know. Like I said, you just don't
10   know.
11   Q    So you have, just sitting here today, no
12   idea?
13   A    I couldn't honestly answer how many days a
14   week, every night, every week. It's too sporadic.
15   Q    Okay. So it's fairly infrequent, then,
16   that that happens?
17   A    No.
18   Q    Would you say it happens frequently?
19   A    Yes.
20   Q    Okay. But beyond that, you can't really
21   narrow down on how often it happens?
22   A    No.
23   Q    Now, is one of your roles or
24   responsibilities as a night manager hiring and firing?
25   A    Yes.

Page 41

1   Q   Okay.  What do you do more of, hiring or
2   firing?
3   A   Firing.
4   Q   Okay.  Do you typically --
5   A   Well, let's clarify staff/dancers.  Who
6   are you talking about?
7   Q   That's what I was going to get into.
8       So you said you have responsibility over
9   bar staff, DJ, really anyone that's at the club; is
10  that right?
11  A   Correct.
12  Q   Do you also have responsibility for
13  terminating any people that are below you, or is there
14  some other specific responsibilities you have over
15  hiring and firing?
16  A   I do fire people, and it's usually
17  discussed with Mr. Braglia before I fire people; but
18  yes, I do have responsibilities for firing people.
19  Q   Does anybody else have responsibilities
20  for firing employees or contractors at the club?
21  A   Mr. Braglia would.
22  Q   Okay.  Do you have any idea whether you do
23  most of the firing or if Mr. Braglia does most of the
24  firing?
25  A   Yet again, I do all the -- verbally,

Page 42

1   "you're fired," would be all from me.
2   Q   Okay.  So you deliver the message?
3   A   Yes.
4   Q   And do you ever make an independent
5   decision to fire somebody?
6   A   I make decisions to go to Mr. Braglia to
7   discuss firing people, yes.
8   Q   Okay.  But you would never fire someone
9   without the consent of Mr. Braglia; is that right?
10  A   Yes.
11  Q   So if Mr. Braglia is not in the club a
12  particular evening, you would wait until the next day
13  to -- if you wanted to fire somebody, you would have
14  to wait until the next day, until you spoke with
15  Mr. Braglia, before doing that?
16  A   Yes.
17  Q   Is that something that's formalized;
18  meaning, are you required to consult with Mr. Braglia
19  first, or do you do it just as a matter of good
20  practice?
21  A   Just as a matter of practice.
22  Q   But you have independent authority to
23  fire?
24  A   Yes.
25  Q   When we were discussing earlier the

Page 43

1   policies against sexual harassment and discrimination,
2   did you take part in compiling those policies or is
3   that something that was -- you were just instructed
4   on?
5   A   Yes, I didn't -- I haven't compiled any
6   club policy.
7   Q   Do you know who is responsible for
8   creating the club policies on things like sexual
9   harassment or discrimination?
10  A   I don't know.
11  Q   What is -- so have you ever fired a -- an
12  entertainer for having chargebacks?
13  A   I've fired entertainers for having
14  complaints from customers about chargeback situations,
15  yes, that may or may not have led to a chargeback.
16  Q   When you said a "chargeback situation,"
17  what do you mean by that?
18  A   It means a complaint lodged by the
19  customer to us that they were overcharged or misled.
20  Q   Okay.  And I'm asking your personal
21  knowledge of this.
22      So that's your understanding of what a
23  chargeback is?
24  A   Yes.
25  Q   Is essentially a complaint?

Page 44

1   A   Yes.
2   Q   Okay.  So if a customer complains to you
3   about an entertainer, you would consider that a
4   chargeback?
5   A   About what was their complaint?
6   Q   They were unsatisfied with the
7   entertainment services.
8   A   Then, no, that's not a chargeback.
9   Q   Okay.  Only a chargeback if they want
10  money back?
11  A   Yes.
12  Q   And do you have a process where, if a
13  customer comes to you and says they're unsatisfied
14  with an entertainer and they want their money back, is
15  there a process that you go through in terms --
16  A   If it comes to me, personally, during
17  working hours?  Are we talking about a girl that was
18  checked in hourly?
19  Q   So just as a general proposition for now,
20  and definitely during working hours, I mean, when
21  you're active in your role at a particular night, I'm
22  curious if you have any protocol that you engage in to
23  determine whether the complaint and refund is
24  warranted or if it's frivolous.
25  A   Our protocol is the girls are required to

Page 45

1  check in. It is documented by the house mother. So
2  if someone comes to me and says, this girl has
3  overcharged me, the first thing I would do would be to
4  radio the house mother and ask what time this person
5  was checked in, and then I would double check that
6  against what she is saying and what the customer is
7  saying he was charged.
8      Q   And you would include the entertainer in
9  that discussion?
10     A   Yes.
11     Q   Always?
12     A   Yes.
13     Q   And if the entertainer is saying one thing
14  and the customer is saying another, who do you side
15  with in the end?
16         MR. WARD: Object to the form.
17         THE WITNESS: I am siding with what our
18     documents say, what the house mother has
19     documented.
20  BY MR. McDONOUGH:
21     Q   Do you know how the house mother gets that
22  documented?
23     A   From a radio. When she checks in with the
24  floorman, the floorman radios it to the house mother.
25     Q   Okay. So a floorman, ultimately, checks a

Page 46

1  girl into -- we are referring to a VIP, I'm guessing,
2  right?
3      A   Correct.
4      Q   Okay. So a floor manager is the one that
5  ultimately makes note of the time that somebody was
6  checked in?
7      A   They make note, as well, but they radio it
8  in to the house mom.
9      Q   Okay. So that information comes from the
10  floor manager to the house mother?
11     A   Correct.
12     Q   And then when there's a dispute, you would
13  go to the house mother and ask them when they were
14  checked in by the floor manager; is that right?
15     A   Yes.
16     Q   And so, I guess, ultimately, whether the
17  log is accurate depends on the floor manager checking
18  the entertainer in on time; is that right?
19         MR. WARD: Object to the form.
20         THE WITNESS: Yes.
21  BY MR. McDONOUGH:
22     Q   And do you -- again, I guess, do you -- in
23  the cases of a discrepancy and a customer wants some
24  type of refund, do you, personally, review this house
25  mother log book on VIP rooms, or do you just speak to

Page 47

1  somebody over the telephone and ask them about it?
2      A   I ask the house mother over the radio what
3  time the person was checked in.
4      Q   And then do you also confer with the
5  waitress?
6      A   Yes, if there is a waitress by, I will
7  confer with the floorman and the waitress.
8      Q   And so, ultimately, whose responsibility
9  is it to keep track of the time that somebody is
10  checked in?
11     A   The dancers.
12     Q   The dancers?
13     A   Uh-huh.
14     Q   So let me understand that.
15         So the floor manager, you said, actually
16  checks somebody in?
17     A   The floorman will document it; it's
18  radioed to the house mother. But ultimately, the
19  responsibility to get their money, the dancers should
20  keep up with their own time.
21     Q   Right. Who collects the money from the
22  customer at the end of the time period they're checked
23  in?
24     A   The dancer.
25     Q   The dancer.

Page 48

1          The floor manager has no role in that?
2      A   No, absolutely not.
3      Q   Okay. And keeping sort of focused on --
4  I'm just trying to understand that a little bit.
5          So with respect to your role in this whole
6  process -- and let's call it dispute resolution -- you
7  check various sources, one of them being with the
8  house mothers, over the phone, to see what time the
9  floor manager has checked that person in.
10         And how do you know when that person was
11  checked out?
12     A   The dancer lets the floorman know, I'm
13  done.
14     Q   Okay. So the entertainers are responsible
15  for letting the floor managers know the session is
16  over?
17     A   Yes.
18     Q   And then the floor managers tell the house
19  moms, once again, that they're checked out?
20     A   Yes.
21     Q   And so if -- so if there's a
22  discrepancy -- so based on that information that you
23  have, none of which you gathered yourself, correct --
24  I mean, you don't ever check someone into a room,
25  right?

Page 49

1  A    No.
2  Q    You rely on this other information to
3  determine whether the customer's complaint is valid?
4  A    Yes.
5  Q    And if you see that -- based on your
6  information gathering, that the customer says they
7  were checked in as of 1:00 a.m. and the house mother
8  is saying that this person was checked in as of 1:30,
9  who do you believe in a situation like that?
10  A    The house mother.
11      MR. WARD: Sorry, I didn't get to put in
12      "object to the form," you were so quick.
13  BY MR. McDONOUGH:
14  Q    Okay. So you believe the house mothers in
15  that situation?
16  A    Yes.
17  Q    As a policy, like, I mean, you trust your
18  employees and assume they're doing their job, right?
19  A    Yes.
20  Q    So how frequently do you end up siding
21  with a customer and deciding that the customer was
22  overcharged?
23      MR. WARD: Object to the form.
24      THE WITNESS: Most of the time, we usually
25      side with the dancer.

Page 50

1  BY MR. McDONOUGH:
2  Q    And that's because there is a house mom
3  and floor manager that corroborate --
4  A    Yes.
5  Q    -- that entertainer's story?
6  A    Yes.
7  Q    How often do these type of discrepancies
8  arise?
9  A    Very rare. Normally, my experience is
10  through Liz Barton. She'll send a complaint over to
11  my desk, it's written with the customer's tab, and I
12  review it and speak with the customer.
13  Q    And then -- you speak with the customer
14  after you've done your diligence already to determine
15  what the floor manager says, what the house mom
16  logbook says, and so you have your facts straight, and
17  then you deal with the customer; is that right?
18  A    Correct.
19  Q    And then you also mentioned that you
20  always include the entertainer and the customer in
21  that conversation.
22      Where does the entertainer come into play?
23  A    I ask the entertainer -- at the same time
24  as I review with the staff, I'll also get the
25  entertainer's input.

Page 51

1  Q    Okay. So you would never -- strike that.
2      When you're discussing the issue with the
3  customer, do you ever make sure that the entertainer
4  is present, as well, or do you try to deal with those
5  two people separately?
6  A    Separately.
7  Q    And that's because you don't want this
8  situation to escalate, or is there another reason for
9  that?
10  A    No. There's no general reason, but
11  usually it's just the entertainer is not there.
12  Q    She went to go work somewhere else, and
13  you're just trying to clean up --
14  A    Or she may not be there on a given night.
15  You just never know. There's no general reason that
16  the girl is not there.
17  Q    Okay. Anyway, so what you just went
18  through is kind of your protocol in dealing with a
19  customer complaint of overcharging?
20  A    Uh-huh.
21  Q    Now, is -- do you know -- and if you don't
22  that's fine. Is there a general club policy in terms
23  of how to deal with the customer complaints concerning
24  overcharging?
25  A    I don't think so.

Page 52

1  Q    Okay.
2  A    It's just usually a communication between
3  Liz and myself.
4  Q    And are those -- again, these are
5  situations that -- when you've dealt with them
6  personally.
7      Have you ever had a situation occur where
8  there was, in fact -- you determined there was a
9  chargeback -- there was an overcharging of, say, for
10  example, $100.
11      When you make that determination, what's
12  your next step?
13      MR. WARD: Object to the form.
14      THE WITNESS: Usually anything that's $100
15      is just going to be looked at as far as a room
16      time: Does the room time match-up to what they
17      made for the time that they spent in the room?
18  BY MR. McDONOUGH:
19  Q    I'm sorry, you got me there.
20      What do you mean by "a room time
21  match-up"?
22  A    When the customer checked into a VIP
23  room --
24  Q    Yeah.
25  A    -- we would match it up to the time that

Page 53

1  the girl was checked in, the amount of time, and how
2  much they were paid.
3      Q    Okay.
4      A    So, say, if a girl was checked in for an
5  hour and she made a thousand dollars, that would be a
6  red flag for me that there was an overcharge.
7      Q    Got it.  Why would that be a red flag for
8  you?
9      A    Well, they were overcharged, because they
10  get 300 an hour.
11      Q    Okay.  And so that would be a red flag for
12  you.
13          I guess my question was:  Once you've made
14  that determination that you believe there was some
15  type of overcharge -- and in your situation, where
16  they were in the room for one hour, they were charged
17  a thousand dollars, and they were supposed to be
18  charged 300, if I take your -- what you said
19  correctly -- do you refund $700 to the customer in
20  that situation?
21      A    Yes.
22      Q    And you do that on the spot?
23      A    No.  Generally, yes, but sometimes, if
24  there are situations where this guy tipped extra or --
25  you know, there's just so many circumstances.  I

Page 54

1  couldn't just say, black and white, yes, we're going
2  to give this guy $700 back.
3          A lot of times, we try to offer a free
4  room -- hey, can you come back?  We'll give you a free
5  VIP room to make it up for you.
6          I always tried not to give money back.  We
7  usually try -- the first thing is to get compensation
8  through -- hey, come back.  We'll get you in the door.
9  We'll give you a free VIP room.
10      Q    And does that usually satisfy the
11  customer, in your experience?
12      A    Sometimes.
13      Q    What if -- have there been situations
14  where -- that you've dealt with, where the customer
15  has said, absolutely not.  I'm never coming back here.
16  I want my money back?
17      A    Oh, yes.
18      Q    And what do you do in that type of
19  situation?
20      A    If we feel the girl was wrong, if the
21  money doesn't match up, then, yes, it's re-paid.
22      Q    So the last question on this:  Does
23  anything, other than the time checked in and the time
24  checked out, influence your decision on whether to
25  refund a customer or provide them with some ancillary

Page 55

1  benefit to offset the overcharging?
2      A    That would be the majority of weighing my
3  decision, yes.
4      Q    Is there any other factor that you would
5  consider?
6      A    None that I can think of offhand.
7      Q    Does the customer satisfaction matter to
8  you in making that determination?
9      A    It does, but I don't ever recall a
10  situation like that happening.
11      Q    You don't recall a customer asking for a
12  refund because they weren't satisfied?
13      A    No.
14      Q    Now, these experiences that you just
15  described, are these always handled the same night
16  that the customer makes a complaint, or do you ever
17  deal with that the next day and --
18      A    Sometimes it's as much as a week, just
19  depending on when I can track down all the folks that
20  were involved:  Waitress, Cheetah Bucks Girls.
21      Q    So you don't -- this is not a same-night
22  decision all the time?
23      A    No.
24      Q    But the customer makes the complaint, I
25  assume, that evening, or can the customer complain a

Page 56

1  week later?
2      A    Yes.
3      Q    Yes, the customer can complain a week
4  later?
5      A    Yes.
6      Q    And you would go through the same process
7  you just described to me in trying to figure out, you
8  know, whether the customer is right or whether they,
9  for some reason, just want their money back?
10      A    Yes.
11      Q    Now, in that example, where we were
12  talking about a thousand dollars in -- let's use the
13  situation where Cheetah Bucks were used.  So say there
14  was -- the entertainer, you're aware, was given a
15  thousand dollars.  They were in the room one hour, and
16  you said that would be a red flag to you, because
17  payment should have been 300, as a general rule.  You
18  said there may be other factors that could interplay,
19  where they might have gotten more than $300.
20          Do you recall what factors those would be?
21          MR. WARD:  I'd probably just object to the
22  form on that.  It's a hypothetical for a lay
23  witness.
24          But are you including the customer
25  complaining in that scenario or just the fact

Page 57

1    that they paid a thousand?
2        MR. McDONOUGH: Oh, a customer
3    complaining, correct.
4        MR. WARD: I still object to an improper
5    hypothetical to a lay witness.
6        THE WITNESS: Can you repeat what you just
7    asked me again?
8    BY MR. McDONOUGH:
9    Q    Sure.
10       We discussed the situation earlier where
11   an entertainer was in a room for an hour, that the
12   entertainer received a thousand dollars, and you said
13   that would be a red flag to you, because that
14   entertainer should have been paid around $300 for an
15   hour.
16       Do you recall that discussion?
17   A    Yes.
18   Q    So I guess my question is:  If it's
19   determined again that -- so the customer says that
20   they were overcharged in that situation.  And you
21   determine that, in fact, yes, you believe the customer
22   is overcharged.  Do you -- and further, the customer
23   does not want any sort of free pass.  They want their
24   money back.
25       Do you give the customer $700 back?

Page 58

1        MR. WARD: Object to the form.
2        THE WITNESS: Never on the night that he's
3    there.  We don't just give him a refund on the
4    spot.
5    BY MR. McDONOUGH:
6    Q    Okay.  So it would always be -- so you'd
7    never do it on the spot?  You always take time to work
8    through these issues and figure out who's right?
9    A    Yes.
10   Q    Now, after -- so say you've decided this
11   after a couple of days and then decided the customer
12   was due $700.
13       Do you go back, refund the customer $700,
14   and then go get that money back from the entertainer,
15   as well?
16   A    Yes.
17   Q    So you tell the entertainer, we want $700
18   back, because we have to give that back to the
19   customer?
20   A    Yes.
21   Q    And did the entertainers usually comply
22   with that?
23   A    Yes.
24   Q    Do you have any kind of hold period on
25   Cheetah Buck -- strike that.

Page 59

1        When an entertainer earns Cheetah Bucks,
2    do you allow them to redeem those Cheetah Bucks that
3    same night?
4    A    Yes.
5    Q    There's no one-day, two-day hold period in
6    the case that there's some kind of issue with the
7    charges?
8    A    No.
9        MR. WARD: When you get to a good spot,
10   I'd like a comfort break.
11       MR. McDONOUGH: Yeah.  All right.  We can
12   take a break.
13       (Short break from 11:24 a.m. to 11:39 a.m.)
14   BY MR. McDONOUGH:
15   Q    So we talked before the break a little bit
16   about your understanding of the chargebacks, your
17   experience with them, and your role sort of in that
18   process, if a customer raises a complaint, saying they
19   were overcharged.
20       Now, have you ever taken an entertainer's
21   money simply because the customer indicated they were
22   not satisfied with the entertainment services?
23   A    No.
24   Q    Never?
25   A    No.

Page 60

1    Q    Have you ever had a customer come up to
2    you and say or -- well, strike that.
3        Has a floor manager ever approached you,
4    saying that a customer complained to them that they
5    were unsatisfied with the entertainer and asked what
6    you wanted them to do?
7    A    No.
8    Q    Has anyone -- has any customer ever
9    approached you directly and complained that they were
10   unsatisfied with the entertainer's services and asked
11   for a refund?
12   A    You know, I -- the only thing I can say is
13   if a girl is too drunk.  I have had a complaint -- it
14   has happened in the past, where a girl has been overly
15   intoxicated, and a customer has said she's, you know,
16   too drunk.
17   Q    So in a case like that, would you ever
18   refund the customer's money due to an entertainer
19   being overly intoxicated?
20   A    If the customer wanted to leave, generally
21   they -- in the past, they just get another girl, or if
22   they want to leave, they will just say, no harm, no
23   foul.  We'll take your room charge off, and you can
24   go.
25   Q    So let me get this right.  So there's --

Page 61

1 are there two components to somebody that -- I don't
2 know -- would you say -- when a customer uses a VIP
3 area, would you call that renting a VIP area?
4        What would you call that?
5    A    I've never called it anything.  Just
6 getting a VIP room.
7    Q    Okay.  So you just -- you call it a
8 getting a VIP --
9    A    Renting or purchasing.
10   Q    So is there a separate charge for the use
11 of the room versus the use of the entertainer
12 services?
13   A    Yes, separate charge.
14   Q    So when you say you would refund the cost
15 of the room, you would not refund what the customer
16 paid to the entertainer?
17   A    Generally, they wouldn't have paid her
18 yet.  They usually pay in the end.
19       But if the room had just started and, for
20 some reason, he had pre-paid, then, yes, we would.
21   Q    Okay.  If a customer, again -- let me talk
22 about specific instances.
23       Do you recall specifically any instance
24 where a customer said entertainer "X" is too drunk.  I
25 don't want her in here anymore?

Page 62

1    A    Yes.
2    Q    Do you recall what that -- one of those
3 entertainers' names was?
4    A    No.  I mean, I just know it's happened
5 over the years, but I couldn't tell you a name.
6    Q    Okay.  So that doesn't happen frequently?
7    A    No.
8    Q    Has it happened in the last year?
9    A    Yes.
10   Q    Do you recall the entertainer's name?
11   A    No.
12   Q    So in that situation -- would you say that
13 happened at least one time in the past year?
14   A    Yes.
15   Q    And can you just not remember the
16 entertainer's name, but can you remember the
17 situation?
18   A    I remember situations, but not a specific
19 situation, but I know they've happened.  But I
20 couldn't give you a specific situation nor an
21 entertainer's name.
22   Q    Okay.  You just know it happened at least
23 once in the past year?
24   A    Yeah.
25   Q    And in those situations, you would

Page 63

1 refund -- or at least offer to refund the customer the
2 room fee, right?
3    A    Yes.
4    Q    And if the entertainer had spent 45
5 minutes in there already out of a total hour, would
6 you require the customer to still pay the entertainer
7 for the 45 minutes?
8    A    Absolutely.
9    Q    Okay.  So regardless, if that entertainer
10 was checked in for 45 minutes -- even if it was
11 supposed to be an hour, and the customer comes out
12 after 45 minutes and says this girl is too drunk, I
13 don't like her, you would still make the customer pay
14 for that 45 minutes?
15   A    Yes.
16   Q    Always?
17   A    Always.
18   Q    And the only situation you can think of,
19 sitting here today, where you would give credence to a
20 customer's complaint would be with respect to
21 intoxication, if the entertainer was too drunk, and
22 you saw it for yourself; is that right?
23       MR. WARD:  Object to the form.
24       THE WITNESS:  That's not -- I've never
25       been presented with anything other than that.

Page 64

1        You're asking me to say that nothing could
2     never happen.  I don't know.  But I'm telling
3     you my experience with what has happened to me.
4 BY MR. McDONOUGH:
5    Q    That's all I'm asking for.
6    A    Yes.
7    Q    I'm saying, in your experience, the only
8 time you've ever given a customer money back for a
9 room or didn't require them -- strike that.
10       The only time you've given a customer
11 money back for being checked into a room is when the
12 entertainer was too intoxicated?
13       MR. WARD:  Object to the form.
14       THE WITNESS:  Or if someone has been
15       thrown out, I'm not going to charge them.  If he
16       goes in a room and we throw him out, then -- so
17       that they're -- he pays the tab, the club, the
18       girl can at least get something.  Whatever time
19       was spent in the room they will be charged
20       for -- whatever time they were in the room,
21       before we asked them to leave the club.
22 BY MR. McDONOUGH:
23   Q    Okay.  So that's a different situation.
24 That's where the customer became unruly, for whatever
25 reason, you decided to kick them out of the club, you

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 65

1 would still charge them in that instance?
2    A    For the time that was spent in the room, I
3 would, yes.
4    Q    And you would still require them to pay
5 the entertainer fee for whatever period of time they
6 were in that room?
7    A    Yes.
8    Q    So either way, there's never a situation
9 where an entertainer would not get paid for time they
10 spent checked into a room?
11    A    Correct.
12    Q    Now, have you ever had to call the police
13 on a customer?
14    A    Yes.
15    Q    Is that fairly frequently or rarely?
16    A    Frequently lately.
17    Q    Frequently lately.
18         And what types of -- strike that.
19         What are some of the reasons that you
20 would call the police on a customer?
21    A    People refusing to leave.
22    Q    And people have refused to leave more
23 lately than at prior times in the club's history?
24    A    Yes, and I don't know why.
25    Q    And you have no inkling as to why that

Page 66

1 might be?
2    A    No.
3    Q    And in those cases, did the police
4 actually come and remove the customer, or does the
5 customer relent and leave because the police are
6 coming?
7    A    Sometimes a customer leaves on his own.
8 Some occasions, very rarely, someone is stupid enough
9 to go to jail.
10    Q    And that has happened in the past year?
11    A    Yes.
12    Q    I'm sorry, to be clear: In the past year,
13 have you had a situation where you had to call the
14 police, the customer still refused, and they ended up
15 getting escorted out by the police?
16    A    Yes.
17    Q    Do the floor managers ever, in a situation
18 like that, take the customer outside of the club or --
19    A    Yes.
20    Q    Okay. So is that protocol, that they
21 remove the customer from the club, or does it depend
22 on the situation?
23    A    No, it's not protocol, but it's certainly
24 our goal. But if it's a situation where we know we
25 can't get the customer out, then the police will be

Page 67

1 asked to come in and escort them out.
2    Q    Okay. Going back to customer complaints,
3 have you ever had a customer -- and I just want to get
4 your testimony correct here.
5         So in your experience, you've never had a
6 customer complain to you about an entertainer's
7 services for anything other than the entertainer being
8 overly drunk?
9    A    Correct.
10    Q    You've never had a customer come to you
11 and complain that the entertainer wouldn't get close
12 enough to him?
13    A    No.
14    Q    You've never had an entertainer -- I mean,
15 a customer approach you and express to you that he
16 expected physical contact and didn't get it, therefore
17 was unsatisfied?
18    A    No.
19    Q    Now, in your role as night manager, do you
20 ever actually provide security to rooms?
21    A    No.
22    Q    The floor managers handle that aspect of
23 it --
24    A    Yes.
25    Q    -- and report to you if there are issues?

Page 68

1    A    Yes.
2    Q    So you would never, in a night, go --
3 actually go into a room -- a VIP room?
4    A    No, I'll walk by a room occasionally.
5    Q    You'll walk by?
6    A    Yeah, and look in. If I'm there, I'll
7 certainly use it as an excuse to walk by and just peep
8 in once in a while.
9    Q    Okay. And when you say "peep in," what do
10 you mean by that?
11    A    Look into the room.
12    Q    Does that require opening a door, or does
13 that require just walking by and kind of --
14    A    Looking in the glass.
15    Q    Looking in the glass.
16         Okay. So this is -- you're talking over
17 the past six months, I guess, or so, correct?
18    A    Yeah.
19    Q    Prior to that, when the doors were --
20 didn't have glass, and you peeped in, what did that
21 entail?
22    A    Peeking through the door and closing it.
23    Q    Okay. And what's the purpose of you doing
24 that?
25    A    Just to make sure everything is going

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

---

Page 69

1 okay.
2 Q     What would entail things not going okay?
3 A     Making sure nothing illegal is going on.
4 Q     What would that include?
5 A     A number of things:  A sex act,
6 inappropriate touching.
7 Q     Drugs?
8 A     Yeah, drugs.
9 Q     And is that something -- so when you -- I
10 want to get away from the word "peep."
11     When you patrol -- is that a fair
12 characterization, patrol the rooms?
13 A     You're making it sound as if that's my
14 normal job description, which it is not.  I'm saying
15 that I have done that.
16 Q     Okay.
17 A     But on a normal night, I don't walk around
18 peeping in rooms.
19 Q     Okay.
20 A     But I have, you know.
21 Q     So on your average night, you're not going
22 to do that?
23 A     I'm usually not going to go to a room,
24 unless I'm called for an issue.
25 Q     Okay.  And if you're called, that means

---

Page 70

1 that a floor manager called you?
2 A     Or a house mom could have possibly called.
3 Q     A house mom could have called you?
4     Would a house mom call a floor manager
5 first to deal with the situation, before calling you?
6 A     Usually, if there's something minor going
7 on, the floorman will call the house mom to go by.
8 Q     Can you give me an example of something
9 minor that you -- a situation you can think of that
10 was minor?
11 A     If a girl is sitting on someone's lap
12 inappropriately, a house mom would go, hey, get up.
13 Q     Okay.  Sitting on a lap inappropriately.
14     So is there an appropriate way to sit on a
15 lap or something that would be, in your eyes,
16 inappropriate?
17 A     Yes, any manner that would be simulating a
18 sexual position --
19 Q     So if somebody was --
20 A     -- i.e., straddling someone.
21 Q     So if a girl is sitting on someone's knee,
22 that wouldn't be inappropriate?
23 A     No, not really.
24 Q     If they're sitting in their lap, would
25 that be inappropriate?

---

Page 71

1 A     If they're sitting in a manner that would
2 look like a sexual position, it would be
3 inappropriate.
4 Q     If they were grinding, it would be
5 inappropriate?
6 A     Yes.
7 Q     And this type of sitting or various types
8 of sitting would be considered a minor infraction that
9 would --
10 A     Yes, that would just be something that
11 they would just be told to get up.
12 Q     Okay.  And if -- again, this is -- I'm
13 trying to stay focused on your personal experience.
14     Have you walked into a room, checked on a
15 room, and seen an entertainer sitting on somebody's
16 lap inappropriately?
17 A     Yes.
18 Q     And what do you do?
19 A     Tell them to get up.
20 Q     Have you ever been in a situation where
21 you requested that the entertainer get up, and you
22 checked again in 10 minutes and found the entertainer
23 right back where she was?
24 A     Yes.
25 Q     And what do you do in that situation?

---

Page 72

1 A     Then we usually will take them to the
2 back, after their room is over, and reprimand them.
3 And depending on how it goes with the entertainer, if
4 she's not getting it, sometimes we may need to give
5 them a little suspension or maybe even VIP
6 restriction.
7 Q     Okay.  So there's a suspension -- and this
8 would all be at your instruction, if there was a
9 suspension or VIP restriction?
10 A     Yes.
11 Q     What's the difference between a suspension
12 and a VIP -- I guess --
13 A     A suspension.
14 Q     -- let's just focus on the suspension.
15     Yeah.  What is that?  What is a
16 suspension?
17 A     It's where you're not allowed to work for
18 a period of time.
19 Q     Okay.  So you're not allowed in the club
20 to work for -- what time period are we talking about
21 here?
22 A     Week, two weeks.
23 Q     Okay.  What is a VIP restriction?
24 A     We don't allow them to go to VIP rooms.
25 Q     Is that, again, for a discrete period of

---

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 73

1  time?
2  A    Yes.
3  Q    What is an exemplary time period for VIP
4  restriction?
5  A    Two weeks.
6  Q    Okay.  And if there's been a suspension,
7  is that noted somewhere in the --
8  A    Yes, in the house mom log.
9  Q    Okay.  That's not something that you would
10  note personally?
11  A    No.
12  Q    What about a VIP restriction, is that
13  something that's noted by The Cheetah?
14  A    Yes.
15  Q    But not something that you would note
16  personally?
17  A    No.
18  Q    Okay.  But again, to be clear, you would
19  impose the VIP restriction or the temporary
20  restriction on working at the club?  That would be
21  something that's in your responsibility?
22  A    Yes.
23  Q    And if that happens to -- say, a
24  suspension or a VIP restriction happens to an
25  entertainer more than once, is there an escalating

Page 74

1  protocol that you use to determine the right course of
2  action?
3  A    There's no protocol.  It's just a judgment
4  situation.  But, yeah, if they continued to do it,
5  they would be suspended more or even terminated, but
6  there's nothing -- there's no specific protocol.
7  Q    So it's not, if you get five VIP
8  restrictions over the course of a year, you're fired?
9  It's something more relaxed than that?
10  A    There's no specific protocol.
11  Q    Okay.  Do you, personally, adhere to any
12  sort of practice with respect to suspensions and VIP
13  restrictions?
14  A    No.  There's different occasions.  Like I
15  said, there's no specific protocol.
16  Q    Is there -- so if a -- if an entertainer
17  is caught -- well, let me step back.
18        Do you have a protocol for when it's been
19  brought to your attention that an entertainer is
20  overly intoxicated?
21  A    Yes, they're removed from the floor and
22  sent home.
23  Q    Is there any type of restriction put on
24  them in that situation?
25  A    Not immediately, but if it continues to be

Page 75

1  an issue with drinking, then they are put on drink
2  restriction.
3  Q    And what does "drink restriction" mean?
4  A    It means they're not allowed to drink.
5  Q    And that, I'm guessing, is also for a set
6  period of time?
7  A    Sometimes.  Sometimes it's permanent.
8  Q    Okay.
9  A    Usually it will be a set period of time.
10  And if they go off and they don't seem to be able to
11  handle it, then we'll say, okay, this is going to be a
12  permanent situation for you.
13  Q    And if an entertainer is caught drinking
14  when on drink restriction, what do you do to that
15  entertainer?
16  A    I usually warn them and try to give them a
17  chance.  But if they continue to drink, then we have
18  to get rid of them.
19  Q    If you had to describe your temperament at
20  work, how would you describe it?
21  A    Fair.
22  Q    Fair.
23        Do you ever yell at work at entertainers?
24  A    I have yelled at entertainers in the past
25  that are over-shouting me when I'm speaking.  I have

Page 76

1  raised my voice, yes, certainly.
2  Q    Is that a frequent occurrence?
3  A    No, very rare.
4  Q    And you're saying it's only when an
5  entertainer is trying to talk over you?
6  A    Yes.
7  Q    So would you say you are generally calm
8  when talking with an entertainer?
9  A    Yes.
10  Q    And if somebody said that you yelled at
11  them or frequently yelled at them, that would, in your
12  mind, be because they were trying to talk over you
13  frequently?
14        MR. WARD:  Object to the form.
15        THE WITNESS:  You're asking me a
16  generalization.  Yeah, that's the only time that
17  I would do it.  But I've also heard girls say,
18  Bob yelled at me, and "yelled at me" was getting
19  on to them, so there was no yelling.
20  BY MR. McDONOUGH:
21  Q    So you would say you're -- you have a fair
22  temperament at work?
23  A    Yes.
24  Q    Have you ever been put on drink
25  restriction or in any way written up at work?

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 77

1   A   No.
2   Q   The only person that would do that would
3   be someone over you, I'm guessing, right?
4   A   Yes.
5   Q   And the only person that's over you right
6   now at the club is Jack Braglia; is that right?
7   A   Jack and Mr. Hagood.
8   Q   Mr. Hagood is also senior to you?
9   A   He's the owner.
10  Q   And so you've never been written up?
11  A   No.
12  Q   Have you ever heard the phrase "payroll
13  girls"?
14  A   Not until these proceedings started.
15  Q   What about Fun Girls?
16  A   Still the same, not until this all came
17  about.
18  Q   What about "F" Girls?
19  A   Still the same.
20  Q   Okay.  Prior to that, you had never heard
21  those terms in your life?
22  A   No.
23  Q   Were you aware that certain entertainers
24  were paying floor managers 20 percent or more of their
25  income in exchange for referring customers to those

Page 78

1   entertainers?
2       MR. WARD:  Object to the form.
3       THE WITNESS:  Yes.
4   BY MR. McDONOUGH:
5   Q   Do you know why entertainers would pay
6   floor managers 20 percent of their income or more to
7   get referrals?
8   A   I don't know.  Maybe they're lazy; they
9   don't want to do the legwork of finding customers.
10  Q   Do you know how many floor managers
11  received 20 percent or more of entertainer tips?
12  A   No.
13  Q   So you've not done an investigation to see
14  who was sort of taking 20 percent from entertainer
15  earnings?
16  A   No.
17  Q   You were just generally aware that it was
18  happening?
19  A   Well, there was nothing in our policies of
20  people receiving tips from girls for doing that, so I
21  had no reason to investigate it.  If girls wanted to
22  tip a floorman, they were able to tip a floorman.
23  Q   And those tips would go into the tip
24  pool --
25  A   Correct.

Page 79

1   Q   -- that you eventually got a portion of at
2   least, at the end of the night?
3   A   Correct.
4   Q   So you never told any floor managers to
5   not take tips from entertainers, I'm guessing, right?
6   A   Correct.
7   Q   Because it wasn't against policies and
8   procedures that you were aware of at the club?
9   A   Correct.
10  Q   Do you know if floormen still will receive
11  20 percent or more of their tips from entertainers?
12  A   No.
13  Q   They don't, currently?
14  A   No.
15  Q   Do you know why that is?
16  A   The policy changed.
17  Q   The policy changed?
18  A   Yes, Mr. Hagood's decision.
19  Q   Do you know approximately when that was?
20  A   Recently, several months.  I'm not sure
21  exactly, but recent.
22  Q   Recent.
23      Within six months?
24  A   Yeah.
25  Q   Now, you said Mr. Hagood made that

Page 80

1   decision?
2   A   Yes.
3   Q   Do you know if he was aware of floor
4   managers receiving 20 percent of entertainer income
5   prior to making that decision?
6   A   I have no idea.
7   Q   Do you talk to Mr. Hagood on a regular
8   basis?
9   A   No.
10  Q   Do you talk to him at all?
11  A   Yes.
12  Q   With what frequency do you think you have
13  conversations with Mr. Hagood?
14  A   When he visits the club.
15  Q   Is it business discussions or just a
16  hello, friendly chat?
17  A   Generally just chit-chat.
18  Q   And do you ever raise issues to
19  Mr. Hagood, or does he ever ask you, you know, about
20  how things are going at the club?
21  A   Yes, he will.
22  Q   And if there are issues, you would inform
23  him?
24  A   If I felt he needed, but usually we
25  don't -- Mr. Braglia runs the club.  Bill kind of is

Page 81

1  a -- he's an owner, but he really doesn't have hands
2  on in the day-to-day operations anymore.
3      Q    Except for getting rid of the floor
4  manager --
5      A    That's a decision he made.
6      Q    Okay.  Do you have any idea when -- so I'm
7  going to refer to the payment by entertainers of
8  20 percent or more to floor managers as a payroll
9  system, just for lack of a -- a short term to use.
10         Do you know when the payroll system first
11  started?
12         MR. WARD: Object to the form.
13         THE WITNESS: No, I don't really remember.
14  BY MR. McDONOUGH:
15      Q    You just knew it existed -- strike that.
16         Do you recall when you first became aware
17  of its existence?
18      A    No.
19      Q    No idea?
20      A    No idea.
21      Q    Now, in approximately 2009 to 2010, were
22  you a night manager?
23      A    Yes.
24      Q    Okay.  So you had responsibility or
25  management -- or you managed the floor managers; is

Page 82

1  that right?
2      A    Yes.
3      Q    And were you aware that, during that time
4  period, the floor managers' pay structure changed?
5      A    The pay structure didn't change during
6  that time.
7      Q    It didn't change?
8         Isn't it the case that floor managers used
9  to be able to make money off bottles, bottle sales?
10      A    No, I don't recall that.
11      Q    Never?
12      A    I don't recall.
13      Q    So do you know currently who -- and again,
14  this is your personal knowledge, just sitting here
15  today.
16         Do you know who sells bottles at the club?
17      A    The waitresses.
18      Q    So the waitresses get credit of some sort
19  for selling bottles?
20      A    I don't think so.
21      Q    Okay.  So it's just a product they sell;
22  they don't get any incentive for selling bottles?
23      A    Correct.
24      Q    And to your knowledge, waitresses always
25  sold the bottles?

Page 83

1      A    Yes.
2      Q    Okay.  And you're not aware of floor
3  managers ever selling bottles?
4      A    A floorman can suggest -- to get into a
5  VIP area, they explain to the customer that -- and
6  we're talking VIP areas.  I'm talking -- I don't know
7  if you're familiar with the Mezzanine and the Den.
8      Q    I've seen -- vaguely.
9         Well, maybe you can describe that for me ,
10  then.  What is the Den?
11      A    It's just two raised-up areas in the main
12  floor.
13      Q    Okay.  And what -- the other area you just
14  talked about, what was that called?
15      A    The Mezzanine.
16      Q    The Mezzanine.
17         So what is the Mezzanine?
18      A    It's a raised-up area over by the main
19  stage.
20      Q    Toward the back of the room?
21      A    Yes, to the left.
22      Q    Is that where The Alluvia is?
23      A    Across from The Alluvia.
24      Q    The back left corner?
25      A    Back left, correct.

Page 84

1      Q    So the floor managers can suggest that, in
2  order to get into that area --
3      A    Well, what they tell them:  If a customer
4  says, how much is --
5         MR. WARD: Let him finish his question.
6         THE WITNESS: Sorry.
7  BY MR. McDONOUGH:
8      Q    Sure.
9         I guess, does a customer have to buy a
10  bottle to get into one of those areas?
11      A    No.
12      Q    Okay.  But floor managers suggest -- do
13  they insinuate that for certain customers, or is that
14  just -- strike that.  Let me make this clearer.
15         Do floor managers ever insinuate that a
16  customer needs to buy a bottle of some caliber to get
17  into one of those areas?
18      A    Can I give you a hypothetical?
19      Q    Sure.
20      A    If you came and asked, how much is it to
21  set up here, they say, it's either 25 a head, or you
22  can buy a bottle.
23      Q    Oh, okay.
24      A    They don't insinuate they have to do it.
25  They just give them either/or; it's their choice.

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 85

1    Q    Two options, okay.
2          All right. And so would the floor
3    managers -- in the case where the customer chose to
4    buy a bottle, instead of paying $25 per head, does the
5    floor manager make any percent of sales on those
6    bottles?
7    A    No.
8    Q    No.
9          And to your knowledge, they never did?
10   A    No.
11   Q    Was -- now, does somebody have to pay any
12   money -- does the customer have to pay money just to
13   go into the main floor?
14   A    Just their cover charge to get in the
15   door.
16   Q    Okay. But there's no additional
17   assessment of $25 or anything else?
18   A    No.
19   Q    Has that always been the case, that you
20   can remember?
21   A    Yes.
22   Q    Okay. So it was never the case, that you
23   can remember, where, in order to get a table, you had
24   to pay some fee on the main floor?
25   A    Yeah, that's happened, as in any

Page 86

1    nightclub. You tip the maitre d', the -- whoever the
2    floor is to get a good table sometimes.
3    Q    Okay. But it's not -- it's not an
4    institutional policy that, to get a table on the main
5    floor, you need to pay a certain amount of money?
6    A    Correct.
7          MR. WARD: Object to the form.
8    BY MR. McDONOUGH:
9    Q    But some customers may want to pay money
10   to get a good table on the main floor?
11   A    Correct.
12   Q    And you all would not oppose that?
13   A    I'm never opposed to someone tipping.
14         MR. WARD: I have that policy too.
15         MR. McDONOUGH: Exactly.
16   BY MR. McDONOUGH:
17   Q    So to the best of your knowledge, floor
18   managers in 2009 were paid exactly the same -- or
19   their earnings are comprised of exactly the same types
20   of payment as they are today?
21   A    No.
22   Q    Let me rephrase that.
23         To the best of your understanding, did a
24   floorman's pay include only tips and their salary or
25   their nightly shift fee back in 2009?

Page 87

1    A    In 2009, there's $15 minimum tip-out for
2    the floor guys from each dancer.
3    Q    Okay.
4    A    That's the only difference. Where now,
5    it's the 10 percent tip pool.
6    Q    So $15 per dancer, that went into a tip
7    pool just the same as the tip pool --
8    A    Just for the floormen.
9    Q    And you would have gotten a portion of
10   that as the night manager?
11   A    Yes.
12   Q    Do you know when that -- was that a
13   mandatory $15 tip?
14   A    Not really.
15   Q    So if somebody --
16   A    If a girl says, I'm not going to tip you,
17   they never made a big deal about it.
18   Q    Do you know when -- okay. So there was no
19   policy saying that, if you were working on a night --
20   A    That they have to do it.
21   Q    I'm sorry, give me one second.
22         There's no policy that, if you're working
23   a night, as an entertainer, you have to pay $15 to the
24   floor managers before you leave --
25   A    No.

Page 88

1    Q    -- back in 2009?
2    A    Correct.
3    Q    And do you know when that form of tipping
4    was stopped or ceased to exist at the club?
5    A    Maybe a year ago. I'm not sure of the
6    exact time frame, but, yeah, it was fairly recently.
7    Q    Okay. Do you have any idea why that was
8    phased out?
9    A    No idea. That wasn't my decision.
10   Q    Do you know whose decision it was?
11   A    No, I don't.
12   Q    So we've talked a little bit about sort of
13   your role as night manager with respect to the floor
14   managers.
15         And to be clear, you are the supervisor
16   for the floor managers; is that right?
17   A    Yeah.
18   Q    What are the names of the people that are
19   floor managers that you supervise today?
20         MR. WARD: I'm sorry, I just didn't hear
21   that.
22         MR. McDONOUGH: Sure.
23   BY MR. McDONOUGH:
24   Q    What are the names of the floor managers
25   that you supervise today?

Page 89

1    A    Phillip Johnson, Mark Holcomb, Guy
2  Robinson, Tommy Ponish, Darrell -- I don't know --
3  Darrell is fairly new.  I don't know his last name --
4  Lee Tatum, David -- don't know David's last name.
5  Let's see, who have I left out?  Let me think.  I
6  think that's it.
7         Rob Wunsch.  I don't know to spell his
8  last name.  W-U-N-S-C-H, maybe.
9    Q    Is there a pecking order among the floor
10 managers?  Do you know what I mean by "pecking order"?
11   A    I have two floor managers who serve as a
12 relief manager to me on my day off.  That would be
13 Phillip and Mark.
14   Q    But otherwise, their responsibilities are
15 all the same?
16   A    Yes.
17   Q    And none of them report to each other?
18   A    No.
19   Q    But they work together?
20   A    Yes.
21   Q    Have you ever been made aware of any
22 claims that a floor manager has assaulted an
23 entertainer in any way?
24   A    No.
25   Q    That's never happened?

Page 90

1         MR. WARD: Are you talking about in his
2    entire career?
3         MR. McDONOUGH: Uh-huh.
4         THE WITNESS: Entertainer Taner?
5  BY MR. McDONOUGH:
6    Q    Oh, just entertainer, not -- I'm confused
7  now.  Not Taner -- I'm not asking for a name of a
8  specific entertainer called Taner, if that's what you
9  mean.  I just mean any entertainer.
10   A    Ah.  Yes, we had a floorman named Chris,
11 who we let go.
12   Q    Chris Haley?
13   A    Yes.
14   Q    Do you recall, was that your decision?
15   A    I spoke with Mr. Braglia.  And actually,
16 he resigned, but we were going to fire him.
17   Q    So he technically resigned, but you were
18 intending on firing him?
19   A    Correct.
20   Q    Did he know you were intending on firing
21 him?
22   A    I think he knew.  That's probably why he
23 did it.
24   Q    And you were the one that actually did the
25 terminating or delivered the message?

Page 91

1    A    I never delivered it.  He sent me a text
2  message saying that he resigned.
3    Q    Okay.  So you hadn't sort of insinuated at
4  some point that he was going to get fired and then got
5  the text message?
6    A    I told him I would have to speak to Jack,
7  and we would get back to him.  He was sent home and
8  told that I would speak to Jack, and then I do believe
9  it was the same night he sent me the text message
10 saying:  Bob Johnson, I will spare you the
11 formalities.  I resign.
12   Q    And what was the reason that you were
13 thinking about firing him?
14   A    There was an entertainer that came to me
15 that said that he asked to meet her in the penthouse
16 and was physically inappropriate with her.
17   Q    Was she more explicit than that as to what
18 happened?
19   A    I think her exact words was, he was
20 groping all over me or grabbing me.  But no, not
21 really.  Just pretty much just "grabbing," "groping."
22 I don't know.
23   Q    And that was the only time you ever heard
24 of that --
25   A    That was --

Page 92

1    Q    Strike that.
2         Sorry, let me clarify that.
3         MR. WARD: I think he understood your
4    question.
5         THE WITNESS: I understood.
6  BY MR. McDONOUGH:
7    Q    Yeah.  Yeah.  Was that the only instance
8  you can think of, sitting here today, of your
9  knowledge of a floor manager acting inappropriately
10 with an entertainer?
11   A    No.  There was Floorman East.  Darron
12 Easterling was inappropriate with a waitress in a VIP
13 room, and he was let go.
14   Q    Do you know, again, what inappropriate
15 conduct was alleged by the waitress?
16   A    He sent her a text to meet him in the
17 Loft; and when she was there, she says she walked into
18 the room, and she saw his penis exposed.  She says she
19 left the room, and he sent her a text saying, "Are you
20 going to kiss it or not?"
21   Q    Okay.  And that's a fireable offense?
22   A    Absolutely.
23   Q    Was he fired, or did he resigned?
24   A    He was fired.
25   Q    Can you think of any other instances of

Page 93

1  you becoming aware that there was inappropriate
2  conduct by a floor manager toward an entertainer?
3      A    Why is the guy -- the guy in the
4  lawsuit -- why is his name escaping me all the sudden?
5  What's his name?  Why can't I think of his name?  I'm
6  having an Alzheimer's moment, sorry.
7          The guy -- Khaleesi's boyfriend.
8          MR. WARD: Can I tell him the name?
9          THE WITNESS: I'm having a brain fart.
10  Seriously, I'm having a brain fart.
11          MR. McDONOUGH: Blake Browning?
12          THE WITNESS: Yes.  Thank you.
13          MR. McDONOUGH: I was seeing you struggle
14  with that.
15          THE WITNESS: I'm sure you enjoyed that,
16  yeah.
17          MR. WARD: We'll tell you how we remember
18  that name later.
19  BY MR. McDONOUGH:
20      Q    Okay.  So explain to me the situation
21  there.
22      A    There was a situation where he was --
23  first, I had warned him previously not to have
24  relations with the dancers, and he was having a
25  relation with an entertainer named Dani.  I warned him

Page 94

1  that he should not, that that would cloud his judgment
2  sometimes and issues that could arise.
3          And later on, there was an issue with
4  Khaleesi, that he was also dating -- that I wasn't
5  aware that he was dating Khaleesi until the issue came
6  up.
7          From what I understand, the floormen were
8  going to pick a blond that someone had requested --
9  said, can you get me a blond?  He wanted to pick his
10  girlfriend.  And, from what I was told, the floormen
11  had someone else they were bringing up, and they told
12  him, look, you're just picking this girl because she's
13  your girlfriend.
14          And so they had, I guess, words amongst
15  each other, but I pulled him into the office and told
16  him that I had warned him about relationships causing
17  issues and told him that we were going to let him go.
18          He shook my hand and walked out.
19      Q    So, to be clear, there was not an
20  allegation that either of those two entertainers were
21  sexually assaulted by Mr. Browning; the allegation was
22  that they were involved in some kind of relationship?
23      A    Yes, I'm just -- you were asking me to
24  name floormen that I had let go, so I thought I should
25  tell you him.

Page 95

1      Q    Okay.  Now, besides those three that you
2  just listed off, can you think of any -- and I'm not
3  really asking about floor managers that you've fired,
4  just generally speaking.
5          I'm asking about specifically floor
6  managers that were fired because they were accused of
7  inappropriate conduct by an entertainer.
8      A    That's it.
9      Q    In your whole 26 years?
10      A    In my management.
11      Q    As management?
12      A    There may have been, in the past, where I
13  wasn't in the know of things.  I could not begin to
14  tell you.
15      Q    Okay.  Yeah.  I'm just asking, in your
16  knowledge, you know, just sitting here today, those
17  three are the only ones you can think of?
18      A    Correct.
19      Q    And did you guys -- or did you,
20  specifically, call the police or notify the
21  authorities with respect to East or Mr. Haley?
22      A    No.
23      Q    Do you know if the entertainers,
24  themselves, did?
25      A    I don't think so, but I don't know for

Page 96

1  sure.
2      Q    Okay.  And we started talking a little bit
3  about, from time to time, you will peek your head into
4  a room to see what's going on in the room, to make
5  sure nothing is happening that shouldn't be happening.
6          Do you recall talking about that?
7      A    Yes.
8      Q    And we talked about things you've seen,
9  including entertainers inappropriately sitting on a
10  lap, for instance.
11          Have you seen, when checking on a room,
12  anything more egregious or -- more severe than sitting
13  on a lap?
14      A    Yes, I have.
15      Q    Can you think of specific instances,
16  sitting here?
17      A    No.
18          (Discussion off the record.)
19  BY MR. McDONOUGH:
20      Q    Yeah.  So you can't think of a specific
21  instance, sitting here, right now, of something more
22  severe than lap-sitting -- or inappropriate
23  lap-sitting?
24      A    That I have seen?
25      Q    Uh-huh.

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 97

1    A    Yes.
2    Q    Yes, you can think of specific instances?
3    A    Yes.
4    Q    Okay. Can you give me the first instance
5  that pops into your head?
6    A    I have seen -- like I mentioned earlier,
7  you tell somebody to get up, when they're straddling a
8  customer. I have seen a situation where the girl got
9  up and something popped out.
10    Q    Okay. And what do you do in a situation
11  like that -- or what did you do in that specific
12  situation?
13    A    We throw the customer out and fire the
14  entertainer, both, on the spot.
15    Q    Can you think of any other instances?
16    A    Yeah, I've seen a lot over my period
17  there. I mean, but I can't really think of any
18  specific instances; but yeah, I've walked into rooms
19  and seen, you know, someone fingering a girl or
20  groping a girl, rubbing boobs, you name it. I mean,
21  yeah, of course I've seen a lot of that kind of stuff.
22        But I can't say two months ago I saw
23  Entertainer Bambi being groped by a customer. I can't
24  give you the specifics, but I've certainly seen things
25  over the years.

Page 98

1    Q    Okay. Are those instances -- when you see
2  something, is that something that you make a note of,
3  or do you tell somebody else to make a note of it?
4    A    Yet again, when we fire someone or
5  reprimand someone, it's the house mother's log.
6    Q    Okay. So that's not something you would
7  note yourself?
8    A    No. I have no notes, just to be clear, on
9  anything.
10    Q    Okay. Now, has there ever been a case
11  where you saw something going on sexually and did not
12  kick the customer out?
13    A    No.
14    Q    So always kick the customer out, any time?
15    A    (Nods head.)
16    Q    And you always fire the entertainer, as
17  well?
18    A    Yes, if they're having sex.
19    Q    Okay. What do you mean by "sex"?
20    A    A penis penetrating a vagina.
21    Q    Okay. So what if we stop short of that?
22  What if we -- oral sex.
23    A    They would be fired.
24    Q    The entertainer would be fired, the
25  customer --

Page 99

1    A    Customer ejected.
2    Q    -- kicked out?
3        What about fingers in inappropriate
4  places? Would that constitute a reason for
5  termination of the entertainer?
6    A    Yes.
7    Q    And in your experience, when you've seen
8  that, you've always fired the entertainer?
9    A    I don't remember if it's -- I can't say
10  always; but, yeah, that should be generally the
11  protocol.
12    Q    And what about in that situation with
13  fingers in inappropriate places, what would you do
14  with the customer in that situation?
15    A    We would ask them to leave.
16    Q    Always?
17    A    I can't say it's always happened, but, for
18  the most part, that would be the case.
19    Q    Can you think of an instance where you
20  allowed a customer to stay despite seeing something
21  like that?
22    A    No.
23    Q    Now, in your view, what is the role of a
24  floor manager?
25    A    To provide security for the club, to greet

Page 100

1  customers, make sure customers are taken care of,
2  getting served properly, getting their drinks, finding
3  tables, finding girls, if asked. Generally, that's
4  about it -- overseeing VIP rooms --
5    Q    Overseeing?
6    A    -- security.
7    Q    What does overseeing a VIP room entail?
8    A    They check on the rooms occasionally. I
9  ask them to go in -- usually the guys are making sure
10  they're getting their drinks -- hey, are you guys
11  doing okay? Do you need your waitress?
12        But also using that as an opportunity to
13  view the room, making sure there's nothing illegal
14  going on.
15    Q    Okay. Now, are floor managers ever paid
16  to not go in the room?
17    A    No.
18    Q    Never?
19    A    Not to my knowledge.
20    Q    So it's your testimony that, not to your
21  knowledge, has -- strike that.
22        Is it your testimony that you have no
23  knowledge of floor managers being paid to not go in a
24  VIP room?
25    A    Correct.

Page 101

```
1     Q    Have you ever been paid to not go near a
2  specific area in the club?
3     A    No.
4     Q    Do you ever check on -- when you describe
5  that you occasionally check -- will peek your head
6  into a room, have you ever done that with the
7  penthouse?
8     A    Yes.
9     Q    Would you say you check on the penthouse
10 more or less frequently than other VIP areas?
11    A    I can't say. Just -- like I said earlier,
12 if I'm in an area, like behind the front door, and
13 there's someone in the penthouse, I can hear music
14 going, there's a back door that you can open to look
15 in that people generally wouldn't see you, and you
16 just peep in there occasionally, but there's no
17 pattern on which room would be checked on more or
18 less --
19    Q    You don't prioritize any particular VIP
20 area over another?
21    A    Like I said, it's just an opportunity
22 situation. If I'm in an area and there is a room
23 being occupied, then, yeah, I can peep in there, but
24 no priority.
25    Q    Okay. Are you aware of a floor manager,
```

Page 102

```
1  under your watch, facilitating prostitution?
2     A    No.
3     Q    Are you aware of any preferential
4  treatment given to entertainers that are more
5  understanding of a customer becoming aggressive or
6  groping?
7     A    No.
8     Q    So you would say it's not a policy, at
9  least to your understanding, of promoting entertainers
10 or giving them better opportunities to earn money if
11 they are willing to allow touching that would be
12 disallowed under the current Cheetah rules?
13    A    Yes, they would not be allowed.
14    Q    And you're not aware of that ever
15 happening?
16    A    Correct.
17    Q    Are you a golfer?
18    A    No.
19         MR. McDONOUGH: Do you want to take a
20 break?
21         MR. WARD: Yeah.
22         (Short break from 12:43 p.m. to 12:44 p.m.)
23 BY MR. McDONOUGH:
24    Q    So are there customers at The Cheetah that
25 you would consider regulars?
```

Page 103

```
1     A    Yes.
2     Q    Do any of those regulars spend significant
3  amounts of money at The Cheetah?
4     A    Yes.
5     Q    And when I say a "significant amount of
6  money," what do you consider a significant amount of
7  money?
8     A    Thousands.
9     Q    Thousands?
10    A    (Nods head.)
11    Q    Thousands on a regular basis?
12         Again, so if I -- when I use the word "a
13 regular," what would that be to you in terms of visits
14 to the club? Is that, like, a weekly visit, a monthly
15 visit?
16    A    I don't know. I couldn't put a time frame
17 on someone coming in. I have no idea.
18    Q    Are there people that come to The Cheetah
19 every day?
20    A    Yeah, there are.
21    Q    Are there customers that come to The
22 Cheetah every day that spend thousands of dollars a
23 day?
24    A    Normally it's just the opposite. Usually
25 the guys that are in every day-in and day-out don't
```

Page 104

```
1  spend anything hardly.
2     Q    What do they do when they're there?
3     A    Kind of like Norm at Cheers. We have a
4  lot of Norms and Cliffords around The Cheetah.
5     Q    Okay. So not, to your knowledge, wealthy;
6  just -- kind of just enjoy the atmosphere and drink?
7     A    Correct.
8     Q    Are those customers valuable to you, as a
9  night manager?
10         I guess we're talking about nighttime
11 here.
12         So are those customers that come in every
13 day and don't spend any money valuable to you, as a
14 night manager?
15    A    Absolutely. If you take up spending a
16 little money over the course of a year, that adds up.
17 So every customer is valuable.
18    Q    Okay. When you say "a little money," what
19 would be considered "a little money"?
20    A    I don't know. 20, 50 bucks, who knows.
21    Q    A couple of lap dances and -- or table
22 dances?
23    A    Sure.
24    Q    And then drinks?
25    A    Sure.
```

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 105

1  Q   To your knowledge, if you had to name the
2  top five customers in terms of spending at The
3  Cheetah, who would they be, again, according to your
4  knowledge?
5  A   I don't know if I could characterize a top
6  five. I can think of guys in the past. But as far as
7  currently, I really don't have a frontrunner who would
8  be -- I would say is our best customer.
9  Q   Did you, as a night manager, place a
10 premium on customers who spend a lot of money when
11 they come in?
12 A   I don't understand your question, "placing
13 a premium."
14 Q   Do you value a customer that comes into
15 The Cheetah on a regular basis and spends thousands of
16 dollars -- do you consider them valuable, to you, in
17 particular?
18 A   I consider them valuable to The Cheetah.
19 Q   Okay. So it doesn't make a difference to
20 you, personally, in your income, whether this person
21 comes into the club or not?
22 A   Usually, no, it doesn't --
23 Q   Not even --
24 A   -- unless the guy tipped me, but --
25 Q   Or tips the floor manager?

Page 106

1  A   Yeah.
2  Q   Do you know a guy named Jeb --
3  A   Yes.
4  Q   -- that frequents the club?
5  A   Yes. Well, I wouldn't say "frequent."
6  Q   You wouldn't say "frequent"?
7      How often does Jeb come in?
8  A   Usually about once or twice a year.
9  Q   So Jeb wouldn't be considered, in your
10 mind, a regular customer of The Cheetah?
11 A   Definitely not.
12 Q   Has Jeb ever tipped you while he was at
13 the club?
14 A   Yes.
15 Q   How much -- what's an average tip from
16 Jeb?
17 A   I don't know. There's no rhyme or reason.
18 Q   What's the largest tip you can recall
19 receiving from Jeb?
20 A   Probably several hundred dollars.
21 Q   So this is most likely rumor, but I'm
22 going to ask anyway.
23     Word on the wire is that Jeb bought you a
24 house. Is that true or false?
25 A   No.

Page 107

1  Q   And word on the wire is that --
2      MR. WARD: Wait a minute. He said, "is
3  that true or false?" and you said "No."
4      So, just for the record, did he buy you a
5  house?
6      THE WITNESS: False.
7  BY MR. McDONOUGH:
8  Q   Did he buy you a car?
9  A   False.
10 Q   Yes or no, did he buy you a car?
11 A   False. He did not.
12 Q   So the most that you can remember Jeb ever
13 tipping you, personally, is a couple hundred dollars?
14 A   Yeah.
15 Q   And do you have a personal friendship with
16 Jeb?
17 A   No.
18 Q   No. So just a working relationship; when
19 he comes in, you say hello?
20 A   Yes.
21 Q   Do you have a conversation typically with
22 Jeb when he comes in?
23 A   Certainly.
24 Q   How much money, if you could estimate,
25 when Jeb comes in, does he spend?

Page 108

1  A   Thousands. I've seen him spend 10 grand
2  before.
3  Q   In a night?
4  A   Yes.
5  Q   Do you know Jeb's last name?
6  A   Stewart.
7  Q   And do you know if Jeb has ever been
8  caught engaging in sexual activity in the club?
9  A   I do not.
10 Q   You're not aware of it?
11 A   I am not aware of it.
12 Q   Would you be aware of something like that?
13     MR. WARD: Object to the form. He just
14 said he wasn't.
15     MR. McDONOUGH: Right. I'm asking if he
16 would be aware of something like that.
17     MR. WARD: Calls for speculation.
18     THE WITNESS: How would I know unless it
19 was reported to me? I don't understand.
20 BY MR. McDONOUGH:
21 Q   I'm just asking, if something like that
22 happened on your watch in the club, if you would be
23 made aware of that through the floor managers or
24 whoever else?
25     MR. WARD: Object to the form, but you can

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 109

```
1      answer.
2             THE WITNESS: Provided a floorman saw him
3      doing something, yes, I would be made aware.
4   BY MR. McDONOUGH:
5      Q     Got it.
6             Who's Jennifer Jackson?
7      A     She is one of our Cheetah Bucks Girls.
8      Q     Okay.  She's one of the names that you
9   gave me earlier when I asked for Cheetah Buck Girl
10  names, correct?
11     A     Correct.
12     Q     Has Jennifer Jackson ever been terminated
13  from the club?
14     A     No.
15     Q     Never?
16     A     Never.
17     Q     Has she ever been reprimanded by the club?
18     A     Yes.
19     Q     Do you recall what for?
20     A     She lost her mother and developed a pill
21  problem, and I put together an intervention.  This is
22  someone that's been kind of a Cheetah family member
23  for a very long time, and we put an intervention
24  together with her and told her that she had a problem,
25  and she took some time off.
```

Page 110

```
1      Q     Okay.  Did you guys pay for her to go to a
2   rehabilitation or --
3      A     No.
4      Q     Do you know if she went to rehabilitation?
5      A     I do not know.
6      Q     Were you the one that reprimanded her for
7   the drug use, I guess -- strike that.
8             So when I asked if she's ever been
9   reprimanded, and you said yes, and then you referred
10  to a treatment program you put in place to deal with
11  an issue that arose with her, and you said it was drug
12  related, and you said "pills," I think, correct?
13     A     Yes, I think so.
14     Q     Do you know -- was that just a suspicion
15  of yours, that there was drugs related, or did you
16  know for a fact?
17     A     It was a very strong suspicion, because
18  she seemed not together, just off, kind of nodding off
19  talking to you, just signs of -- but no, nothing --
20  solid proof, no.
21     Q     She was acting different than she had
22  acted in the past --
23     A     Correct.
24     Q     -- noticeably so?
25             And you -- were you the one to approach
```

Page 111

```
1   her to suggest taking time off?
2      A     Yes.
3      Q     And that was done after consulting with
4   Mr. Braglia, I assume?
5      A     No, I did not consult Mr. Braglia over
6   that.
7      Q     Okay.  That was a separate -- you just
8   took responsibility for that and suggested she take
9   some time off.
10            Do you know how long she took off?
11     A     Several weeks, but I'm not sure exactly
12  how long she took off, no.
13     Q     So it wasn't months?
14     A     No.
15     Q     To your recollection, when she returned
16  after a few weeks, did the issue go away?
17     A     Yes, for a while, but then she slipped,
18  and we brought it to her attention, and she seems to
19  be doing fairly well now.
20     Q     Did you reprimand her again?
21     A     Yes.
22     Q     And did you suggest she take some time off
23  again, as well?
24     A     No.
25     Q     Just told her to get her act together?
```

Page 112

```
1      A     Yes.
2      Q     Have you ever witnessed Mr. Hagood groping
3   any employees or entertainers at the club?
4      A     I have.
5      Q     Okay.  Can you think of specific
6   instances, as you sit here today?
7      A     No.
8      Q     Okay.  So when I asked you that question
9   and you said you have, what came to mind?
10     A     Grabbing boobs.
11     Q     It's known that Mr. Hagood has sort of an
12  affinity for large breasts; is that right?
13     A     Yeah.
14     Q     Do you know -- when you saw this groping,
15  was that something you saw on the main floor, or is
16  that in a private area, or do you not recall one way
17  or another?
18     A     Main floor.
19     Q     Was it a -- I guess, it was a pretty
20  common occurrence?
21     A     No.  I don't know.
22     Q     Not a common occurrence?
23     A     (Shakes head.)
24     Q     But you can't think of any specific
25  instances?
```

Page 113

1   A   No. We're talking several times over a --
2   years' span, so I couldn't give you a specific.
3   Q   Were they entertainers or waitresses?
4   A   Entertainers.
5   Q   And that groping of a -- well, strike
6   that.
7       Touching is not allowed in the club,
8   correct?
9   A   Correct.
10  Q   But Mr. Hagood was the boss, so I suppose
11  there was no one to tell him to stop?
12  A   That's right.
13  Q   Did you ever suggest to him that he
14  shouldn't do that?
15  A   No.
16  Q   Why? Why was that?
17  A   He's the boss. He's -- he owns the club.
18  Q   Right. You wouldn't want to put yourself
19  in a situation where you could get fired for basically
20  calling out the boss?
21  A   He owns the club.
22  Q   Right. Do you know -- does he still own
23  the club?
24  A   Yes.
25  Q   Do you know if he owns the club

Page 114

1   100 percent?
2   A   I have no idea.
3   Q   Now, have you ever witnessed Mr. Braglia
4   groping employees at the club?
5   A   No.
6   Q   Have you ever seen Mr. Braglia spanking a
7   girl's backside at the club?
8   A   I have not.
9   Q   Do you typically work Saturday nights?
10  A   No.
11  Q   You don't?
12  A   (Shakes head.)
13  Q   So what nights do you typically work?
14  A   Monday through Friday.
15  Q   Okay. So Monday through Friday evening
16  you work.
17      And then on the weekends, who takes your
18  place?
19  A   Phillip.
20  Q   Phillip does, all right.
21      So you have not witnessed Mr. Braglia
22  engaging in any kind of conduct like that on your
23  nights?
24  A   I have not.
25  Q   Have you heard of that happening?

Page 115

1   A   No.
2   Q   And you didn't hear about that happening a
3   couple weeks ago, on a Saturday night, before March
4   Madness?
5   A   No.
6   Q   And just to -- not to spend too much time
7   on this, but you said Mr. Hagood is the owner and you
8   didn't feel as though you were in a position to
9   reprimand him for groping an employee on the main
10  floor.
11      Is there a protocol for dealing with an
12  employee who gropes another employee anywhere in the
13  club?
14      MR. WARD: Object to the form.
15      THE WITNESS: For a regular employee, yes,
16  but not Mr. Hagood.
17  BY MR. McDONOUGH:
18  Q   Are you suggesting the rules don't apply
19  to Mr. Hagood?
20  A   I'm just suggesting that he is the owner
21  of the club and it's not my authority to reprimand him
22  or punish him.
23  Q   So when you described the -- your
24  understanding of the like sexual harassment policy at
25  The Cheetah, you said that if someone was to see or

Page 116

1   accuse somebody else of doing that to them, that they
2   would -- they are to report to the general manager --
3   A   Correct.
4   Q   -- Mr. Braglia, correct?
5       So why wouldn't you have reported that to
6   Mr. Braglia?
7   A   Oh, I have. We've talked.
8   Q   Okay. Have you had several conversations
9   about that or one conversation about that?
10  A   I'm sure we've had several over the span
11  of time, but I couldn't tell you how many times I've
12  talked to Jack about that.
13  Q   More than once, though?
14  A   Yes.
15  Q   What was the -- did you guys come up with
16  a resolution on what to do?
17  A   No.
18  Q   Did any entertainers ever complain about
19  it to you?
20  A   No.
21  Q   Did any other type of employee ever
22  complain about it to you?
23  A   No.
24  Q   I suspect, if you were cautious about
25  reporting that activity, then other employees would be

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

---

Page 117

1  probably as cautious, given his role as owner; is that
2  right?
3       MR. WARD: Object to form; speculation.
4       THE WITNESS: I have no idea.
5       MR. McDONOUGH: You can object to form.
6  Just leave it at that, please.
7       THE WITNESS: I have no idea, to answer
8  your question.
9  BY MR. McDONOUGH:
10     Q    Well, in any event, no one has come to you
11  and brought it up -- raised it as an issue?
12     A    Correct.
13     Q    You've just witnessed it, with your own
14  eyes, and conferred with Mr. Braglia about it?
15     A    Correct.
16     Q    And then came to no resolution on the
17  matter?
18     A    Correct.
19     Q    Have you ever brought an entertainer or a
20  waitress to a VIP room at the request of Mr. Hagood?
21     A    No.
22     Q    You've never done that?
23     A    Not to my recollection, no.
24       MR. McDONOUGH: Let's break for lunch.
25       (Lunch break from 1:03 p.m. until 2:02 p.m.)

---

Page 118

1  BY MR. McDONOUGH:
2       Q    Before the break, we took some time and
3  talked about Chris Haley and East.
4            With respect to Chris Haley, was that the
5  first incident that was ever reported to you
6  concerning any aggressive behavior by Chris Haley
7  toward entertainers?
8       A    Yes.
9       Q    You weren't aware of anything else prior
10  to that?
11      A    No.
12      Q    Had you heard of other instances?
13      A    No, sir.
14      Q    And did you -- I think I know the answer
15  to this, but you didn't witness this incident between
16  Chris Haley and the entertainer, correct?
17      A    Correct.
18      Q    Did somebody else witness it?
19      A    I don't know.
20      Q    So you basically had the entertainer come
21  to you and tell you, and then you acted based on that
22  information?
23      A    Correct.
24      Q    And I assume you also approached Chris
25  Haley and told him about the complaint and asked for

---

Page 119

1  his side of the story?
2       A    Yes.
3       Q    Do you remember what he said?
4       A    He said that it was a -- what did he say?
5  She agreed to go in the room with him and that it
6  wasn't like that.
7       Q    Okay.  And that was all he said about the
8  incident?
9       A    Yes.
10      Q    What about with respect to East?  Was the
11  incident we talked about before lunch the first time
12  you had heard anything about East being inappropriate
13  with an entertainer?
14      A    Yes.
15      Q    And you didn't witness this event either,
16  I'm guessing?
17      A    Correct.
18      Q    And how did you become aware of the
19  incident?
20      A    The waitress that was involved in the
21  incident made me aware.
22      Q    The waitress did.
23           Did you -- I forget.  Did you say the name
24  of that waitress?
25      A    Michelle Smith.

---

Page 120

1       Q    And do you recall asking East for his side
2  of the story?
3       A    Yes.
4       Q    And do you remember what he said?
5       A    He really didn't deny it.  He just said --
6  and you would kind of have to know East to understand
7  the context I'm going to give you, but it was, more or
8  less, just kind of like this kind of deal
9  (indicating), shrugging his shoulders, his hands out,
10  going, well, it really wasn't.  No, it really wasn't.
11           And I said, East, look, you were alone.
12  You asked this girl to come in a room.
13           And he -- I think the only thing that he
14  actually did deny was the fact -- he said his penis
15  was not out.
16      Q    But then you had text messages of some
17  sort, I guess --
18      A    Yes.
19      Q    -- indicating that that was false?
20      A    Yes.
21      Q    Have you ever been made aware of
22  incidences with a bartender named Jorge?
23      A    No.
24      Q    No entertainer has reported inappropriate
25  activity toward them by Jorge, to your knowledge?

---

Page 121

1    A    Not to my knowledge.
2    Q    Before I move on, I have follow-up
3  questions on some topics from this morning.
4         You said, at times, you've been made aware
5  that entertainers who are underage were intoxicated or
6  blew over the legal limit prior to leaving, right?
7    A    Yes.
8    Q    And is there a protocol in place for when
9  someone underage has been caught drinking?
10   A    Yes, they get a verbal warning first.
11   Q    And do you report that to anybody, besides
12 the house mom, if you were made aware of it?
13   A    It just goes on the house mom log.
14   Q    Is that something you would also discuss
15 with Mr. Braglia?
16   A    No.
17   Q    So it's common enough that it's not
18 something that would warrant your wasting the time
19 with Mr. Braglia to discuss?
20   A    Correct.
21   Q    Just based on your own knowledge of the
22 club, in your eyes, what is the greatest asset of the
23 club?
24   A    I don't know.
25   Q    Would it be --

Page 122

1    A    What are you -- I don't understand the
2  question.
3    Q    Well, I'm thinking -- so the entertainers,
4  for instance, would they be considered by you to be an
5  asset of the club?
6    A    Certainly.
7    Q    Would they be considered the greatest
8  asset of the club?
9    A    Yeah, probably.
10   Q    What about the ability of The Cheetah to
11 sell alcohol, the liquor license?
12   A    I'm not following you.  Are you saying is
13 the liquor license more important than the dancers?
14   Q    No, I'm just asking you if the liquor
15 license, again, in your view, is an important asset to
16 the club?
17   A    It certainly is.
18   Q    Are you aware, again, personal knowledge,
19 sitting here today, of the nightly average liquor
20 sales at the club?
21   A    Yeah.
22   Q    What would that be?
23   A    Just liquor?
24   Q    So liquor and beer.
25   A    Ten, 12,000.

Page 123

1    Q    Is that currently?
2    A    Yeah.  I'm trying to remember, but I'm
3  pretty sure what I'm telling you is true, but yeah,
4  probably close to --
5    Q    Yeah, I'm not holding you to it.  I'm
6  just -- based on your personal knowledge.  I know you
7  didn't look into this before, because it's just your
8  individual depo, but I was just curious.
9         Now, do you know if there are
10 requirements -- so having a liquor license and finding
11 out that someone underage was drinking that alcohol,
12 are you aware of any requirement that you report that
13 to the City of Atlanta?
14   A    I am not.
15   Q    Are you the person that would be
16 knowledgeable about that, or would that be someone
17 else at the club?
18   A    That would be someone else.
19   Q    Who do you think that would be?
20   A    Mr. Braglia or Hagood, but I've never
21 heard that.
22   Q    Okay.  So you don't -- you don't basically
23 have any part in maintaining the liquor license or,
24 you know, ensuring compliance with the requirements of
25 a liquor license?

Page 124

1    A    No.
2    Q    Okay.  But you also said that sometimes,
3  when Mr. Braglia is not there, you're the most senior
4  person at the club, right?
5    A    Correct.
6    Q    So if there is some requirement for
7  reporting with the liquor license for underage
8  drinking, you don't know what they are?
9    A    No, sir.
10   Q    In your -- based on your best guess, what
11 do you think would happen to the club if the liquor
12 license was revoked?
13   A    It would probably have to shut down.
14   Q    So it sounds like that liquor license is
15 pretty important?
16   A    Yes.
17   Q    And it sounds like the most important
18 thing at the club?
19   A    If we don't have a liquor license, we
20 don't have a club.
21   Q    And do you know, again, in your personal
22 knowledge, if there's any requirements reporting -- if
23 there's some kind of assault, sexual or otherwise,
24 relating to the use of alcohol that you served,
25 whether there's a reporting requirement to the City of

Page 125

1  Atlanta regarding that?
2     A    No, I do not.
3     Q    And then a follow-up question on the
4  Cheetah Buck issue, again.  And you may not know this,
5  but I'm just curious if you do.
6          Do you know -- is it only Cheetah Buck
7  Girls that are allowed to issue Cheetah Bucks or, you
8  know, run a transaction to issue Cheetah Bucks?
9     A    Yes.
10    Q    To your knowledge, nobody else is?
11    A    During the daytime, Sam Kim also doubles
12  as a Cheetah Bucks Girl --
13    Q    Okay.
14    A    -- but that would be the only exception.
15    Q    Yeah.  I'm just asking as in -- you work
16  at night, right?
17    A    Right.
18    Q    So, I mean, based on your knowledge of the
19  nightclub dealings, it's just the Cheetah Buck Girls?
20    A    Yes.
21    Q    You don't step in on that role at all?
22    A    No, I don't sell Cheetah Bucks.
23         (Plaintiff's Exhibit 28 marked for
24         identification.)
25  BY MR. McDONOUGH:

Page 126

1     Q    I'm going to introduce into the record a
2  document that's going to be labeled Exhibit Number 28,
3  and it is Defendant International Follies, Inc.'s
4  Objections and Responses to Plaintiff's First Set of
5  Interrogatories to International Follies, Inc.
6          So, Mr. Johnson, I'm going to represent to
7  you that this is a copy of some answers, essentially,
8  to questions that Plaintiff Valente had asked of The
9  Cheetah.  I'm -- I don't know if you've seen this
10  document before or not.
11         Does it look familiar to you?
12    A    Yeah, I've seen it.
13    Q    Do you know if you participated in
14  assembling this document or providing information to
15  answer some of these questions?
16    A    No, I did not.
17    Q    You did not, or you don't know if you did?
18    A    I did not.
19    Q    Okay.  And I'm just going to ask you just
20  about a few specific answers and really wanted to just
21  get your knowledge about certain incidences in here.
22  You may have knowledge, you may not.  This is broadly
23  from the club, things that have happened in the club.
24  I'm just curious about things that you, personally,
25  are aware of.

Page 127

1          The first one -- this may be an easier way
2  to do this.  If you'll turn to Page 3 of that
3  document, please.
4     A    (Complies.)
5     Q    There are, starting at the very bottom, 1
6  through -- going to Page 6, 1 through 43, there are a
7  bunch of incidences listed concerning activity that
8  happened at the club.
9          If you could just look through those, one
10  by one, and let me know if you recall any of these
11  specific instances or not, if you were involved in
12  seeing it or had -- otherwise had knowledge of this
13  incident.
14    A    I remember an incident where a girl stole
15  the valet's iPad.
16    Q    Which one is that?
17    A    Number 14.
18         I remember Peyton on the next page,
19  Number 22.
20    Q    22?
21    A    Yeah.  I remember --
22    Q    Do you know what "NC/NS" stands for?
23    A    "No call/no show."
24    Q    Okay.  Basically, she didn't show up for
25  work?  Is that what that means?

Page 128

1     A    Correct.
2          I remember Libby, Number 24, vaguely.
3          Do you want me to elaborate --
4     Q    Yeah.  What do you recall from that?
5     A    -- or do you just want a list of the ones
6  that I remember?
7     Q    No, I was going to ask -- if there's
8  something specific I want to know, I'll ask you.  I
9  just want to know if you generally know, and then I'll
10  ask a specific question, if I'm curious.
11    A    Tiffany, Number 41.  I remember all three
12  of those.  Those were very recent.
13    Q    Tiffany, Stormy and Randy?
14    A    Uh-huh.
15    Q    With respect to Randy, what do you recall
16  specifically about the incident at Number 43, from
17  March of 2017?
18    A    She was hanging out a lot with a guy that
19  we were watching, under suspicion of doing something
20  wrong.  It was just fishy, because he was in every day
21  for, like, over a month.  We just started noticing
22  this guy is here all the time, constantly.  Didn't
23  seem to spend a lot of money.  Just kind of shady
24  looking.  You know how you just get a feeling about
25  someone.

Alison Valente v,
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 129

1   And she was spending a lot of time with
2   him and would never go dance for anyone else.  She
3   would never check in hourly with him.  She was with
4   him all night long until her set would come up, and
5   then she would go do her set and then immediately go
6   back to him.  So it was just -- it was just odd, and I
7   just got a weird feeling, you know.
8   And then she would claim that she only
9   makes, like, 60 bucks a night:  I don't make money.  I
10  can't make money here.
11  So we just decided that, if anything, she
12  was, at best, just lazy.  So we told her to pack it
13  up.
14  Q   And then later found out she was having
15  sex with that particular customer?
16  A   Yes.
17  Q   Was that her boyfriend or something else?
18  A   Girls said that, yeah, that she -- this
19  guy would give her more money than us because she was
20  having sex with him.
21  Q   But that was after the fact?
22  A   Correct.
23  Q   That wasn't the reason for the
24  termination?
25  Okay.  Thank you for that.

Page 130

1   If you could turn to Page 8 of this
2   document, and let me know when you're there.
3   A   (Complies.)
4   Okay.
5   Q   So your name comes up here, which is why
6   I'm directing you here.
7   Starting in the second full paragraph, do
8   you see where it says, Fiona McCormick, a transgender
9   bartender that complained verbally to Robert "Bob"
10  Johnson about harassment by a male bar-back, like,
11  including rude comments, slamming her hand and bumping
12  into her.
13  Do you recall any details of that
14  complaint or alleged harassment?
15  A   Yes, I brought it directly to
16  Mr. Braglia's attention.  Actually, she went to him
17  also and confided in him about the transition, before
18  I knew about it.
19  Q   So the harassment was related to the
20  transition?  Is that what I'm taking out of this?
21  A   I really don't know.  You know, for a
22  while, I just thought it was two buddies that were
23  just having an issue, because I had no clue that the
24  transition was happening, so I really didn't
25  understand what was going on or why they were having

Page 131

1   conflict.
2   Q   Okay.  So there was some harassment -- you
3   don't know whether it was sexual in nature or
4   discriminatory in nature -- due to the transition; you
5   just know that it happened?
6   A   Correct.  At the time, I was not aware of
7   the transition and, once again, just thought it was
8   two long-time friends that were having an issue, but
9   did not know what the problem was.
10  Q   And, I guess, after you had brought the
11  complaint to Mr. Braglia, did Mr. Braglia handle the
12  situation from there on out, or did you stay involved?
13  A   Yes, he was on top of it, and I was
14  involved with him, but he was the one that told me
15  about the transition.
16  Q   It also looks like Ms. McCormick
17  complained with respect to a customer, at some point
18  in time, who was making comments to her.
19  Do you recall any details on that?
20  A   Yes.
21  Q   Do you know what the nature of the
22  comments were?
23  A   No.  I understand he would sometimes, on
24  Saturdays, come in and shout to her, Bye, Fiona.  Bye
25  Fiona, very loudly, and -- as to make fun of her, but

Page 132

1   he is banned from our club.
2   Q   Because of that?
3   A   Yes.
4   Q   Do you know if Ms. McCormick ever
5   complained about other employees at the club for any
6   sort of harassment or discrimination or anything of
7   the like?
8   A   After the bar-back?
9   Q   Besides the bar-back and the --
10  A   Besides the bar-back?
11  Q   -- and the customer.
12  A   No, not another employee.
13  Q   Nothing that you're aware of anyway?
14  A   Not that I can remember, no, sir.
15  Q   If you could turn to Page 31.  Let me know
16  when you're there.
17  A   (Complies.)
18  Okay.
19  Q   You'll see in the middle of the page, in
20  the center, there's the words "Interrogatory
21  Number 22."
22  Do you see that?
23  A   Yes.
24  Q   And I'm going to point you to the answer,
25  but I'm going to read you the question so you have the

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 133

1 context here. It says, Please identify each and every
2 employee of Defendant and/or its affiliates who is
3 identified in response to Interrogatory 1 -- and that
4 would be the first list we went through of
5 incidents -- and who was later re-hired or re-employed
6 by defendant or The Cheetah.
7        And then it asked to describe the reasons
8 for and circumstances of the re-hiring or
9 re-employment.
10        Do you have an understanding of what that
11 was looking for?
12    A    Yes.
13    Q    Okay. So if you'd turn to Page 32 now,
14 there's a table that was provided.
15        With respect to -- if you look on the
16 right-hand column there, at the top, it says:
17 Re-hired? Question. Date? Question. Reason?
18 Question.
19        Do you see that?
20    A    Yes.
21    Q    For any of the ones that say "yes," that
22 they were re-hired, just scroll down there and see if
23 you recall anything about those persons.
24        And it seems to be identified by stage
25 name. For instance, like 11, it talks about Cherry

Page 134

1 that was rehired after rehab.
2    A    Yeah, I vaguely remember her coming back.
3        Any person that we're talking about hired
4 is going to be through Mr. Braglia, but I do remember
5 her.
6    Q    So this is with respect -- this is going
7 to be a little bit complicated.
8        If you can separately open Page 4 of
9 that -- you may have to separate it -- or refer to
10 Page 4. These appear to line up number-wise. So if
11 we look for -- again, on Page 32, where it says, yes,
12 re-hired after rehab, and we go to 11 on Page 4, you
13 can see the reason for the firing?
14    A    Uh-huh.
15    Q    It says -- Entry Number 11, it says, in
16 2012, Cherry was fired, dirty in VIP.
17        Do you see that?
18    A    Uh-huh.
19    Q    Do you have an understanding of what
20 "dirty in VIP" would mean?
21    A    I don't know what it was. I have no
22 recollection of when or why she got fired.
23    Q    Okay. All right. So if you go back to --
24 that's just for reference.
25        If you go back to Page 32 again, I would

Page 135

1 just like you to let me know if you have any personal
2 knowledge of any of the yeses in the right-hand
3 column.
4        For instance, Number 25, Sasha. Do you
5 see that one?
6    A    No, I really don't recall --
7    Q    Okay.
8    A    -- the situation with any of these.
9    Q    If you'll turn to the next page, on
10 Number 40, Chanel, does Chanel ring a bell?
11    A    No.
12    Q    Okay. And what about Number 29, Zoey? Do
13 you recall a dancer named Zoey?
14    A    No, not offhand.
15    Q    Okay. You can put that aside.
16    A    (Complies.)
17    Q    Do you recall -- we don't have many
18 snowstorms here in Atlanta, obviously.
19        And do you recall having one in February
20 of 2015? It was actually February 24th, 2015, and
21 there was a snowstorm, and, as I understand it, not
22 many people -- or a lot of people missed work that
23 evening due to the snow, because it was pretty bad and
24 icy.
25        Do you recall a night like that, where you

Page 136

1 all were short-staffed?
2    A    Yes.
3    Q    And you may have the additional context
4 that Ms. Valente was fired the next day, so it was the
5 last night that she worked at The Cheetah. I don't
6 know if you put that together or not, but --
7    A    No, I think that's false.
8        Are you saying she was fired the next day
9 after a snowstorm?
10    Q    Yes. Well, I'm just asking your
11 understanding of it. I'm not trying to put words in
12 your mouth.
13        So do you remember the night of the
14 snowstorm, I guess, is the first question?
15    A    Yes, I remember several events like that.
16    Q    Do you remember one in February of 2015?
17    A    Not specifically.
18    Q    Okay. Do you, by chance, recall the last
19 time you saw Ms. Valente working on an evening?
20    A    Yes. This is why I'm telling you that
21 that's not true, because I was working on the last
22 night of her employment, so it couldn't have been a
23 snowstorm night, because I never work the snowstorms.
24    Q    Okay. What do you -- so do you recall
25 speaking with Ms. Valente that evening?

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 137

1    A    Yes.
2    Q    What do you recall of your conversation?
3    A    I remember an incident where the customer
4  said that this girl had overcharged him while he was
5  there. It wasn't a -- like, where someone's talking
6  from the past or -- this happened -- it was then and
7  there, like, this girl is overcharging me.
8         So, like we discussed earlier, I checked
9  with the house mother and the floormen to see how long
10 she had been checked in. And I really don't remember
11 the times, but she was certainly charging him double
12 what she should have charged him.
13        So I asked her to give back half the
14 money, which she reluctantly did. She shoved it in
15 his hands and basically just stomped away.
16   Q    Okay. So is it your testimony that you
17 did not remove $200 from her hand and hand it to the
18 customer?
19   A    Correct.
20   Q    So you recall her handing money back to
21 this gentleman after he complained, and you determined
22 that the time that he and her were checked in was a
23 shorter period of time than what she ended up getting
24 paid?
25   A    Yes.

Page 138

1    Q    And what happened after that, after she
2  gave the money?
3    A    Nothing. She walked away.
4    Q    And that was the end of it?
5    A    Yes, I walked away, and that was the end
6  of it.
7    Q    Okay. Is that considered a chargeback?
8    A    No. It's not a chargeback, but it's
9  certainly a complaint that he was overcharged.
10   Q    And did you make note of this somewhere --
11   A    No.
12   Q    -- personally?
13   A    No.
14   Q    And so this is your recollection of the
15 last night you remember Valente working -- or you
16 remember working with Valente, correct?
17   A    Correct.
18   Q    Now, were you the one to actually
19 terminate Ms. Valente?
20   A    Yes.
21   Q    Do you remember when you did that?
22   A    Not exactly. I remember coming in to work
23 and the next time I worked seeing another complaint on
24 my desk with her right after I had just had the
25 incident with the gentleman at the host stand.

Page 139

1         So that's when I went to Mr. Braglia and
2  discussed it, and we decided that -- to part ways.
3    Q    Okay. And -- now, you also terminated
4  Ms. Monroe, correct?
5    A    Correct.
6    Q    And was there also something sitting on
7  your desk with respect to Ms. Monroe?
8    A    Yes, sir, it was the two of them.
9    Q    Are you saying there was two separate
10 charges attributable to each of them or one charge
11 where they were both involved?
12   A    Where they were both involved.
13   Q    Okay. Were there any other entertainers
14 involved in that particular charge, that you were
15 aware of?
16   A    No, not that I was aware of.
17   Q    And did you make any notes of this when
18 you, in fact, terminated Ms. Valente, first of all?
19   A    The house mothers did, I'm sure.
20   Q    Okay. If they didn't, did you?
21   A    No.
22   Q    What about with respect to Ms. Monroe?
23   A    No, no notes on my behalf.
24   Q    You generally don't take notes on --
25   A    Anything.

Page 140

1    Q    -- any matters, really?
2         Do you ever recall a time when Ms. Valente
3  came to you to report seeing illegal activity in a VIP
4  room or private area of the club?
5    A    No.
6    Q    Never happened?
7    A    I don't recall any conversation with her
8  about things going on.
9    Q    And do you recall having a meeting with
10 Ms. Valente, Ms. Monroe and Chris Haley?
11   A    Yes.
12   Q    In your office?
13   A    No, in the bartender room.
14   Q    In the bartender room?
15   A    Yes.
16   Q    So you remember it being in the bartender
17 room?
18   A    Yes.
19   Q    Do you recall if anyone else was at that
20 meeting?
21   A    No, just the four of us.
22   Q    And what is your recollection of that
23 meeting?
24        Well, first of all, did you call the
25 meeting?

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 141

1    A    Valente -- Ms. Valente came to me -- or
2  Abby and Monique came to me, complaining that Chris
3  was keeping them from going to the VIP with a
4  customer.
5        So I said, well, do you want us to all sit
6  down and talk?
7        And they said, yeah, that would be great.
8        So we summoned Chris, and the four of us
9  went to the back to talk it out, but then they shared
10 their grievances with Chris, and I kind of mediated.
11   Q    What was the resolution of that meeting?
12   A    Chris -- he said that when he sat someone
13 down to -- in the VIP area and was going to look for a
14 girl for them, that Abby and Monique would always come
15 and sit down while he was away.
16       So I told him that, listen, right or
17 wrong, whether what they did was being a shark or
18 whatever you want to call it, they had the right to go
19 sit with that customer.  So if they're there sitting
20 with that customer, oh, well, you lose out.  I told
21 him that that was not to happen anymore.
22   Q    You told Chris?
23   A    Chris.
24   Q    So help me understand this.
25       So Chris was trying to prevent them from

Page 142

1  sitting with them, was trying to get them up?
2    A    He told them that he had girls coming
3  already.
4        (Ms. Clark-Palmer and Mr. Samuel dropped off
5        telephone).
6  BY MR. McDONOUGH:
7    Q    So your recollection is Chris was trying
8  to remove them from the presence of these customers
9  because he already had a set of girls he was going to
10 sit with them?
11   A    My recollection is Chris said he had girls
12 coming.
13   Q    Okay.  And so is it true that Ms. Valente
14 and Ms. Monroe actually did get up when Chris asked
15 them to move and then came to meet with you?
16       MR. WARD: Object to the form.
17       THE WITNESS: I don't know.
18 BY MR. McDONOUGH:
19   Q    All you know is they arrived before you?
20   A    They came to me after the whole thing was
21 over, so they never said whether they actually got up.
22 I doubt it, but I don't know for sure.
23   Q    Okay.  Now, had you ever had any
24 complaints like that with respect to Chris before?
25   A    No.

Page 143

1    Q    Did you ever -- so did Chris, in that
2  meeting, lodge any complaints about Ms. Valente or
3  Ms. Monroe?
4    A    Yes.  He said that when he was away
5  getting girls that they would always come -- they
6  would watch him; and when he went to get a girl, they
7  would go sit where he was bringing girls to a
8  customer.
9    Q    Okay.  So he had preferred girls -- or
10 some girl that he would have preferred to bring to
11 those customers, and Ms. Valente and Ms. Monroe were
12 getting in the way of that, I guess?
13       MR. WARD: Object to the form.
14       THE WITNESS: He was asked by a customer
15 to get a girl, and that's what he was doing.
16       They came and interfered, sat down, when
17 he was already bringing a girl to the customer.
18 BY MR. McDONOUGH:
19   Q    Okay.  You don't know the details of what
20 happened in that specific instance?
21   A    I sided with the girls.  I sided with Abby
22 and Monique.  I told Chris, if they sit there, they
23 have every right to sit there.
24   Q    Do you recall anything else specifically
25 about that meeting?

Page 144

1    A    No.
2    Q    You don't recall Ms. Valente and
3  Ms. Monroe bringing up the issue of Chris wanting to
4  employ his payroll girls in there so that he would
5  make money off of that transaction, whereas he
6  wouldn't with Ms. Valente or Ms. Monroe?
7    A    No.  They merely said he was trying to get
8  girls, and he said, I've got this, is what they said
9  his exact words were.
10   Q    And that term "payroll girls" or "payroll
11 system" or "payroll" was never raised in that meeting?
12   A    That word "payroll" was never raised until
13 I heard about this lawsuit.
14   Q    Did you ever have any other one-on-one
15 meetings with Ms. Valente?
16   A    No.
17   Q    In all off their 16 years working there?
18   A    No one-on-ones.
19   Q    What about any one-on-ones with
20 Ms. Monroe?
21   A    No.
22   Q    Had you ever received any complaints about
23 them from customers?
24   A    Yes.
25   Q    And you never -- so a lot of complaints, a

Page 145

1  few complaints, one complaint?  Do you have any
2  estimate?
3      A    We get a lot of complaints, yes.
4      Q    Okay.  You never had a meeting with them
5  to discuss those complaints?
6      A    With them, but not just by myself with one
7  person, no.
8      Q    Oh, okay.  I didn't mean -- when I asked
9  if you had a meeting with them, I didn't mean just you
10  and them.  I meant you having a meeting with either of
11  them, and there could have been other people there.
12  I'm just --
13          MR. WARD: It was confusing, in fairness.
14      You talked about one-on-ones.
15          MR. McDONOUGH: Right, right, we did --
16      well, fair enough.
17  BY MR. McDONOUGH:
18      Q    Had you ever met with Ms. Valente, first
19  of all, to discuss any issues that were being raised
20  by customers with respect to them?
21      A    Yes, they were -- they were warned.
22      Q    And do you recall how many times?
23      A    In my office, once; at the Cheetah Bucks,
24  twice; at the executive host stand, at least twice.
25      Q    Do you recall at -- in your office, what

Page 146

1  complaint was conveyed to them?
2      A    That they weren't explaining to people,
3  when they would take them to VIP, what they were in
4  for or what they were expected to spend.
5      Q    Isn't it -- does the waitress not do that?
6  That's the entertainer's job?
7      A    That's the entertainer's responsibility.
8      Q    Okay.  Who actually charges the customer?
9      A    I don't understand the question.
10      Q    So if they're using, say, Cheetah Bucks,
11  who is the one that actually charges the credit card,
12  for instance?
13      A    The Cheetah Bucks Girls would come by and
14  do the transaction for the girl's money, if that's
15  what you mean.
16      Q    Yeah.  So the Cheetah Buck Girl comes by,
17  and then does the entertainer tell them how much money
18  to put on the card, or is that something that the
19  Cheetah Buck Girl asks the customer about, or is there
20  a protocol at all on that?
21          MR. WARD: Object to the form.
22          THE WITNESS: No protocol.
23      I will say, if the dancer asks --
24          MR. McDONOUGH: Wait for the question.
25          THE WITNESS: -- the customer will

Page 147

1  approve.  They will look to the -- they always
2  look to the customer for --
3          MR. WARD: He didn't have a question.
4          MR. McDONOUGH: So the customer had --
5      What's that?
6          MR. WARD: I said you didn't have a
7      question.  I don't know what he was trying to
8      answer.
9  BY MR. McDONOUGH:
10      Q    So the customer has to approve it in the
11  end, to your knowledge, again?
12      A    Yes.
13      Q    But you're never involved in these
14  transactions, correct?
15      A    No, correct.
16      Q    Do you recall -- okay.  So that was the
17  first meeting in your office with Ms. Valente that you
18  referenced when I asked you about meetings.
19          Do you recall you mentioned two meetings
20  at the Cheetah Bucks counter?
21      A    Yes.
22      Q    Do you recall the -- let's take them one
23  at a time.
24          Do you recall, the first one, what was
25  conveyed to Ms. Valente?

Page 148

1      A    Both times were just, you guys have got to
2  start making sure the customer realizes what you're
3  charging him and what you're doing.
4      Q    So when you said "you guys," am I to take
5  it that Monroe was present at that one, as well?
6      A    Yes.
7      Q    Was Monroe present at the one in your
8  office we just talked about a few minutes ago?
9      A    I don't recall.
10      Q    Okay.  So you explained to them they need
11  to be careful that the customer knows what you're
12  charging them for?
13      A    Yes.
14      Q    And so you had a customer tell you that it
15  was unclear why they were being charged $300 an hour?
16      A    Yes.
17      Q    Okay.  So you mentioned meeting in your
18  office, you mentioned two meetings at the Cheetah Buck
19  counter, and then you referenced another meeting.
20          What was that one?
21      A    The executive host stand.
22      Q    At the executive host stand.
23      Where in the club is that?
24      A    At the entrance to the executive room.
25      Q    Okay.  So you had another discussion

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 149

1  with -- was that with just Ms. Valente, or was that
2  Ms. Valente and Ms. Monroe?
3      A    I don't recall if it was both of them.  I
4  just remember at that point saying, if you guys feel
5  uncomfortable explaining to these people, at least try
6  to get Guy involved, and let Guy explain.  If you
7  would like him -- offer it up -- that Guy could help
8  them out to explain, to make sure that they were doing
9  it properly.
10     Q    So in your opinion, based on complaints
11  made to you, what were they doing improperly, exactly?
12     A    They would get someone, scoop them up by
13  the arm and asked them if they wanted to go on a tour,
14  usually someone who maybe might be a little
15  intoxicated.  Walked them up, set down in a corner
16  somewhere at 600, where they always sat, same
17  corner --
18     Q    600, what is that?
19     A    That's a table number.
20     Q    Okay.
21     A    -- instruct the service staff not to come
22  over.  They didn't want anything -- they didn't want
23  anyone to come over.  They don't want a floorman.
24  They didn't want a waitress.
25          They would sit there for a while, 15 to 20

Page 150

1  minutes into the tour, and then tell the customer
2  that, well, we're 150 for a half hour.  We've already
3  been here for 15 or 20 minutes.  Do you want to just
4  go ahead and pay us -- do a half hour?
5          Sometimes the guy would bite and do it;
6  sometimes the guy would say, no, I'm not and walk
7  away.
8      Q    So this is your opinion of what was
9  happening based on kind of seeing this -- this all
10  over the course of time and hearing customer
11  complaints?
12     A    Yes, and the waitresses would tell me.
13  They were upset that they would be shooed away by the
14  girls and told not to come over.  So, basically,
15  you've got someone sitting in the room for free, who's
16  not drinking.
17     Q    Which waitresses were upset about that?
18     A    Sylvia and Jenn Hart, for the most part.
19  They're the two that work in there the most.
20     Q    Is that Jenn Hart?
21     A    Uh-huh.
22     Q    And so those two waitresses would tell you
23  specifically that Ms. Valente and Ms. Monroe told them
24  not to come near them while they were sitting at Table
25  600?

Page 151

1      A    Yes.
2      Q    Do you recall any other instances of
3  discussing with Valente or Monroe complaints that a
4  customer lodged against them, besides the couple of
5  instances we talked about -- four instances we talked
6  about?
7      A    When they were brought back from being
8  fired, we told them that if I saw one more customer
9  complaint on my desk, that that was it; that this was
10  their last chance.
11     Q    And then when that one more showed up,
12  that's when you fired them?
13     A    Nope.
14     Q    No?
15     A    It looked on the up-and-up.  It didn't
16  really look like someone was overcharged, so I never
17  even mentioned it to them.
18     Q    Wait.  You never mentioned what to them?
19     A    The complaint that I got.
20     Q    Oh.  I'm confused.
21          So I guess I'm trying to -- you said
22  that -- you let them come back at some point in time
23  prior -- after being fired, and you told them that if
24  you got one more complaint like that, that they were
25  done?

Page 152

1      A    Yes.
2      Q    And you eventually did terminate them?
3      A    On the next one that I got, yes.
4      Q    On the next one that you got, although --
5  I guess that's where I was unclear.
6          So you had said, when you saw one on your
7  desk the next time, you fired them.  Okay.
8          But you didn't tell them --
9      A    That's the first time they were fired, not
10  the second --
11     Q    Oh, that's the first time.  I was asking
12  about --
13     A    Well, technically, the second time, but
14  anyway -- they were brought back after they were
15  fired.
16     Q    Right.
17     A    Then I got one on my desk that looked
18  legitimate.
19     Q    Let me just take it in sequence.
20          So what is your recollection of the first
21  time you fired them?  Because you said technically you
22  fired them twice.
23          When is the first time that you fired
24  them?
25     A    The first time I wasn't manager.

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 153

1    Q    Oh, you were not manager?
2    A    Right.
3    Q    So this was over 10 years ago?
4    A    Uh-huh.
5    Q    And do you recall -- was it -- you fired
6    both of them together?
7    A    Mr. Braglia asked us to compile a list of
8    girls that we thought were ripping off customers and
9    he wanted to make an example out of, because there
10   seemed to be a problem at the time that he wanted to
11   squash.
12        So all the floormen and house mothers sat
13   down and wrote a list, and the two of them were
14   certainly on the tops of everyone's list.
15   Q    Was that list kept anywhere?
16   A    Not to my knowledge, no.
17   Q    So you don't know if it exists today?
18   A    No.
19   Q    Was it literally a list, like a paper
20   list?
21   A    Yeah, it was everyone sat down with a
22   little scratch sheet of paper and handed it in to
23   Jack.
24   Q    And that was, you're not sure exactly, but
25   at least 10 years ago, at least when you were -- prior

Page 154

1    to being promoted to being a night manager?
2    A    Correct.
3    Q    And so that -- that was what you were
4    referring to when you said technically they had been
5    fired twice before?
6    A    Correct.
7    Q    Fast-forwarding at least 10 years, in 2014
8    sometime, that they were fired again, correct?
9    A    Don't know the dates, but I'm having to
10   assume you're right.
11   Q    All right. Well, sometime prior to this
12   last time they were fired?
13   A    Correct.
14   Q    And do you -- okay. So I think we're at
15   the point where you said that, when you brought them
16   back after this -- after the time -- and I'm going to
17   say in 2014 -- when you brought them back, is that
18   when you told them that, if I get one more of these on
19   my desk --
20   A    Yes.
21   Q    -- you're gone?
22        Okay. So after you brought them back, you
23   had a meeting with them -- or I don't know if it was
24   informal -- but you actually spoke to them and
25   conveyed that message?

Page 155

1    A    Correct.
2    Q    And do you recall if they had any kind of
3    response to that?
4    A    No. They seemed very grateful. I don't
5    recall any problems or -- off the top of my head.
6    Q    And then the very next time that one of
7    those ended up on your desk again, just like you said
8    you would, you fired them?
9    A    Did not fire them.
10   Q    You did not fire them? Okay. That's
11   where I'm getting confused.
12        So you're saying, despite getting one of
13   these on your desk again, you didn't fire them.
14        What did you do when you got another one
15   of those on your desk --
16   A    Like I said --
17   Q    -- after telling them that they were going
18   to be fired?
19   A    -- I looked it over. It looked like there
20   wasn't even really an issue, so I took their side on
21   it --
22   Q    Okay.
23   A    -- and chose not to act -- or not to fire
24   them.
25   Q    When you say you -- when you say you took

Page 156

1    their side on that -- this was, again, a joint -- a
2    joint receipt -- a joint charge, that they were both
3    involved in?
4    A    Yes.
5    Q    Okay. And that's because they worked
6    together frequently? Is that why they keep getting
7    paired together in our discussion here?
8    A    All the time.
9    Q    So this thing shows up on your desk.
10        Do you know how long after that
11   conversation, where you told them they were done if
12   you got another one on your desk -- do you know how
13   long after that it was before another one showed up?
14   A    I do not. I couldn't tell you.
15   Q    Was it like a year or --
16   A    No, no.
17   Q    -- two weeks later?
18   A    It was more a month or two, maybe --
19   Q    Okay.
20   A    -- if I had to guess.
21   Q    And you looked at it and decided to take
22   their side on that -- for that particular transaction?
23   A    Yes.
24   Q    And would you consider that a chargeback?
25   A    I considered that a complaint.

Page 157

1    Q    A complaint.
2    A    Yes.
3    Q    Okay.  And so you essentially gave them
4  the benefit of the doubt --
5    A    Yes.
6    Q    -- is what you're saying there?
7         Now, I imagine another one showed up on
8  your desk.
9    A    Yes.
10   Q    What did you do when the next one showed
11 up on your desk?
12   A    I went to Mr. Braglia, and we decided that
13 we're just not going to keep them; just had to
14 terminate them.
15   Q    And this was the last time that they were
16 terminated?
17   A    Correct.
18   Q    Okay.  And so there was -- so you fired
19 them -- told them, you get another one of these,
20 you're gone?
21   A    Yes.
22   Q    And you got another one sometime later,
23 looked at it fairly, decided it wasn't actually an
24 issue -- or gave them the benefit of the doubt?
25   A    Yes.

Page 158

1    Q    But then after that one, yet another one
2  came up on your desk, and you fired them?
3    A    Yes.
4    Q    Okay.  Did you -- do you recall -- do you
5  recall how the conversation went when you fired them
6  for the last time?
7    A    No.
8    Q    Did you talk to them together or each of
9  them separately?
10   A    I believe it was separately.  I think it
11 was one after the other.  If I'm not mistaken, I think
12 one came in before -- just slightly before the other,
13 and I really don't remember whether if it was Monique
14 or Abby that was in first, but I think they came in
15 within maybe an hour of each other.  I really don't
16 recall.
17   Q    So it was when they came in to go to
18 work -- whenever the next time they were scheduled to
19 go to work?
20   A    Yes.
21   Q    You approached them and said, you're done?
22   A    Had them brought to my office, and yes.
23   Q    Had them brought to your office?
24   A    Yes.
25   Q    And did you tell them that there was this

Page 159

1  complaint that showed up on your desk that you
2  determined -- well, I don't want to put words in your
3  mouth.
4         The complaint that showed up on your desk
5  that caused you to terminate them -- that second one
6  after they were allowed to return back to work and
7  warned that, if they got another one, they would be
8  fired, did you make a determination with respect to
9  that one that the customer was correct in their
10 grievance?
11   A    It was a -- an overcharging situation, I
12 believe, but it would have been -- either way, the
13 fact that I had seen another one, that we decided that
14 that's another complaint, and I've already given them
15 a break on one, so they're -- I went to Jack, and we
16 decided to send them packing.
17   Q    Okay.  Now, you're the one that -- are
18 you -- I didn't ask this question:  Are you the one
19 that ultimately makes the decision, yes or no, on
20 whether something is considered a chargeback?
21   A    No.  I try to convey to the customer or
22 try to solve the issue.  A lot of the times I'm able
23 to, sometimes I can't.  But if I can't resolve the
24 issue, then it goes back to Liz, and then it goes to
25 like a -- I don't know how all that works.

Page 160

1    Q    Okay.  So you're not -- although the
2  complaints that include overcharging show up on your
3  desk, you may not be the one that ultimately makes a
4  decision on whether it was a substantiated claim or
5  not?
6    A    If we -- yes.
7    Q    So that's a correct statement?  You would
8  have input into it, potentially; you would certainly
9  do the research to figure out, you know, what the two
10 sides of the story are:  The customer's and the
11 entertainer's and the waitress and anyone who may have
12 seen the interaction between the customer and the
13 entertainer?
14   A    Yes.
15   Q    Okay.  And you don't know one way or the
16 other the customer or customers that made the
17 complaint that led to the final complaint that led to
18 Valente and Monroe's demise -- you don't know whether
19 that was refunded to the customers or if that was
20 otherwise dealt with with the customer without having
21 to repay?
22   A    The very final one?
23   Q    Yes.
24   A    I do not know.
25   Q    Did you keep any notes on your research on

Page 161

1  that particular one, by chance?
2      A    No.
3      Q    It's kind of jumping a little bit around.
4          Do you recall having a interaction with
5  Ms. Valente, where Ms. Valente wasn't drinking a drink
6  that a customer gave her, and you told her, basically,
7  she better drink the drink?
8      A    I don't remember.
9      Q    Is that something you would do, if you saw
10  that an entertainer -- if a customer bought an
11  entertainer a drink, and the entertainer was not
12  drinking it, would you encourage an entertainer to
13  drink the drink?
14      A    Yes, if -- we've had customers who have
15  complained in the past that, hey, I just bought this
16  girl a drink, and she's over there dancing for this
17  guy.
18          So we would tell them, hey, this guy just
19  bought you a drink. You need to go back and at least
20  drink the drink with him, spend a little bit of time
21  with him, or we give them the option to pay for the
22  drink and go on their way.
23      Q    The entertainer could basically say, you
24  know, I'll pay for it myself, thank you?
25      A    Yeah.

Page 162

1      Q    And the customer would get refunded, I
2  guess, for the drink or never charged?
3      A    Yes.
4      Q    And so that was a -- that's not something,
5  I imagine, that you did, personally, or is it? Let me
6  back up a little bit.
7          So you're saying that you may step into a
8  situation like that, where a customer complains that
9  an entertainer didn't drink a drink, and you,
10  personally, would get involved in that type of a
11  complaint and try to mediate between the customer and
12  the entertainer?
13      A    Yes. That is in my job description.
14      Q    It wouldn't just be a -- that was due to
15  your presence being on the main floor?
16      A    I don't understand.
17      Q    So I'm trying to delineate a little bit
18  between the roles of the floor manager and then your
19  role as, like, the head floor manager, night manager.
20          I'm just trying to understand. Is there
21  anything specific about that type of dispute that
22  would require your involvement versus just a regular
23  floor manager dealing with that situation?
24      A    That's not their job, to handle drinks or
25  food and beverage. They always defer that to me.

Page 163

1      Q    Okay. So that would fall under your
2  umbrella, and floor managers would more be security --
3      A    Right.
4      Q    -- you know, making sure people are
5  checked in and check out and that sort of thing?
6      A    That's correct.
7      Q    And you have responsibility over those
8  things, but you have additional responsibilities that
9  includes really any customer disputes with the
10  establishment or entertainers; is that right?
11      A    Yes.
12      Q    How often was it that you got a complaint
13  about -- from a customer that bought an entertainer a
14  drink, where the customer said, I'm angry. She's not
15  drinking that drink right there?
16      A    That happens occasionally. I know you're
17  asking for a time frame, but I really can't give you a
18  how often that happens, but that is an occurrence that
19  happens. I'm not surprised any time I ever hear that.
20  It's something that happens. Like a spilled drink, it
21  happens.
22          Usually when it happens it's because a
23  girl decided to move on because some guy had called
24  her to a VIP room or something, and they saw an
25  opportunity to make more money, and they'll leave the

Page 164

1  guy. And then he's upset that, hey, I just bought
2  this girl a drink. She left me.
3      Q    Do you recall any specific instance of
4  telling Ms. Valente that she needs to drink the
5  drink -- drink a drink a customer bought her?
6      A    No, I do not.
7      Q    And how about with respect to Ms. Monroe?
8  Do you recall any specific instance of when a customer
9  complained that Ms. Monroe hadn't drank a drink?
10      A    No.
11      Q    Let me just -- I think I have this right,
12  but -- you would specifically tell the entertainer to
13  drink the drink, if that was the solution to the
14  customer's complaint?
15          MR. WARD: Object to the form.
16          THE WITNESS: No. I would just tell them
17      to go back to the customer. He's upset that you
18      walked away, and you've got a drink sitting on
19      the table.
20          But if there's -- I've never looked at
21      someone and said, you must drink the drink.
22  BY MR. McDONOUGH:
23      Q    Okay. Your job was to just diffuse the
24  situation, whether it's having the entertainer drink
25  the drink or going back over there with the drink and

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 165

1  sort of patronizing the customer, just to make them
2  feel less slighted?
3      A   Yes.
4      Q   Do you recall having a conversation with
5  Ms. Valente and Ms. Monroe, together, where you
6  conveyed to them the idea that it was not unexpected
7  that they would have a higher volume of chargebacks
8  than other entertainers, because they were more often
9  checked into VIP rooms as compared to other
10 entertainers?
11     A   Yes, I think I've mentioned that.  That
12 was my original -- when I started noticing more -- a
13 higher number of problems with them, that was my first
14 thought, that, well, they're checked in a lot.  And
15 this is before I knew how they did their tours.  I
16 wasn't aware of their -- the way they acted with the
17 customer taking a tour.
18         But originally, yeah, when I started
19 seeing these number of problems come up, I thought
20 well, you know, they're hourly a lot.  So for a long,
21 long time, I always sided -- you know, I fought really
22 hard.  You know, this took place over a while.  It
23 wasn't like just overnight you guys are getting a lot
24 of chargebacks or complaints, you know, but that was
25 my original thought that, yeah, they're hourly a lot,

Page 166

1  so that could happen.
2      Q   When you say "they're hourly a lot," you
3  mean checked into VIP?
4      A   Yes, yes.
5          MR. WARD:  Do you want to take a break?
6          MR. McDONOUGH:  Yeah, I do, actually.
7          (Short break from 3:13 p.m. to 3:24 p.m.)
8  BY MR. McDONOUGH:
9      Q   All right.  Let's see.  So we talked about
10 specific meetings that you recall having with Valente.
11         And the focus was on Valente, and we
12 talked about Monroe, but do you remember having any
13 specific meetings with Monroe, on her own, about the
14 overcharging?
15     A   I can't recall.
16     Q   Okay.  And maybe you did, but just
17 nothing, sitting here today --
18     A   Yeah.
19     Q   -- rings a bell?
20         Do you recall an incident where you
21 were -- I guess you were assaulted at The Cheetah on
22 stage -- maybe you were on stage or near the stage.
23     A   Maybe I was on stage?
24     Q   Maybe that's a frequent occurrence.  I
25 don't know.

Page 167

1          Have you ever been assaulted at The
2  Cheetah, yourself, by a customer?
3      A   Many times.
4      Q   Many times.
5          So that's not an infrequent occurrence?
6      A   I get -- we get hit on quite frequently.
7      Q   Hit on or --
8      A   Hit.
9      Q   -- hit on?
10     A   Hit.
11     Q   Okay.
12     A   I've got broken fingers, toes -- yeah.
13 It's just part of the job.
14     Q   I mean, if there's a physical assault in
15 The Cheetah by a customer -- nothing sexual, like a
16 physical assault -- you're typically going to head
17 towards that incident, right, to try to break it up or
18 --
19     A   Yes.
20     Q   You're not -- I mean, you still get
21 involved in that, is that right, I mean, if you see
22 it, or do you let the floor managers deal with that?
23     A   I do.  Mr. Braglia tells me not to, but
24 I'm a glutton for punishment, I guess.
25     Q   Right, right.

Page 168

1          Okay.  So do you recall an incident where
2  apparently you were getting attacked, and Ms. Monroe
3  apparently let the other floor managers know, who
4  weren't seeing it, and they came to your rescue, I
5  guess?
6      A   Yes, I think I do remember that.
7      Q   What do you recall from that specifically?
8      A   I remember it was a guy that -- it was
9  right before my knee surgery -- no, it was after my
10 first knee surgery, I think, and so I was kind of
11 gimpy.  And the guy shoved me on the stage and started
12 trying to hit me, so I couldn't get up.  I was kind of
13 trapped, and so I was just kind of stand -- sitting
14 there in like a just block-the-punch position until
15 somebody came over.
16         I honestly think it was the bartender who
17 jumped over the bar first, who was the first guy to
18 get to the guy.  I really -- you know, when stuff like
19 that's going on, you really don't see what's going on.
20     Q   Right.  Right.
21     A   All I'm seeing is the guy trying to kill
22 me on top of me, so I don't know.
23     Q   So what is your -- let me ask your
24 personal opinion of Ms. Valente, first of all, because
25 you guys worked together for, apparently, like a lot

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

---

Page 169

1  of years.
2       So did you -- were you friends with her,
3  first of all?
4       A    No, I wouldn't say I was friends with her.
5       We could speak on the floor very civil.
6  You know, we talked a lot about the Oakland Raiders.
7  She's from California, I'm a big Raider fan, so we
8  would occasionally talk about them.
9       Abby -- I go in and out of their real
10  names and stage names, sorry.
11      Q    Yeah, no.
12      A    Abby would talk to me quite frequently.
13      Q    So let's try and stick with Ms. Valente.
14      What was your personal opinion of her?
15      A    Of her, personally, or her job
16  performance?
17      Q    Personally, first.
18      A    I had no problem with her, really.  Like I
19  said, she and I had several nice conversations on the
20  floor.
21      Q    And what was your opinion of her
22  professionally?
23      A    I thought she was a shark.
24      Q    And what is "a shark"?  What does that
25  mean, when you use the word "shark"?

---

Page 170

1       A    Someone who would use half-truths; not be
2  forthright and honest with the customer, what they
3  were doing, what they were getting into; trying to --
4  I don't know, just not being honest people.
5       Q    So is your personal opinion of
6  Ms. Valente, during the time she was working there,
7  that she was not an honest person?
8       A    Not when she was on the floor with the
9  customers.  I don't think she would tell them what
10  they were in for.  They would just take them on a tour
11  and not say, by the way, you're paying me 150 an
12  hour -- or 150 a half hour, 300 an hour.
13      Q    Do you recall ever putting a cap on the
14  amount that Ms. Valente could charge a customer per
15  hour?
16      A    No.
17      Q    No, you don't recall having a conversation
18  with her, saying, you can, at maximum, charge 300 an
19  hour?
20      A    I do not recall that.
21      Q    Do you know if any entertainer is allowed
22  to charge more than $300 an hour?
23      A    They can ask -- they can get a tip, which
24  generally we wouldn't bat an eye at, like, a
25  20 percent tip, so, like, if someone was getting 300

---

Page 171

1  an hour, and the customer decided to give them 360.
2       But if you get into the area where you're
3  getting charged double or more than that, triple, or
4  whatever, that's going to be something where we're
5  like, hey, you've got to watch it.  You're
6  overcharging.
7       Q    So you would tell -- what if the customer
8  wanted to part with -- what if the customer wanted to
9  gives someone $10,000 for an hour?
10      A    If a customer came to me and said, hey,
11  Bob, I'm going to pay this girl, sure, but that never
12  happened, not to my recollection.
13      Q    Or -- maybe that was too much -- a
14  thousand dollars for an hour.
15      If you were made aware that a customer was
16  charged a thousand dollars an hour for a session with
17  any entertainer, would that be something that you
18  would go to the customer to confirm?
19      A    Yes.
20      Q    Always?
21      A    Yes.
22      Q    20 percent, you would not take that step?
23      A    No.
24      Q    Anything over roughly 20 percent or
25  double, you would want to confirm with the customer?

---

Page 172

1       A    Yes.
2       Q    And as long as the customer said it was
3  okay, then it was okay with you?
4       A    If he was intoxicated, clearly, visibly,
5  like really intoxicated, I still would not approve it,
6  not an exorbitant amount of money --
7       Q    Right.
8       A    Something like a 20 percent tip.  But if
9  someone is really, really intoxicated, I wouldn't
10  approve, like, a large Cheetah Buck tab.
11      And, in fact, if this happens very
12  frequently -- our Cheetah Bucks Girls would come to me
13  and say, this guy is too intoxicated to serve.
14      Q    At that point, you just cut him off from
15  alcohol.
16      Do you also make him leave the club, or do
17  you let him stay?
18      A    Nah, we let him stay.
19      Q    As long as he's not aggressive or
20  rambunctious?
21      A    Correct.
22      Q    Are you aware of any instances where a
23  customer, after having been there all night, spending
24  a bunch of money, disputed entirely the charge on his
25  card -- his credit card?

---

Page 173

1    A    Yeah, I'm sure that's happened.  I can't
2  think of a specific instance, but --
3    Q    Would that be something that you would be
4  made aware of?
5    A    If -- yeah, there has been situations I've
6  heard about that, but I just can't remember.
7    Q    Are you familiar with the one recently?
8    A    No, I don't recall any recently.
9    Q    Do you know an entertainer named Bunny?
10    A    Yes.
11    Q    Is she daytime or nighttime?
12    A    Kind of both.
13    Q    Do you recall her having an issue recently
14  with a charge getting completely reversed, a charge
15  for over $5,000?
16    A    No.
17    Q    No?
18         Would you be aware of something like that,
19  or is that -- it could be that you just --
20    A    No, it could have very easily been
21  something Liz handled.
22    Q    Got it.
23         So Liz may handle it entirely, unless it
24  involves checking with a customer and an entertainer
25  and facilitating -- or mediating?

Page 174

1    A    I can't really speak for when Liz would
2  handle something.  It's -- if she wants my help,
3  she'll ask for it, generally trying to convey to the
4  customer, like, hey -- jar his memory -- this is what
5  you were told.
6         I will sometimes get people who serve them
7  on the phone with me to remind them, hey, you were
8  with your buddy, Joe.  Joe said, hey, I don't have
9  money.  Can you help me out?  Or just try to say
10  things that happened while they were -- said while
11  they were in the room.
12         But if Liz feels like the customer needs
13  me to kind of help him figure out what he spent, then
14  she will send it to me.
15    Q    And, sorry, Liz's last name is?
16    A    Barton.
17    Q    That's Liz Barton.
18         What is her official role?
19    A    Company controller, I think.
20    Q    An accountant?
21    A    Yeah.
22    Q    I mean, if you don't know, that's fine.
23    A    I'm not sure.
24    Q    Yeah.  What role does she fulfill at The
25  Cheetah, without knowing the title?  I mean, just

Page 175

1  financial issues --
2    A    Yeah.
3    Q    -- go through her?
4    A    Uh-huh.
5    Q    Now, the chargeback that led to the first
6  termination of Monroe and Valente, do you recall
7  anything about that issue -- customer issue in
8  particular?
9    A    Yes.
10    Q    What -- do you recall that he was a member
11  of the military?
12    A    I remember that one too, but yes.
13    Q    Is that something --
14    A    Some guy -- I forget.  He just said he
15  was -- he was overcharged.  I remember a military guy,
16  but that's all I really remember, that it was a young
17  guy, a guy in the military.
18    Q    And is that one that you got involved
19  with, even if you don't have -- I understand it was
20  years ago.
21         Do you recall getting involved in that one
22  in terms of hearing out Ms. Valente and Ms. Monroe and
23  hearing out the customer and trying to come up with a
24  solution?
25    A    Yeah, I remember being involved, but I

Page 176

1  really don't remember how that played out, but I
2  remember there was a military guy.  That's about all I
3  can tell.
4    Q    Is it fair to say that it came out in
5  favor of the customer, given that it apparently led to
6  Ms. Monroe and Ms. Valente's termination?
7    A    Yes.  I think it did.  Yes.
8    Q    But you don't recall, again, sitting here
9  today, any details --
10    A    No.
11    Q    -- about how much it was for or anything
12  like that?
13    A    No, I have no idea how much.
14    Q    When were you made aware that the customer
15  later recanted his complaint?
16    A    Military guy or another customer?
17    Q    First, military guy.
18    A    He, to my knowledge, never recanted a
19  complaint.
20    Q    Okay.  You don't recall that happening?
21    A    With anyone or the military guy?
22    Q    With the military guy.
23    A    No.
24    Q    And do you recall that happening with
25  somebody else?

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

---

Page 177

1    A    Yes.
2    Q    Who was that?
3    A    His name was Bob. That's why I remember
4    it. He came in complaining that he was overcharged,
5    and he actually came in, asked to see the manager.
6    Q    He physically --
7    A    He physically showed up one night. He had
8    all of his bills, and they were clearly, clearly
9    overcharged. He was very happy that I told him that
10   we would get to the bottom of it and do something for
11   him. So we -- I talked to Mr. Braglia, and we decided
12   to fire the girls for that.
13        After we fired them, he came back saying
14   that the girls were great, there no problems with
15   the girls, that the only issue was the Cheetah Bucks.
16        So I asked him, was your bill for the VIP
17   room okay?
18        Yes.
19        Was your drinks okay?
20        He said, yes. He said, it was just the
21   Cheetah Bucks, I was overcharged.
22        And I explained to him, well, you do
23   realize that that is the money that the girls got,
24   that is the girls, the Cheetah Bucks.
25        And he just -- wouldn't make sense. He

---

Page 178

1    kept saying, oh, no, it wasn't the girls. It was the
2    Cheetah Bucks.
3    Q    Okay. Do you know if that particular
4    customer used Cheetah Bucks to pay for drinks, as
5    well?
6    A    Don't believe he did, but I'm not
7    100 percent sure.
8    Q    Is that something that you would be able
9    to find out, if you needed to?
10   A    Possibly.
11   Q    You would have records on that somewhere?
12   A    Possibly.
13   Q    Possibly.
14   A    I could not tell that you for sure.
15   Q    Are you aware or has it been brought to
16   your attention an issue concerning waitresses closing
17   out tabs early? Has that ever been an issue at The
18   Cheetah?
19   A    No. I don't really understand what you
20   mean.
21   Q    So say an entertainer booked the room for
22   an hour -- or let's make it easier -- two hours; from
23   1:00 to 3:00, they were expected to go and stay in
24   there.
25        At 2:45, a waitress closes the room,

---

Page 179

1    despite them still being in there, and -- which
2    essentially closes out the VIP time, correct?
3         MR. WARD: Object to the form.
4         THE WITNESS: No, it does not. No. Just
5    because they close the tab, doesn't mean the
6    time is up.
7    BY MR. McDONOUGH:
8    Q    Okay. So what affect, if any, would a
9    waitress closing a tab early have on a VIP session?
10   A    Closing time. Last call for alcohol is at
11   2:20. We're not allowed to serve anything after that.
12   So sometimes, in order to get things expedited at the
13   end of the night, they will go ahead and close out,
14   because they, obviously, can't serve him any more
15   drinks. He's already been charged for the time that
16   he's going to be there. So sometimes there's no need
17   to keep the tab open.
18   Q    So he would have already been charged for
19   the time he was going to be there? How so?
20   A    If he told them, I want the room for two
21   hours -- so let's say he went in at 2:20 -- or 12:20.
22   They ring it up two hours VIP time. So at 2:20, his
23   time is up.
24   Q    Okay. So that's a reference to the room
25   charge that would -- that's charged separately,

---

Page 180

1    correct?
2    A    Correct.
3    Q    So there's the, you know, whatever rental
4    fee, for lack of a better word, the room charge.
5         And then at the end -- so are you saying
6    that, at the beginning, they get charged for the room
7    charge for the expected time?
8    A    Yes.
9    Q    Now, at the end is when they pay for the
10   entertainer's time?
11   A    Sometimes.
12   Q    Sometimes not?
13   A    Sometimes not. We try to encourage the
14   girls to get paid upfront, but sometimes they wait
15   until the end.
16   Q    Were Valente and Monroe the type that
17   would wait until the end?
18   A    I have no idea.
19   Q    It seems to me the only way someone could
20   be overcharged is if they pay at the end, right,
21   because then the time has lapsed, and then they
22   realize it, and then they pay.
23        How am I -- correct my thinking on that.
24   A    Logically thinking, you would assume so,
25   but people are drinking, and many times they get home,

---

Page 181

1  and they look at their credit card statement and try
2  to figure out, why did I spend this much money?  And
3  then they call back at some point later.
4      Q    Even though they had paid upfront for it,
5  like, knew what they were getting into, essentially --
6  they knew they were going to do it for an hour?
7           What is the protocol for extending time,
8  if you were -- say it was 1:00 in the morning, and the
9  customer booked one hour, one hour is up, the customer
10 doesn't want to leave.
11          What is the protocol for extending the
12 room time?
13     A    The waitress simply rings up another hour.
14     Q    Another room fee for the hour and then
15 also another entertainer fee for the hour?
16     A    Cheetah Bucks -- are called again to come
17 back.
18     Q    They're called a second time to come in?
19     A    Yes.
20     Q    Is it usually the case that people book
21 hour by hour, or, in your experience, do people book
22 large chunks of time?
23     A    There is no rhyme or reason on that.  I
24 could not begin to ever tell you that answer.
25     Q    There's no consistent treatment on it?

Page 182

1      A    Definitely not.
2      Q    Are -- and this may not be within your
3  realm of knowledge, but do you know if waitresses and
4  Cheetah Buck Girls are instructed to get advanced
5  payment for booking a room?
6      A    They're instructed to make sure a credit
7  card is good, make sure it was authorized, so that
8  they're not stuck with a card that's going to be
9  declined at the end of the night, but they're not
10 instructed to get the payment.  That would be the only
11 thing that I could think of that would fall into that
12 category.
13     Q    Okay.  So they're not supposed to get
14 pre-payment for the room; they're just supposed to
15 make sure that that card works?
16     A    Make sure that the card has it, yes.
17     Q    But in your experience, the waitress
18 usually gets payment for the room in advance?
19     A    I couldn't tell you either way.  It
20 happens both ways.
21     Q    Okay.  So there's no consistency --
22     A    Correct.
23     Q    -- whether it's paid in advance, whether
24 it's paid when the tab is closed --
25     A    Correct.

Page 183

1      Q    -- or some other time in the middle of the
2  session?
3      A    No rhyme or reason.
4      Q    And there's no protocol, that you're aware
5  of, on that?
6      A    No, not that I'm aware of.
7           MR. McDONOUGH: Can we take five minutes
8      to make sure I don't have any --
9           MR. WARD: Sure.
10          (Short break from 3:46 p.m. to 4:00 p.m.)
11 BY MR. McDONOUGH:
12     Q    All right.  Okay.  Again, before the
13 break, we talked a little bit about this attack that
14 Monroe got involved with and apparently notified floor
15 managers that you needed help.
16          Do you recall, at the end of that,
17 Ms. Monroe mentioning, maybe jokingly, that if the
18 floor managers hadn't been busy hooking up payroll
19 girls that they would have seen you needed help?
20     A    No.
21     Q    Okay.  Do you recall any complaints
22 concerning Valente, first of all, not doing enough in
23 the VIP sessions?
24     A    No.
25     Q    No, no type of complaint like that at all?

Page 184

1      A    None.
2      Q    What about with respect to Ms. Monroe?
3      A    No.
4      Q    Do you recall ever yelling at Ms. Valente
5  for returning what she perceived to be a warm drink?
6      A    No.
7      Q    Is that something you could see yourself
8  doing?
9      A    No.
10     Q    Did you ever recall -- well, first of all,
11 do y'all ever have meetings with all the entertainers
12 on any topic?
13     A    Very, very rarely, but yes.
14     Q    Where would a meeting like that occur?
15     A    On the main floor.
16     Q    You would do it on the main floor?
17     A    Yeah.
18     Q    Off hours or --
19     A    Yeah, uh-huh.
20     Q    Would you ever do that when the
21 establishment is open, or would that be something you
22 would do when on a day when the establishment was
23 closed?
24     A    No.  When we call an all-entertainer
25 meeting, it's always been on the main floor on off

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**Page 185**

1 hours.
2 Q    During hours?  Sorry.
3 A    Off hours.
4 Q    Off hours, okay.
5       Do you and Holly Wood and Heather Overturf
6 get along?
7 A    Yes.
8 Q    Have you ever yelled at Holly Wood?
9 A    Not that I remember.
10 Q    Have you ever instructed Holly Wood to
11 keep her mouth shut at a meeting?
12 A    No.
13 Q    Have you ever yelled at Heather Overturf?
14 A    Not that I recall.
15 Q    Have you ever instructed Heather Overturf
16 to keep her mouth shut at a meeting?
17 A    No.
18 Q    And I guess the last question -- and I
19 might have referred to this earlier, but is it your
20 testimony that you've never gone to an entertainer and
21 taken money out of her hand to return to a customer?
22 A    That is correct.  I have never done that.
23 Q    For any reason?
24 A    Any reason.
25 Q    Are you aware of floor managers doing

**Page 186**

1 that, going to a -- sorry, let me just finish.
2       Are you aware of a floor manager, under
3 your watch, approaching an entertainer, taking money
4 out of her hand and returning it to a customer?
5 A    No.
6       MR. McDONOUGH: That's all I have.
7       MR. WARD: Okay.  You guys are free to go.
8 Thank you very much for your time.
9
10 (Whereupon the deposition was concluded at 4:05 p.m.)
11
12       (Pursuant to Rule 30(e) of the Federal Rules
13       of Civil Procedure and/or O.C.G.A.
14       9-11-30(e), signature of the witness has
15       been reserved.)
16
17
18
19
20
21
22
23
24
25

**Page 187**

1                    ERRATA SHEET
2       I, ROBERT JOHNSON, the witness herein, do
3 hereby certify that I have read the transcript of my
4 deposition testimony dated April 4, 2017, and the same
5 is true and correct to the best of my knowledge with the
6 exception of the following changes noted below, if any:
7 _____  1)  There are no changes noted.
8 _____  2)  The following changes are noted:
9       Pursuant to Rule 30(7) (e) of the Federal Rules
  of Civil Procedure and/or the Official Code of Georgia
10 Annotated 9-11-30 (e), both of which read in part:
  Any changes in form or substance which you desire to
11 make shall be entered upon the deposition... with a
  statement of the reasons given... for making them.
12 Accordingly, to assist you in effecting corrections,
  please use the form below:
13 Page No. _____ Line No. _____
14 Change to:_____
15 Reason for Change:_____
16
17 Page No. _____ Line No. _____
18 Change to:_____
19 Reason for Change:_____
20
21 Page No. _____ Line No. _____
22 Change to:_____
23 Reason for Change:_____
24
25

**Page 188**

1 Deposition of ROBERT JOHNSON
2
3 Page No. _____ Line No. _____
4 Change to:_____
5 Reason for Change:_____
6
7 Page No. _____ Line No. _____
8 Change to:_____
9 Reason for Change:_____
10
11 Page No. _____ Line No. _____
12 Change to:_____
13 Reason for Change:_____
14
15 Page No. _____ Line No. _____
16 Change to:_____
17 Reason for Change:_____
18
19                          ROBERT JOHNSON
20 Sworn to and subscribed before me,
21 this the _____ day of _____, 20___.
22
23                          Notary Public
                           My commission expires:
24
25

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

Page 189

1              D I S C L O S U R E
2
3          I, WHITNEY S. GUYNES, CCR, (WSG Reporting,
4    LLC) do hereby disclose pursuant to Article 10.B of the
5    Rules and Regulations of the Board of Court Reporting of
6    the Judicial Council of Georgia, that I was contacted by
7    the party taking the deposition to provide court
8    reporting services for this deposition, and there is no
9    contract that is prohibited by O.C.G.A. 15-14-37(a) and
10   (b) or Article 7(c) of the Rules and Regulations of the
11   Board for the taking of this deposition.
12          There is no contract to provide reporting
13   services between WSG Reporting, LLC or any person with
14   whom I have a principal and agency relationship nor any
15   attorney at law in this action, party to this action, or
16   party having a financial interest in this action.
17          Any and all financial arrangements beyond my
18   usual and customary rates have been disclosed and
19   offered to all parties.
20
21   *(signature)*
22   _____
     Whitney S. Guynes, B-1897
23   April 10, 2017
24
25

Page 190

1              C E R T I F I C A T E
2    G E O R G I A:
3    GWINNETT COUNTY
4          I hereby certify that the total transcript,
5    pages 1 through 186, represent a true, complete, and
6    correct transcript of the proceedings taken down by me
7    in the case aforesaid (and exhibits admitted, if
8    applicable); that the foregoing transcript is a true and
9    correct record of the evidence given to the best of my
10   ability.
11          The above certification is expressly withdrawn
12   upon the disassembly or photocopying of the foregoing
13   transcript, unless said disassembly or photocopying is
14   done under the auspices of myself, and the signature and
15   original seal is attached thereto.
16          I further certify that I am not a relative or
17   employee or attorney of any party, nor am I financially
18   interested in the outcome of the actions.
19          This the 17th day of April, 2017.
20
21
22   *(signature)*
23   _____
24          Whitney S. Guynes, CCR B-1897
25

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**$**

**$10 (1)**
37:19
**$10,000 (1)**
171:9
**$100 (3)**
30:23;52:10,14
**$15 (4)**
87:1,6,13,23
**$200 (1)**
137:17
**$25 (2)**
85:4,17
**$300 (4)**
56:19;57:14;148:15;
170:22
**$5 (1)**
14:25
**$5,000 (1)**
173:15
**$700 (6)**
53:19;54:2;57:25;
58:12,13,17

**[**

**[phonetic] (3)**
13:5,24;34:14

**A**

**Abby (6)**
141:2,14;143:21;
158:14;169:9,12
**ability (2)**
6:24;122:10
**able (5)**
75:10;78:22;82:9;
159:22;178:8
**Absolutely (6)**
19:14;48:2;54:15;
63:8;92:22;104:15
**according (1)**
105:3
**accosted (1)**
24:8
**accosting (1)**
25:13
**accountant (1)**
174:20
**accurate (1)**
46:17
**accusation (1)**
33:2
**accuse (1)**
116:1
**accused (1)**
95:6
**Across (1)**
83:23
**act (3)**

69:5;111:25;155:23
**acted (3)**
110:22;118:21;
165:16
**acting (2)**
92:9;110:21
**action (1)**
74:2
**active (1)**
44:21
**activities (1)**
30:1
**activity (6)**
21:6;108:8;116:25;
120:25;127:7;140:3
**actually (18)**
47:15;66:4;67:20;
68:3;90:15,24;120:14;
130:16;135:20;138:18;
142:14,21;146:8,11;
154:24;157:23;166:6;
177:5
**additional (4)**
38:7;85:16;136:3;
163:8
**adds (1)**
104:16
**adhere (1)**
74:11
**advance (2)**
182:18,23
**advanced (1)**
182:4
**affect (2)**
27:4;179:8
**affiliates (1)**
133:2
**affinity (1)**
112:12
**again (41)**
7:11;12:17;14:2;
19:4;20:7;23:3;30:18;
39:19;41:25;46:22;
48:19;52:4;57:7,19;
61:21;71:12,22;72:25;
73:18;82:13;92:14;
98:4;103:12;105:3;
111:20,23;122:15,18;
124:21;125:4;131:7;
134:11,25;147:11;
154:8;155:7,13;156:1;
176:8;181:16;183:12
**against (4)**
43:1;45:6;79:7;
151:4
**age (1)**
29:6
**aggressive (3)**
102:5;118:6;172:19
**ago (9)**
12:21,23;88:5;97:22;
115:3;148:8;153:3,25;
175:20

**agree (1)**
19:18
**agreed (1)**
119:5
**Ah (1)**
90:10
**ahead (2)**
150:4;179:13
**alcohol (10)**
26:21;27:1,4,14;
28:14;122:11;123:11;
124:24;172:15;179:10
**allegation (2)**
94:20,21
**alleged (2)**
92:15;130:14
**all-entertainer (1)**
184:24
**allow (3)**
59:2;72:24;102:11
**allowed (11)**
29:7;72:17,19;75:4;
99:20;102:13;113:7;
125:7;159:6;170:21;
179:11
**Alluvia (2)**
83:22,23
**alone (1)**
120:11
**along (3)**
7:9,20;185:6
**although (2)**
152:4;160:1
**Always (24)**
45:11;50:20;54:6;
55:15;58:6,7;63:16,17;
82:24;85:19;98:14,16;
99:8,10,16,17;141:4;
143:5;147:1;149:16;
162:25;165:21;171:20;
184:25
**Alzheimer's (1)**
93:6
**Amanda (1)**
8:25
**among (1)**
89:9
**amongst (1)**
94:14
**amount (9)**
14:8;24;36:1;53:1;
86:5;103:5,6;170:14;
172:6
**amounts (1)**
103:3
**ancillary (1)**
54:25
**and/or (2)**
133:2;186:13
**angry (1)**
163:14
**anymore (3)**
61:25;81:2;141:21

**apologize (1)**
5:12
**apparently (5)**
168:2,3,25;176:5;
183:14
**appear (2)**
28:3;134:10
**appearance (2)**
6:8;8:24
**apply (1)**
115:18
**approach (2)**
67:15;110:25
**approached (4)**
60:3,9;118:24;
158:21
**approaching (1)**
186:3
**appropriate (2)**
18:25;70:14
**approve (4)**
147:1,10;172:5,10
**approximately (3)**
12:19;79:19;81:21
**April (1)**
5:7
**area (15)**
22:24;61:3,3;83:5,
13,18;84:2;101:2,12,
20,22;112:16;140:4;
141:13;171:2
**areas (5)**
83:6,11;84:10,17;
101:10
**arise (5)**
23:23;31:11;32:6;
50:8;94:2
**arises (1)**
21:20
**arm (1)**
149:13
**arose (1)**
110:11
**around (5)**
28:4;57:14;69:17;
104:4;161:3
**arrived (1)**
142:19
**Article (1)**
5:2
**aside (1)**
135:15
**aspect (2)**
21:13;67:22
**aspects (1)**
7:8
**assault (6)**
25:1,13;27:1;124:23;
167:14,16
**assaulted (5)**
24:7;89:22;94:21;
166:21;167:1
**assembling (1)**

126:14
**assessment (1)**
85:17
**asset (4)**
121:22;122:5,8,15
**assume (10)**
7:7;14:22;21:15;
22:20;49:18;55:25;
111:4;118:24;154:10;
180:24
**Atlanta (3)**
123:13;125:1;135:18
**atmosphere (1)**
104:6
**attack (1)**
183:13
**attacked (1)**
168:2
**attempt (1)**
26:15
**attention (4)**
74:19;111:18;
130:16;178:16
**attorney (2)**
6:9;7:20
**attorneys (1)**
15:20
**attributable (1)**
139:10
**authorities (1)**
95:21
**authority (2)**
42:22;115:21
**authorized (1)**
182:7
**available (1)**
34:25
**average (3)**
69:21;106:15;122:19
**aware (55)**
20:22;21:1,21;22:17;
24:3,4,6;25:23;26:11;
28:16;35:8;56:14;
77:23;78:17;79:8;80:3;
81:16;82:3;83:2;89:21;
93:1;94:5;101:25;
102:3,14;108:10,11,12,
16,23;109:3;118:9;
119:18,21;120:21;
121:4,12;122:18;
123:12;126:25;131:6;
132:13;139:15,16;
165:16;171:15;172:22;
173:4,18;176:14;
178:15;183:4,6;
185:25;186:2
**away (11)**
24:14;69:10;111:16;
137:15;138:3,5;
141:15;143:4;150:7,
13;164:18

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

## B

**back (54)**
10:3,3;23:17;33:25;
44:10,14;54:2,4,6,8,15,
16;56:9;57:24,25;
58:13,14,18,18;64:8,
11;67:2;71:23;72:2;
74:17;83:20,24,25;
86:25;88:1;91:7;
101:14;129:6;134:2,
23,25;137:13,20;
141:9;151:7,22;
152:14;154:16,17,22;
159:6,24;161:19;
162:6;164:17,25;
177:13;181:3,17
**background (1)**
6:21
**backside (1)**
114:7
**bad (1)**
135:23
**Bambi (1)**
97:23
**banned (1)**
132:1
**bar (4)**
11:4;29:19;41:9;
168:17
**bar-back (4)**
130:10;132:8,9,10
**bartender (6)**
120:22;130:9;
140:13,14,16;168:16
**bartenders (2)**
14:18;29:22
**Barton (3)**
50:10;174:16,17
**base (1)**
39:1
**based (12)**
6:2;7:11;20:1;48:22;
49:5;118:21;121:21;
123:6;124:10;125:18;
149:10;150:9
**basically (12)**
10:21;11:12;14:13;
31:1;113:19;118:20;
123:22;127:24;137:15;
150:14;161:6,23
**basis (5)**
39:16;40:2;80:8;
103:11;105:15
**bat (1)**
170:24
**battery (1)**
25:1
**became (2)**
64:24;81:16
**become (1)**
119:18

**becoming (2)**
93:1;102:5
**beer (1)**
122:24
**began (1)**
8:3
**begin (2)**
95:13;181:24
**beginning (2)**
37:10;180:6
**behalf (4)**
5:16;6,6,10;139:23
**behavior (2)**
23:22;118:6
**behind (1)**
101:12
**believing (1)**
32:2
**bell (2)**
135:10;166:19
**below (1)**
41:13
**benefit (3)**
55:1;157:4,24
**besides (8)**
23:24;24:9;29:20;
95:1;121:11;132:9,10;
151:4
**best (6)**
6:24;86:17,23;105:8;
124:10;129:12
**better (4)**
10:17;102:10;161:7;
180:4
**beverage (1)**
162:25
**beyond (1)**
40:20
**big (2)**
87:17;169:7
**Bill (2)**
80:25;177:16
**bills (1)**
177:8
**binding (1)**
19:16
**bit (10)**
48:4;59:15;88:12;
96:2;134:7;161:3,20;
162:6,17;183:13
**bite (1)**
150:5
**black (1)**
54:1
**Blake (1)**
93:11
**blew (1)**
121:6
**block-the-punch (1)**
168:14
**blond (2)**
94:8,9
**Board (1)**

**5:3
Bob (6)**
6:16;76:18;91:10;
130:9;171:11;177:3
**boobs (2)**
97:20;112:10
**book (4)**
22:2;46:25;181:20,
21
**booked (2)**
178:21;181:9
**booking (1)**
182:5
**boss (3)**
113:10,17,20
**both (11)**
36:4;37:13;97:14;
139:11,12;148:1;
149:3;153:6;156:2;
173:12;182:20
**bottle (5)**
82:9;84:10,16,22;
85:4
**bottles (7)**
82:9,16,19,22,25;
83:3;85:6
**bottom (2)**
127:5;177:10
**bought (7)**
106:23;161:10,15,
19;163:13;164:1,5
**boyfriend (2)**
93:7;129:17
**Braglia (49)**
6:12;12:4,6,9;13:2,
16;17:11;20:19,21;
21:2;22:4,20;23:1;
24:10,18,24;29:25;
30:4;41:17,21,23;42:6,
9,11,15,18;77:6;80:25;
90:15;111:4,5;114:3,6,
21;116:4,6;117:14;
121:15,19;123:20;
124:3;131:11,11;
134:4;139:1;153:7;
157:12;167:23;177:11
**Braglia's (1)**
130:16
**brain (2)**
93:9,10
**break (16)**
27:11;59:10,12,13,
15;102:20,22;117:24,
25;118:2;159:15;
166:5,7;167:17;
183:10,13
**breasts (1)**
112:12
**Brian (2)**
13:5,6
**bring (3)**
7:13;22:16;143:10
**bringing (4)**

**94:11;143:7,17;
144:3
broadly (1)**
126:22
**broken (1)**
167:12
**brought (7)**
74:19;111:18;
117:11,19;130:15;
131:10;151:7;152:14;
154:15,17,22;158:22,
23;178:15
**Browning (2)**
93:11;94:21
**Brulet (1)**
34:14
**Buck (13)**
30:15;33:21;34:23;
58:25;109:9;125:4,6,
19;146:16,19;148:18;
172:10;182:4
**Bucks (52)**
30:20,22,23;31:6,8,
11,15,16;32:3,6,8,13,
20,22,22;33:3,6,7,8;
34:16,18;35:3,9,12,15,
17,17,19,21,24;55:20;
56:13;59:1,2;104:20;
109:7;125:7,8,12,22;
129:9;145:23;146:10,
13;147:20;172:12;
177:15,21,24;178:2,4;
181:16
**buddies (1)**
130:22
**buddy (1)**
174:8
**bumping (1)**
130:11
**bunch (2)**
127:7;172:24
**Bunny (1)**
173:9
**business (1)**
80:15
**busy (1)**
183:18
**butt (3)**
18:1,14,20
**buy (9)**
30:19;34:24;84:9,16,
22;85:4;107:4,8,10
**Bye (2)**
131:24,24

## C

**cab (1)**
28:11
**caliber (1)**
84:16
**California (1)**
169:7

**call (16)**
37:13;48:6;61:3,4,7;
65:12,20;66:13;70:4,7;
95:20;140:24;141:18;
179:10;181:3;184:24
**call/no (1)**
127:23
**called (11)**
61:5;69:24,25;70:1,
2,3;83:14;90:8;163:23;
181:16,18
**calling (2)**
70:5;113:20
**calls (2)**
30:2;108:17
**calm (1)**
76:7
**came (23)**
77:16;84:20;91:14;
94:5;112:9;117:16;
140:3;141:1,2;142:15,
20;143:16;158:2,12,14,
17;168:4,15;171:10;
176:4;177:4,5,13
**can (70)**
8:9;10:14,16;11:9;
14:19;16:4,19;18:12;
19:1;22:22;23:19;27:7;
32:5;34:7,16;35:16,20,
24;54:4;55:6,19,25;
56:3;57:6;59:11;60:12,
23;62:15,16;63:18;
64:18;70:8,9;83:4,9;
84:1,18,22;85:20,23;
92:8,25;93:8;94:9;
95:2,17;96:15;97:2,4,
15;99:19;101:13,14,
23;105:6;106:18;
107:12;108:25;112:5;
117:5;132:14;134:8,
13;135:15;170:18,23,
23;174:9;176:3;183:7
**cap (1)**
170:13
**capacity (1)**
5:14
**car (2)**
107:8,10
**card (11)**
30:20,23;146:11,18;
172:25,25;181:1;
182:7,8,15,16
**care (2)**
19:4;100:1
**career (1)**
90:2
**careful (1)**
148:11
**case (16)**
15:13,17,18;16:11;
18:16;24:25;28:9;59:6;
60:17;82:8;85:3,19,22;
98:10;99:18;181:20

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**cases (2)**
46:23;66:3

**cashes (1)**
32:19

**catch (1)**
32:19

**category (1)**
182:12

**caught (4)**
74:17;75:13;108:8;
121:9

**caused (1)**
159:5

**causing (2)**
27:9;94:16

**cautious (2)**
116:24;117:1

**ceased (1)**
88:4

**center (1)**
132:20

**certain (4)**
77:23;84:13;86:5;
126:21

**certainly (15)**
22:24;25:17;26:15;
30:6;66:23;68:7;76:1;
97:24;107:23;122:6,
17;137:11;138:9;
153:14;160:8

**chance (4)**
75:17;136:18;
151:10;161:1

**Chanel (2)**
135:10,10

**change (3)**
12:5;82:5,7

**changed (7)**
10:21;11:11,20;
33:24;79:16,17;82:4

**characterization (1)**
69:12

**characterize (1)**
105:5

**charge (22)**
30:5,9,22;35:10;
60:23;61:10,13;64:15;
65:1;85:14;139:10,14;
156:2;170:14,18,22;
172:24;173:14,14;
179:25;180:4,7

**chargeback (13)**
43:14,15,16,23;44:4,
8,9;52:9;138:7,8;
156:24;159:20;175:5

**chargebacks (4)**
43:12;59:16;165:7,
24

**charged (13)**
45:7;53:16,18;64:19;
137:12;148:15;162:2;
171:3,16;179:15,18,25;
180:6

**charges (4)**
59:7;139:10;146:8,
11

**charging (3)**
137:11;148:3,12

**chat (1)**
80:16

**check (10)**
45:1,5;48:7,24;
100:8;101:4,5,9;129:3;
163:5

**checked (10)**
44:18;45:5;46:6,14;
47:3,10,22;48:9,11,19;
49:7,8;52:22;53:1,4;
54:23,24;63:10;64:11;
65:10;71:14,22;
101:17;137:8,10,22;
163:5;165:9,14;166:3

**checking (4)**
9:17;46:17;96:11;
173:24

**checks (3)**
45:23,25;47:16

**Cheers (1)**
104:3

**Cheetah (99)**
12:13;15:10;25:19,
24;26:4;29:13;30:15,
20,22,23;31:1,3,6,8,11,
15,16;32:3,6,8,13,20,
22,22;33:3,6,7,8,18,19,
21;34:16,17,18,22,23,
25;35:3,8,9,12,15,16,
17,19,21,24;55:20;
56:13;58:25;59:1,2;
73:13;102:12,24;
103:3,18,22;104:4;
105:3,15,18;106:10;
109:7,9,22;115:25;
122:10;125:4,6,7,8,12,
19,22;126:9;133:6;
136:5;145:23;146:10,
13,16,19;147:20;
148:18;166:21;167:2,
15;172:10,12;174:25;
177:15,21,24;178:2,4,
18;181:16;182:4

**Cherry (2)**
133:25;134:16

**chit-chat (1)**
80:17

**choice (2)**
13:1;84:25

**chose (2)**
85:3;155:23

**Chris (22)**
90:10,12;118:3,4,6,
16,24;140:10;141:2,8,
10,12,22,23,25;142:7,
11,14,24;143:1,22;
144:3

**chunks (1)**

**181:22**

**circumstances (2)**
53:25;133:8

**City (2)**
123:13;124:25

**civil (2)**
169:5;186:13

**claim (2)**
129:8;160:4

**claims (1)**
89:22

**clarify (5)**
5:13;22:7;31:24;
41:5;92:2

**Clarifying (2)**
20:14,16

**Clark (1)**
8:25

**Clark-Palmer (5)**
8:22;10:6,11,17;
142:4

**clean (1)**
51:13

**clear (7)**
5:25;7:19;66:12;
73:18;88:15;94:19;
98:8

**clearer (1)**
84:14

**clearly (3)**
172:4;177:8,8

**Cliffords (1)**
104:4

**close (4)**
67:11;123:4;179:5,
13

**closed (2)**
182:24;184:23

**closer (1)**
10:8

**closes (2)**
178:25;179:2

**closest (1)**
22:15

**closing (4)**
68:22;178:16;179:9,
10

**cloud (1)**
94:1

**club (88)**
10:22,24;11:24;12:1,
7,10,13;13:17;15:5;
16:16;17:16,17;18:9;
19:8,10,17;20:25;
21:17,23;23:9,24;24:3;
28:7;30:1,5,8,11;35:4;
36:13;41:9,20;42:11;
43:6,8;51:22;64:17,21,
25;66:18,21;72:19;
73:20;77:6;79:8;80:14,
20,25;82:16;88:4;
99:25;101:2;103:14;
105:21;106:4,13;

**108:8,22;109:13,17;**
112:3;113:7,17,21,23,
25;114:4,7;115:13,21;
121:22,23;122:5,8,16,
20;123:17;124:4,11,18,
20;126:23,23;127:8;
132:1,5;140:4;148:23;
172:16

**club's (1)**
65:23

**clue (1)**
130:23

**collecting (1)**
11:14

**collects (1)**
47:21

**column (2)**
133:16;135:3

**comfort (1)**
59:10

**comfortable (1)**
6:19

**coming (7)**
54:15;66:6;103:17;
134:2;138:22;142:2,12

**comment (1)**
18:22

**comments (3)**
130:11;131:18,22

**common (3)**
112:20,22;121:17

**communicate (2)**
21:1;27:3

**communication (1)**
52:2

**company (2)**
12:15;174:19

**compared (1)**
165:9

**compensation (5)**
14:3;35:25;36:19;
38:16;54:7

**compile (1)**
153:7

**compiled (1)**
43:5

**compiling (1)**
43:2

**complain (6)**
55:25;56:3;67:6,11;
116:18,22

**complained (8)**
60:4,9;130:9;131:17;
132:5;137:21;161:15;
164:9

**complaining (4)**
56:25;57:3;141:2;
177:4

**complains (2)**
44:2;162:8

**complaint (35)**
43:18,25;44:5,23;
49:3;50:10;51:19;

**55:16,24;59:18;60:13;**
63:20;118:25;130:14;
131:11;138:9,23;
145:1;146:1;151:9,19,
24;156:25;157:1;
159:1,4,14;160:17,17;
162:11;163:12;164:14;
176:15,19;183:25

**complaints (18)**
17:19;20:3;43:14;
51:23;67:2;142:24;
143:2;144:22,25;
145:1,3,5;149:10;
150:11;151:3;160:2;
165:24;183:21

**completely (2)**
28:1;173:14

**compliance (1)**
123:24

**complicated (1)**
134:7

**Complies (4)**
127:4;130:3;132:17;
135:16

**comply (1)**
58:21

**component (3)**
38:17,19,22

**components (1)**
61:1

**composed (1)**
15:4

**comprised (1)**
86:19

**concerning (7)**
28:20;32:2;51:23;
118:6;127:7;178:16;
183:22

**concluded (1)**
186:10

**conclusion (1)**
30:3

**conduct (5)**
23:25;92:15;93:2;
95:7;114:22

**confer (2)**
47:4,7

**conferred (1)**
117:14

**confided (1)**
130:17

**confirm (2)**
171:18,25

**conflict (1)**
131:1

**confused (4)**
15:22;90:6;151:20;
155:11

**confusing (1)**
145:13

**consent (1)**
42:9

**consider (9)**

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

38:22;39:13;44:3;
55:5;102:25;103:6;
105:16,18;156:24
**considered (8)**
71:8;104:19;106:9;
122:4,7;138:7;156:25;
159:20
**consistency (1)**
182:21
**consistent (1)**
181:25
**constantly (1)**
128:22
**constitute (1)**
99:4
**consult (2)**
42:18;111:5
**consulting (1)**
111:3
**contact (1)**
67:16
**context (3)**
120:7;133:1;136:3
**continue (1)**
75:17
**continued (1)**
74:4
**continues (1)**
74:25
**contractors (1)**
41:20
**controller (1)**
174:19
**conversation (9)**
50:21;107:21;116:9;
137:2;140:7;156:11;
158:5;165:4;170:17
**conversations (3)**
80:13;116:8;169:19
**convey (2)**
159:21;174:3
**conveyed (4)**
146:1;147:25;
154:25;165:6
**copy (1)**
126:7
**corner (3)**
83:24;149:15,17
**corporate (1)**
6:12
**correctly (1)**
53:19
**corroborate (1)**
50:3
**cost (1)**
61:14
**Council (1)**
5:4
**count (1)**
39:19
**counter (2)**
147:20;148:19
**couple (7)**

20:16;23:5;58:11;
104:21;107:13;115:3;
151:4
**course (5)**
74:1,8;97:21;104:16;
150:10
**Court (3)**
5:3;8:10;13:10
**cover (1)**
85:14
**covered (1)**
19:2
**created (1)**
37:19
**creating (1)**
43:8
**credence (1)**
63:19
**credit (7)**
30:20,23;82:18;
146:11;172:25;181:1;
182:6
**curious (5)**
44:22;123:8;125:5;
126:24;128:10
**current (1)**
102:12
**Currently (5)**
15:3;79:13;82:13;
105:7;123:1
**customer (176)**
18:1,8,9,10,17;21:7;
23:13;24:12,14,20,25;
25:2,13;27:4;31:23;
32:2;34:17;39:3;43:19;
44:2,13;45:6,14;46:23;
47:22;49:6,21,21;
50:12,13,17,20;51:3,
19,23;52:22;53:19;
54:11,14,25;55:7,11,
16,24,25;56:3,8,24;
57:2,19,21,22,25;
58:11,13,19;59:18,21;
60:1,4,8,15,20;61:2,15,
21,24;63:1,6,11,13;
64:8,10,24;65:13,20;
66:4,5,7,14,18,21,25;
67:2,3,6,10,15;83:5;
84:3,9,16;85:3,12;97:8,
13,23;98:12,14,25;
99:1,14,20;102:5;
104:17;105:8,14;
106:10;129:15;131:17;
132:11;137:3,18;
141:4,19,20;143:8,14,
17;146:8,19,25;147:2,
4,10;148:2,11,14;
150:1,10;151:4,8;
159:9,21;160:12,16,20;
161:6,10;162:1,8,11;
163:9,13,14;164:5,8,
17;165:1,17;167:2,15;
170:2,14;171:1,7,8,10,

15,18,25;172:2,23;
173:24;174:4,12;
175:7,23;176:5,14,16;
178:4;181:9,9;185:21;
186:4
**customers (35)**
9:18;10:22;11:6,7,
15;17:3;21:8;24:1;
32:10,11;39:11,23;
40:1;43:14;77:25;78:9;
84:13;86:9;100:1,1;
102:24;103:21;104:8,
12;105:2,10;142:8;
143:11;144:23;145:20;
153:8;160:16,19;
161:14;170:9
**customer's (6)**
49:3;50:11;60:18;
63:20;160:10;164:14
**cut (1)**
172:14

# D

**d' (1)**
86:1
**dance (1)**
129:2
**dancer (8)**
47:24,25;48:12;
49:25;87:2,6;135:13;
146:23
**dancers (12)**
23:21,22;32:11;
34:19,20;36:22,23;
47:11,12,19;93:24;
122:13
**dances (3)**
30:24;104:21,22
**dancing (1)**
161:16
**Dani (1)**
93:25
**Darrell (2)**
89:2,3
**Darron (1)**
92:11
**Date (1)**
133:17
**dates (1)**
154:9
**dating (2)**
94:4,5
**David (1)**
89:4
**David's (1)**
89:4
**Davis (1)**
6:6
**Day (13)**
13:21;42:12,14;
55:17;89:12;103:19,
22,23;104:13;128:20;

136:4,8;184:22
**day-in (1)**
103:25
**day-out (1)**
103:25
**days (2)**
40:13;58:11
**daytime (2)**
125:11;173:11
**day-to-day (1)**
81:2
**deal (9)**
50:17;51:4,23;55:17;
70:5;87:17;110:10;
120:8;167:22
**dealing (5)**
31:11;32:1;51:18;
115:11;162:23
**dealings (1)**
125:19
**dealt (5)**
21:24;32:7;52:5;
54:14;160:20
**decided (13)**
58:10,11;64:25;
129:11;139:2;156:21;
157:12,23;159:13,16;
163:23;171:1;177:11
**deciding (1)**
49:21
**decision (13)**
42:5;54:24;55:3,22;
79:18;80:1,5;81:5;
88:9,10;90:14;159:19;
160:4
**decisions (1)**
42:6
**declined (1)**
182:9
**Defendant (3)**
126:3;133:2,6
**defer (1)**
162:25
**definitely (3)**
44:20;106:11;182:1
**delineate (1)**
162:17
**deliver (1)**
42:2
**delivered (2)**
90:25;91:1
**demise (1)**
160:18
**Den (2)**
83:7,10
**deny (2)**
120:5,14
**depend (1)**
66:21
**depending (4)**
12:6;38:11;55:19;
72:3
**depends (1)**

46:17
**depo (1)**
123:8
**deposed (2)**
7:5;16:12
**Deposition (4)**
5:6;16:8;19:3;
186:10
**describe (5)**
75:19,20;83:9;101:4;
133:7
**described (3)**
55:15;56:7;115:23
**describing (1)**
25:12
**description (2)**
69:14;162:13
**desk (18)**
50:11;138:24;139:7;
151:9;152:7,17;
154:19;155:7,13,15;
156:9,12;157:8,11;
158:2;159:1,4;160:3
**despite (4)**
20:18;99:20;155:12;
179:1
**details (4)**
130:13;131:19;
143:19;176:9
**determination (4)**
52:11;53:14;55:8;
159:8
**determine (5)**
44:23;49:3;50:14;
57:21;74:1
**determined (4)**
52:8;57:19;137:21;
159:2
**developed (1)**
109:20
**difference (7)**
27:13,24,25;32:24;
72:11;87:4;105:19
**different (11)**
9:19,21;12:18;25:14,
16;26:20;28:2;29:5;
64:23;74:14;110:21
**differently (1)**
27:22
**diffuse (1)**
164:23
**diligence (1)**
50:14
**directing (1)**
130:6
**directly (8)**
17:13;24:24;25:9;
36:24;39:10,23;60:9;
130:15
**dirty (2)**
134:16,20
**disallowed (1)**
102:12

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

disclosure (1)
  5:1
discovery (1)
  20:9
discrepancies (1)
  50:7
discrepancy (2)
  46:23;48:22
discrete (1)
  72:25
discrimination (4)
  24:22;43:1,9;132:6
discriminatory (1)
  131:4
discuss (5)
  42:7;121:14,19;
  145:5,19
discussed (4)
  41:17;57:10;137:8;
  139:2
discussing (4)
  38:15;42:25;51:2;
  151:3
discussion (5)
  45:9;57:16;96:18;
  148:25;156:7
discussions (1)
  80:15
dispute (3)
  46:12;48:6;162:21
disputed (1)
  172:24
disputes (1)
  163:9
DJ (7)
  14:19,20,21;29:22;
  38:1,3;41:9
DJs (2)
  14:24;36:16
document (7)
  19:11;47:17;126:2,
  10,14;127:3;130:2
documented (3)
  45:1,19,22
documents (4)
  7:9,11;16:7;45:18
dollar (3)
  36:4,6;38:10
dollars (13)
  30:22;37:18;53:5,17;
  56:12,15;57:12;
  103:22;105:16;106:20;
  107:13;171:14,16
dollars' (1)
  34:18
Don (1)
  8:25
done (12)
  9:22;48:13;50:14;
  69:15;78:13;101:6;
  111:3;117:22;151:25;
  156:11;158:21;185:22
door (8)

9:17;10:1;54:8;
  68:12,22;85:15;
  101:12,14
doorman (1)
  9:16
doors (1)
  68:19
double (4)
  45:5;137:11;171:3,
  25
doubles (1)
  125:11
doubt (3)
  142:22;157:4,24
down (12)
  8:13;40:21;55:19;
  124:13;133:22;141:6,
  13,15;143:16;149:15;
  153:13,21
drank (2)
  28:13;164:9
drink (40)
  29:7;75:1,3,4,14,17;
  76:24;104:6;161:5,7,7,
  11,13,13,16,19,20,20,
  22;162:2,9,9;163:14,
  15,20;164:2,4,5,5,5,9,
  13,13,18,21,21,24,25,
  25;184:5
drinking (13)
  27:19,20;29:12;75:1,
  13;121:9;123:11;
  124:8;150:16;161:5,
  12;163:15;180:25
Drinks (9)
  34:19,20;100:2,10;
  104:24;162:24;177:19;
  178:4;179:15
drive (1)
  28:10
dropped (1)
  142:4
drug (2)
  110:7,11
Drugs (3)
  69:7,8;110:15
drunk (7)
  11:1;60:13,16;61:24;
  63:12,21;67:8
due (5)
  58:12;60:18;131:4;
  135:23;162:14
duly (1)
  5:10
during (10)
  11:24;12:9;17:24;
  44:16,20;82:3,5;
  125:11;170:6;185:2
duties (1)
  10:21

E

earlier (9)
  38:15,23;42:25;
  57:10;97:6;101:11;
  109:9;137:8;185:19
early (2)
  178:17;179:9
earn (2)
  40:4;102:10
earned (1)
  39:22
earnings (2)
  78:15;86:19
earns (1)
  59:1
easier (2)
  127:1;178:22
easily (1)
  173:20
East (8)
  92:11;95:21;118:3;
  119:10,12;120:1,6,11
Easterling (1)
  92:12
egregious (1)
  96:12
either (7)
  65:8;84:21;94:20;
  119:15;145:10;159:12;
  182:19
either/or (1)
  84:25
ejected (1)
  99:1
elaborate (1)
  128:3
else (28)
  14:19;16:4;17:5,10;
  24:10;29:20;31:20;
  32:10;34:20;35:15;
  38:21;41:19;51:12;
  85:17;94:11;98:3;
  108:24;116:1;118:9,
  18;123:17,18;125:10;
  129:2,17;140:19;
  143:24;176:25
employ (1)
  144:4
employee (9)
  33:18,19;115:9,12,
  12,15;116:21;132:12;
  133:2
employees (8)
  17:5;35:4;41:20;
  49:18;112:3;114:4;
  116:25;132:5
employment (1)
  136:22
encourage (2)
  161:12;180:13
end (19)
  20:3;36:8;39:21;
  45:15;47:22;49:20;
  61:18;79:2;138:4,5;

147:11;179:13;180:5,
  9,15,17,20;182:9;
  183:16
ended (3)
  66:14;137:23;155:7
engage (1)
  44:22
engaging (2)
  108:8;114:22
enjoy (1)
  104:6
enjoyed (1)
  93:15
enough (5)
  66:8;67:12;121:17;
  145:16;183:22
ensure (1)
  28:10
ensuring (1)
  123:24
entail (4)
  11:22;68:21;69:2;
  100:7
entertainer (96)
  22:14;24:7,23;25:2,
  14;32:13,14;43:12;
  44:3,14;45:8,13;46:18;
  50:20,22,23;51:3,11;
  56:14;57:11,12,14;
  58:14,17;59:1;60:5,18;
  61:11,16,24;63:4,6,9,
  21;64:12;65:5,9;67:7,
  11,14;71:15,21,22;
  72:3;73:25;74:16,19;
  75:13,15;76:5,8;78:11,
  14;80:4;87:23;89:23;
  90:4,6,8,9;91:14;
  92:10;93:2,25;95:7;
  97:14,23;98:16,24;
  99:5,8;117:19;118:16,
  20;119:13;120:24;
  146:17;160:13;161:10,
  11,11,12,23;162:9,12;
  163:13;164:12,24;
  170:21;171:17;173:9,
  24;178:21;181:15;
  185:20;186:3
entertainers (39)
  14:16,22;15:6;23:25;
  28:13,17;29:6,21;35:3;
  37:18;38:11;43:13;
  48:14;58:21;75:23,24;
  77:23;78:1,5;79:5,11;
  81:7;94:20;95:23;96:9;
  102:4,9;112:3;113:3,4;
  116:18;118:7;121:5;
  122:3;139:13;163:10;
  165:8,10;184:11
entertainers' (1)
  62:3
entertainer's (13)
  37:4;50:5,25;59:20;
  60:10;62:10,16,21;

67:6;146:6,7;160:11;
  180:10
entertainment (2)
  44:7;59:22
entire (2)
  11:24;90:2
entirely (3)
  31:21;172:24;173:23
entirety (1)
  39:6
entrance (1)
  148:24
Entry (1)
  134:15
equal (1)
  37:24
escalate (1)
  51:8
escalating (1)
  73:25
escaping (1)
  93:4
escort (4)
  18:6,7;24:14;67:1
escorted (1)
  66:15
essentially (5)
  43:25;126:7;157:3;
  179:2;181:5
establishment (3)
  163:10;184:21,22
estimate (3)
  40:7;107:24;145:2
even (8)
  63:10;72:5;74:5;
  105:23;151:17;155:20;
  175:19;181:4
evening (11)
  12:7;35:23;37:4,23;
  38:12;42:12;55:25;
  114:15;135:23;136:19,
  25
event (2)
  117:10;119:15
events (2)
  7:12;136:15
eventually (2)
  79:1;152:2
everybody (1)
  9:25
everyone (3)
  34:12;37:24;153:21
everyone's (1)
  153:14
exact (3)
  88:6;91:19;144:9
exactly (12)
  10:24;14:7;15:14;
  27:23;79:21;86:15,18,
  19;111:11;138:22;
  149:11;153:24
EXAMINATION (1)
  6:3

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**examined (1)**
5:10
**example (5)**
37:17;52:10;56:11;
70:8;153:9
**Except (1)**
81:3
**exception (2)**
15:19;125:14
**exchange (1)**
77:25
**Excuse (2)**
10:6;68:7
**executive (1)**
145:24;148:21,22,24
**exemplary (1)**
73:3
**Exhibit (2)**
125:23;126:2
**exhibits (1)**
7:10
**exist (1)**
88:4
**existed (1)**
81:15
**existence (1)**
81:17
**exists (1)**
153:17
**exorbitant (1)**
172:6
**expect (3)**
36:8;39:21,24
**expected (5)**
40:1;67:16;146:4;
178:23;180:7
**expedited (1)**
179:12
**experience (10)**
50:9;54:11;59:17;
64:3,7;67:5;71:13;
99:7;181:21;182:17
**experiences (2)**
23:4;55:14
**explain (4)**
83:5;93:20;149:6,8
**explained (2)**
148:10;177:22
**explaining (2)**
146:2;149:5
**explicit (1)**
91:17
**exposed (1)**
92:18
**express (1)**
67:15
**extending (1)**
181:7,11
**extent (4)**
7:11;8:9;21:19;26:9
**extra (1)**
53:24
**extreme (1)**

28:9
**eye (1)**
170:24
**eyes (3)**
70:15;117:14;121:22

**F**

**facilitating (2)**
102:1;173:25
**fact (10)**
20:18;52:8;56:25;
57:21;110:16;120:14;
129:21;139:18;159:13;
172:11
**factor (1)**
55:4
**factors (2)**
56:18,20
**facts (1)**
50:16
**fair (6)**
69:11;75:21,22;
76:21;145:16;176:4
**fairly (6)**
40:15;65:15;88:6;
89:3;111:19;157:23
**fairness (1)**
145:13
**fall (2)**
163:1;182:11
**false (7)**
106:24;107:3,6,9,11;
120:19;136:7
**familiar (5)**
16:14,18;83:7;
126:11;173:7
**family (1)**
109:22
**fan (1)**
169:7
**far (3)**
18:25;52:15;105:6
**fart (2)**
93:9,10
**Fast-forwarding (1)**
154:7
**favor (1)**
176:5
**February (3)**
135:19,20;136:16
**Federal (1)**
186:12
**fee (7)**
63:2;65:5;85:24;
86:25;180:4;181:14,15
**feel (6)**
6:19;7:18;54:20;
115:8;149:4;165:2
**feeling (2)**
128:24;129:7
**feels (2)**
16:23;174:12

**felt (1)**
80:24
**few (4)**
111:16;126:20;
145:1;148:8
**figure (7)**
27:8;38:10;56:7;
58:8;160:9;174:13;
181:2
**final (2)**
160:17,22
**financial (1)**
175:1
**find (1)**
178:9
**finding (4)**
78:9;100:2,3;123:10
**fine (3)**
16:21;51:22;174:22
**fingering (1)**
97:19
**fingers (3)**
99:3,13;167:12
**finish (3)**
13:9;84:5;186:1
**Fiona (1)**
130:8;131:24,25
**fire (15)**
41:16,17;42:5,8,13,
23;90:16;97:13;98:4,
16;155:9,10,13,23;
177:12
**fireable (1)**
92:21
**fired (37)**
42:1;43:11,13;74:8;
91:4;92:23,24;95:3,6;
98:23,24;99:8;113:19;
134:16,22;136:4,8;
151:8,12,23;152:7,9,
15,21,22,23;153:5;
154:5,8,12;155:8,18;
157:18;158:2,5;159:8;
177:13
**firing (13)**
40:24;41:2,3,15,18,
20,23,24;42:7;90:18,
20;91:13;134:13
**first (42)**
5:10;6:21;8:2;9:6;
24:17;42:19;45:3;54:7;
70:5;81:10,16;93:23;
97:4;118:5;119:11;
121:10;126:4;127:1;
133:4;136:14;139:18;
140:24;145:18;147:17,
24;152:9,11,20,23,25;
158:14;165:13;168:10,
17,17,24;169:3,17;
175:5;176:17;183:22;
184:10
**fishy (1)**
128:20

**five (4)**
74:7;105:2,6;183:7
**flag (5)**
53:6,7,11;56:16;
57:13
**floor (117)**
8:5,18;9:6,7,22;10:4;
11:10,13;12:22,23;
13:20;14:5,22;21:4,9,
19,24;22:9,12,14,25;
23:8;24:13;25:3;27:3;
35:20,22;36:1,9,21,25;
37:2,8,9,11,23;38:4;
39:5;46:4,10,14,17;
47:15;48:1,9,15,18;
50:3,15;60:3;66:17;
67:22;70:1,4;74:21;
77:24;78:6,10;79:4;
80:3;81:3,8,25;82:4,8;
83:2,12;84:1,12,15;
85:2,5,13,24;86:2,5,10,
17;87:2,24;88:13,16,
19,24;89:9,11,22;92:9;
93:2;95:3,5;99:24;
100:15,23;101:25;
105:25;108:23;112:15,
18;115:10;162:15,18,
19,23;163:2;167:22;
168:3;169:5,20;170:8;
183:14,18;184:15,16,
25;185:25;186:2
**Floorman (18)**
8:4,5;37:11;39:3;
45:24,24,25;47:7,17;
48:12;70:7;78:22,22;
83:4;90:10;92:11;
109:2;149:23
**floorman's (1)**
86:24
**floormen (12)**
14:8;35:16;36:16;
37:8;38:2;79:10;87:8;
94:7,10,24;137:9;
153:12
**focus (2)**
72:14;166:11
**focused (2)**
48:3;71:13
**folks (2)**
36:15;55:19
**Follies (9)**
5:16;6:10,13;7:24;
8:3;12:13,15;126:3,5
**follow (1)**
26:15
**followed (1)**
26:13
**following (1)**
122:12
**follows (1)**
5:11
**follow-up (2)**
121:2;125:3

**food (4)**
34:19,20,24;162:25
**forget (2)**
119:23;175:14
**form (29)**
9:10;17:6;22:1;25:4;
30:2;45:16;46:19;
49:12,23;52:13;56:22;
58:1;63:23;64:13;
76:14;78:2;81:12;86:7;
88:3;108:13,25;
115:14;117:3,5;
142:16;143:13;146:21;
164:15;179:3
**formalities (1)**
91:11
**formalized (1)**
42:17
**forthright (1)**
170:2
**fought (1)**
165:21
**foul (1)**
60:23
**found (2)**
71:22;129:14
**four (3)**
140:21;141:8;151:5
**frame (3)**
88:6;103:16;163:17
**free (7)**
7:18;54:3,4,9;57:23;
150:15;186:7
**frequency (1)**
80:12
**frequent (5)**
39:16;76:2;106:5,6;
166:24
**frequently (13)**
40:18;49:20;62:6;
65:15,16,17;76:11,13;
101:10;156:6;167:6;
169:12;172:12
**frequents (1)**
106:4
**Friday (2)**
114:14,15
**friendly (1)**
80:16
**friends (3)**
131:8;169:2,4
**friendship (1)**
107:15
**frivolous (1)**
44:24
**front (2)**
11:23;101:12
**frontrunner (1)**
105:7
**fulfill (1)**
174:24
**full (1)**
130:7

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**fully (1)**
19:15
**Fun (2)**
77:15;131:25
**funded (1)**
36:21
**further (1)**
57:22

### G

**Garrison (1)**
6:6
**gathered (1)**
48:23
**gathering (1)**
49:6
**gave (7)**
14:8,22;109:9;138:2;
157:3,24;161:6
**General (22)**
13:7,8,14;15:12;
16:15,25;17:18,21;
22:7;23:5,6;24:2,5;
28:15;29:15;35:19;
44:19;51:10,15,22;
56:17;116:2
**generalization (1)**
76:16
**generally (19)**
6:22;16:21;30:24;
31:18,19;53:23;60:20;
61:17;76:7;78:17;
80:17;95:4;99:10;
100:3;101:15;128:9;
139:24;170:24;174:3
**gentleman (2)**
137:21;138:25
**Georgia (1)**
5:4
**gets (6)**
34:17;37:24;38:1,3;
45:21;182:18
**gimpy (1)**
168:11
**girl (43)**
18:13,17;24:12;
27:20,21;34:10,11;
44:17;45:2;46:1;51:16;
53:1,4;54:20;60:13,14,
21;63:12;64:18;70:11,
21;87:16;94:12;97:8,
19,20;109:9;120:12;
125:12;127:14;137:4,
7;141:14;143:6,10,15,
17;146:16,19;161:16;
163:23;164:2;171:11
**girlfriend (2)**
94:10,13
**girls (42)**
10:22;11:1;14:6;
33:7,8,21;44:25;55:20;
76:17;77:13,15,18;

78:20,21;100:3;109:7;
125:7,19;129:18;
142:2,9,11;143:5,7,9,
21;144:4,8,10;146:13;
150:14;153:8;172:12;
177:12,14,15,23,24;
178:1;180:14;182:4;
183:19
**girl's (2)**
114:7;146:14
**given (12)**
11:10;27:2;32:22;
33:19;51:14;56:14;
64:8,10;102:4;117:1;
159:14;176:5
**gives (1)**
171:9
**giving (1)**
102:10
**glass (3)**
68:14,15,20
**glutton (1)**
167:24
**goal (1)**
66:24
**goes (9)**
36:14,15;37:22;39:4;
64:16;72:3;121:13;
159:24,24
**golfer (1)**
102:17
**good (7)**
34:23,23;42:19;59:9;
86:2,10;182:7
**grabbed (3)**
17:25;27:20,21
**grabbing (4)**
11:1;91:20,21;
112:10
**grabs (1)**
24:12
**grand (1)**
108:1
**grateful (1)**
155:4
**great (2)**
141:7;177:14
**greatest (2)**
121:22;122:7
**greet (1)**
99:25
**greeting (1)**
9:17
**grievance (1)**
159:10
**grievances (1)**
141:10
**grinding (1)**
71:4
**groped (1)**
97:23
**gropes (1)**
115:12

groping (9)
91:20,21;97:20;
102:6;112:2,14;113:5;
114:4;115:9
**ground (2)**
19:21;23:20
**guess (27)**
26:16;35:21;38:12;
46:16,22;53:13;57:18;
68:17;72:12;84:9;
94:14;104:10;110:7;
112:19;120:17;124:10;
131:10;136:14;143:12;
151:21;152:5;156:20;
162:2;166:21;167:24;
168:5;185:18
**guessing (6)**
31:3;46:1;75:5;77:3;
79:5;119:16
**guy (38)**
14:25;18:13,14;
53:24;54:2;89:1;93:3,
3,7;105:24;106:2;
128:18,22;129:19;
149:6,6,7;150:5,6;
161:17,18;163:23;
164:1;168:8,11,17,18,
21;172:13;175:14,15,
17,17;176:2,16,17,21,
22
**guys (15)**
14:5;87:2;95:19;
100:9,10;103:25;
105:6;110:1;116:15;
148:1,4;149:4;165:23;
168:25;186:7

### H

**Hagood (14)**
77:7,8;79:25;80:7,
13,19;112:2,11;
113:10;115:7,16,19;
117:20;123:20
**Hagood's (1)**
79:18
**Haley (8)**
90:12;95:21;118:3,4,
6,16,25;140:10
**half (6)**
38:1,3;137:13;150:2,
4;170:12
**half-truths (1)**
170:1
**hand (7)**
14:25;94:18;130:11;
137:17,17;185:21;
186:4
**handbook (1)**
17:7
**handed (1)**
153:22
**handing (1)**
115:12

137:20
**handle (8)**
23:9,12;67:22;75:11;
131:11;162:24;173:23;
174:2
**handled (2)**
55:15;173:21
**hands (3)**
81:1;120:9;137:15
**hanging (1)**
128:18
**happen (6)**
39:24;62:6;64:2;
124:11;141:21;166:1
**happened (25)**
20:25;21:23;60:14;
62:4,8,13,19,22;64:3;
66:10;85:25;89:25;
91:18;99:17;108:22;
126:23;127:8;131:5;
137:6;138:1;140:6;
143:20;171:12;173:1;
174:10
**happening (14)**
25:23;26:4,12;55:10;
78:18;96:5,5;102:15;
114:25;115:2;130:24;
150:9;176:20,24
**happenings (1)**
30:11
**happens (14)**
39:15;40:16,18,21;
73:23,24;163:16,18,19,
20,21,22;172:11;
182:20
**happy (1)**
177:9
**harassed (3)**
16:24;17:3;18:18
**harassing (1)**
17:5
**harassment (18)**
16:15,15,22;17:3,7,
23;21:6;22:3,13;24:21;
43:1,9;115:24;130:10,
14,19;131:2;132:6
**hard (2)**
8:11;165:22
**hardly (1)**
104:1
**harm (1)**
60:22
**Hart (2)**
150:18,20
**head (15)**
8:6;16:20;39:7;
84:21;85:4;96:3;97:5;
98:15;101:5;103:10;
112:23;114:12;155:5;
162:19;167:16
**hear (8)**
10:14,16;17:18;28:3;
88:20;101:13;115:2;

163:19
**heard (11)**
26:3;76:17;77:12,20;
91:23;114:25;118:12;
119:12;123:21;144:13;
173:6
**hearing (3)**
150:10;175:22,23
**Heather (3)**
185:5,13,15
**held (1)**
35:2
**Hello (4)**
10:14,15;80:16;
107:19
**help (8)**
8:10;141:24;149:7;
174:2,9,13;183:15,19
**Heninger (1)**
6:6
**hesitation (1)**
7:17
**hey (12)**
54:4,8;70:12;100:10;
161:15,18;164:1;
171:5,10;174:4,7,8
**higher (2)**
165:7,13
**hire (2)**
13:2,4
**hired (2)**
13:22;134:3
**hiring (3)**
40:24;41:1,15
**history (1)**
65:23
**hit (7)**
23:16;167:6,7,8,9,
10;168:12
**Holcomb (1)**
89:1
**hold (3)**
34:4;58:24;59:5
**holding (1)**
123:5
**Holly (3)**
185:5,8,10
**home (5)**
28:18;29:8;74:22;
91:7;180:25
**honest (3)**
170:2,4,7
**honestly (2)**
40:13;168:16
**hooking (1)**
183:18
**host (4)**
138:25;145:24;
148:21,22
**hour (31)**
53:5,10,16;56:15;
57:11,15;63:5,11;
148:15;150:2,4;

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

158:15;170:12,12,12,
  15,19,22;171:1,9,14,
  16;178:22;181:6,9,9,
  13,14,15,21,21
hourly (5)
  44:18;129:3;165:20,
  25;166:2
hours (11)
  17:24;44:17,20;
  178:22;179:21,22;
  184:18;185:1,2,3,4
house (36)
  11:23;28:23,24;
  30:21;45:1,4,18,21,24;
  46:8,10,13,24;47:2,18;
  48:8,18;49:7,10,14;
  50:2,15;70:2,3,4,7,12;
  73:8;98:5;106:24;
  107:5;121:12,13;
  137:9;139:19;153:12
hundred (4)
  30:22;37:18;106:20;
  107:13
hypothetical (3)
  56:22;57:5;84:18

                 I

icy (1)
  135:24
idea (16)
  15:15;40:12;41:22;
  80:6;81:6,19,20;88:7,
  9;103:17;114:2;117:4,
  7;165:6;176:13;180:18
identification (1)
  125:24
identified (2)
  133:3,24
identify (1)
  133:1
IDs (1)
  9:17
ie (1)
  70:20
illegal (3)
  69:3;100:13;140:3
imagine (2)
  157:7;162:5
imbibed (1)
  28:17
immediately (3)
  18:11;74:25;129:5
important (4)
  122:13,15;124:15,17
impose (1)
  73:19
improper (1)
  57:4
improperly (1)
  149:11
inappropriate (18)
  23:22,25;69:6;70:16,

22,25;71:3,5;91:16;
  92:12,14;93:1;95:7;
  96:22;99:3,13;119:12;
  120:24
inappropriately (5)
  70:12,13;71:16;92:9;
  96:9
Inc (1)
  126:5
incentive (1)
  82:22
incidences (4)
  20:19;120:22;
  126:21;127:7
incident (15)
  21:20;118:5,15;
  119:8,11,19,21;127:13,
  14;128:16;137:3;
  138:25;166:20;167:17;
  168:1
incidents (1)
  133:5
include (6)
  17:3;45:8;50:20;
  69:4;86:24;160:2
includes (1)
  163:9
including (5)
  17:24;38:4;56:24;
  96:9;130:11
income (9)
  15:7,10;37:4;38:25;
  39:14;77:25;78:6;80:4;
  105:20
Inc's (1)
  126:3
independent (2)
  42:4,22
independently (2)
  21:15;29:2
indicated (1)
  59:21
indicating (2)
  120:9,19
individual (2)
  5:14;123:8
inebriated (1)
  28:1
inflicts (1)
  25:2
influence (1)
  54:24
inform (1)
  80:22
informal (1)
  154:24
information (6)
  46:9;48:22;49:2,6;
  118:22;126:14
infraction (1)
  71:8
infrequent (2)
  40:15;167:5

inkling (1)
  65:25
input (2)
  50:25;160:8
insinuate (3)
  84:13,15,24
insinuated (1)
  91:3
instance (16)
  32:3;61:23;65:1;
  92:7;96:10,21;97:4;
  99:19;122:4;133:25;
  135:4;143:20;146:12;
  164:3,8;173:2
instances (15)
  61:22;92:25;96:15;
  97:2,5,18;98:1;112:6,
  25;118:12;127:11;
  151:2,5,5;172:22
instead (1)
  85:4
institutional (1)
  86:4
instruct (5)
  23:8,12,20,24;
  149:21
instructed (6)
  43:3;182:4,6,10;
  185:10,15
instruction (1)
  72:8
instructs (1)
  7:22
intending (2)
  90:18,20
interaction (2)
  160:12;161:4
interfered (1)
  143:16
interject (1)
  10:7
International (8)
  5:16;6:10;7:24;8:3;
  12:13,15;126:3,5
interplay (1)
  56:18
Interrogatories (1)
  126:5
Interrogatory (2)
  132:20;133:3
intervention (2)
  109:21,23
into (40)
  16:10;39:4,6;41:7;
  46:1;48:24;50:22;
  52:22;64:11;65:10;
  68:3,11;71:14;78:23;
  83:4;84:2,10,17;85:13;
  87:6;92:17;94:15;96:3;
  97:5,18;101:6;105:14,
  21;123:7;126:1;
  130:12;150:1;160:8;
  162:7;165:9;166:3;

170:3;171:2;181:5;
  182:11
intoxicated (12)
  28:2,17;60:15,19;
  64:12;74:20;121:5;
  149:15;172:4,5,9,13
intoxication (2)
  28:10;63:21
introduce (2)
  7:9;126:1
investigate (2)
  17:1;78:21
investigation (1)
  78:13
involved (21)
  26:21;27:1,14;55:20;
  94:22;119:20;127:11;
  131:12,14;139:11,12,
  14;147:13;149:6;
  156:3;162:10;167:21;
  175:18,21,25;183:14
involvement (1)
  162:22
involves (1)
  173:24
iPad (1)
  127:15
issuance (1)
  31:15
issue (32)
  21:24;22:12;26:6;
  31:14,17,22;32:12;
  51:2;59:6;69:24;75:1;
  94:3,5;110:11;111:16;
  117:11;125:4,7,8;
  130:23;131:8;144:3;
  155:20;157:24;159:22,
  24;173:13;175:7,7;
  177:15;178:16,17
issued (1)
  32:21
issues (15)
  17:23;23:23;28:25;
  29:3;31:11;32:2,5;
  58:8;67:25;80:18,22;
  94:2,17;145:19;175:1
issuing (1)
  33:5
item (1)
  34:24

                 J

Jack (9)
  6:12;13:16;77:6,7;
  91:6,8;116:12;153:23;
  159:15
Jackson (3)
  33:22;109:6,12
jail (1)
  66:9
jar (1)
  174:4

Jeb (12)
  106:2,7,9,12,16,19,
  23;107:12,16,22,25;
  108:7
Jeb's (1)
  108:5
Jenn (2)
  150:18,20
Jennifer (3)
  33:22;109:6,12
Jim (1)
  6:5
Jo (2)
  34:3,8
job (10)
  11:11;21:10;49:18;
  69:14;146:6;162:13,
  24;164:23;167:13;
  169:15
Joe (2)
  174:8,8
JOHNSON (9)
  5:6,9,20;6:15,16;
  89:1;91:10;126:6;
  130:10
join (1)
  8:22
joined (1)
  8:25
joint (3)
  156:1,2,2
jokingly (1)
  183:17
Jorge (2)
  120:22,25
judgment (2)
  74:3;94:1
Judicial (1)
  5:3
jump (1)
  16:10
jumped (1)
  168:17
jumping (1)
  161:3

                 K

keep (9)
  32:21;47:9,20;156:6;
  157:13;160:25;179:17;
  185:11,16
keeping (3)
  21:17;48:3;141:3
kept (2)
  153:15;178:1
Kevin (3)
  5:21;6:9;7:7
Khaleesi (2)
  94:4,5
Khaleesi's (1)
  93:7
kick (3)

64:25;98:12,14
**kicked (1)**
99:2
**kill (1)**
168:21
**Kim (2)**
13:24;125:11
**kind (32)**
7:2,8;14:12;17:18;
29:2;31:21;51:18;
58:24;59:6;68:13;
80:25;94:22;97:21;
104:3,6;109:22;
110:18;114:22;120:6,
8,8;124:23;128:23;
141:10;150:9;155:2;
161:3;168:10,12,13;
173:12;174:13
**kiss (1)**
92:20
**knee (3)**
70:21;168:9,10
**knew (6)**
81:15;90:22;130:18;
165:15;181:5,6
**knowing (1)**
174:25
**knowledge (37)**
6:2;7:12;13:17;
19:10,13;26:13,20;
30:18;43:21;82:14,24;
85:9;86:17;92:9;95:16;
100:19,21,23;104:5;
105:1,4;120:25;121:1,
21;122:18;123:6;
124:22;125:10,18;
126:21,22;127:12;
135:2;147:11;153:16;
176:18;182:3
**knowledgeable (1)**
123:16
**known (1)**
112:11
**knows (2)**
104:20;148:11
**Korey (1)**
33:22

**L**

**labeled (1)**
126:2
**lack (1)**
81:9;180:4
**lap (8)**
70:11,13,15,24;
71:16;96:10,13;104:21
**lapsed (1)**
180:21
**lap-sitting (2)**
96:22,23
**large (3)**
112:12;172:10;

181:22
**largest (1)**
106:18
**last (18)**
33:25;54:22;62:8;
89:3,4,8;108:5;136:5,
18,21;138:15;151:10;
154:12;157:15;158:6;
174:15;179:10;185:18
**lately (1)**
39:17;65:16,17,23
**later (10)**
56:1,4;93:18;94:3;
129:14;133:5;156:17;
157:22;176:15;181:3
**lawsuit (2)**
93:4;144:13
**lawyers (3)**
15:22;16:3,3
**lay (2)**
56:22;57:5
**lazy (2)**
78:8;129:12
**lean (1)**
10:13
**least (13)**
21:13;62:13,22;63:1;
64:18;79:2;102:9;
145:24;149:5;153:25,
25;154:7;161:19
**leave (12)**
60:20,22;64:21;
65:21,22;66:5;87:24;
99:15;117:6;163:25;
172:16;181:10
**leaves (1)**
66:7
**leaving (1)**
121:6
**led (5)**
43:15;160:17,17;
175:5;176:5
**Lee (1)**
89:4
**left (6)**
83:21,24,25;89:5;
92:19;164:2
**legal (2)**
30:2;121:6
**legally (1)**
29:7
**legitimate (1)**
152:18
**legwork (1)**
78:9
**less (5)**
26:11;101:10,18;
120:8;165:2
**lets (1)**
48:12
**letting (1)**
48:15
**Libby (1)**

128:2
**license (10)**
122:11,13,15;
123:10,23,25;124:7,12,
14,19
**life (1)**
77:21
**likely (1)**
106:21
**limit (1)**
121:6
**line (1)**
134:10
**liquor (13)**
122:11,13,14,19,23,
24;123:10,23,25;124:7,
11,14,19
**list (8)**
128:5;133:4;153:7,
13,14,15,19,20
**listed (2)**
95:2;127:7
**listen (1)**
141:16
**literally (1)**
153:19
**little (17)**
10:8;48:4;59:15;
72:5;88:12;96:2;
104:16,18,19;134:7;
149:14;153:22;161:3,
20;162:6,17;183:13
**Liz (8)**
50:10;52:3;159:24;
173:21,23;174:1,12,17
**Liz's (1)**
174:15
**lodge (1)**
143:2
**lodged (2)**
43:18;151:4
**Loft (1)**
92:17
**log (7)**
28:23;29:2;46:17,25;
73:8;98:5;121:13
**logbook (1)**
50:16
**logging (1)**
28:25
**Logically (1)**
180:24
**long (12)**
7:23;109:23;111:10,
12;129:4;137:9;
156:10,13;165:20,21;
172:2,19
**long-time (1)**
131:8
**look (16)**
68:6,11;71:2;94:12;
101:14;120:11;123:7;
126:11;127:9;133:15;

134:11;141:13;147:1,
2;151:16;181:1
**looked (8)**
52:15;151:15;
152:17;155:19,19;
156:21;157:23;164:20
**looking (7)**
6:1;24:2,4;68:14,15;
128:24;133:11
**looks (1)**
131:16
**lose (1)**
141:20
**lost (1)**
109:20
**lot (19)**
54:3;97:16,21;104:4;
105:10;128:18,23;
129:1;135:22;144:25;
145:3;159:22;165:14,
20,23,25;166:2;
168:25;169:6
**loudly (1)**
131:25
**lunch (3)**
117:24,25;119:11

**M**

**Madness (1)**
115:4
**maiden (1)**
33:25
**main (13)**
83:11,18;85:13,24;
86:4,10;112:15,18;
115:9;162:15;184:15,
16,25
**maintaining (1)**
123:23
**maitre (1)**
86:1
**majority (1)**
55:2
**makes (8)**
28:16;35:8;46:5;
55:16,24;129:9;
159:19;160:3
**making (11)**
10:25;11:6;55:8;
69:3,13;80:5;100:9,13;
131:18;148:2;163:4
**male (2)**
34:9;130:10
**managed (1)**
81:25
**management (3)**
81:25;95:10,11
**manager (81)**
8:5,18;9:6,8,22;
11:10,14,21;12:20,22,
23;13:7,8,14,19,20,21,
24;16:13,23,25;17:21;

19:12;21:4,19,24;22:8,
9,12,17;23:5;25:3;
27:3,3;28:15,15;29:18;
35:22;36:1;37:11,22;
38:5,8;40:24;46:4,10,
14,17;47:15;48:1,9;
50:3,15;60:3;67:19;
70:1,4;81:4,22;85:5;
87:10;88:13;89:12,22;
92:9;93:2;99:24;
101:25;104:9,14;
105:9,25;116:2;
152:25;153:1;154:1;
162:18,19,19,23;177:5;
186:2
**managers (49)**
10:4;14:22;21:5;
23:1,8;35:20;36:21,25;
37:2,8,9,23;39:5;48:15,
18;66:17;67:22;77:24;
78:6,10;79:4;80:4;
81:8,25;82:8;83:3;
84:1,12,15;85:3;86:18;
87:24;88:14,16,19,24;
89:10,11;95:3,6;
100:15,23;108:23;
163:2;167:22;168:3;
183:15,18;185:25
**managers' (2)**
36:9;82:4
**manager's (1)**
21:10
**mandatory (1)**
87:13
**manner (2)**
70:17;71:1
**many (11)**
33:11;40:13;53:25;
78:10;116:11;135:17,
22;145:22;167:3,4;
180:25
**March (2)**
115:3;128:17
**mark (3)**
7:9;89:1,13
**marked (1)**
125:23
**match (2)**
52:25;54:21
**match-up (2)**
52:16,21
**matter (7)**
5:13;6:17,18;42:19,
21;55:7;117:17
**matters (1)**
140:1
**maximum (1)**
170:18
**may (24)**
7:9;15:21;17:5;
22:23,23;25:9;43:15,
15;51:14;56:18;72:4;
86:9;95:12;125:4;

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

126:22,22;127:1;
134:9;136:3;160:3,11;
162:7;173:23;182:2
**maybe (19)**
14:24;22:7;31:23;
34:1;36:17;72:5;78:8;
83:9;88:5;89:8;149:14;
156:18;158:15;166:16,
22,23,24;171:13;
183:17
**McCormick (3)**
130:8;131:16;132:4
**McDONOUGH (86)**
5:17,19,23,25;6:4,6,
14;8:15,17;9:2,12;
10:16,19;13:12;16:1;
18:23;19:9,18,22,24;
20:11,12,15,22;5:25:5;
26:25;27:10,12;30:7;
37:9,15;45:20;46:21;
49:13;50:1;52:18;57:2,
8;58:5;59:11,14;64:4,
22;76:20;78:4;81:14;
84:7;86:8,15,16;88:22,
23;90:3,5;92:6;93:11,
13,19;96:19;102:19,
23;107:7;108:15,20;
109:4;115:17;117:5,9,
24;118:1;125:25;
142:6,18;143:18;
145:15,17;146:24;
147:4,9;164:22;166:6,
8;179:7;183:7,11;
186:6
**mean (38)**
7:18;9:10;10:24;
11:6;17:25;19:24;
29:21;31:7;37:8;43:17;
44:20;48:24;49:17;
52:20;62:4;67:14;
68:10;75:3;89:10;90:9,
9;97:17,20;98:19;
125:18;134:20;145:8,
9;146:15;166:3;
167:14,20,21;169:25;
174:22,25;178:20;
179:5
**meaning (1)**
42:18
**means (6)**
15:14;40:4;43:18;
69:25;75:4;127:25
**meant (1)**
145:10
**mediate (1)**
162:11
**mediated (1)**
141:10
**mediating (1)**
173:25
**medications (1)**
7:2
**meet (3)**

91:15;92:16;142:15
**meeting (19)**
140:9,20,23,25;
141:11;143:2,25;
144:11;145:4,9,10;
147:17;148:17,19;
154:23;184:14,25;
185:11,16
**meetings (8)**
35:2;144:15;147:18,
19;148:18;166:10,13;
184:11
**Meghan (1)**
34:13
**member (2)**
109:22;175:10
**memory (1)**
174:4
**mentioned (10)**
16:10;38:23;50:19;
97:6;147:19;148:17,
18;151:17,18;165:11
**mentioning (1)**
183:17
**merely (1)**
144:7
**message (6)**
42:2;90:25;91:2,5,9;
154:25
**messages (1)**
120:16
**met (1)**
145:18
**Mezzanine (4)**
83:7,15,16,17
**Michelle (1)**
119:25
**middle (2)**
132:19;183:1
**might (4)**
56:19;66:1;149:14;
185:19
**military (8)**
175:11,15,17;176:2,
16,17,21,22
**mind (3)**
76:12;106:10;112:9
**minimize (1)**
26:10
**minimum (1)**
87:1
**minor (4)**
70:6,9,10;71:8
**minute (1)**
107:2
**minutes (10)**
63:5,7,10,12,14;
71:22;148:8;150:1,3;
183:7
**misled (1)**
43:19
**missed (1)**
135:22

**mistaken (1)**
158:11
**misunderstood (1)**
36:18
**mom (11)**
46:8;50:2,15;70:2,3,
4,7,12;73:8;121:12,13
**moment (1)**
93:6
**moms (1)**
48:19
**Monday (2)**
114:14,15
**money (55)**
11:14;14:22;30:21,
25;35:9,11;36:1;40:4;
44:10,14;47:19,21;
54:6,16,21;56:9;57:24;
58:14;59:21;60:18;
64:8,11;82:9;85:12,12;
86:5,9;102:10;103:3,6,
7;104:13,16,18,19;
105:10;107:24;128:23;
129:9,10,19;137:14,20;
138:2;144:5;146:14,
17;163:25;172:6,24;
174:9;177:23;181:2;
185:21;186:3
**Monique (4)**
141:2,14;143:22;
158:13
**Monopoly (1)**
30:25
**Monroe (29)**
6:7;139:4,7,22;
140:10;142:14;143:3,
11;144:3,6,20;148:5,7;
149:2;150:23;151:3;
164:7,9;165:5;166:12,
13;168:2;175:6,22;
176:6;180:16;183:14,
17;184:2
**Monroe's (1)**
160:18
**Montgomery (1)**
33:22
**month (3)**
20:8;128:21;156:18
**monthly (1)**
103:14
**months (5)**
68:17;79:20,23;
97:22;111:13
**more (37)**
6:19;25:15;39:17;
41:1;56:19;65:22;
73:25;74:5,9;77:24;
78:6,11;79:11;81:8;
91:17;96:12,12,21;
101:10,17;102:4;
116:13;120:7;122:13;
129:19;151:8,11,24;
154:18;156:18;163:2,

25;165:8,12;170:22;
171:3;179:14
**morning (2)**
121:3;181:8
**most (11)**
12:10;41:23,23;
49:24;99:18;106:21;
107:12;124:3,17;
150:18,19
**mother (15)**
28:23;45:1,4,18,21,
24;46:10,13,25;47:2,
18;49:7,10;109:20;
137:9
**mothers (5)**
28:24;48:8;49:14;
139:19;153:12
**mother's (1)**
98:5
**mouth (2)**
136:12;159:3;
185:11,16
**move (4)**
10:7;121:2;142:15;
163:23
**much (21)**
9:18;10:5;14:5,10;
28:14,14;31:2;53:2;
55:18;84:4,20;91:21;
106:15;107:24;115:6;
146:17;171:13;176:11,
13;181:2;186:8
**Mulcahy (1)**
34:6
**music (1)**
101:13
**must (1)**
164:21
**myself (3)**
52:3;145:6;161:24

**N**

**Nah (1)**
172:18
**name (28)**
6:5,16;33:24,25,25;
34:5;62:5,10,16,21;
89:3,4,8;90:7;93:4,5,5,
8,18;94:24;97:20;
105:1;108:5;119:23;
130:5;133:25;174:15;
177:3
**named (6)**
90:10;93:25;106:2;
120:22;135:13;173:9
**names (8)**
33:20;62:3;88:18,24;
109:8,10;169:10,10
**narrow (1)**
40:21
**nature (3)**
131:3,4,21

**NC/NS (1)**
127:22
**near (3)**
101:1;150:24;166:22
**nearby (1)**
22:16
**need (10)**
16:20;22:7;27:2;
31:23;72:4;86:5;
100:11;148:10;161:19;
179:16
**needed (1)**
80:24;178:9;183:15,
19
**needs (5)**
8:13;24:20;84:16;
164:4;174:12
**new (1)**
89:3
**next (17)**
6:11;28:19;42:12,14;
52:12;55:17;127:18;
135:9;136:4,8;138:23;
152:3,4,7;155:6;
157:10;158:18
**nice (1)**
169:19
**night (55)**
11:21,24;12:9,20;
13:24;14:13;28:15,18;
29:9,18;33:15,19;36:8;
37:19,22;38:8;39:22;
40:14,24;44:21;51:14;
55:15;58:2;59:3;67:19;
68:2;69:17,21;79:2;
81:22;87:10,19,23;
88:13;91:9;104:9,14;
105:9;108:3;115:3;
125:16;129:4,9;
135:25;136:5,13,22,23;
138:15;154:1;162:19;
172:23;177:7;179:13;
182:9
**nightclub (2)**
86:1;125:19
**nightly (4)**
39:14;40:2;86:25;
122:19
**nights (4)**
39:25;114:9,13,23
**nighttime (2)**
104:10;173:11
**nobody (2)**
16:4;125:10
**nod (1)**
8:13
**nodding (1)**
110:18
**Nods (4)**
8:6;39:7;98:15;
103:10
**None (5)**
19:16;48:23;55:6;

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

89:17;184:1
nonetheless (1)
    17:22
Nope (1)
    151:13
nor (1)
    62:20
Norm (1)
    104:3
normal (2)
    69:14,17
normally (3)
    10:13;50:9;103:24
Norms (1)
    104:4
notation (1)
    28:20
note (8)
    46:5,7;73:10,15;
    98:2,3,7;138:10
noted (2)
    73:7,13
notes (5)
    98:8;139:17,23,24;
    160:25
noticeably (1)
    110:24
noticed (1)
    19:6
noticing (2)
    128:21;165:12
notified (1)
    183:14
notify (1)
    95:20
number (17)
    31:7;32:18;69:5;
    126:2;127:17,19;
    128:2,11,16;132:21;
    134:15;135:4,10,12;
    149:19;165:13,19
number-wise (1)
    134:10

O

Oakland (1)
    169:6
object (31)
    7:20;9:10;19:1,20;
    22:1;25:4;30:2;45:16;
    46:19;49:12,23;52:13;
    56:21;57:4;58:1;63:23;
    64:13;76:14;78:2;
    81:12;86:7;108:13,25;
    115:14;117:3,5;
    142:16;143:13;146:21;
    164:15;179:3
Objections (1)
    126:4
obviously (3)
    38:10;135:18;179:14
occasionally (6)

68:4;100:8;101:5,16;
    163:16;169:8
occasions (2)
    66:8;74:14
occupied (1)
    101:23
occur (2)
    52:7;184:14
occurrence (6)
    76:2;112:20,22;
    163:18;166:24;167:5
occurs (1)
    18:4
OCGA (1)
    186:13
odd (1)
    129:6
off (27)
    16:19;35:9,11;60:23;
    75:10;82:9;89:12;95:2;
    96:18;109:25;110:18,
    18;111:1,9,10,12,22;
    142:4;144:5,17;153:8;
    155:5;172:14;184:18,
    25;185:3,4
offense (1)
    92:21
offer (3)
    54:3;63:1;149:7
offhand (2)
    55:6;135:14
office (9)
    94:15;140:12;
    145:23,25;147:17;
    148:8,18;158:22,23
official (2)
    33:9;174:18
offset (1)
    55:1
often (6)
    40:21;50:7;106:7;
    163:12,18;165:8
once (10)
    17:8;48:19;53:13;
    62:23;68:8;73:25;
    106:8;116:13;131:7;
    145:23
one (88)
    5:13;15:24;17:12;
    21:13;22:13;23:14;
    27:7;28:16;29:6;31:16;
    32:13;40:23;45:13;
    46:4;48:7;53:16;56:15;
    62:2,13;84:10,17;
    87:21;90:24;109:7,8;
    110:6,25;112:16;
    113:11;116:9;117:10;
    127:1,9,10,16;131:14;
    135:5,19;136:16;
    138:18;139:10;145:1,
    6;146:11;147:22,24;
    148:5,7,20;151:8,11,
    24;152:3,4,6,17;

154:18;155:6,12,14;
    156:12,13;157:7,10,19,
    22;158:1,1,11,12;
    159:5,7,9,13,15,17,18;
    160:3,15,22;161:1;
    173:7;175:12,18,21;
    177:7;181:9,9
one-day (1)
    59:5
one-on-one (1)
    144:14
one-on-ones (3)
    144:18,19;145:14
ones (3)
    95:17;128:5;133:21
only (24)
    20:8;26:5;32:8;44:9;
    60:12;63:18;64:7,10;
    76:4,16;77:2,5;86:24;
    87:4;91:23;92:7;95:17;
    120:13;125:6,14;
    129:8;177:15;180:19;
    182:10
on-site (1)
    29:25
open (4)
    101:14;134:8;
    179:17;184:21
opening (1)
    68:12
operations (2)
    11:23;81:2
opinion (7)
    19:20;149:10;150:8;
    168:24;169:14,21;
    170:5
opportunities (1)
    102:10
opportunity (3)
    100:12;101:21;
    163:25
oppose (1)
    86:12
opposed (1)
    86:13
opposite (1)
    103:24
option (1)
    161:21
options (1)
    85:1
oral (1)
    98:22
order (5)
    84:2;85:23;89:9,10;
    179:12
original (2)
    165:12,25
originally (2)
    32:23;165:18
otherwise (4)
    89:14;124:23;
    127:12;160:20

out (59)
    18:6,9,15,17;24:2,15,
    20;27:8;28:6;31:17;
    48:11,19;54:24;56:7;
    58:8;63:5,11;64:15,16,
    25;66:15,25;67:1;88:8;
    89:5;94:18;97:9,13;
    98:12,14;99:2;113:20;
    120:9,15;123:11;
    128:18;129:14;130:20;
    131:12;141:9,20;
    149:8;153:9;160:9;
    163:5;169:9;174:9,13;
    175:22,23;176:1,4;
    178:9,17;179:2,13;
    181:2;185:21;186:4
outside (3)
    29:13;31:3;66:18
over (43)
    11:20;29:19;41:8,14;
    47:1,2;48:8,16;50:10;
    62:5;68:16;72:2;74:8;
    76:5,12;77:3,5;83:18;
    91:20;97:16,25;
    101:20;104:16;111:5;
    113:1;116:10;121:6;
    128:21;142:21;149:22,
    23;150:10,14;153:3;
    155:19;161:16;163:7;
    164:25;165:22;168:15,
    17;171:24;173:15
overcharge (2)
    53:6,15
overcharged (16)
    32:3;43:19;45:3;
    49:22;53:9;57:20,22;
    59:19;137:4;138:9;
    151:16;175:15;177:4,
    9,21;180:20
overcharging (9)
    51:19,24;52:9;55:1;
    137:7;159:11;160:2;
    166:14;171:6
overlooking (2)
    10:22,23
overly (5)
    28:17;60:14,19;67:8;
    74:20
overnight (1)
    165:23
Oversee (1)
    11:23
overseeing (3)
    100:4,5,7
over-shouting (1)
    75:25
Overturf (3)
    185:5,13,15
own (6)
    47:20;66:7;113:22;
    117:13;121:21;166:13
owner (5)
    77:9;81:1;115:7,20;

117:1
owns (3)
    113:17,21,25

P

pack (1)
    129:12
packing (1)
    159:16
Page (13)
    127:2,6,18;130:1;
    132:15,19;133:13;
    134:8,10,11,12,25;
    135:9
paid (17)
    14:3,12;53:2;57:1,
    14;61:16,17;65:9;
    86:18;100:15,23;
    101:1;137:24;180:14;
    181:4;182:23,24
paired (1)
    156:7
paper (2)
    153:19,22
paragraph (1)
    130:7
paralegal (1)
    6:11
part (11)
    35:14;38:22;39:14,
    19;43:2;99:18;123:23;
    139:2;150:18;167:13;
    171:8
participated (1)
    126:13
particular (12)
    12:7;33:15;42:12;
    44:21;101:19;105:17;
    129:15;139:14;156:22;
    161:1;175:8;178:3
Pasco (2)
    34:3,8
pass (1)
    57:23
past (14)
    23:5;60:14,21;62:13,
    23;66:10,12;68:17;
    75:24;95:12;105:6;
    110:22;137:6;161:15
patrol (2)
    69:11,12
patronizing (1)
    165:1
pattern (1)
    101:17
pause (1)
    27:7
pay (29)
    14:4,7,7,11;15:3;
    30:24;61:18;63:6,13;
    65:4;78:5;82:4,5;
    85:11,12,24;86:5,9,24;

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

87:23;110:1;150:4;
161:21,24;171:11;
178:4;180:9,20,22
**paying (3)**
77:24;85:4;170:11
**payment (6)**
56:17;81:7;86:20;
182:5,10,18
**payroll (9)**
77:12;81:8,10;144:4,
10,10,11,12;183:18
**pays (1)**
64:17
**pecking (2)**
89:9,10
**peek (2)**
96:3;101:5
**Peeking (1)**
68:22
**peep (5)**
68:7,9;69:10;101:16,
23
**peeped (1)**
68:20
**peeping (1)**
69:18
**penetrating (1)**
98:20
**penis (3)**
92:18;98:20;120:14
**penthouse (4)**
91:15;101:7,9,13
**people (27)**
10:25;15:22;17:22;
23:15;41:13,16,17,18;
42:7;51:5;65:21,22;
78:20;88:18;101:15;
103:18;135:22,22;
145:11;146:2;149:5;
163:4;170:4;174:6;
180:25;181:20,21
**per (4)**
14:8;85:4;87:6;
170:14
**perceived (1)**
184:5
**percent (25)**
35:10;36:10,14;37:3,
16,20,25;39:2;40:3,7;
77:24;78:6,11,14;
79:11;80:4;81:8;85:5;
87:5;114:1;170:25;
171:22,24;172:8;178:7
**percentage (5)**
35:22;36:5,7,24;39:1
**perfectly (1)**
18:25
**performance (1)**
169:16
**period (13)**
47:22;58:24;59:5;
65:5;72:18,20,25;73:3;
75:6,9;82:4;97:16;

137:23
**periods (1)**
12:18
**permanent (2)**
75:7,12
**person (20)**
12:10;20:1;22:15;
23:15;28:21;32:19;
33:1;45:4;47:3;48:9,
10;49:8;77:2,5;105:20;
123:15;124:4;134:3;
145:7;170:7
**personal (16)**
6:1;7:12;11:19;23:4;
30:18;43:20;71:13;
82:14;107:15;122:18;
123:6;124:21;135:1;
168:24;169:14;170:5
**personally (20)**
9:14;16:6;20:20;
25:18;35:2,11;44:16;
46:24;52:6;73:10,16;
74:11;105:20;107:13;
126:24;138:12;162:5,
10;169:15,17
**persons (2)**
34:7;133:23
**Peyton (1)**
127:18
**phased (1)**
88:8
**Phillip (4)**
89:1,13;114:19,20
**phone (3)**
10:8;48:8;174:7
**phrase (1)**
77:12
**physical (3)**
67:16;167:14,16
**physically (1)**
91:16;177:6,7
**pick (2)**
94:8,9
**picking (1)**
94:12
**pill (1)**
109:20
**pills (1)**
110:12
**Pippin (1)**
6:11
**place (8)**
24:6;25:16;26:12;
105:9;110:10;114:18;
121:8;165:22
**places (2)**
99:4,13
**placing (1)**
105:12
**Plaintiff (1)**
126:8
**Plaintiffs (1)**
6:7

**Plaintiff's (2)**
125:23;126:4
**play (1)**
50:22
**played (1)**
176:1
**please (5)**
7:14;10:12;117:6;
127:3;133:1
**plus (1)**
39:1
**pm (9)**
102:22,22;117:25,
25;166:7,7;183:10,10;
186:10
**point (11)**
9:25;11:15;18:22;
91:4;131:17;132:24;
149:4;151:22;154:15;
172:14;181:3
**police (8)**
65:12,20;66:3,5,14,
15,25;95:20
**policies (11)**
16:15,21;19:8,10;
26:16,19;43:1,2,8;
78:19;79:7
**policy (17)**
17:16,17,20;24:6,11;
29:15;43:6;49:17;
51:22;79:16,17;86:4,
14;87:19,22;102:8;
115:24
**Ponish (1)**
89:2
**pool (13)**
36:10,12,20;37:3,19;
39:2,4,6,8;78:24;87:5,
7,7
**popped (1)**
97:9
**pops (1)**
97:5
**portion (7)**
35:22;36:20;37:21,
24;38:14;79:1;87:9
**position (4)**
70:18;71:2;115:8;
168:14
**possibly (4)**
70:2;178:10,12,13
**potentially (1)**
160:8
**practice (3)**
42:20,21;74:12
**prefer (1)**
6:15
**preferential (1)**
102:3
**preferred (2)**
143:9,10
**preliminary (1)**
5:13

**premium (2)**
105:10,13
**pre-paid (1)**
61:20
**prepared (1)**
7:7
**preparing (1)**
16:7
**pre-payment (1)**
182:14
**presence (2)**
142:8;162:15
**present (8)**
12:6,10;15:22;16:3;
19:4;51:4;148:5,7
**presented (1)**
63:25
**pretty (8)**
9:18;10:5;31:2;
91:21;112:19;123:3;
124:15;135:23
**prevent (1)**
141:25
**previously (1)**
93:23
**prior (10)**
26:6;65:23;68:19;
77:20;80:5;118:9;
121:6;151:23;153:25;
154:11
**prioritize (1)**
101:19
**priority (1)**
101:24
**private (2)**
112:16;140:4
**probably (8)**
12:21;56:21;90:22;
106:20;117:1;122:9;
123:4;124:13
**problem (5)**
109:21,24;131:9;
153:10;169:18
**problems (4)**
155:5;165:13,19;
177:14
**procedural (1)**
7:8
**Procedure (1)**
186:13
**procedures (2)**
26:16;79:8
**proceedings (3)**
8:23;26:5;77:14
**process (5)**
44:12,15;48:6;56:6;
59:18
**product (2)**
34:24;82:21
**professionally (1)**
169:22
**program (1)**
110:10

**promoted (3)**
12:20,25;154:1
**promoting (1)**
102:9
**proof (1)**
110:20
**properly (2)**
100:2;149:9
**proposition (2)**
17:18;44:19
**prostitution (1)**
102:1
**protocol (28)**
21:25;23:6;25:3,13,
14,16;27:5;28:2;29:5;
44:22,25;51:18;66:20,
23;74:1,3,6,10,15,18;
99:11;115:11;121:8;
146:20,22;181:7,11;
183:4
**protocols (2)**
26:12;27:14
**provide (5)**
21:10,16;54:25;
67:20;99:25
**Provided (2)**
109:2;133:14
**providing (1)**
126:14
**pulled (1)**
94:15
**punish (1)**
115:22
**punishment (1)**
167:24
**purchase (2)**
30:20;34:22
**purchasing (1)**
61:9
**purpose (1)**
68:23
**purposes (1)**
8:24
**pursuant (2)**
5:1;186:12
**put (16)**
23:19;39:6;49:11;
74:23;75:1;76:24;
103:16;109:21,23;
110:10;113:18;135:15;
136:6,11;146:18;159:2
**putting (2)**
20:5;170:13

**Q**

**quick (1)**
49:12
**quite (2)**
167:6;169:12

**R**

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**radio (4)**
45:4,23;46:7;47:2
**radioed (1)**
47:18
**radios (1)**
45:24
**Raider (1)**
169:7
**Raiders (1)**
169:6
**raise (1)**
80:18
**raised (6)**
32:12;76:1;117:11;
144:11,12;145:19
**raised-up (2)**
83:11,18
**raises (2)**
18:5;59:18
**rambunctious (1)**
172:20
**Randy (2)**
128:13,15
**rape (5)**
25:15,16,19;26:7,11
**rapes (2)**
25:23;26:3
**rare (2)**
50:9;76:3
**rarely (3)**
65:15;66:8;184:13
**read (1)**
132:25
**real (1)**
169:9
**realize (2)**
177:23;180:22
**realizes (1)**
148:2
**really (39)**
11:11;14:9;19:5;
40:20;41:9;70:23;81:1,
13;87:14;91:21;95:3;
97:17;105:7;120:5,10,
10;126:20;130:21,24;
135:6;137:10;140:1;
151:16;155:20;158:13,
15;163:9,17;165:21;
168:18,19;169:18;
172:5,9,9;174:1;
175:16;176:1;178:19
**realm (1)**
182:3
**reason (21)**
7:1,4;28:3;39:11;
51:8,10,15;56:9;61:20;
64:25;78:21;91:12;
99:4;106:17;129:23;
133:17;134:13;181:23;
183:3;185:23,24
**reasons (2)**
65:19;133:7
**recall (82)**

12:19;13:23;14:2,4,
10;55:9,11;56:20;
57:16;61:23;62:2,10;
81:16;82:10,12;90:14;
96:6;106:18;109:19;
112:16;120:1;127:10;
128:4,15;130:13;
131:19;133:23;135:6,
13,17,19,25;136:18,24;
137:2,20;140:2,7,9,19;
143:24;144:2;145:22,
25;147:16,19,22,24;
148:9;149:3;151:2;
153:5;155:2,5;158:4,5,
16;161:4;164:3,8;
165:4;166:10,15,20;
168:1,7;170:13,17,20;
173:8,13;175:6,10,21;
176:8,20,24;183:16,21;
184:4,10;185:14
**recanted (2)**
176:15,18
**receipt (1)**
156:2
**receive (4)**
15:6;35:24;36:8;
79:10
**received (3)**
57:12;78:11;144:22
**receiving (3)**
78:20;80:4;106:19
**recent (3)**
79:21,22;128:12
**Recently (5)**
79:20;88:6;173:7,8,
13
**recite (1)**
16:17
**recollection (9)**
111:15;117:23;
134:22;138:14;140:22;
142:7,11;152:20;
171:12
**record (9)**
6:5;7:10;12:12;15:9;
20:10;30:17;96:18;
107:4;126:1
**records (1)**
178:11
**red (5)**
53:6,7,11;56:16;
57:13
**redeem (1)**
59:2
**re-employed (1)**
133:5
**re-employment (1)**
133:9
**refer (5)**
6:15;12:12;19:11;
81:7;134:9
**reference (3)**
16:20;134:24;179:24

**referenced (2)**
147:18;148:19
**referrals (1)**
78:7
**referred (2)**
110:9;185:19
**referring (8)**
5:23;12:14;17:4;
35:17;38:18;46:1;
77:25;154:4
**refund (13)**
44:23;46:24;53:19;
54:25;55:12;58:3,13;
60:11,18;61:14,15;
63:1,1
**refunded (2)**
160:19;162:1
**refused (2)**
65:22;66:14
**refusing (1)**
65:21
**regarding (1)**
125:1
**Regardless (2)**
28:6;63:9
**regular (7)**
80:7;103:11,13;
105:15;106:10;115:15;
162:22
**regulars (2)**
102:25;103:2
**Regulations (1)**
5:2
**rehab (2)**
134:1,12
**rehabilitation (2)**
110:2,4
**rehired (1)**
134:1
**re-hired (4)**
133:5,17,22;134:12
**re-hiring (1)**
133:8
**related (4)**
35:15;110:12,15;
130:19
**relating (2)**
32:6;124:24
**relation (1)**
93:25
**relations (2)**
23:20;93:24
**relationship (2)**
94:22;107:18
**relationships (1)**
94:16
**relaxed (1)**
74:9
**relent (1)**
66:5
**relief (3)**
9:18;34:13;89:12
**reluctantly (1)**

137:14
**rely (1)**
49:2
**remember (48)**
8:19;14:9;62:15,16,
18;81:13;85:20,23;
93:17;99:9;107:12;
119:3;120:4;123:2;
127:14,18,21;128:2,6,
11;132:14;134:2,4;
136:13,15,16;137:3,10;
138:15,16,21,22;
140:16;149:4;158:13;
161:8;166:12;168:6,8;
173:6;175:12,15,16,25;
176:1,2;177:3;185:9
**remind (2)**
8:11;174:7
**remove (5)**
18:11;66:4,21;
137:17;142:8
**removed (1)**
74:21
**rental (1)**
180:3
**renting (2)**
61:3,9
**re-paid (1)**
54:21
**repay (1)**
160:21
**repeat (1)**
57:6
**rephrase (1)**
86:22
**report (24)**
16:24;17:12,20;
20:17,19;21:5,21,25;
22:9,20;24:13,16,18,
23;25:9;29:10,11,12;
67:25;89:17;116:2;
121:11;123:12;140:3
**reported (14)**
13:23;17:8,9,10;
18:17;22:4;25:3,7,16,
19;108:19;116:5;
118:5;120:24
**Reporter (2)**
5:1;8:10
**reporter's (1)**
13:10
**Reporting (5)**
5:3;116:25;124:7,22,
25
**reports (1)**
22:14
**represent (1)**
126:6
**representative (1)**
6:12
**reprimand (5)**
72:2;98:5;111:20;
115:9,21

**reprimanded (3)**
109:17;110:6,9
**request (1)**
117:20
**requested (2)**
71:21;94:8
**require (6)**
63:6;64:9;65:4;
68:12,13;162:22
**required (2)**
42:18;44:25
**requirement (3)**
123:12;124:6,25
**requirements (3)**
123:10,24;124:22
**rescue (1)**
168:4
**research (2)**
160:9,25
**reserved (1)**
24:23;186:15
**resign (1)**
91:11
**resigned (4)**
90:16,17;91:2;92:23
**resolution (4)**
48:6;116:16;117:16;
141:11
**resolve (1)**
159:23
**respect (20)**
11:5;33:2;48:5;
63:20;74:12;88:13;
95:21;118:4;119:10;
128:15;131:17;133:15;
134:6;139:7,22;
142:24;145:20;159:8;
164:7;184:2
**response (2)**
133:3;155:3
**Responses (1)**
126:4
**responsibilities (15)**
9:7,21;10:4;11:9,19;
12:5;29:12,19,21;
40:24;41:14,18,19;
89:14;163:8
**responsibility (12)**
16:25;22:21;28:22;
41:8,12;47:8,19;73:21;
81:24;111:8;146:7;
163:7
**responsible (14)**
11:13,14;20:2;21:16;
28:24;29:24;30:1;
31:10,17,20;32:1;33:5;
43:7;48:14
**rest (2)**
37:22;38:5
**restrain (2)**
23:15,19
**restriction (1)**
72:6,9,23;73:4,12,19,

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

20,24;74:23;75:2,3,14;
76:25
**restrictions (2)**
74:8,13
**return (2)**
159:6;185:21
**returned (1)**
111:15
**returning (2)**
184:5;186:4
**reversed (1)**
173:14
**review (4)**
16:6;46:24;50:12,24
**revoked (1)**
124:12
**rhyme (3)**
106:17;181:23;183:3
**rid (2)**
75:18;81:3
**Right (80)**
8:15;9:20;10:11;
11:25;14:16;16:4,16;
21:17;22:6;24:14,21;
25:6;26:17;27:15;31:4,
5;33:3;35:23;41:10;
42:9;46:2,14,18;47:21;
48:25;49:18;50:17;
56:8;58:8;59:11;60:25;
63:2,22;71:23;74:1;
77:3,5,6;79:5;82:1;
85:2;88:16;96:21;
108:15;112:12;113:12,
18,22;114:20;117:2;
121:6;124:4;125:16,
17;134:23;138:24;
141:16,18;143:23;
145:15,15;152:16;
153:2;154:10,11;
163:3,10,15;164:11;
166:9;167:17,21,25,25;
168:9,20,20;172:7;
180:20;183:12
**right-hand (2)**
133:16;135:2
**ring (2)**
135:10;179:22
**rings (2)**
166:19;181:13
**ripping (1)**
153:8
**rise (1)**
27:2
**Rob (1)**
89:7
**ROBERT (3)**
5:6,9;130:9
**Robinson (1)**
89:2
**role (20)**
8:2;21:4;22:7;29:16,
18;31:10;32:7;38:8;
44:21;48:1,5;59:17;

67:19;88:13;99:23;
117:1;125:21;162:19;
174:18,24
**roles (2)**
40:23;162:18
**room (72)**
24:12;48:24;52:15,
16,17,20,23;53:16;
54:4,5,9;56:15;57:11;
60:23;61:6,11,15,19;
63:2;64:9,11,16,19,20;
65:2,6,10;68:3,3,4,11;
69:23;71:14,15;72:2;
83:20;92:13,18,19;
96:4,4,11;100:7,13,16,
24;101:6,17,22;
117:20;119:5;120:12;
140:4,13,14,17;148:24;
150:15;163:24;174:11;
177:17;178:21,25;
179:20,24;180:4,6;
181:12,14;182:5,14,18
**rooms (9)**
46:25;67:20;69:12,
18;72:24;97:18;100:4,
8;165:9
**rotated (1)**
9:25
**roughly (1)**
171:24
**rubbing (1)**
97:20
**rude (1)**
130:11
**rule (2)**
56:17;186:12
**Rules (5)**
5:2;102:12;115:18;
186:12
**Rulo (2)**
13:5,6
**rumor (1)**
106:21
**rumors (1)**
26:3
**run (1)**
125:8
**runs (1)**
80:25

**S**

**sake (1)**
13:11
**salary (6)**
14:12;15:5;38:15,16;
39:1;86:24
**sale (1)**
34:25
**sales (4)**
35:18;82:9;85:5;
122:20
**Sam (1)**

125:11
**same (16)**
10:5;11:6,12;27:15;
50:23;55:15;56:6;59:3;
77:16,19;86:18,19;
87:7;89:15;91:9;
149:16
**same-night (1)**
55:21
**Samuel (3)**
8:22,25;142:4
**Sasha (1)**
135:4
**sat (5)**
141:12;143:16;
149:16;153:12,21
**satisfaction (1)**
55:7
**satisfied (2)**
55:12;59:22
**satisfy (1)**
54:10
**Saturday (2)**
114:9;115:3
**Saturdays (1)**
131:24
**saw (13)**
21:24;63:22;92:18;
97:22;98:11;109:2;
112:14,15;136:19;
151:8;152:6;161:9;
163:24
**saying (26)**
6:19;45:6,7,13,14;
49:8;59:18;60:4;64:7;
69:14;76:4;87:19;91:2,
10;92:19;122:12;
136:8;139:9;149:4;
155:12;157:6;162:7;
170:18;177:13;178:1;
180:5
**scenario (1)**
56:25
**scheduled (1)**
158:18
**scoop (1)**
149:12
**scratch (1)**
153:22
**scroll (1)**
133:22
**second (8)**
18:10;27:8;87:21;
130:7;152:10,13;
159:5;181:18
**secure (1)**
21:17
**security (13)**
10:22,25;21:11,16;
24:5,13,17;25:3,7;
67:20;99:25;100:6;
163:2
**seeing (9)**

93:13;99:20;127:12;
138:23;140:3;150:9;
165:19;168:4,21
**seem (2)**
75:10;128:23
**seemed (3)**
110:18;153:10;155:4
**seems (3)**
111:18;133:24;
180:19
**sees (1)**
22:13
**sell (3)**
82:21;122:11;125:22
**selling (3)**
82:19,22;83:3
**sells (1)**
82:16
**send (4)**
28:18;50:10;159:16;
174:14
**senior (4)**
12:1,10;77:8;124:3
**sense (1)**
177:25
**sent (7)**
29:8;74:22;91:1,7,9;
92:16,19
**separate (5)**
61:10,13;111:7;
134:9;139:9
**separately (6)**
51:5,6;134:8;158:9,
10;179:25
**sequence (1)**
152:19
**serial (1)**
31:7
**serious (1)**
25:15
**Seriously (1)**
93:10
**serve (5)**
89:11;172:13;174:6;
179:11,14
**served (2)**
100:2;124:24
**service (3)**
34:24;35:10;149:21
**services (5)**
44:7;59:22;60:10;
61:12;67:7
**session (4)**
48:15;171:16;179:9;
183:2
**sessions (1)**
183:23
**set (10)**
14:8;36:1,7;75:5,9;
84:21;126:4;129:4,5;
142:9
**several (9)**
36:15;79:20;106:20;

111:11;113:1;116:8,
10;136:15;169:19
**severe (2)**
96:12,22
**sex (6)**
69:5;98:18,19,22;
129:15,20
**sexual (17)**
16:15,22;17:2,7,24;
22:3,13;24:21;43:1,8;
70:18;71:2;108:8;
115:24;124:23;131:3;
167:15
**sexually (4)**
16:24;18:18;94:21;
98:11
**shady (1)**
128:23
**shake (1)**
8:14
**Shakes (2)**
112:23;114:12
**share (2)**
38:7;39:8
**shared (1)**
141:9
**shark (4)**
141:17;169:23,24,25
**sheet (1)**
153:22
**Sherri (1)**
33:23
**shift (9)**
11:24;14:4,7,7,9,11;
28:19;29:9;86:25
**shooed (1)**
150:13
**shook (1)**
94:18
**short (8)**
8:5;27:11;59:13;
81:9;98:21;102:22;
166:7;183:10
**shorter (1)**
137:23
**short-staffed (1)**
136:1
**shoulders (1)**
120:9
**shout (1)**
131:24
**shoved (2)**
137:14;168:11
**show (3)**
127:23,24;160:2
**showed (7)**
151:11;156:13;
157:7,10;159:1,4;
177:7
**shows (1)**
156:9
**shrugging (1)**
120:9

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

shut (3)
124:13;185:11,16
side (7)
45:14;49:25;119:1;
120:1;155:20;156:1,22
sided (3)
143:21,21;165:21
sides (1)
160:10
siding (2)
45:17;49:20
signature (1)
186:14
significant (3)
103:2,5,6
signs (1)
110:19
simply (2)
59:21;181:13
simulating (1)
70:17
sit (12)
6:25;70:14;112:6;
141:5,15,19;142:10;
143:7,22,23;149:15,25
sitting (29)
6:11;16:4;40:11;
63:19;70:11,13,21,24;
71:1,7,8,15;82:14;
92:8;95:16;96:9,12,16,
21;122:19;139:6;
141:19;142:1;150:15,
24;164:18;166:17;
168:13;176:8
situation (54)
9:18;23:13;24:19;
27:2,14,21;28:21;
29:10;32:16;43:16;
49:9,15;51:8;52:7;
53:15,20;54:19;55:10;
56:13;57:10,20;62:12,
17,19,20;63:18;64:23;
65:8;66:13,17,22,24;
70:5,9;71:20,25;74:4,
24;75:12;93:20,22;
97:8,10,12;99:12,14;
101:22;113:19;131:12;
135:8;159:11;162:8,
23;164:24
situations (9)
23:9,11;43:14;52:5;
53:24;54:13;62:18,25;
173:5
six (2)
68:17;79:23
slamming (1)
130:11
slapped (2)
18:1,14
slighted (1)
165:2
slightly (1)
158:12

slipped (1)
111:17
Slominski (1)
34:15
small (2)
5:13;14:24
Smith (1)
119:25
snow (1)
135:23
snowstorm (4)
135:21;136:9,14,23
snowstorms (2)
135:18;136:23
sold (1)
82:25
sole (2)
38:25,25
solid (1)
110:20
solution (2)
164:13;175:24
solve (1)
159:22
somebody (22)
17:5,10;27:25;28:2;
32:10;42:5,13;46:5;
47:1,9,16;61:1;70:19;
76:10;85:11;87:15;
97:7;98:3;116:1;
118:18;168:15;176:25
somebody's (1)
71:15
someone (42)
16:23;18:5;20:17;
27:19,20;28:16;30:19;
31:19;32:18;42:8;45:2;
48:24;64:14;66:8;
70:20;77:3;86:13;94:8,
11;97:19;98:4,5;
101:13;103:17;109:22;
115:25;121:9;123:11,
16,18;128:25;141:12;
149:12,14;150:15;
151:16;164:21;170:1,
25;171:9;172:9;180:19
someone's (3)
70:11,21;137:5
sometime (3)
154:8,11;157:22
sometimes (21)
53:23;54:2,15;55:18;
66:7;72:4;75:7,7;86:2;
94:2;124:2;131:23;
150:5,6;159:23;174:6;
179:12,16;180:11,12,
13,14
somewhere (5)
51:12;73:7;138:10;
149:16;178:11
sorry (23)
5:20;8:9;10:6;13:13;
15:9;18:20;20:13;

28:15;34:4;37:7;39:9;
49:11;52:19;66:12;
84:6;87:21;88:20;92:2;
93:6;169:10;174:15;
185:2;186:1
sort (18)
11:7;13:19;14:23;
17:24;37:24;48:3;
57:23;59:17;74:12;
78:14;82:18;88:12;
91:3;112:11;120:17;
132:6;163:5;165:1
sorting (1)
31:17
sound (1)
69:13
sounds (3)
20:4;124:14,17
source (1)
15:9
sources (2)
15:7;48:7
span (2)
113:2;116:10
spanked (1)
18:20
spanking (1)
114:6
spare (1)
91:10
speak (12)
10:13,13;15:24;24:9;
28:18;46:25;50:12,13;
91:6,8;169:5;174:1
speaker (1)
10:8
speaking (5)
5:15;31:22;75:25;
95:4;136:25
specific (29)
37:21;41:14;61:22;
62:18,20;74:6,10,15;
90:8;96:15,20;97:2,11,
18;101:2;112:5,24;
113:2;126:20;127:11;
128:8,10;143:20;
162:21;164:3,8;
166:10,13;173:2
specifically (12)
7:22;23:9;35:3;
61:23;95:5,20;128:16;
136:17;143:24;150:23;
164:12;168:7
specifics (1)
97:24
speculation (2)
108:17;117:3
spell (3)
13:25;34:14;89:7
spend (12)
103:2,22;104:1,13;
105:10;107:25;108:1;
115:6;128:23;146:4;

161:20;181:2
spending (4)
104:15;105:2;129:1;
172:23
spends (1)
105:15
spent (6)
52:17;63:4;64:19;
65:2,10;174:13
spilled (1)
163:20
split (4)
37:2;38:1,2,5
spoke (4)
16:3;42:14;90:15;
154:24
spoken (3)
15:16,18;29:9
sporadic (2)
40:6,14
spot (5)
53:22;58:4,7;59:9;
97:14
squash (1)
153:11
staff (3)
41:9;50:24;149:21
staff/dancers (1)
41:5
stage (8)
83:19;133:24;
166:22,22,22,23;
168:11;169:10
stand (5)
138:25;145:24;
148:21,22;168:13
standing (1)
24:3
stands (1)
127:22
start (1)
148:2
started (12)
8:18,19;9:6;26:5;
61:19;77:14;81:11;
96:2;128:21;165:12,
18;168:11
starting (2)
127:5;130:7
state (1)
30:17
statement (2)
160:7;181:1
static (1)
27:9
stationed (2)
9:9,17
stay (6)
71:13;99:20;131:12;
172:17,18;178:23
step (5)
52:12;74:17;125:21;
162:7;171:22

Stephanie (1)
6:10
Stewart (1)
108:6
stick (2)
15:2;169:13
still (16)
7:21;17:22;29:8;
57:4;63:6,13;65:1,4;
66:14;77:16,19;79:10;
113:22;167:20;172:5;
179:1
stole (1)
127:14
Stolen (4)
32:8,10,13;33:1
stomped (1)
137:15
stood (1)
37:11
stop (2)
98:21;113:11
stopped (1)
88:4
Stormy (1)
128:13
story (4)
50:5;119:1;120:2;
160:10
straddling (2)
70:20;97:7
straight (1)
50:16
strictly (1)
17:4
strike (15)
23:6;30:13;39:14,20;
51:1;58:25;60:2;64:9;
65:18;81:15;84:14;
92:1;100:21;110:7;
113:5
strong (1)
110:17
structure (6)
14:3;15:3;38:15,16;
82:4,5
struggle (1)
93:13
stuck (1)
182:8
stuff (5)
8:12;11:4;24:5;
97:21;168:18
stupid (2)
11:2;66:8
subject (1)
20:5
substantiated (1)
160:4
sudden (1)
93:4
suggest (2)
83:4;84:1,12;111:1,

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

22;113:13
**suggested (1)**
111:8
**suggesting (2)**
115:18,20
**summoned (1)**
141:8
**supervise (2)**
88:19,25
**supervisor (1)**
88:15
**suppose (1)**
113:10
**supposed (12)**
20:18;21:20;24:11,
13,16,17,23;37:4;
53:17;63:11;182:13,14
**sure (51)**
10:25;11:6;15:14;
18:2,23;19:22;20:11;
23:14;26:23;27:10,16,
18;31:21,25;51:3;57:9;
68:25;69:3;79:20;84:8,
19;88:5,22;93:15;96:1,
5;100:1,9,13;104:23,
25;111:11;116:10;
123:3;139:19;142:22;
148:2;149:8;153:24;
163:4;171:11;173:1;
174:23;178:7,14;
182:6,7,15,16;183:8,9
**surgery (2)**
168:9,10
**surprised (1)**
163:19
**surroundings (1)**
24:4
**suspect (1)**
116:24
**suspended (1)**
74:5
**suspension (9)**
72:5,7,9,11,13,14,16;
73:6,24
**suspensions (1)**
74:12
**suspicion (3)**
110:14,17;128:19
**swiftly (1)**
24:14
**swing (1)**
23:16
**sworn (1)**
5:10
**Sylvia (2)**
34:15;150:18
**system (3)**
81:9,10;144:11

**T**

**tab (7)**
50:11;64:17;172:10;

179:5,9,17;182:24
**table (9)**
85:23;86:2,4,10;
104:21;133:14;149:19;
150:24;164:19
**tables (1)**
100:3
**tabs (1)**
178:17
**talk (12)**
17:2;23:1;61:21;
76:5,12;80:7,10;141:6,
9;158:8;169:8,12
**talked (19)**
5:22,24;59:15;83:14;
88:12;96:8;116:7,12;
118:3;119:11;145:14;
148:8;151:5,5;166:9,
12;169:6;177:11;
183:13
**talking (19)**
22:3;24:19;36:18;
41:6;44:17;56:12;
68:16;72:20;76:8;83:6,
6;90:1;96:2,6;104:10;
110:19;113:1;134:3;
137:5
**talks (1)**
133:25
**Tan (1)**
13:24
**Taner (3)**
90:4,7,8
**Tatum (1)**
89:4
**technically (4)**
90:17;152:13,21;
154:4
**telephone (4)**
8:23;9:1;47:1;142:5
**telling (5)**
64:2;123:3;136:20;
155:17;164:4
**tells (1)**
167:23
**temperament (2)**
75:19;76:22
**temporary (1)**
73:19
**Ten (1)**
122:25
**term (3)**
37:8;81:9;144:10
**terminate (4)**
138:19;152:2;
157:14;159:5
**terminated (5)**
74:5;109:12;139:3,
18;157:16
**terminating (2)**
41:13;90:25
**termination (4)**
99:5;129:24;175:6;

176:6
**terms (9)**
28:13;35:25;36:18;
44:15;51:22;77:21;
103:13;105:2;175:22
**testified (1)**
5:11
**testify (2)**
7:1;19:15
**testimony (5)**
67:4;100:20,22;
137:16;185:20
**therefore (1)**
67:16
**thinking (4)**
91:13;122:3;180:23,
24
**though (3)**
115:8;116:13;181:4
**thought (9)**
35:17;94:24;130:22;
131:7;153:8;165:14,
19,25;169:23
**thousand (9)**
34:17;53:5,17;56:12,
15;57:1,12;171:14,16
**Thousands (6)**
103:8,9,11,22;
105:15;108:1
**three (3)**
95:1,17;128:11
**throw (5)**
18:14,17;28:6;64:16;
97:13
**thrown (2)**
24:20;64:15
**Tiffany (2)**
128:11,13
**times (12)**
54:3;65:23;113:1;
116:11;121:4;137:11;
145:22;148:1;159:22;
167:3,4;180:25
**tip (26)**
14:24;36:10,12,20;
37:3,19;38:17,19,22;
39:2,6,6;78:22,22,23;
86:1;87:5,6,7,13,16;
106:15,18;170:23,25;
172:8
**tip-out (3)**
14:20,23;87:1
**tipped (6)**
35:16,20;39:10;
53:24;105:24;106:12
**tipping (3)**
86:13;88:3;107:13
**tips (17)**
14:6,15;15:6;35:14,
22;36:9;39:3,6,23,25;
78:11,20,23;79:5,11;
86:24;105:25
**Title (1)**

15:13;16:11;33:9;
174:25
**today (20)**
6:7,13,25;7:2;12:6;
15:13;16:12;40:11;
63:19;82:15;86:20;
88:19,25;92:8;95:16;
112:6;122:19;153:17;
166:17;176:9
**toes (1)**
167:12
**together (12)**
89:19;109:21,24;
110:18;111:25;136:6;
153:6;156:6,7;158:8;
165:5;168:25
**told (29)**
71:11;79:4;91:6,8;
94:10,11,15,17;109:24;
111:25;118:25;129:12;
131:14;141:16,20,22;
142:2;143:22;150:14,
23;151:8,23;154:18;
156:11;157:19;161:6;
174:5;177:9;179:20
**Tommy (1)**
89:2
**took (8)**
109:25;111:8,10,12;
118:2;155:20,25;
165:22
**top (8)**
14:15;16:19;105:2,5;
131:13;133:16;155:5;
168:22
**topic (2)**
20:6;184:12
**topics (2)**
19:2;121:3
**tops (1)**
153:14
**total (1)**
63:5
**touching (4)**
23:22;69:6;102:11;
113:7
**tour (4)**
149:13;150:1;
165:17;170:10
**tours (1)**
165:15
**Toward (4)**
83:20;93:2;118:7;
120:25
**towards (1)**
167:17
**track (5)**
31:7;32:18,21;47:9;
55:19
**transaction (4)**
125:8;144:5;146:14;
156:22
**transactions (1)**

147:14
**transgender (1)**
130:8
**transition (6)**
130:17,20,24;131:4,
7,15
**trapped (1)**
168:13
**treat (1)**
27:21
**treatment (3)**
102:4;110:10;181:25
**tried (1)**
54:6
**triple (1)**
171:3
**true (6)**
39:21;106:24;107:3;
123:3;136:21;142:13
**trust (1)**
49:17
**truthfully (1)**
7:2
**try (7)**
8:11;10:10;23:16;
27:8;51:4;54:3,7;
75:16;149:5;159:21,
22;162:11;167:17;
169:13;174:9;180:13;
181:1
**trying (21)**
48:4;51:13;56:7;
71:13;76:5,12;123:2;
136:11;141:25;142:1,
7;144:7;147:7;151:21;
162:17,20;168:12,21;
170:3;174:3;175:23
**turn (6)**
35:21;127:2;130:1;
132:15;133:13;135:9
**turned (1)**
32:23
**twice (5)**
106:8;145:24,24;
152:22;154:5
**two (28)**
12:17;33:13,14;
34:13;51:5;61:1;72:22;
73:5;83:11;85:1;89:11;
94:20;97:22;130:22;
131:8;139:8,9;147:19;
148:18;150:19,22;
153:13;156:17,18;
160:9;178:22;179:20,
22
**two-day (1)**
59:5
**type (15)**
17:19;20:19;21:5;
28:25;46:24;50:7;
53:15;54:18;71:7;
74:23;116:21;162:10,
21;180:16;183:25

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**types (5)**
23:11;24:22;65:18;
71:7;86:19
**typical (1)**
9:22
**typically (5)**
41:4;107:21;114:9,
13;167:16

**U**

**ultimately (12)**
20:2;21:16;29:24;
30:1;31:16;45:25;46:5,
16;47:8,18;159:19;
160:3
**umbrella (1)**
163:2
**unable (1)**
28:1
**unclear (3)**
7:17;148:15;152:5
**uncomfortable (1)**
149:5
**under (7)**
21:25;29:6;102:1,12;
128:19;163:1;186:2
**underage (5)**
29:12;121:5,9;
123:11;124:7
**understood (3)**
26:23;92:3,5
**unexpected (1)**
165:6
**unless (6)**
7:21;19:17;69:24;
105:24;108:18;173:23
**unruly (8)**
11:7;18:13;21:7,8;
23:13,25;25:1;64:24
**unsatisfied (5)**
44:6,13;60:5,10;
67:17
**up (61)**
7:13;12:23;20:6;
47:20;49:20;51:13;
52:25;54:5,21;60:1;
66:14;70:12;71:11,19,
21;76:25;77:10;84:21;
94:6,11;97:7,9;104:15,
16;116:15;117:11;
127:24;129:4,13;
130:5;134:10;137:23;
142:1,14,21;144:3;
149:7,12,15;151:11;
155:7;156:9,13;157:7,
11;158:2;159:1,4;
160:2;162:6;165:19;
167:17;168:12;175:23;
177:7;179:6,22,23;
181:9,13;183:18
**up-and-up (1)**
151:15

**upfront (2)**
180:14;181:4
**upon (1)**
25:2
**upset (4)**
150:13,17;164:1,17
**use (14)**
27:4;30:24;31:3;
56:12;61:10,11;68:7;
74:1;81:9;103:12;
110:7;124:24;169:25;
170:1
**used (5)**
34:5,16;56:13;82:8;
178:4
**uses (1)**
61:2
**using (3)**
37:7;100:12;146:10
**usual (1)**
11:4
**usually (24)**
18:12;41:16;49:24;
51:11;52:2,14;54:7,10;
58:21;61:18;69:23;
70:6;72:1;75:9,16;
80:24;100:9;103:24;
105:22;106:8;149:14;
163:22;181:20;182:18

**V**

**vagina (1)**
98:20
**vaguely (3)**
83:8;128:2;134:2
**Valente (42)**
6:7;126:8;136:4,19,
25;138:15,16,19;
139:18;140:2,10;
141:1,1;142:13;143:2,
11;144:2,6,15;145:18;
147:17,25;149:1,2;
150:23;151:3;160:18;
161:5,5;164:4;165:5;
166:10,11;168:24;
169:13;170:6,14;
175:6,22;180:16;
183:22;184:4
**Valente's (1)**
176:6
**valet's (1)**
127:15
**valid (1)**
49:3
**valuable (5)**
104:8,13,17;105:16,
18
**value (1)**
105:14
**varies (2)**
36:3;38:11
**various (2)**

**48:7;71:7**
**vary (2)**
36:2,4
**verbal (2)**
8:10;121:10
**verbally (2)**
41:25;130:9
**versus (2)**
61:11;162:22
**via (1)**
8:23
**view (1)**
99:23;100:13;122:15
**VII (2)**
15:13;16:11
**VIP (44)**
46:1,25;52:22;54:5,
9;61:2,3,6,8;68:3;72:5,
9,12,23,24;73:3,12,19,
24;74:7,12;83:5,6;
92:12;100:4,7,24;
101:10,19;117:20;
134:16,20;140:3;
141:3,13;146:3;
163:24;165:9;166:3;
177:16;179:2,9,22;
183:23
**visibly (1)**
172:4
**visit (2)**
103:14,15
**visits (2)**
80:14;103:13
**voice (1)**
76:1
**volume (1)**
165:7

**W**

**wait (7)**
42:12,14;107:2;
146:24;151:18;180:14,
17
**waitress (18)**
47:5,6,7;55:20;
92:12,15;100:11;
117:20;119:20,22,24;
146:5;149:24;160:11;
178:25;179:9;181:13;
182:17
**waitresses (9)**
82:17,18,24;113:3;
150:12,17,22;178:16;
182:3
**walk (6)**
28:1;68:4,5,7;69:17;
150:6
**walked (8)**
71:14;92:17;94:18;
97:18;138:3,5;149:15;
164:18
**walking (1)**

**68:13**
**wants (3)**
30:19;46:23;174:2
**WARD (68)**
5:12,18,22,24;6:9,9;
8:12,24;9:10;10:10,12;
13:9;15:21;18:21,24;
19:14,19,23;20:7,14;
22:1;25:4;26:23;27:7;
30:2;37:7,12,14;45:16;
46:19;49:11,23;52:13;
56:21;57:4;58:1;59:9;
63:23;64:13;76:14;
78:2;81:12;84:5;86:7,
14;88:20;90:1;92:3;
93:8,17;102:21;107:2;
108:13,17,25;115:14;
117:3;142:16;143:13;
145:13;146:21;147:3,
6;164:15;166:5;179:3;
183:9;186:7
**warm (1)**
184:5
**warn (1)**
75:16
**warned (5)**
93:23,25;94:16;
145:21;159:7
**warning (1)**
121:10
**warrant (1)**
121:18
**warranted (1)**
44:24
**wasting (1)**
121:18
**watch (5)**
102:1;108:22;143:6;
171:5;186:3
**watching (1)**
128:19
**way (23)**
6:22;10:7,13;18:18;
24:8;27:5;31:7;35:12,
15;65:8;70:14;76:25;
89:23;112:16;127:1;
143:12;159:12;160:15;
161:22;165:16;170:11;
180:19;182:19
**ways (2)**
139:2;182:20
**wealthy (1)**
104:5
**week (6)**
40:14,14;55:18;56:1,
3;72:22
**weekends (1)**
114:17
**weekly (1)**
103:14
**weeks (6)**
72:22;73:5;111:14,
16;115:3;156:17

**weighing (1)**
55:2
**weird (1)**
129:7
**weren't (5)**
14:12;55:12;118:9;
146:2;168:4
**what's (9)**
52:11;68:23;72:11;
93:5;96:4;106:15,18;
147:5;168:19
**whenever (1)**
158:18
**whereas (1)**
144:5
**WHEREUPON (2)**
5:8;186:10
**white (1)**
54:1
**whole (3)**
48:5;95:9;142:20
**who's (4)**
33:5;58:8;109:6;
150:15
**whose (2)**
47:8;88:10
**wife (2)**
15:24;16:2
**willing (1)**
102:11
**wire (2)**
106:23;107:1
**within (5)**
23:5;29:11;79:23;
158:15;182:2
**without (3)**
42:9;160:20;174:25
**witness (46)**
5:15;8:16;10:9,14,
16;15:24;19:15;20:5;
22:2;30:4;37:13;45:17;
46:20;49:24;52:14;
56:23;57:5,6;58:2;
63:24;64:14;76:15;
78:3;81:13;84:6;90:4;
92:5;93:9,12,15;107:6;
108:18;109:2;115:15;
117:4,7;118:15,18;
119:15;142:17;143:14;
146:22,25;164:16;
179:4;186:14
**witnessed (4)**
112:2;114:3,21;
117:13
**Wood (3)**
185:5,8,10
**word (7)**
69:10;103:12;
106:23;107:1;144:12;
169:25;180:4
**words (6)**
91:19;94:14;132:20;
136:11;144:9;159:2

Alison Valente v.
International Follies, Inc., d/b/a The Cheetah

Robert 'Bob' Johnson
April 4, 2017

**work (25)**
6:22;13:16;17:24;
28:19;51:12;58:7;
72:17,20;75:20,23;
76:22,25;89:19;114:9,
13,16;125:15;127:25;
135:22;136:23;138:22;
150:19;158:18,19;
159:6
**worked (7)**
7:23;10:1;14:9;
136:5;138:23;156:5;
168:25
**working (15)**
8:3;25:18;37:23;
44:17,20;73:20;87:19,
22;107:18;136:19,21;
138:15,16;144:17;
170:6
**works (2)**
159:25;182:15
**worth (1)**
34:18
**write (1)**
8:12
**written (4)**
17:20;50:11;76:25;
77:10
**wrong (4)**
11:1;54:20;128:20;
141:17
**wrote (1)**
153:13
**Wunsch (1)**
89:7
**W-U-N-S-C-H (1)**
89:8

**Y**

**y'all (1)**
184:11
**year (12)**
8:19;12:19;62:8,13,
23;66:10,12;74:8;88:5;
104:16;106:8;156:15
**years (16)**
7:25;8:1;12:21,23;
16:13;19:12;23:6;62:5;
95:9;97:25;144:17;
153:3,25;154:7;169:1;
175:20
**years' (1)**
113:2
**yell (1)**
75:23
**yelled (7)**
75:24;76:10,11,18,
18;185:8,13
**yelling (2)**
76:19;184:4
**...eses (1)**
135:2

**young (1)**
175:16

**Z**

**Zoey (2)**
135:12,13

**1**

**1 (3)**
127:5,6;133:3
**1:00 (3)**
49:7;178:23;181:8
**1:03 (1)**
117:25
**1:30 (1)**
49:8
**10 (16)**
12:21,23;35:10;
36:10,14;37:3,16,20,
25;39:2;71:22;87:5;
108:1;153:3,25;154:7
**100 (2)**
114:1;178:7
**10B (1)**
5:2
**11 (3)**
133:25;134:12,15
**11:24 (1)**
59:13
**11:39 (1)**
59:13
**12,000 (1)**
122:25
**12:20 (1)**
179:21
**12:43 (1)**
102:22
**12:44 (1)**
102:22
**14 (1)**
127:17
**15 (2)**
149:25;150:3
**150 (3)**
150:2;170:11,12
**16 (1)**
144:17
**1990 (7)**
8:20,21;10:3;11:17;
13:2,22;14:2

**2**

**2:02 (1)**
117:25
**2:20 (3)**
179:11,21,22
**2:45 (1)**
178:25
**20 (14)**
77:24;78:6,11,14;

79:11;80:4;81:8;
104:20;149:25;150:3;
170:25;171:22,24;
172:8
**2009 (5)**
81:21;86:18,25;87:1;
88:1
**2010 (1)**
81:21
**2012 (1)**
134:16
**2014 (2)**
154:7,17
**2015 (3)**
135:20,20;136:16
**2017 (2)**
5:7;128:17
**21 (1)**
29:6
**22 (3)**
127:19,20;132:21
**24 (1)**
128:2
**24th (1)**
135:20
**25 (2)**
84:21;135:4
**26 (5)**
7:25;8:1;16:13;
19:12;95:9
**28 (2)**
125:23;126:2
**29 (1)**
135:12

**3**

**3 (1)**
127:2
**3:00 (1)**
178:23
**3:13 (1)**
166:7
**3:24 (1)**
166:7
**3:46 (1)**
183:10
**300 (6)**
53:10,18;56:17;
170:12,18,25
**30b6 (7)**
5:15;18:25;19:3,7,
14,19;20:5
**30e (1)**
186:12
**31 (1)**
132:15
**32 (3)**
133:13;134:11,25
**360 (1)**
171:1

**4**

**4 (4)**
5:7;134:8,10,12
**4:00 (1)**
183:10
**4:05 (1)**
186:10
**40 (1)**
135:10
**41 (1)**
128:11
**43 (2)**
127:6;128:16
**45 (5)**
63:4,7,10,12,14

**5**

**50 (2)**
40:7;104:20

**6**

**6 (1)**
127:6
**60 (1)**
129:9
**600 (3)**
149:16,18;150:25

**8**

**8 (1)**
130:1

**9**

**90 (2)**
9:4,5
**9-11-30e (1)**
186:14
**96 (1)**
9:3