1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4    ALISON VALENTE, JENNIFER
      BARLOW, KATHRYN MONROE,
 5    SOPHIA SMITH, STEPHANIE
      LEBEAU on behalf of            CIVIL ACTION
 6    themselves and all others      FILE NO.
      similarly situated,            1:15-CV-02477-ELR
 7
                      Plaintiffs,
 8
                 vs.
 9
      INTERNATIONAL FOLLIES, INC.,
10    d/b/a THE CHEETAH and WILLIAM
      HAGOOD,
11
                      Defendants.
12

13
                      DEPOSITION OF
14
                  SAMANTHA LEIGH KIM
15
              Monday, October 30, 2017
16
                      1:39 p.m.
17
                   Suite 2700
18              260 Peachtree Street
                  Atlanta, Georgia
19

20        Renda K. Cornick, RPR, CCR-B-909

21
                  WSG REPORTING, LLC
22               2745 Daniel Park Run
                Dacula, Georgia 30019
23                  (770) 367-7822
              office@WSGreporting.com
24
                      ORIGINAL
25
```

2

```
 1              APPEARANCES OF COUNSEL

 2
    On behalf of the Plaintiffs:
 3
         AINSWORTH G. DUDLEY, JR., Esq.
 4       Ainsworth Dudley
         Building One, Suite 200
 5       4200 Northside Parkway
         Atlanta, Georgia 30327
 6       404-687-8295
         adudley@gmail.com
 7

 8  On behalf of the Defendant:

 9       KEVIN WARD, Esq.
         Schulten, Ward, Turner & Weiss, LLP
10       260 Peachtree Street, N.W.
         Suite 2700
11       Atlanta, Georgia 30303
         404-688-6807
12       k.ward@swtwlaw.com

13

14  Also present:

15       Jessica Cuesta

16

17

18

19

20

21

22

23

24

25
```

ORIGINAL

```
 1                    TABLE OF CONTENTS

 2        Witness                              Page

 3    SAMANTHA LEIGH KIM

 4        Examination by Mr. Dudley             4

 5

 6

 7                        -  -  -

 8

 9
      Plaintiff's
10      Exhibit              Description        Page

11    Exhibit 1      ^                    #

12

13        (Original Exhibit 1 has been attached to the
      original transcript.)
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                (Reporter disclosure made pursuant to
 2        Article 10.B of the Rules and Regulations of the
 3        Board of Court Reporting of the Judicial Council
 4        of Georgia.)
 5                SAMANTHA LEIGH KIM,
 6    having been first duly sworn, was examined and
 7    testified as follows:
 8                        EXAMINATION
 9    BY MR. DUDLEY:
10        Q.      Samantha, how are you today, or this
11    afternoon?
12        A.      Doing all right, sir.  Yourself?
13        Q.      I am doing good.  I won't introduce
14    myself.  We met before.
15                You have testified several times on behalf
16    of Cheetah, have you not?
17        A.      I have.  I think this is my third.
18        Q.      Other than the hearings that were
19    conducted back in 2015, have you done any depositions
20    on behalf of Cheetah?
21        A.      Yes.
22        Q.      Which ones have you done?  Let me rephrase
23    that.  When did you do depositions?
24        A.      I believe I had a limited scope FLSA
25    deposition in July of last year.
```

1       Q.      Okay.

2       A.      And I represented the club as a 30(b)(6)

3    witness in July of this year.  I believe it was July.

4       Q.      The one in July, was that in the Title VII

5    case?

6       A.      No, sir.

7       Q.      Was it in a RICO case?

8       A.      No, sir.  It was unrelated to the Valente

9    case.

10      Q.      It was another FLSA case?

11      A.      No, sir.  It was not FLSA.

12      Q.      Can you tell me what it was about?

13      A.      It had to do with a customer leaving the

14   club and being in an accident.

15      Q.      Personal injury case?

16      A.      I believe so.

17      Q.      Tell me how long you've worked for

18   Cheetah.

19      A.      In different roles since 2000.

20      Q.      Tell me all the roles you have had at

21   Cheetah since 2000 in chronological order if you can.

22      A.      Makeup artist.  Front door hostess.

23   Relief manager.  Nightshift housemom.  Daytime

24   manager.

25      Q.      When were you nightshift relief manager

1│ roughly?

2│      A.      I was a dayshift relief manager.

3│      Q.      Sorry.

4│      A.      It was, I believe, 2005.

5│      Q.      2005 only or did it -- is that when you

6│ started doing it?

7│      A.      I believe it was only in the year 2005.

8│ It was maternity relief.

9│      Q.      And you have been the dayshift manager

10│ since 2005?

11│      A.      No, sir.  Since 2011.

12│      Q.      That's what I was asking.  What did you do

13│ between 2005 and 2011?

14│      A.      Front door.  Dayshift management relief.

15│ Nightshift housemom relief.

16│      Q.      What are your duties as dayshift manager?

17│      A.      I check in the girls as they arrive and

18│ create the daily rotation.  I watch the floor.  I

19│ manage the bar staff and the wait staff as well as

20│ ordering liquor and paper goods.  I organize

21│ maintenance, landscaping, cleaning crew.  Chemical

22│ goods.  AC repair.  Help to sell Cheetah Bucks.

23│      Q.      Anything else?

24│      A.      Train girls when they are new.  Hire wait

25│ staff, bar staff when necessary.

1          I think that's it.  I have my fingers in a
2    lot of pots.
3          Q.    You do.
4                When you say order liquor, I understand
5    that.  What do you mean by paper goods?
6          A.    Bev naps, paper cups, straws, stirrers.
7          Q.    Are you responsible for entertainers
8    checking in or does the dayshift housemom handle that?
9          A.    I am also the dayshift housemom working as
10   manager.
11         Q.    Are you the only housemom on duty during
12   dayshift?
13         A.    If I am there, generally, yes.  I have a
14   relief manager that works on Saturdays.
15         Q.    Would it be a true statement to say that
16   your primary duties during the day are the manager and
17   the housemom?
18         A.    Yes.  I fill both roles.
19         Q.    So would you agree with the statement that
20   you check in the entertainers -- and again, I am
21   asking you about before April 9th, 2016, then I will
22   ask you some questions after that.  Until you hear
23   otherwise I am asking about before April 9th, 2016.
24         A.    Okay.
25         Q.    During that period of time, you handled

1    the check-in of entertainers, right?

2          A.      Yes.

3          Q.      And you handled the stage rotation.

4          A.      Yes.

5          Q.      And you do the checkout process.

6          ·A.     Yes.

7          Q.      Did you Breathalyze before April 9th,

8    2016?

9          A.      For some years before April 9th, 2016, I

10   had a floorman that would Breathalyze.  He came in at

11   4:00.  For some years I did not.  It is fair to say

12   that I have done the Breathalyzer as part of my

13   checkout duty and there was a time I had a floorman

14   who did it.

15         Q.      Are you doing the Breathalyzer now?

16         A.      Yes.

17         Q.      Do you know why the housemoms are now

18   doing the Breathalzying as opposed to floormen?  Is

19   there a reason for it?

20         A.      I as a housemom do the Breathalyzer as the

21   floorman because I do not have a floorman.

22         Q.      Do you know why they changed the person

23   responsible for doing Breathalyzers at nightshift?

24         A.      I do not.

25         Q.      You handle scheduling for dayshift?

1      A.      Yes, sir.

2      Q.      You are the person that would deal with

3   covers on behalf of entertainers during dayshift?

4      A.      The entertainers themselves are

5   responsible for getting covers.

6      Q.      But you would be responsible for keeping

7   track of who was using a cover and who was covering?

8      A.      Yes.

9      Q.      You would be notified of that and you

10  would keep track of it?

11     A.      I would be notified when the cover

12  arrived, if she was there to work for whoever.

13     Q.      Did you keep a written list of people who

14  were being covered and those who were covering?

15     A.      It is on our daily, but that's it.

16     Q.      Your daily what?

17     A.      The daily schedule.

18     Q.      Tell me what all is on the daily schedule.

19     A.      The date.   The name of the housemom who

20  was working.   The color of the rotation that they

21  would start on for that day and the girls who are

22  scheduled.   Then you would write in your own

23  handwriting girls who just came in to work extra.

24     Q.      How would I tell on this form who was a

25  cover and who was being covered?

```
1        A.      I am sorry, on what form?
2        Q.      The form you are talking about.
3        A.      If they are scheduled, they are printed on
4    the form.  If they are not scheduled, then it is in
5    handwriting.
6        Q.      For what period of time do you have these
7    records?
8        A.      The daily attendance I am not exactly
9    sure.  Through the duration of time that I worked as a
10   housemom.
11       Q.      Where are your records of that right now?
12       A.      The dailies are kept at The Cheetah.  They
13   are not my records.
14       Q.      So Cheetah has those?
15       A.      Yes, sir.
16       Q.      They would have the three-year period
17   preceding April 9th, 2016?
18       A.      To my knowledge.
19               MR. WARD:  Off the record?
20               MR. DUDLEY:  (Nods head.)
21               (Discussion off the record.)
22       Q.      (By Mr. Dudley)  So what does it -- have a
23   stage name -- I don't understand the print versus the
24   handwritten.  You are saying there is a printed
25   schedule per shift.
```

1        A.      Yes.

2        Q.      It is prepared in advance of the shift.

3        A.      Yes.

4        Q.      This is the way it has always been done?

5        A.      Yes.

6        Q.      So there has always been a printed

7    schedule for entertainers?

8        A.      A printed daily, yes.

9        Q.      And on that list, I can tell who is

10   covering and who is being covered because there will

11   be a handwritten name next to the name of the person

12   they are covering; is that right?

13       A.      That is the way I do it.  I strike through

14   the name of the person who was scheduled and then in

15   my handwriting write the name of the girl who is

16   actually to work the shift.

17               It will also show the people who requested

18   off.

19       Q.      I will submit to you that you have

20   testified in the past in these cases that you have

21   testified that entertainers were not subject to

22   schedules.  You are now telling me that you have

23   printed schedules for every shift.

24       A.      They are not fired if they don't work

25   their scheduled day.  But upon getting hired they are

```
 1   asked to give three days a week to be scheduled.
 2        Q.    Are there any other documents that would
 3   show me when somebody is covering or who is
 4   covering --
 5        A.    I don't believe so.
 6        Q.    -- that Cheetah has.
 7              And again, talking about the period prior
 8   to April 9th, 2016, you agree with the statement that
 9   Cheetah had a policy requiring their entertainers to
10   get a cover if they had an unexcused absence, right?
11        A.    They are not required to get a cover.
12   They requested they get their shift covered for, like,
13   an unexcused reason.
14        Q.    So your testimony today is that's not
15   Cheetah's policy?
16        A.    That is Cheetah's policy that we request
17   them to have a cover, yes.
18              (Plaintiff's Exhibit 1 was marked for
19         identification.)
20        Q.    (By Mr. Dudley)  Do you recognize this
21   document?
22        A.    Yes.
23        Q.    Can you tell me what it is?
24        A.    The Nightshift Entertainer Orientation and
25   Guidelines.
```

1        Q.      Go to Page 2.  Go down to the fourth

2   bullet point under scheduling and attendance, the one

3   that starts if you cannot.

4                Yeah.   That's the right bullet point.

5                If you could, go to the second paragraph

6   of that bullet point and read that to me, please.

7        A.      If you have a valid reason for not making

8   your shift, you must provide documentation to your

9   housemom upon returning to work.  If not, you must get

10  your shift covered by another entertainer who is not

11  scheduled for that shift.

12       Q.      Does that change your testimony?

13       A.      No.  I understand that it says "must," but

14  I have never, I mean --

15       Q.      "Must" is in bold and underlined, is it

16  not?

17       A.      Correct.  It is a guideline.  We would

18  rather them work their shift.

19       Q.      You think "must" is a guideline?

20       A.      I think this document is a guideline.

21       Q.      This is the document that for nightshift

22  dancers is given to them by the housemom and they are

23  told to adhere to it, are they not?

24       A.      Yes, sir.

25       Q.      I am going to show you this document.

```
 1              Do you recognize that document?
 2       A.     Yes, sir.
 3       Q.     Is that Cheetah's policies and procedures
 4  post April 9th, 2016?
 5       A.     I believe so.  Yes.
 6       Q.     Please look at it and let me know.
 7       A.     It says revised April 2016.  That's a yes.
 8       Q.     That's a document you give to new
 9  entertainers post April 9th, 2016, right?
10       A.     Yes.
11       Q.     Could you read the part about attendance
12  on this document, please.
13              MR. WARD:  Do I have a copy of that?
14              MR. DUDLEY:  I don't have one.
15              MR. WARD:  Where are we going, this
16       paragraph?
17              MR. DUDLEY:  Attendance.
18              MR. WARD:  Which paragraph is that on?
19              MR. DUDLEY:  First page.
20              MR. WARD:  Am I missing something?
21              MR. DUDLEY:  Let me see it.
22              This is why I am not entering it as an
23       exhibit.  I only have one copy.
24              First page, failure to report to work.
25       Q.     (By Mr. Dudley)  Could you please read
```

1    that to me.

2         Q.     All employees are required to report for

3    work according to their assigned schedules.  If for

4    any reason an employee cannot report to work, the

5    employee must notify manager or housemom and make

6    arrangements for a substitute to cover her shift.

7              Is that a correct reading of Cheetah's

8    policy regarding covers post April 9th, 2016?

9         A.     Yes.

10        Q.     Thank you.

11             What is the purpose of Cheetah's cover

12   policy?

13             MR. WARD:  Object to the form.

14             THE WITNESS:  The Cheetah would like to

15        have entertainers working.

16        Q.     (By Mr. Dudley)  And they ensure that

17   happens by having a cover policy, do they not?

18        A.     It is an option for the entertainer to

19   take a night off.

20        Q.     Ensures if an entertainer takes a night

21   off that somebody is working for them, right?

22        A.     In theory, yes.

23        Q.     It is important enough that Cheetah

24   continues to use it even after entertainers are

25   designated employees, correct?

1          A.       Yes.

2          Q.       You would agree that entertainers make

3   good money at Cheetah?

4          A.       Most entertainers, yes.

5          Q.       And you would agree that many entertainers

6   make in excess of a thousand dollars a shift?

7          A.       It is rare on my shift.

8          Q.       Rare on dayshift.  Tell me if I am wrong,

9   I remember in your testimony before you went to great

10  lengths to talk about how much money entertainers made

11  in tips.  Do you recall that?

12              MR. WARD:  Object to the form.

13              THE WITNESS:  They make great money in

14      tips.

15         Q.       (By Mr. Dudley)  Do you think it is

16  unusual for a girl to make over a thousand dollars a

17  night in tips?

18         A.       Unusual, no.

19         Q.       It is quite common for an entertainer to

20  make $500 a night, correct?

21         A.       On nightshift, probably, yes.

22         Q.       What about dayshift?

23         A.       It can happen.

24         Q.       Quite common?

25         A.       Sure.

1      Q.      I understand all do not do it.  But there
2   are a good number of entertainers who are making $500
3   a shift, right?
4      A.      With so many girls I can't give you a
5   percentage on that.  Am I surprised to hear they have
6   a $500 day, no.
7      Q.      And you acknowledge that some entertainers
8   may make a thousand dollars a shift for VIP dancing,
9   correct?
10     A.      Yes.
11     Q.      And you would agree with the statement
12  that the entertainers made $300 an hour doing VIP
13  dancing and it is not uncommon for entertainers to do
14  at least one VIP per shift, correct?
15     A.      For girls that are regularly in VIP, yes.
16     Q.      In dayshift entertainers are charged a
17  $10-per-check-in fee?
18     A.      Prior to April 9th, 2016?
19     Q.      Yes.
20     A.      Yes.  It was $10 per hour.
21     Q.      Or 30 minutes, right?
22     A.      Correct.
23     Q.      What happened to those VIP check-in fees
24  at the end of the shift?
25     A.      On dayshift?

1        Q.      Dayshift.

2        A.      They went to the housemom and the DJ.

3        Q.      So on dayshift you are telling me that VIP

4    check-in fees went to the housemom and the DJ rather

5    than to Cheetah?

6        A.      Yes.

7        Q.      Are any records kept of those?

8        A.      No.

9        Q.      Is there a particular reason why there are

10   no records?

11       A.      Not to my knowledge.

12       Q.      Can you explain to me why Cheetah would

13   keep records of that in the nightshift but not the

14   dayshift?

15       A.      Because at nightshift it gets turned into

16   the club and dayshift it does not.

17       Q.      The reason why records aren't kept is

18   because the housemom and the DJs get to keep the

19   check-in fees, correct?

20       A.      It was part of the girls' checkout, yes,

21   including their tipout.

22       Q.      Are those fees accounted for in any way by

23   Cheetah or you?

24       A.      They don't go to Cheetah.  They are

25   accounted for as my tips.  But they are not --

```
 1          Q.     Do you declare them as tips with Cheetah?

 2          A.     I am sorry?

 3          Q.     Do you declare the check-in fees as tips

 4    with Cheetah?

 5                 MR. WARD:  I think she is confused.

 6                 THE WITNESS:  I am.

 7                 MR. WARD:  I know she is confused.  Can I

 8          help?  I can tell you what the problem is.

 9                 MR. DUDLEY:  I will try to figure it out.

10          Q.     (By Mr. Dudley)  Let me ask you this, the

11    check-in fees, are they included as income on your tax

12    returns?

13          A.     Yes.

14          Q.     How are they included?  Are they included

15    as tip income or is it because it is on a W-2 that

16    Cheetah gives you, or 1099?

17          A.     It is not on a W-2.  No.  I report them as

18    previously unclaimed tips.

19          Q.     Do you report the VIP check-in fees as a

20    tip?

21          A.     It was a tip to me so yes.

22          Q.     I am not asking you that.  Do you report

23    it as a tip?

24          A.     On my taxes?

25          Q.     Yes.
```

```
 1        A.      Yes.
 2        Q.      You consider the mandatory fee paid by an
 3   entertainer to be a tip to you?
 4        A.      At that time, yes.
 5        Q.      How did a DJ and housemom divide up the
 6   VIP check-in fees?
 7                MR. WARD:  Object to form.
 8                THE WITNESS:  In half.
 9        Q.      (By Mr. Dudley)  DJ got half, you got
10   half.
11        A.      Correct.
12        Q.      This time you're a house manager, right?
13        A.      Housemom, yes.
14        Q.      You were a daytime manager during this
15   period of time?
16                MR. WARD:  Object to form.
17                THE WITNESS:  I was daytime manager and
18        housemom.
19        Q.      (By Mr. Dudley)  Dayshift entertainers are
20   assessed a $25 late fee for being late for their
21   shift.
22                MR. WARD:  Object to the form.
23                THE WITNESS:  No.
24        Q.      (By Mr. Dudley)  Are they not fined for
25   being late for shifts?
```

```
 1        A.      The daytime fee was not $25.  And they
 2   were very rarely fined.
 3        Q.      How much was it?
 4        A.      15.
 5        Q.      So it is your contention that there was a
 6   $15 fine if someone is late to work, correct?
 7               MR. WARD:  Object to the form.  Misstates
 8          her testimony.
 9        Q.      (By Mr. Dudley)  Tell me how your
10   testimony is different than that.
11               MR. DUDLEY:  The answer or the question?
12               MR. WARD:  The answer because you restated
13          the testimony.
14               MR. DUDLEY:  I will withdraw it rather
15          than go through that process.
16        Q.      (By Mr. Dudley)  I am simply asking you
17   how much the fee was which I believe you testified was
18   $15, right?
19        A.      Yes.
20        Q.      Is that a flat $15 regardless of what time
21   they come in?
22               MR. WARD:  I am going to object to the
23          form again.
24               THE WITNESS:  I believe so.  It has been
25          so long since I collected a late fee.  I believe
```

1        on daytime it was only $15.

2        Q.      (By Mr. Dudley)   It did not escalate?

3        A.      No.

4        Q.      Where did this money go?

5        A.      To the first girl that was in the door.

6        Q.      Tell me how that worked.

7        A.      The first girl that checked in on the rare

8    occasions that we collected a late fee from someone

9    who arrived late to a scheduled shift, that late fee

10   was given to the first entertainer to arrive as

11   incentive for being on time.

12       Q.      Let me see if I understand this.  You

13   charged $15.  You personally collected it from the

14   entertainer at the end of the shift, right?

15       A.      At the end of the shift or when she walked

16   in.  Either way.

17       Q.      And then you turned around and gave that

18   $15 to who you claim was the first person that arrived

19   for shift, which I should be able to tell from the

20   sign-in sheets, right?

21       A.      Well, at that time there wasn't a sign-in

22   timesheet but yes.

23       Q.      What happened to the second $15 that was

24   fined against someone?

25       A.      It would go to the second girl.

1        Q.      You are telling me that went on and on.

2    You would fine and give that money back to another

3    girl, take a fine, give it back to the next one,

4    that's the way it went?

5        A.      Yeah.

6        Q.      There were no records of this?

7        A.      (Witness shakes head.)

8              MR. WARD:  I need a break.

9              (Recess from 2:10 p.m. to 2:12 p.m.)

10       Q.      (By Mr. Dudley)  We are back on the

11   record.

12              I want to sum up your testimony about late

13   fees, make sure I understand.  Late fees go to you.

14   You purportedly give it back to the entertainers,

15   right?

16       A.      I collect it and give it to the first one

17   who arrived, yes.

18       Q.      Keep no records of it?

19       A.      I don't believe so.  There may be a couple

20   of designations on the dailies that say LT, but I am

21   not a hundred percent sure.

22       Q.      I can determine who was paid late fees by

23   going, looking at people in the order they are checked

24   in?

25              MR. WARD:  Object to the form.

```
 1              THE WITNESS:  Yes.
 2       Q.     (By Mr. Dudley)  What's the policy of the
 3   late fee you charged for dayshift?  Why did you do
 4   that?
 5       A.     To try to get girls to arrive on time for
 6   their shift.
 7       Q.     The beneficiary of that was you
 8   personally, correct?
 9       A.     I am not sure I understand.
10       Q.     Well, you collected the money, right?
11       A.     Yes.
12       Q.     Do you contend that anybody benefited from
13   that other than you?
14       A.     I didn't benefit from late fees.
15       Q.     Did the club benefit from it?
16       A.     No.
17       Q.     I thought you just told me that that
18   encouraged people to come in earlier.  Didn't you
19   testify to that?
20       A.     Nonmonetarily, yes.  The club would
21   benefit from having girls there on time.
22       Q.     There is no way for me to prove the amount
23   of the late fee because Cheetah has no records of it,
24   right?
25       A.     To my knowledge, I don't believe so, no.
```

1        Q.      When it was assessed, it was mandatory,
2    right?
3        A.      I mean, do we say that you have to be on
4    time for your scheduled shifts, yes.  Was every person
5    who ever arrived late charged a late fee, no.
6        Q.      Were entertainers fined for missing stage
7    sets?
8        A.      On the rarest occasion.
9        Q.      How much was the fine?
10       A.      I believe it was $20.  Again, it has been
11   so long since I collected it, I am not a hundred
12   percent.
13       Q.      Was it not $25 per the written policy?
14       A.      I know it is $25 on the nightshift.
15       Q.      You can't remember what it was for
16   dayshift?
17       A.      I believe it was 20.  But again, it is a
18   fee I have rarely enacted.
19       Q.      What happened to those fees?
20       A.      Missed set fees would have been turned in
21   to the house if collected.
22       Q.      Tell me how that worked.  How would you
23   keep track of it?  Who did it go to?
24       A.      At the end of your shift you would put it
25   on a checkout form with the denomination of bills that

```
 1   were used to pay and how much the total was, the day
 2   it was collected.  It would be turned into Cheetah
 3   Bucks.
 4        Q.     Do you have records of those amounts that
 5   were collected as missed stage fees?
 6        A.     I do not.
 7        Q.     Have you given any records to Cheetah?
 8        A.     I don't have any records.  I don't have
 9   anything to give them.
10        Q.     The record you created was given to the
11   Cheetah Buck girl and after that you have no records
12   of it?
13        A.     Correct.
14               MR. WARD:  Object to the form.
15        Q.     (By Mr. Dudley)  Now, what was the purpose
16   of a missed stage fee?
17        A.     To try to get girls to do their stage set.
18        Q.     Who benefited from the payment of the fee?
19        A.     I don't know.
20        Q.     Whoever received it which in your
21   testimony I believe was the club; is that right?
22        A.     Correct.
23        Q.     They would be a beneficiary, would they
24   not?
25        A.     Then yes.
```

1      Q.      They would be a monetary beneficiary and

2    they would also be a beneficiary of encouraging

3    dancers to make their stage sets, right?

4      A.      Correct.

5      Q.      What was the customary tipout to housemoms

6    for dayshift?

7      A.      Before 2016, it was $10.

8      Q.      So that worked just like nightshift?

9      A.      The $10 housemom was the same, yes.

10     Q.      That was something that you kept, right?

11     A.      Yes.

12     Q.      And that was a mandatory minimum of 10,

13   correct?

14     A.      It was a suggested minimum of 10.

15     Q.      And what was the floorman fee for

16   dayshift?

17             MR. WARD:  Object to the form.

18     Q.      (By Mr. Dudley)  Pre April 9, 2016.

19             MR. WARD:  Object to the form.

20             THE WITNESS:  When I had a floorman, it

21        was a suggested $5.

22     Q.      (By Mr. Dudley)  What period of time did

23   you not have a floorman?

24     A.      It has been a couple of years since I had

25   one.  I couldn't tell you exactly when.

1        Q.      When you did not have a floorman, did you
2    take $5 as a floorman fee?
3        A.      No.
4        Q.      Is there no security during the day?
5        A.      I also play that role.
6        Q.      Busy woman.
7        A.      I am.
8        Q.      Obviously you are a beneficiary of any
9    rule that would require an entertainer to tip a
10   housemom, right?
11       A.      Yes.  I am the housemom as well.
12       Q.      How much was an entertainer expected to
13   tip a DJ during dayshift prior to April 9th, 2016?
14       A.      I believe it was also $10.
15       Q.      You have personally reprimanded
16   entertainers for not tipping enough, have you not?
17       A.      I don't believe so.
18       Q.      Can you think of any circumstance why it
19   would justify you telling an entertainer she hadn't
20   tipped enough?
21       A.      When I was working as a nightshift
22   housemom, if I knew someone spent three hours in VIP
23   and they wanted to give $5 to their DJ, that's a sign
24   that I would ask them.  But again, they were suggested
25   tipouts.  It wasn't mandatory.

1        Q.      With respect to entertainers during

2    dayshift, do you have the power to hire entertainers?

3        A.      In conjunction with Jack Braglia, yeah.

4        Q.      Your recommendation makes a strong

5    influence on him.

6                MR. WARD:  Object to the form.

7                THE WITNESS:  I don't know how to answer

8        that.

9        Q.      (By Mr. Dudley)  You know Jack well.  You

10   have hired dancers with him probably hundreds of

11   times.  You know how to answer that, don't you?

12               MR. WARD:  Object to form.

13               THE WITNESS:  I don't know how much weight

14       my opinion comes to him that -- when it comes to

15       that.  He has turned down lots of girls I would

16       have hired.

17       Q.      (By Mr. Dudley)  You give your opinion.

18   Sometimes he takes it, sometimes he doesn't, correct?

19       A.      Correct.

20       Q.      As dayshift manager or housemom, you have

21   the authority to reprimand, discipline dancers, right?

22       A.      Yes.

23       Q.      Does that authority extend to termination?

24       A.      In a case of, like, in a very

25   black-and-white case, yes.  In general, I always

1  consult Jack.

2       Q.    You have the authority to do it in a clear

3  case but normally you run it by Jack.  Is it safe to

4  say that's the way it is done?

5       A.    Correct.

6       Q.    You have the authority to send dancers

7  home, correct?

8       A.    Yes.

9       Q.    You have done that, correct?

10      A.    Yes.

11      Q.    You have done that for a multitude of

12 reasons, correct?

13      A.    Correct.

14      Q.    You did that when they didn't meet

15 Cheetah's appearance requirements, correct?

16      A.    I have never hired anyone I had to send

17 home for not fitting our appearance, no.

18            MR. DUDLEY:  I didn't ask you that.

19            (The record was read by the reporter.)

20      Q.    (By Mr. Dudley)  I am not asking whether

21 you hired somebody.  You made some reference to hiring

22 in your answer.  I am not asking if you hired someone

23 based on their appearance or lack of appearance.

24            I am asking you whether you sent somebody

25 home because they didn't satisfy Cheetah's appearance

```
 1    requirements.
 2              MR. WARD:  Object to the form.
 3              THE WITNESS:  The closest thing I can get
 4         to that is sending someone to the boutique to buy
 5         breakaways.  But I have never sent anyone home.
 6         Q.    (By Mr. Dudley)  You never sent anyone
 7    home for the color of their hair?
 8         A.    I don't believe so, no.
 9         Q.    Never sent anybody home because you didn't
10    think the outfit was appropriate?
11         A.    Absolutely not.
12         Q.    Never sent anybody home because you didn't
13    feel appearancewise they weren't meeting Cheetah
14    standards?
15         A.    No.
16         Q.    You have witnessed entertainers getting
17    ready for work.
18         A.    Yes.
19         Q.    And you understand that entertainers put
20    on makeup, do their hair, nails, shave, do all these
21    things to dance.  Do you understand that?
22         A.    Yes.
23         Q.    You have watched them do that, correct?
24         A.    Uh-huh.
25         Q.    Some of them take a long time to do it.
```

1        A.      Was that a question?

2        Q.      Yes.

3        A.      Yes.

4        Q.      Some of them take several hours to do it.

5        A.      Yes.

6        Q.      Do you agree that it is not unreasonable

7    for an entertainer to take an hour to get ready for

8    work?

9        A.      I don't think it is unusual for any woman

10   to take an hour to get ready for work.

11       Q.      Do you think it is an unreasonable amount

12   of time to get ready for work at The Cheetah, to take

13   an hour?

14       A.      No.

15       Q.      The dayshift ends at 8:00.

16       A.      Yes.

17       Q.      That's the same time the nightshift

18   begins.

19       A.      Yes.

20       Q.      Prior to April 9th, 2016, dayshift

21   entertainers had to go through a checkout process

22   after 8:00, correct?

23       A.      Whenever their shift ends, yes.

24       Q.      They are there at 8:00, they got to go

25   through a checkout process, right?

```
 1        A.       Correct.
 2        Q.       Tell me what that involves.
 3        A.       They come off the floor and head to the
 4   break room.  This is prior to 2016.  They come to the
 5   break room.  They would tip their DJ, tip their
 6   housemom, pay any fees.  Then they go to the
 7   Breathalyzer, tip their floorman, Breathalyze, get
 8   their slip and head out for the day.
 9              Now without the floorman, they tip the DJ,
10   tip me, I Breathalyze them, they go home.
11        Q.       If they haven't cashed in Cheetah Bucks
12   they have to do that at the end of the shift, too,
13   right?
14        A.       Correct.
15        Q.       How do entertainers leave during a
16   shift -- I am talking about when they are driving
17   their own vehicles -- how do they leave that is any
18   different from somebody leaving after the nightshift?
19   Does that make sense to you?
20        A.       I am not sure I understand the question.
21   They get their ticket.  They get their car if they
22   drove or wait on their ride and exit the property.
23        Q.       Why at night is it Cheetah's policy to
24   have the lot cleared before they are allowed to leave
25   but it is okay for them to leave in the dayshift
```

1  without the lot being cleared?

2      A.      I don't know.

3      Q.      Can you think of any reason why things

4  would be different?

5              MR. WARD:  Object to the form.

6              THE WITNESS:  We don't ask all of our

7       customers to leave when one shift leaves.

8      Q.      (By Mr. Dudley)  Is there more security

9  around --

10     A.      Security is coming on.

11     Q.      -- at 8:00 o'clock than there would be at

12 3:30 or 3:00 o'clock or is it the same?

13     A.      I believe it is the same amount of

14 floormen.  There are probably more valets during shift

15 change.

16     Q.      How long does it take to go through the

17 checkout process on a normal day?

18     A.      Just a few minutes.

19     Q.      What if there are lines?

20             MR. WARD:  What if what?

21     Q.      (By Mr. Dudley)  What if there are lines?

22     A.      Everybody is hustling.  We have two

23 Breathalyzers.  The line is not going to take long

24 when I have 12 girls working.

25     Q.      You have one person checking out how many

1   girls on your normal dayshift?

2        A.      Twelve to 18.

3        Q.      A lot of times it is more than that, isn't

4   it?

5                MR. WARD:  Object to form.

6                THE WITNESS:  Not lately.

7        Q.      (By Mr. Dudley)  One person doing a

8   Breathalyzer, collecting all the fees and fines,

9   collecting money for the DJ, collecting money for the

10  housemom, collecting money for the floorman, the

11  dancer going through the -- cashing out the Cheetah

12  Bucks, all these kind of things you do in a couple of

13  minutes?

14       A.      At the time you are talking about, there

15  were three people collecting the fees.  There was the

16  DJ collecting for himself, the floorman collecting his

17  and Breathalyzing them and me collecting fines.

18       Q.      It wouldn't take a couple of minutes to

19  Breathalyze one person?

20       A.      No.  It takes about 30 seconds to

21  Breathalyze one person, maybe 45.

22       Q.      The prior witness testified that you were

23  given a sheet indicating who had cover and who was

24  covering them for nightshift.  Is that true?

25               MR. WARD:  Object to the form.

1          THE WITNESS:    That the nightshift
2     housemoms turn in weekly attendance to me, yes,
3     they do.
4          Q.    (By Mr. Dudley)    On that document -- I am
5     referring to the document she has talked about that I
6     will represent to you I have never seen because it has
7     never been given to me.    But it is my understanding
8     that her testimony said that will show who had a cover
9     and who covered, right?
10         A.    Yes.
11         Q.    What happens to that document after it is
12    given to you?
13         A.    Filed in a binder.
14         Q.    Where is that binder?
15         A.    In the office.
16         Q.    The office at Cheetah?
17         A.    Yes.
18         Q.    This is something kept on a nightly basis?
19         A.    Yes.    It is a daily sheet.    They turn it
20    in weekly.
21         Q.    Cheetah has always maintained those
22    records to your knowledge?
23         A.    To my knowledge, yes.
24         Q.    You would agree with the statement that
25    the best way to determine a dancer's schedule before

1    April 9th, 2016, is to look at their entertainer info

2    sheet?

3         A.    For the first schedule that she set, sure.

4         Q.    Schedule change would be another info

5    sheet, wouldn't there?

6         A.    It would change on the housemom's dailies.

7         Q.    So the daily documents, again, would show

8    me what people's schedules were.

9         A.    It will show you who was scheduled that

10   day, yes.

11        Q.    Wouldn't show what their schedule is,

12   though, would it, or it would?

13        A.    It is just one day.  It would show who is

14   scheduled for that day.

15        Q.    Do you know any of the entertainers I

16   represent?

17        A.    Have I met them before or could I name

18   them?

19        Q.    I am sure you have met them.  Do you know

20   who some of them are for dayshift?

21        A.    I don't know specifically who is

22   represented by who.  But I have a good grasp on who is

23   involved.

24        Q.    Can you tell me who you think is involved?

25   It is not a lot of dayshift people, I don't think, is

1   it?

2        A.      No.    There are several that have worked

3   day and night.   I am not really sure who is

4   represented by what attorney.

5        Q.      Doesn't matter.    Just tell me the ones you

6   remember.

7        A.      Amica Jolly.   Heather Legget.   Jacqueline

8   Hutsell.   Miriam Adams.   Summer Angie.   No.   Sara

9   Angie.   Stephanie Waggoner.   Katherine Kahn.   Those

10  are the ones that are coming to me right now.

11       Q.      With respect to Hutsell, Adams, Angie, and

12  Waggoner, do you remember what they typically earned a

13  night or a day?

14       A.      I am sorry, I don't.

15       Q.      Do you have any recollection of --

16       A.      Sara Angie was a pretty successful

17  entertainer.

18       Q.      I want to talk to you a little bit about

19  after April 9th, 2016.

20              How did entertainers on dayshift, how did

21  their compensation change?

22       A.      Other than now getting two thirteen from

23  the club an hour, it did not change.

24       Q.      It is your understanding the club paid

25  them two thirteen an hour then the club utilized the

1  tip credit for the remaining five twelve an hour

2  minimum wage; is that your understanding?

3       A.     I am not familiar with the tip credit.

4  But we do ask the girls to claim their tip credit to

5  make sure they satisfy their minimum wage.

6       Q.     Is that what you tell them?

7       A.     I tell them they need to claim their tips

8  at the end of the shift.

9       Q.     How much do you tell them to claim?

10      A.     What they made.  I don't really tell them

11 to claim anything.

12      Q.     You don't tell them to claim $80 or claim

13 enough to cover the minimum wage obligation?

14      A.     $80 is an example that I give as, you

15 know, if you are an average entertainer, you work

16 three shifts, you are claiming $80, that's only

17 $12,000 at the end of the year.  That's not realistic

18 for most of our girls.

19      Q.     But it is enough to cover the minimum wage

20 obligation tipwise on the shift, right?

21      A.     I believe so, yes.

22      Q.     Entertainers' tipouts changed post April

23 9th, 2016, right?

24      A.     Correct.

25      Q.     And tell me how the tipouts changed from

1   the way it was before that date.

2          A.      There is now just a 10 percent

3   contribution to a tip pool that on dayshift goes to

4   the DJ.

5          Q.      What are housemoms tipped?  Nothing?

6          A.      Housemoms do not even have a suggested tip

7   now.

8          Q.      They now have a bucket?

9          A.      Right.

10                 MR. WARD:   Excuse me.  I can't hear you.

11         Q.      (By Mr. Dudley)  They now have a bucket?

12         A.      I believe so.  Yes.  I use a bucket.

13         Q.      Before there was not a bucket, was there?

14         A.      On nightshift I think there has always

15   been a bucket.  On dayshift before, no.

16         Q.      The 10 percent is based upon the

17   entertainer's income or tips for the shift, right?

18         A.      Yes.

19         Q.      The figure that is used to calculate 10

20   percent may not be the same amount as declared by the

21   entertainer, correct?

22         A.      I am sorry.  Repeat it, please.

23         Q.      The tip pool is based upon 10 percent of

24   an entertainer's tips for the shift, correct?

25         A.      Correct.  It should be 10 percent of what

1    they earned that day.

2        Q.      That may not be the same figure when an

3    entertainer declares tips for that same shift,

4    correct?

5                MR. WARD:  Object to form.

6                THE WITNESS:  I don't know what they

7        declared.

8        Q.      (By Mr. Dudley)  If they declared 80, for

9    example, and paid 10 percent of a thousand, you are

10   certainly going to know.  If their 10 percent is a

11   hundred dollars for the night, you are certainly going

12   to know that the $80 figure is not the actual tips,

13   right?

14       A.      Yes.  One would know that.  But I don't

15   watch them key in their tips.

16       Q.      I guess what I am saying to you is the 10

17   percent is not based upon the amount they declare as

18   tips.  It is based upon the amount they earned as

19   tips, right?

20       A.      I don't know what they declare as tips.

21   It is based on what they tell us they earned.

22       Q.      Cheetah's policy is it is 10 percent of

23   the amount they earned is tips if they tipout,

24   correct?

25       A.      Correct.

1      Q.      And you leave it up to the entertainer to

2   allocate whatever she wants in tips as long as it

3   meets the minimum wage obligation, correct?

4              MR. WARD:   Object to form.

5              THE WITNESS:   We rely on the entertainers

6        to report their tips.

7      Q.      (By Mr. Dudley)   You could keep track of

8   both of those figures to make sure that they are the

9   same, could you not?

10     A.      I don't see what they put into the

11  computer.

12     Q.      But you could keep track of the -- since

13  you are basing it on a percentage of what they make,

14  you could have accurate amounts, correct?

15     A.      I don't receive that 10 percent.  So you

16  keep saying I.  I am not a part of that 10 percent.

17     Q.      But Cheetah could.

18     A.      Cheetah is not a part of that 10 percent,

19  either.  It goes to the DJ.

20     Q.      Well, somebody is taking the 10 percent

21  that works for Cheetah, right?

22     A.      Yes.

23     Q.      So it is a Cheetah tip pool arrangement,

24  right?

25     A.      Yes.

1        Q.      I think we already established that the
2    cover policy continued after April 9th, 2016, right?
3        A.      Yes.  Girls continued to take nights off.
4        Q.      You have been involved in covering,
5    correct?
6        A.      Have I?  Has someone dropped off money to
7    me to give to someone else, yes.
8        Q.      Not only that, on each shift you know who
9    is getting a cover and who is covering, right?
10               MR. WARD:  Object to the form.
11               THE WITNESS:  You do your best.  You don't
12        always know.  You do your best.
13        Q.      (By Mr. Dudley)  Do you keep records of
14    it?
15        A.      We keep records of who worked, yes.
16        Q.      You keep records of who covered and who
17    was covered, right?
18        A.      Who either requested off or who was
19    covered, yes.  When you say -- there is not a separate
20    list.  It is on the daily.
21        Q.      But it shows those two things.
22        A.      Yes.
23        Q.      Entertainers pre and post April 9th, 2016,
24    are expected to pay for their permits out of the tips
25    they earn working for Cheetah, correct?

1          A.      They are expected to pay for their
2    permits.  They have to have one before they start.  I
3    don't know if I would say they are expected to pay it
4    from their tips.  They are expected to buy their
5    permits.
6          Q.      Are you aware of any entertainer who did
7    not -- that I represent who did not buy a permit the
8    week she started working for Cheetah?
9          A.      I am not aware of anyone who has ever
10   worked for the Cheetah without a permit.
11         Q.      You can just answer my question yes or no.
12   You can explain if you want.
13         A.      I don't think anyone has worked without a
14   permit.  The club has loaned money to entertainers
15   so --
16              MR. WARD:  He wants to know if you know if
17         any of his clients got a permit within a week
18         after being hired.
19         Q.      (By Mr. Dudley)  The workweek they were
20   hired.  That's all I am asking.
21         A.      Sure.
22         Q.      You know that to be the case?
23              MR. WARD:  I think now we got it cleared
24         up, ask the question again.
25         Q.      (By Mr. Dudley)  I am only asking you

1    about the people I represent.

2         A.    Okay.

3         Q.    You know some of them.  The ones you are

4    aware of, can you tell me whether any of them didn't

5    get a permit during the workweek they started working?

6         A.    If they were working they had a permit.

7         Q.    You don't know when they bought it, the

8    permit, the week they started working, do you?

9         A.    Off the top of my head, no.

10        Q.    If somebody renewed a permit while they

11   were working at Cheetah, obviously they would purchase

12   that permit during a workweek they were working for

13   Cheetah, more than likely?

14        A.    Yes.

15        Q.    And that would be paid out of their tips

16   as far as you know.

17        A.    Yes.

18        Q.    And who else has to have a permit to work

19   at Cheetah?  Waitresses do?

20        A.    Yes.

21        Q.    Bartenders do?

22        A.    Yes.

23        Q.    Entertainers do?

24        A.    Yes.

25        Q.    Do you?

```
 1        A.      Yes.

 2        Q.      So management does, too?

 3        A.      Yes.

 4        Q.      Housemoms, too?

 5        A.      Yes.   Kitchen, bathroom employees.

 6        Q.      Does Jack?

 7        A.      Yes.

 8        Q.      What about a cook in the kitchen?

 9        A.      Yes.

10                My bathroom attendants.

11        Q.      Is there anybody at Cheetah that you are

12    aware of that doesn't have to buy a permit?

13        A.      No.

14                MR. WARD:   Which is why y'all's letters

15            always go to Jack.

16                MR. DUDLEY:   I don't even know what you

17            are talking about.   I think you are talking about

18            somebody else.   We won't get into that.

19        Q.      (By Mr. Dudley)   As far as you know,

20    that's the way the statute reads.   Everybody that

21    works with the Cheetah has to get a permit.

22                MR. WARD:   Object to the form.

23        Q.      (By Mr. Dudley)   Just your understanding

24    of it.

25                MR. WARD:   That's fine.   You can give your
```

```
1         understanding.

2              THE WITNESS:  Yes.

3         Q.    (By Mr. Dudley)  Does Cheetah pay for

4    anyone's permits?

5         A.    I think we pay for our kitchen guys'

6    permits.

7         Q.    Do you know why that is?

8         A.    I do not.

9              MR. WARD:  She can ask questions if you

10        want her to.  I don't care.

11             MR. DUDLEY:  No.

12             I think that is going to be it.  Give me

13        about five minutes.  I will let you know.

14             MR. WARD:  Let me cover this on the

15        record.  It seems to be an issue.  As soon as I

16        get confidentiality orders signed by everybody,

17        we will be releasing these documents that you

18        keep saying you haven't been getting.

19             MR. DUDLEY:  I would love you to put on

20        the record exactly what I am going to get.  I

21        would love for you to do that.  That may have

22        something to do with whether we can speed up the

23        protective order issue.  Some of them we have

24        already signed orders that ought to cover this.

25             MR. WARD:  Just one.  And everybody --
```

1                   MR. DUDLEY:  We got more than one.

2                   MR. WARD:  Well, which ones?

3                   MR. DUDLEY:  I think the collective there

4        is a protective order, isn't there?

5                   MR. WARD:  No.  I sent you the Title VII

6        one.

7                   MR. DUDLEY:  I know there is in the Gepp

8        case.  I know that in Chris Berney's cases they

9        were entered early.  I mean, it would help me.

10                  I have two issues with the protective

11       order.  One is that it covers documents that have

12       already been produced.  Some discovery periods

13       are over with.  I think it is frankly just not

14       appropriate to go back and make everything you

15       have given to me or anyone else subject to a

16       confidentiality order.

17                  Second, I have a real concern about doing

18       a confidentiality order that is going to forbid

19       me from going over certain documents with my

20       clients.  It prevents me from preparing for my

21       case.  If I knew what the documents were, I could

22       tell you whether I would approve of them being

23       attorneys' eyes only.  Otherwise I don't want to

24       get in a fight every time I want to show a

25       document to my client.  It intrudes into the

1   attorney-client relationship.  I just hope you

2   understand the position on that.

3           MR. WARD:  I am just saying as soon as you

4   sign it, you can have it.  You can have all the

5   positions in the world.

6           MR. DUDLEY:  What you have given me hasn't

7   addressed my concerns, okay?

8           MR. WARD:  That one was reviewed by

9   Mr. Gepp over your objections, entered as we

10  prepared it.  I am saying we will do the same one

11  in every case right now, this second.

12          How many documents have been marked

13  attorneys' eyes only?  Some financial documents?

14  Has any document --

15          MR. DUDLEY:  The ones you are giving to me

16  are attorneys only.  The Gepp one is attorneys'

17  eyes only.

18          MR. WARD:  No.  It has two designations.

19  We have to designate it for it to be attorneys'

20  eyes only.  I would like you to show me what

21  documents we have designated as attorneys' eyes

22  only.  Look at the order.  I think you are

23  misunderstanding me.

24          MR. DUDLEY:  Are you telling me the

25  documents I am about to get are not attorneys'

```
 1          eyes only?
 2                  MR. WARD:  I don't know the answer.
 3                  MR. DUDLEY:  Why are we even having this
 4          argument if they aren't?
 5                  MR. WARD:  About what?
 6                  MR. DUDLEY:  About attorneys' eyes only.
 7                  MR. WARD:  About a category of attorneys'
 8          eyes only?
 9          Q.     (By Mr. Dudley)  If they don't exist, why
10     are we --
11                  MR. WARD:  There will be some documents
12          that will have attorneys' eyes only.  They are
13          most likely to be financial documents of the club
14          which we don't want to send to all the employees.
15          You represent the employees.  But we feel like it
16          would be helpful for both sides for you to see
17          those.
18                  I don't want my employees seeing tax
19          returns for my -- that's the sort of document
20          that I contemplate being attorneys' eyes only.
21          Schedules and stuff like that, I don't care about
22          that stuff being attorneys' eyes only.  I really
23          don't.
24                  And, for example, we do not want you
25          sharing disciplinary records of one girl with
```

1          another girl.  That would be unfair to the girl

2          that got disciplined, right?

3                    MR. DUDLEY:  I don't know about that.  I

4          don't know whether I would agree with you there.

5          Unfortunately, these girls may have a right to

6          know that.

7                    Now, I will do everything I can do to

8          protect the girl who was disciplined.  I don't

9          think we can say -- they may have knowledge about

10         it.  They may be able to confirm that it

11         happened.

12                   MR. WARD:  I would suggest to you you get

13         into circumstances among other things which might

14         be a conflict.  But you can find -- it is

15         incumbent on you to decide if you are going to

16         tell a girl another girl got disciplined.

17                   We would say this is confidential, don't

18         share it with people -- in other words, people

19         that are not your clients that got disciplined,

20         it is none of your client's business who got

21         disciplined.

22                   It may be their business if other girls

23         unnamed, unidentified were disciplined but I

24         really think that has to go in front of the

25         judge.  These girls, they will take things out on

```
 1          each other.
 2                  You know exactly what I am talking about
 3          here.  They will start catting on each other and
 4          being mean to each other and talking about each
 5          other in the workplace.
 6                  It will create a terrible environment for
 7          them if you tell your clients about all the
 8          disciplinary actions of other girls.  That's my
 9          concern.  It is for them.
10                  MR. DUDLEY:  Well, I will certainly -- not
11          knowing what you are going to give me and the
12          circumstance of it being produced, you have to
13          understand my position on all of this.
14                  MR. WARD:  I don't.  I think what you are
15          doing --
16                  MR. DUDLEY:  You ought to because I think
17          any lawyer would appreciate the fact that giving
18          something four years later is probably not a
19          timely response to production.
20                  MR. WARD:  In your position, I would get
21          the documents.  If I felt like the other side
22          improperly designated them, I would be right in
23          front of the judge.
24                  MR. DUDLEY:  That may happen.
25                  MR. WARD:  That's fine.
```

1           MR. DUDLEY:   Let's finish this deposition,

2     then I will be happy to talk to you about it.

3           (Recess from 2:51 p.m. to 3:03 p.m.)

4           (Deposition concluded at 3:03 p.m.)

5           (Pursuant to Rule 30(e) of the Federal

6     Rules of Civil Procedure and/or O.C.G.A.

7     9-11-30(e), signature of the witness has been

8     reserved.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

```
 1              C E R T I F I C A T E

 2

 3    STATE OF GEORGIA:

 4    COUNTY OF FULTON:

 5

 6              I hereby certify that the foregoing

 7        transcript was taken down, as stated in the

 8        caption, and the questions and answers thereto

 9        were reduced to typewriting under my direction;

10        that the foregoing pages 1 through 53 represent a

11        true, complete, and correct transcript of the

12        evidence given upon said hearing, and I further

13        certify that I am not of kin or counsel to the

14        parties in the case; am not in the regular employ

15        of counsel for any of said parties; nor am I in

16        anywise interested in the result of said case.

17              This, the 13th day of November, 2017.

18

19

20        RENDA K. CORNICK, CCR-B-909

21

22

23

24

25
```

COURT REPORTER DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosures:

I am a Georgia Certified Court Reporter.  I am here as a representative of WSG Reporting, LLC.

I am not disqualified for a relationship of interest under the provisions of O.C.G.A. Section 9-11-28(c).

WSG Reporting, LLC, was contacted by Ainsworth Dudley, Esq., to provide court reporting services for this deposition.

WSG Reporting, LLC, will not be taking this deposition under any contract that was prohibited by O.C.G.A. 15-14-37 (a) and (b).

WSG Reporting, LLC, has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

WSG Reporting, LLC, will charge its usual and customary rate to all parties in the case, and a financial discount will not be given to any party to this litigation.

Renda K. Cornick, CCR-B-909
October 30, 2017

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosures:

WSG Reporting, LLC, is not disqualified for a relationship of interest under the provisions of O.C.G.A. 9-11-28(c).

WSG Reporting, LLC, was contacted by the offices of Ainsworth Dudley to provide court reporting services for this deposition.

WSG Reporting, LLC, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

WSG Reporting, LLC, has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

WSG Reporting, LLC, will charge its usual and customary rate to all parties in the case and a financial discount will not be given to any party to this litigation.

This the 16th day of November, 2017.

FIRM REPRESENTATIVE
WSG Reporting, LLC

```
 1 | DEPOSITION OF:  SAMANTHA LEIGH KIM/RKC
   |
 2 |      I do hereby certify that I have read all
   | questions propounded to me and all answers given by me
 3 | on October 30, 2017, taken before Renda K. Cornick,
   | and that:
 4 |
   |      1)   There are no changes noted.
 5 |      2)   The following changes are noted:
   |
 6 |      Pursuant to Rule 30(e) of the Federal Rules of
   | Civil Procedure and/or the Official Code of Georgia
 7 | Annotated 9-11-30(e), both of which read in part:  Any
   | changes in form or substance which you desire to make
 8 | shall be entered upon the deposition...with a
   | statement of the reasons given...for making them.
 9 | Accordingly, to assist you in effecting corrections,
   | please use the form below:
10 |
   |
11 | Page No.          Line No.          should read:
   |
12 |
   | Page No.          Line No.          should read:
13 |
14 | Page No.          Line No.          should read:
   |
15 |
   | Page No.          Line No.          should read:
16 |
17 | Page No.          Line No.          should read:
   |
18 |
   | Page No.          Line No.          should read:
19 |
20 | Page No.          Line No.          should read:
   |
21 |
   | Page No.          Line No.          should read:
22 |
23 | Page No.          Line No.          should read:
   |
24 |
   | Page No.          Line No.          should read:
25 |
```

```
 1    DEPOSITION OF:   SAMANTHA LEIGH KIM/RKC

 2    Page No.         Line No.         should read:

 3
      Page No.         Line No.         should read:
 4

 5    Page No.         Line No.         should read:

 6
      Page No.         Line No.         should read:
 7

 8    Page No.         Line No.         should read:

 9
      Page No.         Line No.         should read:
10

11    Page No.         Line No.         should read:

12
      Page No.         Line No.         should read:
13

14
      If supplemental or additional pages are necessary,
15    please furnish same in typewriting annexed to this
      deposition.
16

17
                       SAMANTHA LEIGH KIM
18
      Sworn to and subscribed before me,
19    This the         day of              , 20      .

20
      Notary Public
21    My commission expires:

22

23

24

25
```

AMENDED CERTIFICATE

STATE OF GEORGIA

COUNTY OF GWINNETT

IN RE:   ALISON VALENTE, JENNIFER BARLOW, KATHRYN
MONROE, SOPHIA SMITH, STEPHANIE LEBEAU on behalf
of themselves and all others similarly situated,
v.
INTERNATIONAL FOLLIES, INC. et al

WITNESS:   SAMANTHA LEIGH KIM

I hereby certify that in addition to the certification made on Page  54

of the transcript, the more than thirty (30) days provided the witness to read

and sign the original transcript has expired.  Therefore, the original is being

filed without signature of the witness.

This the  10th  day of  January, 2018

_____

Whitney S. Guynes, CCR - B-1897